# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

SUPPRESSED

        Plaintiff

v.

SUPPRESSED

        Defendant

)
)
)
)
)
)
)
)
)

Case Number:

**Case No: 20cv4230**
**Judge Rebecca R. Pallmeyer**
**Magistrate Judge Jeffrey Cole**

Complaint

Sealed Document Pursuant To LR 26.2

[signature]

5055 North Clark, APT /07

Chicago, Ill 60660

# FILED

JUL 17 2020

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT

for the

Northern District of Illinois—Eastern Division

Plaintiff

| | |
|---|---|
| Name: | **Scott Rydin Foster** |
| Street Address: | 5655 North Clark Street, PMB 103 |
| City and County: | Chicago, Cook County |
| State and Zip Code: | Illinois 60660 |
| Telephone Number: | 312 485 9800 |
| Email Address: | ScottFosterGVC@gmail.com |
| Email Address: | Scott@Scottfosterrealtor.com |

Versus

Defendants

| | |
|---|---|
| Name: | **PHH Mortgage now wholly owned by Ocwen Loan Servicing** |
| Former Address: | 3000 Leadenhall Road |
| City and County: | Mt Laurel, Burlington County |
| State and Zip Code: | New Jersey 08054 |
| Telephone Number: | No longer extant |
| Email Address: | No longer extant |
| Current Address of Ocwen Loan Serv: | 1661 Worthington Rd Suite 100 |
| City and County: | West Palm Beach, Palm Beach County |
| State and Zip Code: | Florida 33409 |
| Telephone Number: | 800-210-8849 |
| Email Address: | shareholderrelations@ocwen.com |

| | |
|---|---|
| Name: | **Jerome Selitto** |
| | (Former CEO of PHH from 2010 to 2012) |
| Street Address: | 7 World Trade Center Fl. 36 5 Fl |
| City and County: | New York, New York County |
| State and Zip Code: | New York 10007 |
| Telephone Number: | 415 523 8837 |
| Email Address: | hello@better.com |

| | |
|---|---|
| Name | **Glen Messina** |
| | (Former CEO of PHH from 2012 to 2018. |
| | Current CEO Ocwen) |
| Street Address: | 1661 Worthington Rd, Suite 100 |
| City and County: | West Palm Beach, Palm Beach County |
| State and Zip Code: | Florida 33409 |
| Telephone Number: | 800 210 8849 |
| Email Address: | shareholderrelations@ocwen.com |

| | |
|---|---|
| Name | **William Bellows (PHH Robo Signer)** |
| Street Address: | 503 Whitman Drive |
| City and County: | Turnersville, Gloucester County |
| State and Zip Code: | New Jersey 08012 |
| Telephone Number: | 856 232 9475 |
| Email Address: | Unknown |

| | |
|---|---|
| Name: | **Nial Robbins (PHH Robo Signer)** |
| Street Address: | 4912 Adra Court |
| City and County: | Fleming Island, Clay County |
| State and Zip Code: | Florida |
| Telephone Number: | 207 721 0758 |
| Email Address: | Unknown |

2

| | |
|---|---|
| Name: | **Siwatu Wilson (PHH Robo Signer)** |
| Street Address: | 47 Newton Avenue |
| City and County: | Woodbury, Gloucester County |
| State and Zip Code: | New Jersey 07826 |
| Telephone Number: | 856 848 5360 |
| Email Address: | Unknown |

| | |
|---|---|
| Name: | **Denisha Hunt (PHH Robo Signer)** |
| Street Address: | Unknown |
| City and County: | Unknown |
| State and Zip Code: | Unknown |
| Telephone Number: | Unknown |
| Email Address: | Unknown |

| | |
|---|---|
| Name: | **Aurora Bank** |
| Street Address: | 1000 N West St Ste 200 |
| City and County: | Wilmington, New Castle County |
| State and Zip Code: | Delaware 19801 |
| Telephone Number: | 331 684 9199 |
| Email Address: | Unknown |
| CEO in 2010: | Tom Wind |

| | |
|---|---|
| Name: | **Bank of America** |
| Street Address: | 100 North Tryon Street |
| City and County: | Charlotte, Mecklenburg County |
| State and Zip Code: | North Carolina 28202 |
| Telephone Number: | 866 607 1234 |
| Email Address: | Unknown |
| CEO in 2010: | Thomas Moynihan |

| | |
|---|---|
| Name: | **Citibank** |
| Street Address: | 701 East 60th Street North |
| City and County: | Sioux Falls, Minnehaha County |
| State and Zip Code: | South Dakota.57104 |
| Telephone Number: | 212 559 1000 |
| Email Address: | Unknown |
| CEO in 2010: | Vikram Pandit |

| | |
|---|---|
| Name: | **JP Morgan Chase** |
| Street Address: | 270 Park Avenue |
| City and County: | New York City, New York County |
| State and Zip Code: | New York 10017 |
| Telephone Number: | 212 270 6000 |
| Email Address: | Unknown |
| CEO in 2010: | Jamie Dimon |

| | |
|---|---|
| Name: | **Met Life Bank** |
| Street Address: | 177 South Commons Drive |
| City and County: | Aurora. Kane County |
| State and Zip Code: | Illinois 60504 |
| Telephone Number: | 800 638 5433 |
| Email Address: | Unknown |
| CEO in 2010: | C. Robert Henrickson |

| | |
|---|---|
| Name: | **PNC Bank** |
| Street Address: | One PNC Plaza 249 5th Ave |
| City and County: | Pittsburgh, Allegheny County |
| State and Zip Code: | Pennsylvania 15222 |
| Telephone Number: | 412 762 2000 |
| Email Address: | Unknown |
| CEO in 2010: | James E Rohr |

| | |
|---|---|
| Name: | **Sovereign Bank** |
| Street Address: | 75 State Street |
| City and County: | Boston, Suffolk County |
| State and Zip Code: | Massachusetts 02109 |
| Telephone Number: | 617 346 7330 |
| Email Address: | Unknown |
| CEO in 2010: | Gabriel Jaramillo |

| | |
|---|---|
| Name: | **Sun Trust** |
| Street Address: | 303 Peachtree Northeast |
| City and County: | Atlanta, Fulton County |
| State and Zip Code: | Georgia 30308 |
| Telephone Number: | 800 786 8787 |
| Email Address: | Unknown |
| CEO in 2010: | James M Wells III |

Name:                  **US Bank**
Street Address:        425 Walnut
City and County:       Cincinnati. Hamilton County
State and Zip Code:    Ohio 54202
Telephone Number:      800 872 2657
Email Address:         Unknown
CEO in 2010:           Richard Davis


Name:                  **Wells Fargo**
Street Address:        420 Montgomery Street
City and County:       San Francisco, San Francisco County
State and Zip Code:    California 94104
Telephone Number:      800 869 3557
Email Address:         Unknown
CEO in 2010:                John Stumpf

Name:                  **GMAC Mortgage (Ally Financial)**
Street Address:        100 Witmer Road
City and County:       Horsham, Montgomery County
State and Zip Code:    Pennsylvania 19044
Telephone Number:      800 284 2271
Email Address:         Unknown
CEO in 2010:                Anthony Renzi

Name:                  **HSBC Finance Group**
Street Address:        26525 N Riverwoods Blvd
City and County:       Mettawa, Lake County
State and Zip Code:    Illinois 60045
Telephone Number:      224 880 7000
Email Address:         Unknown
CEO in 2010:                Patrick Burke


Name:                  **Joseph Mungovan Herbas Esq**
Street Address:        209 South LaSalle, Suite 970
City and County:       Chicago Cook
State and Zip Code:    Illinois 60604
Telephone Number:      312 994 4740
Email Address:         Unknown


Name:                 **Thomas Joseph  Belczak Esq**
Street Address:       2121 Waukegan Road
City and County:      Bannockburn, Lake
State and Zip Code:   Illinois 60015
Telephone Number:     847 291 1717
Email Address:        Unknown

Name:                 **Shapiro Kreisman & Associates**
Street Address:       2121 Waukegan Road
City and County:      Bannockburn, Lake
State and Zip Code:   Illinois 60015
Telephone Number:     847 291 1717
Email Address:        Unknown

## False Claim Act Claim

Now comes Relator Scott Rydin Foster ("Foster") and states the following:

## Introduction

This is a False Claim Act Claim that could result in at best a total recovery to the United States of America that would surpass the largest FCA award to date in **GlaxoSmithKline**.

To provide specific financial context to the allegations contained herein, Foster will be referring to  different quarterly reports from a US government publication known as **"Metrics, from OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data**." OCC is an acronym that stands for Controller of the Currency, OTS is an acronym that stands for Office of

6

Thrift Supervision. Both of these entities are part of the United States Department of Treasury.

Foster will also be referring at length to a publication titled

**"CONGRESSIONAL OVERSIGHT PANEL NOVEMBER OVERSIGHT REPORT EXAMINING THE CONSEQUENCES OF MORTGAGE IRREGULARITIES FOR FINANCIAL STABILITY AND FORECLOSURE MITIGATION."** (Congressional Oversight Panel Report)

This publication was "ordered to be printed" on November 16, 2010.

The quotes from this publication will refer to the pollical milieu at the time this fraud occurred and why there was no discovery or linking of the material that is being presented herein.

Nevertheless, the clear conclusion from reading these two major sources is that the issue of specific conduct complained of and detailed in this pleading during a specific time period should not have gone undetected, but for which there is no evidence that it was detected. But even if it was undetected at the time, there should be little doubt that it can be clearly detected now given the guidance from Foster as to what to look for. Indeed, given the data presented and the context of the data that Foster is giving, this fraud should be easily drawn from the existing records of the defendants. This filing just let's DOJ—Civil Division know where to look.

To be cynical, it would be a wonderful time for the defendants to "come clean" as this matter has been filed right at the end of the 10 year statute of limitations, which means that they need not fear any further collateral causes of action being filed.

7

And it's actually small enough amount that the named parties can't just throw up their hands and say, "It's too much money, and it will break our company" or "The allegations are not specific enough." Indeed, most of the major banks named in this complaint have just recently passed the government mandated "Stress Test" that allows them to pay the same quarterly dividend to their shareholders, not to mention the fact that over the past 10 years, these banks have taken in over $1 Trillion Dollars in profits.

With respect to specificity, This False Claim Act Claim pertains to a specific type of mortgage fraud committed by the named defendants against (but more likely in cooperation with) two Government Sponsored Entities (GSEs), Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac") during a specific time period that began no earlier than July 21, 2010 and ended no later than approximately six months later on January 20 2011 and which peak of initial fraud occurred within the four months after July 21, 2010 wherein it slowed to a trickle..

This False Claim Act claim pertains to a very specific group of as many as 92,000 mortgagees who as holders of a Fannie Mae or Freddie Mac home mortgage **called** the named defendants and requested, and were granted forbearance on their mortgages. The initial calls from the mortgagees seeking six month's forbearance came no earlier than the beginning of January 2010. As will be detailed herein, rather than ultimately receiving the promised forbearance, the mortgagees were foreclosed upon as the result of the passage of **Dodd Frank** on July 21, 2010 and a specific paragraph in **Dodd Frank** that prompted the tortfeasors named herein to take the

8

action they did which was an illegal retroactive application of a specific passage of **Dodd Frank**, and as a result there was a huge amount of "robo signing" that put this group into only the foreclosure que rather than forbearance que. Foster was a part of this group and which he will specifically document in this filing the clear lies that were undertaken by PHH Mortgage. (Forbearance is otherwise known as Principal Deferral or Term Extension.)

This cause of action does **not** pertain to those cases where Forbearance was included with other types of loan modification such as principal reduction.

It is noted that as the result of the COVID-19 crisis and subsequent government response with the CARES Act and whatever upcoming "HEROES" Act is passed, there will unquestionably be many other types of fraud committed upon the United States of America by various parties who will have benefitted from the trillions of dollars quickly dispersed under various programs, which monies dwarf the sums in this complaint. An award in this matter will send a message to potential fraudsters unlike any other FCA award could send given that this complaint while timely is being filed almost ten years after the commencement of the fraud. Foster believes that the attendant publicity that would come with this award would save the United States of America an additional $100 Billion Dollars by discouraging the same kind of illicit conduct as well as to encourage reporting by any number of Relators of similar frauds. Furthermore, it is Foster's hope that this FCA claim advances the long term actions of the United States of America wherein unlike past crises it will not be just enough for the United States of America to respond to the crisis, but the United States

9

of America must now be immediately prepared to respond to the financial abuses of the current crisis that involve the fraudulent taking of government money.)

The Attorney General of the United States/ Department of Justice is advised that this complaint will need to be reviewed by not just a DOJ—Civil Division lawyer, but certainly someone who is skilled in forensic economic analysis, perhaps an official from the Office of the Comptroller of the Currency--Office of Thrift Supervision. Finally, should DOJ not take timely action, Foster will bring this matter to the attention of two different members of the national news media--one from each side of the political spectrum, simply because the facts raised in this complaint cannot be concealed or altered at this point in time by the defendants, and therefore the secrecy that normally accompanies an FCA claim is not relevant in this matter.

Finally it is noted that this sealed pleading will almost certainly be read by the Honorable Virginia Cowley Kendall or her clerks. Like Foster, Judge Kendall graduated from Northwestern University, where she received her undergraduate degree in 1984 in what was almost certainly either the School of Education, School of Arts and Sciences, or the Medill School of Journalism. Foster attended Northwestern beginning in 1968 on an Evans Scholarship where at one time he was in the top two percent of the Evans Scholar and was briefly in 1970 a national student leader in the Student Environmental Movement that had a "Teach Out" at Northwestern's Technological Institute in January 1970 that was visited by founders of Earth Day so that they could observe what was done as they prepared for the first Earth Day that was held in April 1970. (This came before Foster suffered a massive brain trauma in

10

1973 avoiding a head on collision with a wrong way driver on Interstate 94, and thus was not able to graduate until 1985.)

Since Foster first matriculated at Northwestern, there have been approximately 87,000 Northwestern undergraduates who have gone on to receive their undergraduate diploma. And during that time there has been exactly one Northwestern Provost, Vice President or Dean who has been forced to resign because of financial improprieties. This was the Dean of Medill, Ira "Bill" Cole, who was forced to resign in 1984 because of revelations of a slush fund he ran involving his private airplane. And of those 87,000 undergraduates, there was one NU undergrad who "took good 'ole Dean Bill down"—Foster.

Moreover, although not a lawyer, Foster's legal writing in an Illinois Appellate Court Case that "came down" in 1993 ultimately contributed to the legal foundation of the revelation of Catholic clergy sexual abuse of young males, which revelations came to light in 2005 and which legal principles subsequently morphed into the "Me Too Movement", which most recent accomplishment is the incarceration of Harvey Weinstein for a rape he committed more than 20 years before as well as successful civil law suits being filed because of the tolling of the statute of limitations, wherein the victims were coerced into silence. This issue will be touched upon in this pleading as will Foster having previously addressed the issue of racial discrimination in Cook County with respect to foreclosures, which he came to encounter while fighting his illegal foreclosure as well as being a "short sale expert" in his work as a Real Estate Broker.

Foster is not an attorney and never will be. By contrast both his older sister Joanne and his younger brother Grady are. Joanne (she of the perfect 800 Verbal SAT score) was named Lawyer of the Year by the American Indian Housing Council in 2013 and is truly one of America's greatest Indian Rights attorneys. Grady, the family dummy (also an Evans Scholar who was Phi Beta Kappa as a Junior at the University of Wisconsin and went on to graduate from Stanford Law School) ultimately became the Chief Economist for the United States Postal Service who because of his predicted ascendancy of Internet related services in his annual prognostication report of 1995 correctly insisted that lower upcoming Postal Service first class mail revenue would result for years to come can honestly say that he saved the United States over two billion dollars. Therefore, Foster will be delighted if he too can make a similar significant contribution to this great country.

But this will not match his greatest lifetime accomplishment, which is Foster's overcoming as of July 22, 2019—the massive brain trauma that he sustained on January 6, 1973-46 years later.

## Overview

1) This claim is brought pursuant to the provisions of the False Claim Act ("FCA"/Lincoln Law) 31. USC Sections 3729-3733. Foster is seeking 25 percent of all funds recovered in this matter because he is the sole Relator in this matter. Pursuant to 18 USC 1344, the federal statute of limitations for financial institutions is **ten** years. This statute of limitations does not include additional

12

years that may be added wherein the statute of limitations is tolled because of fraudulent concealment, which is precisely what occurred in this matter. Nevertheless, this claim has been filed within the applicable ten year time period.

2) Although the specific financial fraud committed in this matter occurred in 2010 in response to the passage of the **Dodd Frank Wall Street Reform and Consumer Protection Act** on July 21, 2010, Foster could not have discovered the fraud specified herein any earlier than November 16, 2016, which is when the specific facts that pertain to the foreclosure of his property that was secured by a **Federal National Mortgage Association ("Fannie Mae")** mortgage were disclosed by one of the defendants, PHH Mortgage ("PHH").

3) Indeed, the phrase "disclosed" is a misnomer because it took a truly remarkable painstaking analysis by Foster wherein he looked at and deciphered coding numbers in his mortgage account that was first provided by PHH on November 16, 2016, that he subsequently discovered the very specific facts that revealed the fraudulent scheme that is detailed herein. As detailed herein, these very specific facts revealed a very specific scheme that had a very specific time period in 2010, and it pertained to a very specific and relatively small category of individual mortgage holders (mortgagees).

4) Foster readily acknowledges that he is extrapolating the fraud committed in the one instance that he is outlining in great detail to other similarly situated instances of fraud committed by PHH. Moreover, Foster is extrapolating the facts as detailed herein to the identical type of fraud and most importantly specific circumstances of fraud committed upon the Federal Government by other

mortgage originators/retail banks named in this complaint. (These mortgage originators/retail banks are also known as servicers, and in turn they usually used other servicers during the time period covered in this pleading.) A mortgage originator is defined as. "An institution or individual that works with an underwriter to complete a home loan transaction for a borrower. Mortgage originators consist of retail banks, mortgage bankers, and mortgage brokers." It is vitally important to know that with one exception the 13 defendants relied on servicers to handle the paperwork of loans that they originated. That exception was PHH, which made it "easier" for Foster to uncover the fraud in his particular case.

5) As detailed herein this claim involves retail banks who were the largest mortgage originators in the United States in 2010, and who were processing existing **MORTGAGE FORBEARANCE REQUESTS BY MORTGAGEES,** on behalf of mortgages they had originated, which mortgages were secured by Fannie Mae and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which are both Government Sponsored Entities ("GSEs").. Therefore, all of the named major banks in this complaint are subject to a False Claim Act claim if a mortgage was originated under these two programs as it is well established that Mortgage Fraud on a GSE committed by a mortgage originator/retail bank allows a Relator to bring a False Claim Act Claim.

6) This claim is **not** the same type of claim as a successful claim brought against PHH brought by a former PHH employee named Mary Bozzelli who brought a qui tam/whistleblower/False Claim Act claim against PHH. That case is captioned

14

United States ex rel. Mary Bozzelli v PHH Mortgage Corporation and PHH Corporation, 13 cv-3084 (E.D N.Y.) The specific issues/allegations raised in the Bozzelli matter were the following: 1. Failing to document the borrower's creditworthiness. 2. Failing to correctly document the borrower's debt to income ratio. 3. Insuring a loan for FHA Mortgage Insurance even though the borrower did not meet HUD's minimum statutory investment for the loan. Therefore, those issues pertained to initiating and completing a mortgage, whereas the issue raised herein pertains to a small percentage of existing mortgages during a specific time period in 2010.

7) A critical advantage that Foster brings to this matter is that throughout the time period which events as referenced herein occurred, Foster was a Managing Real Estate Broker in the State of Illinois whose almost exclusive practice during the Relevant Time Period was closing short sales on behalf of clients who were scheduled to be foreclosed upon in the Circuit Court of Cook County--Chancery Division

8) Many of these clients had a near verbatim story to tell Foster. It was as follows: A): During the **Relevant Time Period** as referenced herein, the clients called up their lenders to seek forbearance on their loans. They were told that they were being given forbearance. But the forbearance was not confirmed in writing, and subsequently after the passage of **Dodd Frank** on July 21, 2010, the lenders often even denied that a verbal promise over the phone of forbearance had been given. As a result, the client then had only three alternatives. The first was for one's property to be foreclosed upon, wherein one not only lost possession of

15

one's property but owed whatever remaining balance had accrued as the result of the property being sold as well as associated costs such as legal fees that had been added. Typically, these costs exceeded one hundred thousand dollars and resulted in profound damage being done to the mortgage holder's life in general and one's credit rating over a minimum of five years such that one could not secure a mortgage for at least five years. The second alternative was to complete a short sale, wherein the mortgage holder's property was sold but the difference between the sale price net proceeds and the amount that was owed was written off by mortgage originator/retail bank, and ultimately GSE and from there the United States Government directly. And the party that executed the short sale had a significantly better credit profile than if one had gone into foreclosure to the extent that the short sale seller was under certain circumstances able to purchase a new residence in slightly over two years. The additional advantage of a short sale versus a foreclosure was that the mortgage originator/retail bank and subsequently GSE/United States Government almost universally sustained a lesser loss than it would have sustained if the same property had been foreclosed upon. The third alternative was in most instances, no alternative at all. This "alternative" was for the mortgagee to apply for some sort of loan modification with respect to payment terms and keep one's property. The roadblock to this alternative was that the negative credit that had already resulted from the mortgagee's previous failure to receive the promised forbearance and subsequently being placed in foreclosure almost always resulted in the applicant failing to receive loan modification. Not only that but to even apply for this "alternative" the mortgagee would have to

16

"plead guilty to not having made one's prior mortgage payments, thus providing exculpatory 'evidence' to the very same institution that had defrauded her. This failure will be covered in greater detail in the section labelled **Dual Tracking**. This was a truly embittering/infuriating experience that Foster often heard from his clients.

9) So a short sale was often the best alternative for these clients, and that is what Foster proceeded to attempt to accomplish on behalf of his clients.

10) But these short sales also resulted in significant losses for the United States of America as well as the individual home owner who had originally sought a mere forbearance because over the next number of years, the value of these residences did increase substantially. Therefore, had a forbearance been given, there would not only have been no short sale and accompanying losses for the United States of America, but the mortgage holder would have/could have ended up continuing to own the residential property wherein if one had been able to do such, one would have had significant equity to this very day, and the United States of America would not have lost tens of thousands of dollars per short sale transaction as a result of a short sale. A major collateral result of this is that prices in the Chicago area decreased more than they would have otherwise decreased, and as a result property tax collections decreased, which in turn contributed in some small part to the massive debt problem that Chicago, Cook County, and the State of Illinois suffer to this day. Moreover, there was a significantly larger loss sustained in Chicago's African American neighborhoods as the direct result of the defendants failing to approve short sales in African American neighborhoods compared to

17

White, Latino, and Mixed neighborhoods. The result was massive destruction of housing values in African American neighborhoods that as a percentage dwarfed those of other neighborhoods. Plain and simple, race was THE factor. (For the record, Foster is a life long moderate Republican who was raised in a political family whose mother and father both knew Everett McKinley Dirksen who was the coauthor of the landmark Voting Rights Act of 1965. Therefore, Foster scarcely qualifies as a "flaming liberal."

11) The mortgage originators/retail banks named in this complaint comprise the 13 largest mortgage originators/retail banks in the United States in the year 2010, part of which year includes the **Relevant Time Period**. (Please note that the **Relevant Time Period** is one of the eleven components of the **Blueprint** that will shortly be explained in this pleading.)

12) For the collective tortfeasors, the beauty of the fraud as detailed herein is that it was only for a limited period of time, and it was only four tenths of one percent (.004) of the larger mortgage market during the **Relevant Time Period** in 2010, which in turn meant that it could have been easily overlooked by Federal Regulators given the frantic milieu of that time.

13) Indeed, given the fraud that Foster is outlining in this matter, only the following two scenarios are likely if the evidence pertaining to the other 12 mortgage originators/retail banks is exculpatory. The first scenario is that all of the other 12 mortgage originators/retail banks with the exception of PHH did not commit the fraud that is to be outlined herein. The second scenario is that all of the above 12 mortgage originators/retail banks have "come clean", and that substantial funds

18

have already been accounted for and recovered by the United States of America—for which there is no evidence.The problem with the first scenario is that PHH would have already been charged by the United States of America as having committed the fraud as being outlined by Foster herein because the other 12 mortgage originators/retail banks aggregate numerical submissions/data during the **Relevant Time Period** are/were different from that of PHH. The problem with the second scenario is that PHH would have long since been charged of committing fraud as outlined herein by the United States Government as PHH would have been caught submitting different statistical data than the other lenders. There is of course, a third possible explanation. That is the Foster was the only person to undergo the experience he is about to detail herein, which likelihood is about as probable as the existence of the Tooth Fairy.

14) As noted, Foster is unquestionably extrapolating the fraud that he discovered in this matter to other major mortgage originators/retail banks in the year 2010. And Foster will in this pleading give specific facts from his discovery of his fraud that will provide the all-important context for the **"Blue Print"** of the discovery of other identical frauds committed by the other loan originators/retail banks.

15) Foster is also painfully aware of the passage of time that has occurred since Foster's discovery of the facts in November 2016 that revealed the fraud committed upon him. As such, Foster will also give an explanation of a specific event and its consequences that occurred in Foster's life three years ago that prevented him from filing this case sooner once he discovered the fraud that occurred and a few months later discovered the existence of the FCA statute.

19

Indeed, Foster or DOJ can subpoena his phone records from the first part of 2017 that will show that Foster made a phone call to the United States Department of Justice wherein he spoke with a lawyer who reviewed files for FCA claims.

16) It is Foster's position that the fraud with respect to a coverup is to this day still ongoing, and that because of the very specific type of fraud and the timing of its occurrence, that this fraud has not yet been discovered by the United States government. Indeed, it may well be that this particular fraud has been a long kept dirty little secret among the 13 mortgage originators/retail banks who oversaw Fannie Mae and Freddie Mac mortgage forbearance requests during the **Relevant Time Period**. And it is a dirty little secret that could have been kept because it would have been limited to a small cadre of participants within each one of the 13 named defendants. This small group gone would have gone undetected for all of these years as it only took at most three people at any given lender to run this fraud along with the help of "robo signers" who would were instructed to sign whatever documents to sign when they were to were told to do such. This fraud was also most likely abetted by a few executives with Fannie Mae and Freddie Mac.

17) In addition to PHH, Foster has researched various major awards against the other mortgage originators/retail banks named herein, and he has yet to find anything that **specifically** addresses the issues that Foster is raising herein.

18) Recovery could be easily done quickly because this fraud lends itself to a macro analysis that should be easily discovered and quickly used against the mortgage

originators/retail banks named herein such that monies would be rebated to the United States government not on a case by case basis but as a lump sum payment.

Moreover, because of the COVID-19 crisis and because of what will no doubt be an upcoming drop in housing prices, there will be a huge number of foreclosures, short sales, and forbearance requests forthcoming with the same 13 mortgage originators/retail banks who administer funding for the two GSEs, and which mortgages are being serviced by the very same 13 mortgage originators/retail banks as named herein. There will no doubt be significant opportunities for the same sort of similar fraud to once again transpire. Moreover, there will unquestionably be many other types of fraud committed upon the United States of America by various parties who will have benefitted from the trillions of dollars dispersed under various programs, which monies dwarf the sums in this complaint.

19) Therefore, there is no better time than now for the United States Government to make clear to those who might commit fraud, that even ten years later (and beyond in the case of fraudulent concealment). the United States of America can and will recover vast sums of money with the aid of "average" American citizens. And there can be no better time to make known to hardworking honest citizens who have lost their jobs, that one very lucrative "job" could be to "work" as a Relator for the United States of America in recovering monies stolen by fraud. And being a Relator is not sex specific, age specific, location specific, education specific, political point of view specific, or any kind of specific other than being knowledge specific.

20) The eleven specific components of the **Blueprint** are as follows

    A):    <u>**Housing Prices (as measured before, during, and after the**</u>

          <u>**Relevant Time Period**</u>)

    B):    <u>**Dual Tracking**</u>

    C):    <u>**Buyback Demand**</u>

    D):    <u>**Passage of Dodd-Frank Wall Street Reform and Consumer**</u>

          <u>**Protection Act. ("Dodd Frank") On July 21, 2010,**</u>

    E)    <u>**A change in Fannie Mae Policy for Granting Forbearance That**</u>

          <u>**Was Announced by Fannie Mae on September 21, 2010 And**</u>

          <u>**Went into Effect on November1, 2010, Wherein a Mortgagee**</u>

          <u>**Would be Required to Submit a "Paperwork" Application (as**</u>

          <u>**Opposed to The Previous Mere Phone Application) for One's**</u>

          <u>**Forbearance Request to be Accepted by Fannie Mae.**</u>

    F):    <u>**Relevant Time Period**</u>

    G):    <u>**Qualifying Group That Pertains to This FCA Claim**</u>

    H):    <u>**Analysis of Quarterly Reports Titled OCC and OTS Mortgage**</u>

          <u>**Metrics Report Disclosures of National Bank and Federal**</u>

          <u>**Thrift Mortgage Loan Data**</u>

    I):    <u>**Approximate Losses Sustained by the United States of**</u>

          <u>**America.**</u>

(J): **Relevant Quotes Taken from the "CONGRESSIONAL OVERSIGHT PANEL NOVEMBER OVERSIGHT REPORT\*EXAMINING THE CONSEQUENCES OF MORTGAGE IRREGULARITIES FOR FINANCIAL STABILITY AND FORECLOSURE MITIGATION"**

(K): **The Federal Lawsuit that was filed by Foster on the same day as this False Claim Act Claim was filed.**

21) The first part of the **Blueprint** is **Housing Prices** before, during, and after the **Relevant Time Period** as defined herein:

A): The dramatic fall in housing prices beginning in late 2007 was precipitated by the Subprime Mortgage Crisis, which is regarded as having occurred from 2007 through 2010. This crisis is widely recognized as having been "A" if not "THE" primary cause of the "Great United States Recession" that began in December 2007 and ran through June 2009.

B): The S&P/Case-Shiller 20-City Composite Home Price Index ("Case Shiller Index") is widely regarded as the premier index of single family home prices throughout the United States. And the information pertaining to the S&P/Case-Shiller 20-City Composite Home Price Index to which Foster is about to refer was taken by Foster directly from the Federal Reserve Bank of Saint Louis' Web Site.

C): The S&P/Case-Shiller 20-City Composite Home Price Index was normalized at 100 beginning in January 2000.

23

D):     At the beginning of the "Great Recession" in December 2007, the

Case Shiller Index was 185. This December 2007 reading followed a Case Shiller

Index peak reading of 206 in April of 2006. This December 2007 reading means

that the Case Shiller Index had risen 85 percent in a mere eight years. By contrast

the rate of inflation in the United States had risen a mere 20 percent during the

same time period from 2000 to 2007. Therefore, the combination of these two

statistics strongly suggested that housing prices would further decrease, which is

precisely what happened. By the end of the Great Recession, the Case Shiller

Index had declined from 185 at the beginning of the Great Recession to 141 at the

end of the Great Recession.

E):     And it is the month to month Case Shiller Index readings

beginning at the end of the Great Recession in June 2009 that contribute to an

explanation of the **"Blueprint"** that is about to be outlined.

F):     The month to month  Case Shiller Index Readings that are

meaningful in this matter are as follows:

June 2009 141 (End of Recession)

July 2009 142

August 2009 143

September 2009 144

October 2009 144

November 2009 145

December 2009 146

January 2010 146 (Beginning of the **Relevant Time Period**)

24

February 2010 146

March 2010 146

April 2009 147

May 2010 147

June 2010 147

July 2010 146 (Passage of "**Dodd Frank**")

August 2010 145 (Most likely peak of the **Relevant Time Period**)

September 2010 144

October 2010 143

November 2010 143

December 2010 142. (End of the **Relevant Time Period**)

G):     (Eventually, the Case Shiller Index would record its lowest index number in March 2012 at 136 after which it rebounded to the last recorded reading in April 2020 of 223, from which it will no doubt drop significantly for a substantial period of time because of the huge numbers of jobs that have been lost by home owners. [There are contrary predictions by biased real estate market experts including the National Association of Realtors that the real estate housing market will be booming because of the drop in interest rates and corresponding drop in mortgage rates.]).

22) The second component of the **Blue Print,** was a widely practiced scheme known as **Dual Tracking**

25

A):    Dual Tracking occurred when borrowers who called their lenders/servicers after the beginning of the **Relevant Time Period** but before the passage of **Dodd Frank** were promised by phone forbearance. Forbearance was promised to people who were told to get behind on their loans to make them eligible for a modification. And when they got behind they were **simultaneously** put into a foreclosure track as well.

(B):    Belatedly, on May 1, 2013 the Illinois Supreme Court instituted rules to prevent **Dual Tracking** as well as other lender abuses, which were reflected in Illinois Supreme Court Rule 113, which pertains to Practice and Procedure in Mortgage Foreclosure Cases and Illinois Supreme Court Rule 114, which rules pertain to Loss Mitigation. Thus, it is important to know that in the United States during the **Relevant Time Period**, dual tracking was NOT illegal.  For the United States overall, the Consumer Financial Protection Bureau, which was established by the **Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010**, issued mortgage servicing rules that, after being codified into federal law, went into effect as of January 10, 2014. These mortgage servicing rules restricted but did not eliminate **Dual Tracking**.

C):    The standard means of mortgage customers transacting business with mortgage holders/servicers when the mortgage customers were seeking loan modification and forbearances in the beginning of 2010 was **over the phone** with representatives of the lenders--NOT through follow up emails exchanged between the mortgage originator/retail bank and the

26

mortgagee. Emails clearly would have verified what occurred during the phone conversation.

D):     Forbearance was unquestionably the least preferred outcome by loan originators/retail banks as a means of modification especially as will soon be demonstrated for loan originators/retail banks when the mortgage funding had been supplied by or guaranteed by the United States of America. The reason mortgage forbearance was the least preferred outcome for the mortgage originator/retail bank is because of the following:

i):     A forbearance did not preclude further problems for the mortgage originator/retail bank in the event that the mortgagee did not honor the forbearance agreement and failed to complete what was almost always a six month forbearance period.

ii):     Even a successfully completed six month forbearance could result in further work and complications for the mortgage originator/retail bank in the event that the borrower got paid up but then went back into a delinquency, which happened with significant frequency that approximated 50 percent.

(iii)     There was an even greater reason to want to foreclose on those seeking forbearance. The mortgagees who were seeking forbearance owned properties that in the aggregate were more valuable than those who wanted to complete a short sale on their property. (This was clearly the case with Foster who along with his late wife purchased his property in

27

2001 for $420,000 cash and five years later took out a mortgage with
PHH for $285,000 and was NEVER "underwater" with respect to his
mortgage with PHH, which is to say that they always had positive equity
in the property.) Therefore, foreclosing or closing a short sale on a
property where forbearance had been requested would decrease the
percentage of loss compared to those properties where there was no
forbearance requested, which in turn would reflect positively on the
mortgage originator/retail bank.

26):     The third and third most important component of the **Blueprint** was a
government requirement known as **Buyback Demand**. Specifically, if a
mortgage originator/retail bank mishandled a Fannie Mae or Freddie Mac
mortgage/loan, it became the mortgage originator/retail bank's
responsibility for the loan and therefore the mortgage originator's/retail
bank's loss. Again. This requirement is called a **"Buyback Demand"**. It
is also referred to as a "Put Back." A **Buyback Demand** would be
initiated by either Fannie Mae or Freddie Mac when the originating entity
(mortgage originator/retail bank) did not follow guidelines in the
underwriting manuals of Fannie Mae or Freddie Mac. It is the **Buyback
Demand** that is what precipitated the fraud committed in this matter. This
will clearly prove to be relevant in Foster's case, which unquestionably
involved flagrantly criminal behavior. If the loan was not purchased by the
mortgage originator/retail bank via a **Buyback Demand**, and the loan
went into default, it became a **Mortgage Backed Security** guaranteed by

28

the federal government, which losses were/are paid for by the federal government. Therefore, there was an **enormous incentive** for the mortgage originator/retail bank to do everything possible to "stick" Fannie or Freddie (and therefore the federal government) with a loan that it had mishandled. As the result of the well-known drop in home prices not only in the Chicago area but throughout the nation and the other problems with the economy in 2010 there was a flood of foreclosures that resulted in huge losses being taken by Fannie Mae and Freddie Mac which losses were borne by the United States of America in the form of Mortgage Backed Securities. It should be noted that low quality mortgage backed securities had played a major role in the above referenced Subprime Mortgage Crisis that began in 2007 ,and that by 2010, there was little further tolerance in the United States Government for further Mortgage Backed Security losses, which unquestionably contributed to the fraud outlined herein. But by 2012, the market for high quality Mortgage Backed Securities had recovered and was a profit center for US mortgage lenders/retail banks/, including the 13 named herein. It should be further noted that of the 13 defendants named, only PHH is at the brink of insolvency whereas the other 12 mortgage originators/retail banks have over the past eight years amassed almost $1 Trillion Dollars in cumulative profits, and while harmed are unquestionably surviving the COVID-19 pandemic.

(A): (The concepts of Dual Tracking and Buyback Demand were explained to Foster by his still best friend in the real estate industry—Charlie Eck, a former President of the National Association of Mortgage Brokers.)

27): The fourth and second most important component of the **Blueprint** was the passage of **Dodd-Frank Wall Street Reform and Consumer Protection Act**. ("Dodd Frank")  On July 21, 2010, Mr. Obama signed Dodd Frank into law, which Section 1401 (2) (G). reads as follows:

"SEC. 1401. DEFINITIONS….(2) MORTGAGE ORIGINATOR.—The term 'mortgage originator'—…(G) does not include a servicer or servicer employees, agents and contractors, including but not limited to those who offer or negotiate terms of a residential mortgage loan for purposes of renegotiating, modifying, replacing and subordinating principal of existing mortgages where borrowers are behind in their payments, in default or have a reasonable likelihood of being in default or falling behind."

(A): Therefore subsequent to the passage of Dodd Frank and this specific provision of Dodd Frank, there was no penalty for PHH or any of the other 12 mortgage originator/retail bank named herein to hire or continue to utilize those "who offered or negotiated terms of a residential mortgage loan for purposes of renegotiating, modifying, replacing and subordinating principal of existing mortgages where borrowers are behind in their payments, in default or have a reasonable likelihood of being in default or falling behind."

(B): But there was **No Retroactive** Authorized Application of this provision in **Dodd Frank** with respect to ongoing forbearances that had been agreed to on the phone by representatives of mortgage originators/retail banks! That was and is fraud!

Repeat. There was **No Retroactive** Authorized Application of this provision in **Dodd Frank** with respect to ongoing forbearances that had been agreed to on the phone by representatives of mortgage originators/retail banks! That was and is fraud!

Repeat. There was **No Retroactive** Authorized Application of this provision in **Dodd Frank** with respect to ongoing forbearances that had been agreed to on the phone by representatives of mortgage originators/retail banks! That was and is fraud!

(C):    And it is those mortgagees whose mortgages were among the two federally "backed" GSEs (Fannie Mae, Freddie Mac), who were in the midst of a forbearance period at the time of the passage of Dodd Frank that were affected by the misuse of Dodd Frank's passage and the successful attempts of the 13 named mortgage originators/retail banks to commit fraud and illegally retroactively apply this specific provision of Dodd Frank that constitute the **Qualifying Group That Pertains to This FCA Claim**, which group will shortly be further delineated in this pleading and which members total 92,000 and where the average loss due to this fraud was a minimum of $40,000, which means a minimum loss to the United States of America of $1.8 Billion Dollars. **As will be seen, this estimate of 92,000 members comes from an immediate spike in Initial Foreclosure Filings during the Third Quarter of 2010.**

31

28):     The fifth and least important component of the **Blueprint** came

with **A change in Fannie Mae Policy for Granting Forbearance That Was Announced  by Fannie Mae on September 21, 2010 And Went into Effect on November1, 2010, Wherein a Mortgagee Would be Required to Submit a "Paperwork" Application (as Opposed to The Previous Mere Phone Application)  for One's Forbearance Request to be Accepted by Fannie Mae.**

(A):  The institution of the September 21, 2010 rule demonstrated that Fannie Mae quickly recognized the problem with the abuses f above referenced provision of Dodd Frank, But Fannie Mae chose to not address the problem for the individual borrowers who were in the **Relevant Period** and therefore **Qualifying Group That Pertains to This FCA Claim**.

(B):    In turn, this strongly suggests some sort of higher executive level complicity by Fannie Mae as well as Freddie Mac, both of whom almost certainly turned a "blind eye for fear of what they might see." Perhaps these executives convinced themselves that they saw the "big picture", which "big picture" may have a myriad of explanations. But the most likely explanation is that many if not most of the mortgages in the

**Qualifying Group That Pertains to This FCA Claim**. were originally granted one's mortgage with a well-known and popular provision of mortgage application in the early 2000s  known as "no doc (no document) stated income" wherein the borrower didn't even need to provide proof of

32

one's income, but merely needed to "state" one's income There is no question that "no doc" mortgages contributed to the dramatic rise in housing prices which led to the Subprime Mortgage Crisis. Therefore, there easily could have resulted an attitude among these executives that "What's good for the geese is good for the gander.", which is to say that there was an attitude that those mortgagees who were given a mortgage without documentation were now trying to benefit a second time by getting forbearance without documentation when many of them wouldn't have even gotten a mortgage in the first place were it not for "no doc" stated income, and therefore there was no reason to spare them the negative consequences of their loans being accelerated after the passage of Dodd Frank and change to an exclusive foreclosure track precluded the possibility of getting forbearance. But a decision by the authorities in charge of Fannie Mae and Freddie Mac to ignore "no doc" forbearances does not excuse criminal conduct in retroactively foreclosing on mortgages that had been promised forbearance. (Certainly Foster's mortgage, which began in 2006 was a "no doc" mortgage)

This "no doc" practice came about as a direct result of the passage of Gramm Leach Bliley, which was effective as of November 12, 1999, and which passage led to the aforementioned explosion in housing prices during the early to mid 2000s which in turn led to what previously has been referenced in this brief as the Subprime Mortgage Crisis that began in 2007 and simultaneously, led to the "Great United States Recession" that also began in 2007. And in Foster's opinion, what led to the passage of Gramm Leach Bliley was the Savings and Loan Crisis of 1986 to 1995. And what in part led to the S&L crisis? The failure of Continental Bank in 1984 a mere one block away from the Dirksen Building in which this FCA claim has been filed. How does Foster trace the passage of Gramm Leach Bliley to this event that occurred 25 years before? Because the center of the S&L crisis was in Texas, and as a result of this, the underwriting

33

and valuation standards/requirements for single family properties were more stringent in Texas than in other states, and as a result the rise in housing prices in Texas were lower during this time period that lasted throughout the 1990s decade compared to the rest of the nation. Therefore, Senator Phil Gramm of Texas probably came to the conclusion that lower underwriting standards would ameliorate the stricter underwriting standards that had harmed Texas property values, and that the passage of GLBA would benefit the nation. GLBA was effective November 12, 1999 with bipartisan support. The interesting result of the more stringent underwriting requirements in Texas is that during the Subprime Mortgage Crisis and afterward, Texas single family home prices suffered less of a decrease in price as a direct result of their higher initial underwriting standards that were in force in the 1990s.

ii):     As will be seen in the section titled **The Federal Lawsuit that was**

**filed by Foster on the same day as this False Claim Act Claim was**

**filed.**. for a period of time, Foster didn't even know that his loan had been

accelerated, and that he was not going to be able to complete forbearance

that he was promised.[2]

The timing of the initial foreclosure came at a time when Foster's beloved late wife, Halina had terminal esophageal cancer, and would pass on April 15, 2011 leaving Foster with a seven year old daughter to raise. But Foster persisted financially as his 2010 gross commissions were $182,000, his 2011 gross commissions were $188,000, and his 2012 gross commissions were $250,000. But by 2016, his gross commissions had plummeted to $20,000, and he earned his last commission in real estate to this very date when in August 2016 he handled a high end Lake Shore Drive apartment rental for Joe and Jaye Maddon. Later that year, Mr. Maddon would manage the Chicago Cubs to their first World Series victory in 108 years, What had happened in the intervening years? Foster spent over $75,000 defending himself in this matter and a related matter that also attempted to take possession of his property, which combined monies in addition to the massive amount of time he spent in his defenses would have easily sustained his real estate practice

And by November 2016, he would be homeless with a then 12 year old daughter to raise, where going forward between the two of them, they slept for at least a 2 hour period at 24 different "venues" including Chicago's Red, Brown, Purple, and Blue CTA Transit Line Trains, three different automobiles, and for Foster by himself, one public park (Washington Park—"Bughouse Square" across from Chicago's Newberry Library). How did they first end riding on the Red Line, the main public transit artery of Chicago? Because Foster and his daughter were living in a bedroom that had been rented to them by one of his successful short sale clients. The problem was that the client was an ex-Navy Seal who would get

drunk and beat his girlfriend. It was living hell. So Foster had a friend of his take possession of the meager belongings that Foster had not put in storage, and he and his 12 year old daughter proceeded to ride the CTA Red line, Brown Line, and then Purple Line in sequence after a Dunkin Donuts by Loyola University closed at 1:00 am. They existed on Social Security and Western Union payments sent from friends, which payments were typically in amounts of $100 and received by Foster at his local currency exchange in the Rogers Park neighborhood of Chicago. And for a near year long period, Foster and his daughter lived out of a single small suit case where they would eventually sleep at a safe local motel, wherein they would essentially rent two nights stay for one night's fee by arriving very early one day (midnight) and sleeping very until the day after (1:00 pm) such that they were at the motel for about 37 hours. Over time, Foster would come to drive for Lyft and Uber, where at one time, Foster was the highest rated Uber driver (4.98) among the 30,000 Chicago area Uber drivers in the greater Chicago area, and he was told by a local Uber executive that his written passenger compliments put him in a class by himself. Indeed, Foster and his daughter are still currently "homeless", although they are currently living in a stable situation and Foster's income is about to become a **minimum** of $10,000 a month as a result of his being financially able to restart his real estate practice and develop a marketing program for Realtors as well as selling properties. So he will shortly have an income that is at the very least in the top 20 percent of earners in the United States. And in his spare time, Foster can continue to drive for Uber and solicit real estate customers, which he estimates will essentially increase his hourly Uber earnings to $70 an hour.

29): The seventh component of the **Blue Print** is the

### **Qualifying Group ("Qualifying Group") That Pertains to This FCA claim.**

(A): The **Qualifying Group** does NOT include any mortgagee that requested and received mortgage forbearance through any of the 13 named defendants through Fannie Mae and Freddie Mac before January 1, 2010 because the forbearance period of six months would have either been completed or failed to have been completed before the passage of **Dodd Frank**.

35

(B):　Rather the **Qualifying Group** would include any mortgagee who requested and was given forbearance no earlier than January 21, 2010 because this was six months prior to the passage of **Dodd Frank** and therefore six forbearance periods, which was typically the average forbearance period granted and for the purposes of this pleading is the **only** length of forbearance period.

[3] Why is it that Foster was the first person to discover this fraud and report it? The answer is: A; His friendship with Charlie Eck, a former President of the National Association of Mortgage Brokers who unquestionably was among the most knowledgeable of independent mortgage brokers in Illinois who were not beholden to any specific retail bank. B; Because Foster had completed many short sales, he was familiar with similar stories from other people who had been wronged C; Foster was able to fight his foreclosure in one of twenty Judicial foreclosure states where a court of law made a determination as to whether a foreclosure would go through as opposed to the 30 non-judicial foreclosure states that were sometimes referred to a title company foreclosure states. And while there was flagrant judicial corruption in Foster's judicial foreclosure, Foster was still able to get the necessary records, which he would not have most likely gotten in one of the 30 non-judicial foreclosure states. D; Foster had because of his life experiences filing, enough tenacity and creativity to look at the account details. E; Most importantly Foster had a HUGE amount of equity that was stolen from him not to mention his even larger losses in income that would over time unquestionably exceed one million dollars.. F: After Foster's mortgage was granted in 2006, a number of loan originators/retail banks subsequently put an arbitration clause into the mortgage, which unquestionably discouraged lawyers from inquiring about class action law suits that would have made profitable further inquiry. G; The final reason is that those people who had wanted a forbearance that had been cancelled were still "underwater" on their mortgages but instead got off to a "fresh start" via a short sale, which not only absolved them from their debt allowed them to purchase another similar residence with a Fannie Mae/FHA loan in two years whereby the person was much better off than if one had stayed in the house because of the forbearance having been granted. (Foster certainly has such clients who even years later are grateful to him.)

The eighth and unquestionably most important component of the

**Blueprint** is an **Analysis of quarterly reports titled OCC and OTS Mortgage**

**Metrics Report Disclosures of National Bank and Federal Thrift Mortgage Loan Data** These were composed by the United States Department of Treasury.

Please be advised that the format for this section is different from prior formats in that Foster will name the specific document and page to which he is referring. Then in a paragraph below this citation, Foster will follow up with a paragraph that begins with the word "**Comment**" in which he will give his perspective as to the relevance of the material he has just cited.

After analyzing and providing commentary of the four quarterly **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data** documents that are referenced in this pleading, Foster will then provide a paragraph that details what Foster does not know in terms of best determining the total amount of damages, and what further needs to be done in order to provide these answers, which can generally be accomplished by simply digging deeper into the data already supplied by Treasury simply because generally, the additional data that is sought has already provided the basis for the data that was supplied in these quarterly **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data** publications.

(Please note that the entire report for the Third Quarter of the 2010 **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data** publication is included in the Exhibit Section. It is listed as **Exhibit 1**.)

37

There will also be relevant pages from three other quarterly **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data** reports that are referred to in this section, which pages are also included in the Exhibits:

They include the following:

**Exhibit 2**: Newly Initiated Foreclosures, Page 43 of First Quarter of the 2011 **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data**, which page pertained to Newly Initiated Foreclosures for the past four quarters

**Exhibit 3**: Newly Initiated Foreclosures, Page 44 of Third Quarter of the 2011 **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data**, which page pertained to Newly Initiated Foreclosures for the past four quarters.

**Exhibit 4**: New Retention Actions for the past five quarters, Page 21 of First Quarter of the 2011 **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data**,

**Exhibit 5**: Page 41 Fourth Quarter of the 2010 **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data.**

## Information derived from OCC and OTS Mortgage Metrics Report
## Disclosure of National Bank and Federal Thrift Mortgage Loan Data Third
## Quarter 2010 (Exhibit 1)

"There were 33.3 million first-lien residential mortgages serviced by national banks and federally regulated thrifts totaling almost $6 trillion in principal balances.

Page 4

**Comment #1**: Therefore the average mortgage during this quarter was about $180,000.

"Mortgages serviced for Fannie Mae and Freddie Mac (GSEs) performed better than the overall portfolio because of their higher concentration of prime mortgages. Of the GSE mortgages, 92.3 percent were current and performing at the end of the third quarter Loans serviced for the two GSEs made up 61 percent of the total portfolio

Page 5

**Comment #2**: This means that there were 20,313,000 mortgages during this quarter that were serviced by either Fannie Mae or Freddie Mac, which are both GSE's

**Comment #3**: This means that there were about 1,564,000 GSE mortgages during this quarter that were delinquent.

**Comment #4**: Because GSEs were better performers, it made hiding the behavior complained of easier to execute because the number of foreclosures would still look good in comparison to other mortgage portfolios, and it also put pressure on those who were servicing GSE to continue to perform at higher standards, which

39

meant that there be as few put backs as possible as the result the result of **Buyback Demands**.

"Modified mortgages held in the servicers' portfolios performed better than modified mortgages serviced for others."

Page 8

**Comment: # 5**: This is hardly a surprise. This demonstrates that lenders/servicers were more careful with their own money and/or that third parties who de facto serviced the mortgages for the original lender/servicer were more reckless.

"Newly initiated foreclosures increased 31.2 percent from the previous quarter and 3.7 percent from a year ago, reflecting the large number of seriously delinquent mortgages and loans in process of foreclosure progressing toward foreclosure sale."

Page 8

**Comment #6**: **The 31.2 percent increase in "newly Initiated foreclosure filings for the 3rd Quarter of 2010 is THE "smoking gun" statistic as to the specific issue and facts raised in this ENTIRE pleading, given that this is unquestionably the quarter that "newly initiated foreclosures" would have been expected to have spiked dramatically as the direct result of the Passage of Dodd Frank and the resulting illegal actions alleged by Foster to have been taken by the defendants!**

Moreover, this statistic provides a basis for an estimate as to how many **potential** members there are in the **Subject Group**. One possible estimate for this group is 55,000. This is because the overall increase in newly minted foreclosure filings for this period was approximately 90,000, of which 61 percent can be assumed to be GSEs which means a total of 55,000. However, the actual number is almost certainly higher as it is this GSE group that would be most

40

susceptible to the fraud that was committed compared to Government owned mortgages such as FHA or private mortgages. And this trend of increased newly filed foreclosures continued in the fourth quarter albeit with a decrease relative to the third quarter Spike because in many instances, it probably took some time to file a foreclosure action even after the forbearance was no longer honored. Only after the fourth quarter of 2010 would there be an expected drop in newly initiated foreclosures which is **precisely** what happened.

Specifically on page 43 of **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data First Quarter 2011 (Exhibit 2)** are the quarterly statistics for newly initiated foreclosures for the past year that unquestionably bear relevance to this matter. They are as follows:

291,758 for Second Quarter 2010 (This is the Baseline for Newly Initiated Foreclosures as this is before the passage of **Dodd Frank**

382,751 for Third Quarter 2010 (Again: This is the quarter for which there was expected to be a Spike in newly filed foreclosures.)

352,318 for Fourth Quarter 2010

312,404 for First Quarter 2011

**Comment #7**: This is precisely what was to be expected as there would have been **additional** newly minted foreclosure filings in the Fourth Quarter of 2010 relative to the Second Quarter Baseline. Thus, these newly initiated foreclosure filing totals were lower than the previous quarter of Third Quarter 2010 but were higher than the base period of the Second Quarter 2010.

**Comment #8**: Further substantiating this view and highlighting this huge Spike is the fact that newly initiated foreclosures decreased by 7.9 percent during the fourth quarter of 2010, and newly initiated foreclosures then further decreased by 11.3 during the first quarter of 2011. That there was less of a decrease in the fourth quarter of 2010 but not a complete decrease to the level of the second

quarter of 2010 further supports the position that there were most likely filings in the fourth quarter of 2010 that also reflected the conduct complained of, and this means that **the Subject Group** is actually larger than the estimate of 55,000 for the Third Quarter 2010 for the Subject Group as there was approximately an additional 37,000 members of the **Subject Group** that were added in the Fourth Quarter of 2010 than would have otherwise been expected if one were to look at the baseline group in the Second Quarter of 2010. Therefore there are approximately 92,000 members of the Subject Group, which is composed of the those GSE mortgagees who had an initial foreclosure filing as the result of the illegal retroactive application of **Dodd Frank.** One such example of a newly initiated foreclosure filing in the fourth quarter of 2010 was Foster whose filing date for his lawsuit was in November 2010

**Comment #9** This data is not consistent with a predicted decrease due to the moratorium of foreclosures that was put into place in October 2010 because the only moratorium that was really in place was a moratorium on existing foreclosure filings prior to this Spike, and it was essentially a political "whitewash" as will be shown in the tenth component of the Blueprint, which pertains to **"CONGRESSIONAL OVERSIGHT PANEL NOVEMBER OVERSIGHT REPORT*EXAMINING THE CONSEQUENCES OF MORTGAGE IRREGULARITIES FOR FINANCIAL STABILITY AND FORECLOSURE MITIGATION"**

**Comment #10**: This also further substantiates the allegations contained herein in that the newly initiated foreclosure data for the fourth quarter of 2010 is marginally below the number of newly initiated foreclosures of Third Quarter 2010 but 21 percent higher than the base line period of Second Quarter 2010.

"More than 91 percent of the mortgages in the portfolio were serviced for third parties because of loan sales and securitization."

Page 10

42

**Comment: #11**: This is a blue print for fraud as it demonstrates just how chaotic the banking/mortgage system had become because of the number of parties involved in any given mortgage transaction. This chaos is well recognized in the **"CONGRESSIONAL OVERSIGHT PANEL NOVEMBER OVERSIGHT REPORT*EXAMINING THE CONSEQUENCES OF MORTGAGE IRREGULARITIES FOR FINANCIAL STABILITY AND FORECLOSURE MITIGATION"** that is included as the tenth component of the Blueprint in this pleading.

[Definitions] "Principal deferral modifications—Modifications that remove a portion of the principal from the amount used to calculate monthly principal and interest payments for a set period. The deferred amount becomes due at the end of the loan term."

Page 12

**Comment #12:** "Principal deferral modification" or "term extension" are types of forbearance.

[Definitions] "Short sales—Sales of the mortgaged properties at prices that net less than the total amount due on the mortgages. Servicers and borrowers negotiate repayment programs, forbearance, or forgiveness for any remaining deficiency on the debt. Short sales typically have less adverse impact than foreclosure on borrowers' credit record."

Page 13

**Comment: #13:** Not only is this an accurate definition, but the United States' total losses in this matter are not merely from foreclosures on properties but short sales that would have not otherwise occurred. And while this overall losses sustained by the United States of America in this matter must be mitigated by the approximate 50 percent of where members of the Subject Group who were granted forbearances would have later gone into delinquency, this

43

mitigation/having of damages must in turn be otherwise mitigated by the overall loss in housing value that was sustained as the result of the criminal conduct outlined herein. This not only included lower prices in GSE properties that were foreclosed upon or short sold going forward into 2012, but rather the overall housing market values that suffered as the direct result of the fraud as detailed herein.

"Newly initiated home retention actions relative to newly initiated foreclosure actions declined during the third quarter largely because of both the 17.0 percent **decline** in home retention actions and the 31.2 percent **increase** in newly initiated foreclosure actions.."

Page 23 of the Third Quarter of the 2010 **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data**

**Comment #14:This is "Smoking Gun Number Two" because it unquestionably reflects not only the increase in newly filed foreclosures, but it simultaneously reflects the lack of home retention, which in part reflects forbearances being retracted during the all-important Third Quarter 2010.**

Page 17 of the Third Quarter of the 2010 **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data** also shows a substantial decrease of GSE properties that were 90 days or more delinquent. The number of properties that were 90 days or more delinquent was 360,798 for the Third Quarter 2010, which decreased from 517,496 for the Second Quarter 2010, which in turn decreased from 648,625 for First Quarter 2010. This was a total percentage **decrease** of 287,827 properties or 44 percent..

But there is more:

44

Delinquencies of 30 days to 59 days increased from 404,565 for First Quarter 2010 to 444,871 by Third Quarter 2010. As contrasted to the 44 percent **decrease** of 90 or more days delinquency, this was a ten percent **increase**.

Delinquencies of 60 to 90 days decreased 179,974 to 171,249. This was a five percent **decrease.**

**Comment #15**: These statistics reflect the serious Third Quarter decrease in delinquencies which length of 90 days or more is directly related to the timing of the retroactive application of Dodd Frank. This is Smoking Gun Number Three.

"Newly initiated foreclosures decreased by 7.9 percent during the fourth quarter of 2010, they were up 12.7 percent from a year ago. This decrease can be attributed at least in part to the moratoria on foreclosure processing announced by several large servicers but also to the decline in serious delinquencies as well as the increase in trial-period plans during the quarter. **Servicers indicated that new foreclosure actions will likely rise as moratoria are lifted and alternatives for seriously delinquent borrowers are exhausted**." (emphasis added)

This information is taken from Page 41 Fourth Quarter of the 2010 **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data. (Exhibit 3)**

**Comment #16**: This is at best, a complete whiff by the town idiot! This is clearly not what happened as the following quarterly statistics for newly initiated foreclosure filings once again demonstrate. As has been pointed out, the reason newly initiated foreclosure filings declined in the Fourth Quarter of 2010 is because newly initiated foreclosure filings skyrocketed by 31 percent in the Third Quarter of 2010. As has been pointed out, this HUGE increase in Newly Initiated



Foreclosure Filings was the direct result of retroactive foreclosure application of a specific passage of **Dodd Frank**.

Here are the relevant quarters for Newly Initiated Foreclosure Filings:

291,758 for Second Quarter 2010        (This is the Baseline for Newly Initiated Foreclosures as this is before the passage of **Dodd Frank)**

382,751 for Third Quarter 2010

352,945 for Fourth Quarter 2010

312,235 for First Quarter 2011

287,182 for Second Quarter 2011

(N.B. Because Foster could not find Second Quarter 2011 **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data** online, he used the data from Page 44 of Third Quarter 2011 **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data** Newly Initiated Foreclosures for the prior four quarters in order to get the data for the Second Quarter of 2011**This is (Exhibit 3)**

### **Additional Data that Foster does not have**

1. Foster does not know precisely how many of these newly minted foreclosure filings are attributable for other causes and what those other causes may be. But given this huge an increase, it is certain that this is not just a random occurrence. Certainly, the tortfeasors should come up with some alternate explanations.


2. He does not quite know the losses sustained by the GSEs on any given failure to grant forbearance, although his educated guess is that it amounts to $50,000 per residence.

3. He does not know the percentage of short sales versus foreclosed upon properties that resulted from the foreclosures on the subject group.

4. He does not know the loss for properties in the Subject Group that were short sold as compared to losses on foreclosures

5. He does not know the percentage of properties in the subject group that would have been given forbearance and then would have defaulted on the forbearance, although a fair estimate for this group is generally around 50 percent, which in turn would potentially lower the overall damages by half. However, this statistic would have to be mitigated by the overall lowering in value of property levels throughout the United States that occurred as the direct result of the conduct complained of. This in turn would have resulted in significantly greater losses being "put" to the GSE s wherein future additional foreclosures and short sales occurred. as the direct result of the lowering of value,

However in judicial foreclosure states it typically took a minimum of two months to notify the mortgagee that the loan was being foreclosed upon and 15 months to complete the foreclosure which meant that the **Subject Group** would on average be foreclosed upon 17 months after July 2010, which is March 2012, And, not surprisingly, the lowest point in the Case Shiller Index was March 2012 at 136, which was the lowest it had been since January 2003 and it has not even been close to that low since. Therefore, the Case Shiller low correlates directly to the actions taken by the defendants in response to the passage of Dodd Frank. Furthermore, this does not include the overall losses in terms of all residential properties sold during this time or lower property tax collections. And there was clearly collateral damage that extended to years later due to the depression of prices that would not have occurred elsewhere. Thus this is an instance of collateral losses, which led to further collateral losses, which overall losses dwarfed the "set aside" of the fifty percent of forbearances that went back into the foreclosure que.

47

**Quotes** from Third Quarter of the 2010 **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data** **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data that demonstrate the push for Verification of income (as opposed to a forbearance request being granted over the phone.)**

"Servicers implemented 470,321 new home retention actions—loan modifications, trial-period plans, and payment plans—during the quarter. This represents a 17.0 percent decline from the previous quarter. HAMP modifications decreased by 45.7 percent during the quarter while other modifications increased by 10.1 percent. New HAMP trial plans decreased by 33.2 percent, and other trial-period plans decreased 21.0 percent from the previous quarters (see table **Servicers report that this decline resulted from requirements to obtain, verify, and analyze borrower income before beginning a trial period plan** (emphasis added) and the falling number of borrowers who are eligible for existing modification programs."

Page 5

"This trend of lower delinquency rates following modification corresponds with the increasing emphasis on repayment sustainability through reduction of the borrower's monthly payment, verified borrower income, and payment affordability relative to income."

Page 7

"HAMP modifications performed better than other modifications implemented during the same periods at the end of the third quarter of 2010....These lower

48

post-modification delinquency rates reflect HAMP's emphasis on the affordability

of monthly payments relative to borrower income, **verification of income,** and

completion of a successful trial payment period."

End of page 7

"Lower recent re-default rates may also result from the increased emphasis of

HAMP and other modification programs to lower monthly payments relative to

the borrower's income and ability to repay, as well as verification of income and

completion of a successful trial period."

End page 38

**Comment #17**:Verification of income is stressed several times, which in turn led

to a culture of ignoring the previous problems that occurred with the telephone

forbearance requests that were considered expendable. There is overall a culture

of self congratulation about income verification and resolving this crisis, but this

is also tacit admission of the problems that were caused by the previous policy of

stated income and conducting business by phone.

The ninth  component of the **Blueprint** are the **Approximate Losses Sustained**
**by the United States of America.**.

The ninth  component of the **Blueprint** is an estimate of the **Approximate Losses**
**Sustained by the United States of America.**

For this estimate, Foster is relying on his experiences as a Realtor who has done

133 short sales. Based on his experience, Foster is assuming a loss of $40,000 per

49

GSE mortgage, which would be a combination of short sales and foreclosures. This is a loss of 22 percent per mortgage, and that percentage is unquestionably lower than the numbers Foster saw at the closing table.

As already noted, Foster believes the Subject Group to be 92,000 members, which is the additional GSE mortgages that were added as newly initiated foreclosures for the Third and Fourth Quarter of 2010 over and above what would have been expected from the Baseline group of Second Quarter 2010. Assuming a recidivism rate of 50 percent that would have occurred, this means that there ultimately would have been 46,000 foreclosures and short sales that would not have otherwise occurred. This means a total loss to the United States of America of $1,840,000,000. But this aggregate amount would also need to be lowered because there surely was a certain percentage of the **Subject Group** who did go on to get some other form of assistance. So "for the sake of argument, Foster is halving the loss to $920,000,000. In turn this means that a total of $2.76 Billion could be recovered. If correct, this award would approach **Glaxo**..

The properties that were most susceptible to being in the **Subject Group** were those properties that had been purchased in the past ten years at higher than the average price of $180,000. But for the purposes of this calculation, Foster is using the average mortgage of $180,000.

The Case Shiller Index five years before in July 2010 was 191. As previously noted, the Case Shiller Index for July 2010 was 146, which means that there was a 23 percent decrease in the value of the average American residence.

There was of course typically equity added to the value of the residence by the mortgage payments, which probably resulted in the average value of this residence grouping being about ten percent "underwater"

Therefore, a fair average loss that would have been sustained by the GSEs would have been a minimum of 30 percent or slightly more than $50,000 per residence, which estimate is $10,000 higher than Foster's observation, which means that throughout this section, Foster's numbers are conservative,

50

And as noted the chances are very high that this conservative estimate is low simply because the default rate on mortgages other than GSEs was.

Unlike other FCA claims, this probably does not have as much specific facts as perhaps other successful FCA claims have. But the potential for a record setting recovery would hopefully overweigh that concern not to mention the fact that much of the incriminating data is already be in the possession of Treasury. And Foster would certainly be willing to work with DOJ to achieve the desired results.

The tenth component of the **Blueprint** is **Relevant Quotes Taken from the "CONGRESSIONAL OVERSIGHT PANEL NOVEMBER OVERSIGHT REPORT\*EXAMINING THE CONSEQUENCES OF MORTGAGE IRREGULARITIES FOR FINANCIAL STABILITY AND FORECLOSURE MITIGATION"**

The following are Relevant Quotes Taken from the "CONGRESSIONAL OVERSIGHT PANEL NOVEMBER OVERSIGHT REPORT\*EXAMINING THE CONSEQUENCES OF MORTGAGE IRREGULARITIES FOR FINANCIAL STABILITY AND FORECLOSURE MITIGATION" (Please know that due to the size of the file, Foster has not included this readily available publication in his Appendix)

"As one reads the selections of this report, please keep in mind the following: 1): That the "sky is falling" scenario never even came close to occurring. To the contrary, the banks named as defendants made an aggregate $1 Trillion dollars in profit since this report was written. 2); That the specifics of the case sub judice

clearly show significant financial harm that was done 3): This Oversight Report unquestionably shows the political pressure to not "look under the hood" with respect to illegal foreclosures. To the contrary, this Congressional Report shows how much political support and pressure there was given to **not** discovering further irregularities 4): But this fear whether valid or not does not excuse clearly illegal behavior that may have cost the United States of America $4 Billion Dollars and made life living hell for as many as 140,000 American households who did absolutely nothing wrong.

**Please be advised that because Foster copied from the report verbatim, that Foster has left the foot note numbers,**

"EXECUTIVE SUMMARY'

"In the fall of 2010, reports began to surface alleging that companies servicing $6.4 trillion in American mortgages may have bypassed legally required steps to foreclose on a home. Employees or contractors of Bank of America, GMAC Mortgage, and other major loan servicers testified that they signed, and in some cases backdated, thousands of documents claiming personal knowledge of facts about mortgages that they did not actually know to be true. Allegations of ''robo-signing'' are deeply disturbing and have given rise to ongoing federal and state investigations. At this point the ultimate implications remain unclear. **It is possible, however, that ''robo-signing'' may have concealed much deeper problems in the mortgage market that could potentially threaten financial stability and undermine the government's efforts to mitigate the foreclosure crisis.** (Emphasis added) Although it is not yet possible to determine whether

52

such threats will materialize, the Panel urges Treasury and bank regulators to take immediate steps to understand and prepare for the potential risks. In the best-case scenario, concerns about mortgage documentation irregularities may prove overblown. In this view, which has been embraced by the financial industry, a handful of employees failed to follow procedures in signing foreclosure-related affidavits, but the facts underlying the affidavits are demonstrably accurate. Foreclosures could proceed as soon as the invalid affidavits are replaced with properly executed paperwork. The worst-case scenario is considerably grimmer. In this view, which has been articulated by academics and homeowner advocates, the "robo-signing" of affidavits served to cover up the fact that loan servicers cannot demonstrate the facts required to conduct a lawful foreclosure. In essence, banks may be unable to prove that they own the mortgage loans they claim to own. The risk stems from the possibility that the rapid growth of mortgage securitization outpaced the ability of the legal and financial system to track mortgage loan ownership. In earlier years, under the traditional mortgage model, a homeowner borrowed money from a single bank and then paid back the same bank. In the rare instances when a bank transferred its rights, the sale was recorded by hand in the borrower's county property office. Thus, the ownership of any individual mortgage could be easily demonstrated. Nowadays, a single mortgage loan may be sold dozens of times between various banks across the country. In the view of some market participants, the sheer speed of the modern mortgage market has rendered obsolete the traditional ink-and-paper recordation process, so the financial industry developed an electronic transfer process that

bypasses county property offices. This electronic process has, however, faced legal challenges that could, in an extreme scenario, call into question the validity of 33 million mortgage loans. Further, the financial industry now commonly bundles the rights to thousands of individual loans into a mortgage-backed security (MBS). The securitization process is complicated and requires several properly executed transfers. If at any point the required legal steps are not followed to the letter, then the ownership of the mortgage loan could fall into question. Homeowner advocates have alleged that frequent ''robo-signing'' of ownership affidavits may have concealed extensive industry failures to document mortgage loan transfers properly. If documentation problems prove to be pervasive and, more importantly, throw into doubt the ownership of not only foreclosed properties but also pooled mortgages, the consequences could be severe. Clear and uncontested property rights are the foundation of the housing market. If these rights fall into question, that foundation could collapse. Borrowers may be unable to determine whether they are sending their monthly payments to the right people. Judges may block any effort to foreclose, even in cases where borrowers have failed to make regular payments. Multiple banks may attempt to foreclose upon the same property. Borrowers who have already suffered foreclosure may seek to regain title to their homes and force any new owners to move out. Would-be buyers and sellers could find themselves in limbo, unable to know with any certainty whether they can safely buy or sell a home. If such problems were to arise on a large scale, the housing market could experience even greater disruptions than have already occurred, resulting in significant harm

to major financial institutions. For example, if a Wall Street bank were to discover that, due to shoddily executed paperwork, it still owns millions of defaulted mortgages that it thought it sold off years ago, it could face billions of dollars in unexpected losses. Documentation into question their ability to grant modifications or to demand payments from homeowners. The servicers' use of ''robo-signing'' may also have affected determinations about individual loans; servicers may have been more willing to foreclose if they were not bearing the full costs of a properly executed foreclosure. Treasury has so far not provided reports of any investigation as to whether documentation problems could undermine HAMP. It should engage in active efforts to monitor the impact of foreclosure irregularities, and it should report its findings to Congress and the public. In addition to documentation concerns, another problem has arisen with securitized mortgage loans that could also threaten financial stability. Investors in mortgage-backed securities typically demanded certain assurances about the quality of the loans they purchased: for instance, that the borrowers had certain minimum credit ratings and income, or that their homes had appraised for at least a minimum value. Allegations have surfaced that banks may have misrepresented the quality of many loans sold for securitization. Banks found to have provided misrepresentations could be required to repurchase any affected mortgages. Because millions of these mortgages are in default or foreclosure, the result could be extensive capital losses if such repurchase risk is not adequately reserved."

"To put in perspective the potential problem, one investor action alone could seek to force Bank of America to repurchase and absorb partial losses on up

to $47 billion in troubled loans due to alleged misrepresentations of loan quality.
Bank of America currently has $230 billion in shareholders' equity, so if several
similar-sized actions—whether motivated by concerns about underwriting or loan
ownership—were to succeed, the company could suffer disabling damage to its
regulatory capital. It is possible that widespread challenges along these lines could
pose risks to the very financial stability that the Troubled Asset Relief Program
was designed to protect. Treasury has claimed that based on evidence to date,
mortgage-related problems currently pose no danger to the financial system, but
in light of the extensive uncertainties in the market today, Treasury's assertions
appear premature. Treasury should explain why it sees no danger. Bank regulators
should also conduct new stress tests on Wall Street banks to measure their ability
to deal with a potential crisis. The Panel emphasizes that mortgage lenders and
securitization servicers should not undertake to foreclose on any homeowner
unless they are able to do so in full compliance with applicable laws and their
contractual agreements with the homeowner. The American financial system is in
a precarious place. Treasury's authority to support the financial system through
the Troubled Asset Relief Program has expired, and the resolution authority
created by the Dodd-Frank Wall Street Reform and Consumer Protection Act of
2010 remains untested. The 2009 stress tests that evaluated the health of the
financial system looked only to the end of 2010, providing little assurance that
banks could withstand sharp losses in the years to come. The housing market and
the broader economy remain troubled and thus vulnerable to future shocks. In

short, even as the government's response to the financial crisis is drawing to a

close, severe threats remain that have the potential to damage financial stability. "

Pages 1 to 3

**Comment #1:** Robo signing is well described and is well known. Mortgage

securitization is well documented and its enormous problems or potential

problems made clear and emphasize. But     there is no focus is on foreclosures

with robo signers with respect to fraud committed by the lenders.

"SECTION ONE: A. Overview In the fall of 2010, with the Troubled

Asset Relief Program's (TARP) authority expiring, reports began to surface of

problems with foreclosure documentation, particularly in states where

foreclosures happen through the courts. GMAC Mortgage, a subsidiary of current

TARP recipient Ally Financial, announced on September 24, 2010 that it had

identified irregularities in its foreclosure document procedures that raised

questions about the validity of foreclosures on mortgages that it serviced. Similar

revelations soon followed from Bank of America, a former TARP recipient, and

others. Employees of these companies or their contractors have testified that they

signed, and in some cases backdated, thousands of documents attesting to

personal knowledge of facts about the mortgage and the property that they did not

actually know to be true. Mortgage servicers also appeared to be cutting corners

in other ways. According to these banks, their employees were having trouble

keeping up with the crush of foreclosures, but additional training and employees

57

would generally suffice to get the process in order again. At present, the reach of these irregularities is unknown. The irregularities may be limited to paperwork errors among certain servicers in certain states; alternatively, they may call into question aspects of the securitization process that pooled and sold interests in innumerable mortgages during the housing boom. Depending on their extent, the irregularities may affect both Treasury's ongoing foreclosure programs and the financial stability that Treasury, under the Emergency Economic Stabilization Act of 2008 (EESA), was tasked with restoring. Further, the mortgage market faces ongoing risks related to the right of mortgage-backed securities to force banks to repurchase any loans. Losses stemming from these repurchases would compound any risks associated with documentation irregularities. Under EESA, the Congressional Oversight Panel is charged with reviewing the current state of the financial markets and the regulatory system. The Panel's oversight interest in foreclosure documentation irregularities stems from several distinct concerns: If Severe Disruptions in the Housing Market Materialize, Financial Stability and Taxpayer Funds Could Be Imperiled. If document irregularities prove to be pervasive and, more importantly, throw into question ownership of not only foreclosed properties but also pooled mortgages, the result could be significant harm to financial stability—the very stability that the TARP was designed to protect. In the worst case scenario, a clear chain of title—an essential element of a functioning housing market—may be difficult to establish for properties subject to mortgage loans that were pooled and securitized. Rating agencies are already cautious in their outlook for the banking sector, and further blows could have a

significant effect. The implications could also be dire for taxpayers' recovery of their TARP investments. Treasury still has $66.8 billion invested in the banking sector generally, and as the Panel discussed in its July report, ''Small Banks in the Capital Purchase Program,'' the prospects for repayment from smaller banks are still uncertain and dependent, in great part, on a sector healthy enough to attract private investment.I HAMP May Rely on Uncertain Legal Authority and Inaccurate Foreclosure Cost Estimates, Potentially Posing a Risk to Foreclosure Mitigation Efforts. If irregularities in the foreclosure process reflect deeper failures to document properly changes of ownership as mortgage loans were securitized, then it is possible that Treasury is dealing with the wrong parties in the course of the Home Affordable Modification Program (HAMP). This could mean that borrowers either received or were denied modifications improperly. Some servicers dealing with Treasury may have no legal right to initiate foreclosures, which may call into question their ability to grant modifications or to demand payments from homeowners, whether they are part of a foreclosure mitigation program or otherwise. The servicers' tendency to cut corners may also have affected the determination to modify or foreclose upon individual loans. Because the net present value (NPV) model compares the net present value of the modification to a foreclosure, improper procedures that cut corners might have affected the foreclosure cost calculation and thus might have affected the outcome of the NPV test. TARP-Recipient Banks May Have Failed to Meet Legal Obligations. Many of the entities implicated in the recent document irregularities, including Ally Financial, Bank of America, and JPMorgan Chase, are current or

former TARP recipients. Ally Financial, notably, remains in TARP and is in possession of $17.2 billion in taxpayer funds. Bank of America received funds not only from TARP's Capital Purchase Program (CPP) but also what Treasury deemed ''exceptional assistance'' from TARP's Targeted Investment Program (TIP). Some of the banks involved were also subject to the Supervisory Capital Assessment Program (SCAP), also known as the stress tests: Treasury's and the Board of Governors of the Federal Reserve's (Federal Reserve) efforts to determine the health of the largest banks under a variety of stressed scenarios. The Congressional Oversight Panel will continue to monitor Treasury's engagement with these ongoing events, not only to protect the taxpayers' existing TARP investments and to oversee its foreclosure mitigation programs, but also to meet the Panel's statutory mandate to ''review the current state of the financial markets and the regulatory system.'' B. Background In the fall of 2010, a series of revelations about foreclosure documentation irregularities hit the housing markets. The transfer of a property's title from the mortgagor (the homeowner) to the mortgagee (typically a bank or a trust) necessary for a successful foreclosure requires a series of steps established by state law.2 As further described below, depositions taken in a variety of cases in which homeowners were fighting foreclosure actions indicated that mortgage servicer employees—who were required to have personal knowledge of the matters to which they were attesting in their affidavits—were signing hundreds of these documents a day. Other documents appeared to have been backdated improperly and ineffectively or incorrectly notarized. While these documentation irregularities may sound minor,

they have the potential to throw the foreclosure system—and possibly the mortgage loan system and housing market itself—into turmoil. At a minimum, in certain cases, signers of affidavits appear to have signed documents attesting to information that they did not verify and without a notary present. If this is the extent of the irregularities, then the issue may be limited to these signers and the foreclosure proceedings they were involved in, and in many cases, the irregularities may potentially be remedied by reviewing the documents more thoroughly and then resubmitting them. If, however, the problem is related not simply to a limited number of foreclosure documents but also to irregularities in the mortgage origination and pooling process, then the impact of the irregularities could be far broader, affecting a vast number of investors in the mortgage-backed securities (MBS) market, already completed foreclosures, and current homeowners. This latter scenario could result in extensive litigation, an extended freeze in the foreclosure market, and significant stress on bank balance sheets arising from the substantial repurchase liability that can arise from mistakes or misrepresentations in mortgage documents.

C. Timeline After the housing market started to collapse in 2006, the effects rippled through the financial sector and led to disruptions in the credit markets in 2008 and 2009. In an economy that had been hit hard by the financial crisis and soon settled into a deep recession, the housing market declined, dragging down housing prices and increasing the likelihood of default. This put pressure on a variety of parties involved in the mortgage market. During the boom, there were many players involved in the process of lending, securitizing

and servicing mortgages, and many of these players took on multiple roles.4 The initial role of servicers was largely administrative.5 They were hired by the MBS investors to handle all back-office functions for existing loans, and generally acted as intermediaries between borrowers and MBS investors.6 However, when the housing bubble burst, and the number of delinquencies began to rise, the role of servicers evolved correspondingly.7 Servicer focus shifted from performing purely administrative tasks to engaging in active loss mitigation efforts.8 Servicers found themselves responsible for processing all defaults, modifications, short sales, and foreclosures.9 The servicers themselves have admitted that they were simply not prepared for the volume of work that the crisis generated.10 Thus, many servicers began subcontracting out much of their duties to so-called ''foreclosure mills,'' contractors that had significant incentives to move foreclosures along quickly. Thus, as the boom in the housing market mutated into a boom in foreclosures,11 banks rushed to move delinquent borrowers out of their homes as quickly as possible, leading, apparently, to procedures of which the best that can be said is that they were sloppy and cursory. Concerns with foreclosure irregularities first arose when depositions of so-called ''robo-signers'' came to light.''

End page 7 and the above is complete and verbatim, which means that the first seven pages of the Report are included in their entirety.

**Comment #2**. This further demonstrates the extreme pressure that was being felt to not destroy the overall banking system, which defendants earned over $1 Trillion Dollars in profits since this time. But once again, this says nothing about

62

foreclosures that were illegally done and cost the United States of America as much as $7 Billion

"Similarly, faced with revelations that robo-signers had signed tens of thousands of foreclosure documents without actually verifying the information in them, Bank of America announced on October 8, 2010, that it would freeze foreclosure sales in all 50 states until it could investigate and address the irregularities.16 GMAC Mortgage took similar action, announcing that while it would not suspend foreclosures, it had "temporarily suspended evictions and post-foreclosure closings" in 23 states.17 In a statement, it referred to the issue as a "procedural error . . . in certain affidavits" and stated that "we are confident that the processing errors did not result in any inappropriate foreclosures." GMAC also announced that the company had taken three remedial steps to address the problem: additional education and training for employees, the release of a "more robust policy" to govern the process, and the hiring of additional staff to assist with foreclosure processing.18 These voluntary, privately determined suspensions were brief.19 On October 12, 2010, GMAC Mortgage released a statement indicating that in cases in which it had initiated a review process for its foreclosure procedures, it would resume foreclosure proceedings once any problems had been identified and, where necessary, addressed. It also noted that it "found no evidence to date of any inappropriate foreclosures."20 On October 18, Bank of America announced that it had completed its review of irregularities in the 23 states that require judicial review of foreclosure proceedings and that it

63

would begin processing foreclosure affidavits for 102,000 foreclosure proceedings in those states. It stated that it would review proceedings in the remaining 27 states on a case-by-case basis and that foreclosure sales in those states would be delayed until those reviews are complete. It further stated that in all states, it appeared that the ''basis of our foreclosure decisions is accurate.''21 Various commentators, however, have questioned Bank of America's ability to make such determinations in such a short timeframe.22 Then, on October 27, another large bank entered the fray when Wells Fargo announced that it had uncovered irregularities in its foreclosure processes and stated that it would submit supplemental affidavits in 55,000 foreclosure actions.23 Meanwhile, as the revelations of irregularities quickly multiplied, some argued that over and above the banks' and servicers' voluntary actions, the federal government should impose a nationwide moratorium on foreclosures.24 Housing and Urban Development Secretary Shaun Donovan rejected the idea, arguing that ''a national, blanket moratorium on all foreclosure sales would do far more harm than good.''25 At the same time, on October 13, attorneys general from all 50 states26 announced a bipartisan effort to look into the possibility that documents or affidavits were improperly submitted in their jurisdictions. Although the public focus today lies generally on foreclosures, the possibility of document irregularities in mortgage transactions has expanded beyond their significance to foreclosure proceedings. Recently, investors have begun to claim that similar irregularities in origination and pooling of loans should trigger actions against entities in the mortgage origination, securitization, and servicing industries.

Page 8 to Page 10

**Comment #3:** The banks response to the issue of robo signing was to deny and "sweep under the rug.'

"b. Violations of Representations and Warranties in the PSA60 Residential mortgage-backed securities' PSAs typically contain or incorporate a variety of representations and warranties. These representations and warranties cover such topics as the organization of the sponsor and depositor, the quality and status of the mortgage loans, and the validity of their transfers. More particularly, PSAs, whose terms are unique to each MBS, include representations and warranties by the originator or seller relating to the conveyance of good title,61 documentation for theloan,62 underwriting standards,63 compliance with applicable law,64 and delivery of mortgage files,65 among other things.66 In addition, the mortgage files must contain specific loan and mortgage documents and notification of material breaches of any representations and warranties. If any of the representations or warranties are breached, and the breach materially and adversely affects the value of a loan, which can be as simple as reducing its market value, **the offending loan is to be "put-back" to the sponsor, meaning that the sponsor is required to repurchase the loan for the outstanding principal balance plus any accrued interest.67** (Emphasis added) If successfully exercised, these put-back clauses have enormous value for investors, because they permit the holder of a security with (at present) little value to attempt to recoup some of the lost value from the originator (or, if the originator is

65

out of business, the sponsor or a successor). Put-backs shift credit risk from MBS investors to MBS sponsors (typically, as noted above, investment banks): the sponsor now has the defective loan on its balance sheet, and the trust has cash for the full unpaid principal balance of the loan plus accrued interest on its balance sheet.68 This means that the sponsor may have to increase its risk-based capital and will bear the risk of future losses on the loan, while the trust receives 100 cents on the dollar for the loan.69 Not surprisingly, put-back actions are very fact-specific and can be hotly contested.70 Servicers do not often pursue representation and warranties violations. A 2010 study by Amherst Mortgage Securities showed that while private mortgage insurers were rescinding coverage on a substantial percentage of the loans they insured because of violations of very similar representation and warranties, there was very little put-back activity by servicers, even though one would expect relatively similar rates.71 One explanation for the apparent lack of servicer put-back activity may be the possibility of servicer conflicts of interest. Servicers are often affiliated with securitization sponsors and therefore have disincentives to pursue representation and warranty violations. Trustees have disincentives to remove servicers because they act as backup servicers and bear the costs of servicing if the servicer is terminated from the deal. Finally, investors are poorly situated to monitor servicers. Whereas a securitization trustee could gain access to individual loan files—but typically do not72—investors cannot review loan files without substantial collective costs.73 On the other hand, investor lawsuits have the

potential to be lucrative for lawyers, so it is possible that some investor groups may take action despite their limited access to information.74

Pages 17 to 19

Possible Legal Consequences of the Document Irregularities to Various Parties

The above is on page 19 but Foster then goes down to the next quote which is on page 22

"• Borrowers/homeowners—Borrowers may have several available causes of action. They may seek to reclaim foreclosed properties that have been resold. They may also refuse to pay the trustee or servicer on the grounds that these parties do not own or legitimately act on behalf of the owner of the mortgage or the note.80 In addition, they may defend themselves against foreclosure proceedings on the claim that robo-signing irregularities deprived them of due process...

Then is then a skipped paragraph

"Investors—Originators of mortgages destined for mortgage securities execute mortgage loan purchase agreements, incorporated into PSAs, that, as mentioned earlier, make representations and warranties the breach of which can result in put-back rights requiring that the mortgage originator repurchase defective mortgages. MBS investors may assert claims regarding issues that arose during the origination and securitization process. For instance, they may assert that

67

violations of underwriting standards or faulty appraisals were misrepresentations and material omissions that violate representations and warranties and may, in some cases where the necessary elements are established, raise fraud claims.82 They may also raise issues about the validity of the REMIC, the bankruptcy-remote, tax-exempt conduit that is central to the mortgage securitization process. A potential investor claim is that mortgage origination violations and title defects prevented a ''true sale'' of the mortgages, consistent with Internal Revenue Service (IRS) regulations and as required by the New York State trust law, invalidating the REMIC. Some commentators believe that inquiries by investors could uncover untimely attempts to cure the problem by substituting complying property more than 90 days after formation of the REMIC, a prohibited transaction that could cause loss of REMIC status, resulting in the loss of pass-through taxation status and taxation of income to the trust and to the investor.83 Loss of REMIC status would provide substantial grounds for widespread put-backs. Moreover, this type of litigation could be extremely lucrative for the lawyers representing the investors. It may be expected that, for this type of action, the investors' counsel would have strong incentives to litigate forcefully''

Page 23

**Comment #4:** Put- back rights is simply another phrase for **Buyback Demand**. And this would be far more feared than a mere individual who was defending oneself in a foreclosure lawsuit

68

"If successfully exercised, these put-back clauses have enormous value for investors, because they permit the holder of a security with (at present) little value to attempt to recoup some of the lost value from the originator (or, if the originator is out of business, the sponsor or a successor). Put-backs shift credit risk from MBS investors to MBS sponsors (typically, as noted above, investment banks): the sponsor now has the defective loan on its balance sheet, and the trust has cash for the full unpaid principal balance of the loan plus accrued interest on its balance sheet."

Page 18

**Comment #5:** This is also analogous to Buyback demand. And the concern being expressed is that the rich will get richer is put backs are further allowed

"Nonetheless, it is possible that banks may see a financial advantage to delaying put-backs through litigation and other procedural hurdles, if only to slow the pace at which they must be completed and to keep the loans off of their books a little longer."

Page 26

**Comment #6:** The ultimate delay in litigation is to hide the facts that would lead to litigation.

69

"Similarly, Fannie Mae and Freddie Mac may become embroiled in the controversies. Fannie and Freddie have already been actively engaged in efforts to put-back nonconforming loans to the originators/sponsors of the loans they guarantee."

Page 26

**Comment #7:** This shows an extreme incentive for the defendants to not reveal to Fannie Mae their criminal conduct.

"But they may also find themselves on the other side, as targets of litigation. In addition to being embedded in the entire securitization process, they are part owners of MERS which is becoming a litigation target… Both Fannie and Freddie have recently ceased allowing MERS to bring foreclosure actions. Further, Fannie and Freddie used at least one of the law firms implicated in the irregularities to handle foreclosures. Given that these two government-supported firms are perceived as the ultimate ''deep pocket,'' it is likely that interested litigants will attempt to find a way to attach liability to them, which, if successful, could further affect the taxpayers."

Bottom of page 26 and beginning of page 27

**Comment #8:** And this is precisely what occurred did occur. Fannie took responsibility to protect itself by requiring written documentation. And of course, Fannie would do its best to "protect" the United States of America

"In addition, put-backs of mortgages, damages from lawsuits, and claims against title companies, mortgage servicers, and MBS pooling and securitization firms have the potential to drive these firms out of business."

Page 28

**Comment #9:** Once again. This demonstrates why it was so important to cover up.

"Should these and other companies that provide services to the mortgage market either decide to exit the market or go bankrupt, and no other companies opt to take their place in the current environment, the housing market would likely suffer. Even the mere possibility of such losses in the future could have a chilling effect on the risk tolerance of these firms, and could dim the housing market expectations of prospective home buyers and mortgage investors, further reducing housing demand and raising the cost of mortgages."

End of page 27 and beginning of page 28

**Comment #10:** This is precisely the fear that promoted the hiding of what occurred.

"More generally, however, and as noted below, the efficient functioning of the housing market is highly dependent on the existence of clear property rights and a level of trust that various market participants have in each other and in the integrity of the market system. If the current foreclosure irregularities prove to be widespread, they have the potential to undermine trust in the legitimacy of many foreclosures and hence in the legality of title on many foreclosed properties. In that case, it is possible that buyers will avoid purchasing properties in foreclosure proceedings because they cannot be sure that they are purchasing a clean title. Protections in the law, such as those for a bona-fide purchaser for value, may not ease their anxiety if they are concerned that they will become embroiled in litigation when prior owners appeal foreclosure rulings. These concerns would be likely to continue until the situation is resolved, or at least until the legal issues surrounding title to foreclosed properties have been clarified."

Page 28

**Comment #11:** This clearly gives an enormous incentive to cover up the issue that is being reviewed herein.

"Those buyers who remain will likely face less competition and will offer very low bids. Even foreclosed homes that have already been sold are at risk, since

72

homes sold before these documentation issues came to light cannot be assumed to have a legally provable chain of title. These homes will therefore likely be difficult to resell, except at low prices that attract risk-tolerant buyers"

Page 28

**Comment #12:** This clearly gives an enormous incentive to cover up the issue that is being litigated herein.

"—beyond establishing that the misrepresentations were so material that without them the investment would not have been made—is to establish ''loss causation,'' i.e., that the misrepresentations caused the investor's losses directly. Any losses caused by unforeseeable external factors such as ''changed economic circumstances''

Page 30

"Currently, these issues are being explored at the state level and, as discussed above, the private investor level. The recent disclosures about robo-signing may provide additional causes of action and additional arguments for private lawsuits asking for put-backs of deficient loans. **In response to a question at the Panel's most recent hearing on housing issues, however, one of the witnesses indicated that he was not aware of any successful put-backs for foreclosure procedure problems alone.** (emphasis added) According to some consumer

73

lawyers who are significantly involved in these proceedings, while it is very unlikely that a national class action lawsuit based on wrongful foreclosure claims could be successfully filed, it may be possible on a state-by-state basis. The outcome in these cases is uncertain, and consumer lawyers said that at this point it would be difficult to quantify potential losses arising out of these actions or any similar challenges in individual foreclosure procedures. Various states are proceeding under a variety of theories. As noted above, on October 13, 2010, all 50 state attorneys general, as well as state bank and mortgage regulators, announced that they would pursue a "bi-partisan multistate group" to investigate foreclosure irregularities. They are working together to investigate allegations of questionable and potentially fraudulent foreclosure documentation practices, and may design rules to improve foreclosure practices. They also may begin individual actions against some of the implicated institutions."

Page 33

**Comment #13**: What were the results of this inquiry with respect to foreclosures as the vast majority of these actions pertained to underwriting and none of these were FCA claims.. Or was there an agreement with the various AG's to not move forward with any FCA claims?..

"In addition to these potential lawsuits, the Administration's Financial Fraud Enforcement Task Force (FFETF) is in the early stages of an investigation into whether banks and other companies that submitted flawed paperwork in state

74

foreclosure proceedings may also have violated federal laws. Treasury's
representative informed the Panel that through Treasury's Financial Crimes
Enforcement Network (FinCEN) they are actively participating in the work of the
FFETF led by the Department of Justice.142 Treasury"

Page 34

**Comment #14**: Nothing was done with respect to the allegations of this lawsuit..

"In some respects, the irregularities and the mounting legal problems in the
mortgage system seem to be the consequence of the banks asking the property law
system to do something that it may be largely unequipped to do: process millions
of foreclosures within a relatively short period of time. The Panel emphasizes that
mortgage lenders and securitization servicers should not undertake to foreclose on
any homeowner unless they are able to do so in full compliance with applicable
laws and their contractual agreements with the homeowner. If legal uncertainty
remains, foreclosure should cease with respect to that homeowner until all matters
are objectively resolved and vetted through competent counsel in each applicable
jurisdiction."

Page 38

**Comment #15:** This is clearly not what occurred

75

"Satisfaction of applicable legal standards and legal certainty is in the best
interests of homeowners as well as creditors and will enable all concerned parties
to exercise properly their legal and contractual rights and remedies."

Page 39

**Comment #16:** That is clearly not what occurred.


"The CEO of Bank of America, Brian Moynihan, noted in the company's most
recent earnings call that Bank of America has resumed foreclosures, but ''it's
going to take us three or five weeks to get through and actually get all the judicial
states taken care of. The teams reviewing data have not found information which
was inaccurate, would affect the frame factors of the foreclosure; i.e., the
customer's delinquency, He focused on the faulty affidavits and argued that
''[they] fixed the affidavit signing problem or will be fixed in very short order.
'Many of the other large banks have issued statements in the same vein.1Most of
these banks have either not commented on the issues around the transfer of
ownership of the mortgage or maintain that alleged ownership transfer problems
are without merit or exaggerated

Page 41

**Comment #17:** Given that this problem was fixed so quickly, BOA should be
able to demonstrate to DOJ that this is precisely what occurred, and BOA should
have documentation that refutes the allegations made herein.

"Many investment analysts believe that potential costs associated with bank foreclosure irregularities are manageable, with potential liabilities representing a limited threat to earnings, rather than bank capital. Market estimates stemming from foreclosure irregularities to a potential prolonged foreclosure moratorium range from $1.5 to $10.0 billion for the entire industry." However, while the situation remains fluid, the emerging consensus in the market is that the risk from mortgage put-backs is a potentially bigger source of instability for the banks.191 Using calculations based on current market estimates of investment analysts, the Panel calculates a consensus exposure for the industry of $52 billion

Page 43

**Comment #18:** This shows the losses to be expected. And in the aggregate they were reasonable losses that could be sustained.

"However, while the situation remains fluid, the emerging consensus in the market is that the risk from mortgage put-backs is a potentially bigger source of instability for the banks."

Page 43

**Comment #19:** This is absolutely correct, and it demonstrates just why the coverup occurred as it did.

"However, it is important to note that, so far, many of the experts who have spoken to the question (and the banks themselves) believe that securities documentation concerns are unlikely to trigger meaningful broad-based losses. These experts state that although put-backs owing to breaches of representations and warranties will continue to exert a toll on the banks, it will largely be manageable, with costs covered from ongoing reserves and earnings. Furthermore, as noted in Section D, there are a considerable number of legal considerations that will likely lead to losses being spread out over time. Residential U.S. mortgage debt outstanding was $10.6 trillion as of June 2010.196 Of this amount, $5.7 trillion is government-sponsored enterprise (GSE) or agency-backed paper, $1.4 trillion is private label (or non-GSE issued) securities, and $3.5 trillion is non- securitized debt held on financial institution balance sheets."

Page 44

**Comment #20:** Please keep in mind that agency backed paper is FHA, VA etc. and is not GSE.

"The four largest banks accounted for approximately 60 percent of all loan originations between 2005 and 2007. Totals for Bank of America, Wells Fargo, JPMorgan Chase, and Citigroup include volumes originated by companies that these firms subsequently acquired. As Figure 4 indicates, a significant portion of

Bank of America's mortgage loan portfolio is comprised of loans assumed upon

its acquisition of Countrywide Financial. Similarly, JPMorgan Chase more than

doubled its mortgage loan portfolio with its acquisition of Washington Mutual."

Page 46

**Comment #21:** This is the genesis of this corruption. No doc loans that were

written by two lenders who went out of business. This also resulted in the focus of

inquiry being directed to loan origination as opposed to this specific issue.

"As shown in Figure 6, below, the five leading underwriters (pro forma for

acquisitions) of non-agency MBS between 2005 and 2007 accounted for 58

percent of the total underwriting volume for the period. It is of note that the three

firms with the largest underwriting volumes during this period, Lehman Brothers,

Bear Stearns, and Countrywide Securities, have either failed or been acquired by

another company."

Page 47

**Comment #22:** This once again provides the explanation of not only what

occurred to get to this situation, but it also focused on the clearly flawed issue of

underwriting as opposed to the issue presented here

"The leading mortgage servicers are ranked below by loan volume serviced and

market share, including the percentage of the overall portfolio in foreclosure.

79

During the second quarter of 2010, the 10 largest servicers in the United States were responsible for servicing 67.2 percent of all outstanding residential mortgages. [These were]: Bank of America; Wells Fargo; JPMorgan; Citigroup; Ally Financial (GMAC); U.S. Bancorp n/a SunTrust Banks; PHH Mortgage; OneWest Bank, and CA (IndyMac)…"

Page 48

**Comment #23**: Clearly this list is very similar to the defendants, and of course, the number of defendants can be expanded upon by DOJ

"…as of June 2010, 63 percent of foreclosures occurred on homes where the loan was either owned or guaranteed by government investors such as Fannie Mae and Freddie Mac, while the remaining 37 percent of foreclosures were on homes owned by private investors."

Page 54

**Comment #24:** This is a poorly written sentence as it does not include the percentage of government guaranteed loans in FHA, and VA as opposed to Fannie and Freddie that were GSE.

"… after unilaterally halting foreclosure proceedings, both Bank of America207 and Ally Financial (GMAC) announced their intention to resume foreclosure

proceedings in the wake of internal reviews that did not uncover systemic irregularities, according to both firm."

Page 48

"Bank of America initially suspended foreclosure sales on October 8, 2010 across all 50 states after reviewing its internal foreclosure procedures. On October 18, 2010, the bank began amending and re-filing 102,000 foreclosure affidavits in 23 judicial foreclosure states, a process expected to take three to five weeks to complete. While asserting that it is addressing issues surrounding affidavit signatures, the company claims that it has not been able to identify any improper foreclosure decision"

Page 49

(There are further denials across on pages 50 and 51.)

**Comment #25:** Therefore Bank of America should be able to address this problem and provide accurate information as to the allegations contained herein.

"Industry analysts have noted that a three-month foreclosure delay could increase servicing costs and losses on foreclosed properties. In addition, banks could also face added litigation costs associated with resolving flawed foreclosure procedures. However, these estimates can of course become quickly outdated in

the current environment. As noted, firms that previously suspended foreclosures are now beginning to re-file and re-execute foreclosure affidavits, and market estimates accounting for shorter foreclosure moratoriums are currently unavailable. Although they have not been implicated in the recent news of foreclosure moratoriums, thousands of small to mid-level banks also face some risk from foreclosure suspensions if they act as servicers for larger banks. Generally, small community banks, as well as credit unions, are more likely to keep mortgage loans on their books as opposed to selling them in the secondary market. They primarily use securitization to hedge risk and increase lending power. Accordingly, foreclosure moratoriums would prevent small banks and credit unions from working through nonperforming loans on their balance sheets, limiting their capacity to originate new loans."

Page 51

**Comment #26:** This is further fear mongering.

"Thus far, loans originated in 2005–2008 have the highest concentration of repurchase demands. Repurchase volumes stemming from older vintages have not had a material effect on the nation's largest banks, and due to tightened underwriting standards implemented at the end of 2008."

Page 52

82

**Comment #27:** This is a critical admission as it does address the lower underwriting "no doc" standard at the time of Foster's mortgage in 2006.

"GSEs benefit from direct access to the banks' loan files and lower hurdles for breaches of representations and warranties due to the relatively higher standard of loan underwriting.

Page 53

**Comment #28:** This further demonstrates why there would be fraud on GSE's

"GSEs have already forced banks to repurchase $12.4 billion in mortgages. Bank of America, which has the largest loan portfolio in comparison to its peers, has received a total of $18.0 billion in representation and warranty claims from the GSEs on 2004–2008 vintages. Of this total, Bank of America has resolved $11.4 billion, incurring $2.5 billion in associated losses. "

Page 55

**Comment #29;** This once again shows the incentive for these lenders to not admit to more fraud,

"Bank of America offers a window into the comparatively slow rate at which private-label securities have been put-back to banks. Between 2004 and 2008, Bank of America sold approximately $750 billion of loans to parties other than

the GSEs.250 As of October 2010, Bank of America received $3.9 billion in repurchase requests from private-label and whole-loan investors. To date, Bank of America has rescinded $1.9 billion in private-label and whole-loan put-back claims and approved $1.0 billion for repurchase, with an estimated loss of $600 million."

Page 56

**Comment #30**: There is a huge difference between the loss of these put backs and those put backs that involve a GSE.

"However, the bank believes that it has turned the corner in terms of new repurchase requests from the GSEs. Further, the passage of time is apparently on the banks' side here, as JPMorgan Chase noted that breaches of representations and warranties generally occur within 24 months of the loan being originated. JPMorgan Chase noted that delinquencies or foreclosures on loans aged more than two years generally reflect economic hardship of the borrower."

Page 56

**Comment #31:** But all of these relate to fraudulent applications.

"Losses stemming from mortgage put-backs are viewed as the biggest potential liability of the banking sector from the foreclosure crisis. While it is difficult to quantify the impact this issue may have on bank balance sheets, a number of

84

analysts have compiled estimates on potential risks to the sector. The first step in estimating the industry's exposure is identifying the appropriate universe of loans, within the $10.6 trillion mortgage debt market. The 2005–2008 period is the starting point for this analysis. Of the loans originated during this period, $3.7 trillion were sold by banks to the GSE"

Page 57

**Comment #32:** This gives further perspective to put backs. But once again none of this addresses illegal foreclosures

"Projected Loan Losses—Delinquent or non-performing mortgage loans provide the initial pipeline for potential mortgage put-backs. Accordingly, estimates of cumulative losses on loans issued between 2005 and 2008 govern the aggregate put-back risk of the banks. The blended estimate for GSE loans is 13 percent, and the blended private label estimate is 30 percent.255 • Gross Put-backs—The next step is projecting what percentage of these delinquent or nonperforming loans holders will choose to put-back to the banks. The average estimate for gross put-backs for the GSEs is 30 percent, and private label loans is 24 percent. • Successful Put-backs—Of these put-back requests, analysts estimate that 50 percent of GSE loans and 33 percent of private label loans are put-back successfully to the banks."

Page 58

85

**Comment #32:** Once again this speaks to what most likely is sloppier work by the GSEs.

"The estimated $52 billion would be borne predominantly by four firms (Bank of America, JPMorgan Chase, Wells Fargo, and Citigroup), accounting for the majority of the industry's total exposure and projected losses.259 In the aggregate these four banks have already reserved $9.9 billion for future representations and warranties expenses, which is in addition to the $11.4 billion in expenses already incurred.260 Thus, of this potential liability, $21.3 billion has either been previously expensed or reserved for by the major banks.261 Given the timing associated with put-back requests and associated accounting recognition, it is not inconceivable that the major banks could recognize future losses over a 2–3 year period."

Page 59

**Comment #33:** What happened to this money that was set aside? It appears that it was successful in saving the lenders.

"Widespread put-backs could destabilize financial institutions that remain exposed and could lead to a precarious situation for those that were emerging from the crisis."

Page 69

86

**Comment #34:** This highlighted fears at the time as there is no question that this group would qualify for a putback.

"Policymakers Should Evaluate System-Wide Consequences of Documentation Irregularities. As disturbing as the potential implications of documentation irregularities may be for ''too big to fail'' banks, the consequences would not be limited to the largest banks in the market."

Page 69

**Comment #35:** This is an additional level of fear mongering on behalf of smaller banks.

"Mortgage Purchase Programs On September 7, 2008, Treasury announced the GSE Mortgage Backed Securities Purchase Program. The Housing and Economic Recovery Act of 2008 provided Treasury with the authority to purchase MBS guaranteed by GSEs through December 31, 2009. Treasury purchased approximately $225 billion in GSE MBS by the time its authority expired.360"

Page 92

**Comment #36:** This is important as this meant that there was no repurchase of MBS during the time period to which claim pertains.

"As of October 2010, there was approximately $154.6 billion in MBS still outstanding under this program.361 In March 2009, the Federal Reserve authorized purchases of $1.25 trillion MBS guaranteed by Fannie Mae, Freddie Mac, and Ginnie Mae, and $200 billion of agency debt securities from Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.362 The intended purchase amount for agency debt securities was subsequently decreased to $175 billion. All purchasing activity was completed on March 31, 2010. As of November 10, the Federal Reserve held $1.05 trillion of agency MBS and $150 billion of agency debt.364

Page 92

**Comment #37:** This **very important** as this means that as of the date of the occurrence that there were no more further repurchases, which is to say that the lender was on its own.

The Eleventh component of the **Blueprint** is **The Federal Lawsuit that was filed by Foster on the same day as this False Claim Act Claim was filed.** (The outright lies that were spread out over SIX years are staggering. And it will take a very serious effort to work through all of the detail in this pleading.) Please also know that the **Ledger** that is repeatedly referred to in Foster's complaint is included in this pleading as **Exhibit 6** not **Exhibit 1** as it is referred to in this section N.B The heading of this law suit is not

88

included in this section. Rather this section just begins with the pleading, which is as

follows:

Now comes Plaintiff pro-se Scott Rydin Foster ("Foster") and states as follows:

1): This matter is filed Pursuant to 18 USC 1344, and is filed within the federal statute

of limitations for financial institutions, which is ten years. This statute of limitations

does not include additional years that may be added wherein the statute of limitations

is tolled because of fraudulent concealment, which is precisely what occurred in this

matter. The first date of this cause of action began with the filing of a foreclosure law

suit in November 2010. And the first date of the discovery of the cause of action came

no earlier than December 2016.

2): Defendant PHH Mortgage is now wholly owned by Ocwen Loan Servicing.

Defendant Glen Messina is currently the CEO of Ocwen Loan Servicing and

beginning in 2012 was the CEO of PHH Mortgage. Defendant Jerome Selitto was the

CEO of PHH Mortgage from the beginning of the facts that constitute this pleading in

2010 to 2012. Nial Robbins, William Bellows, Siwatu Wilson, and Denisha Hunt were

Robo Signers for PHH Mortgage. Attorney Joseph Mungovan Herbas; Attorney

Thomas Joseph Belczak are both attorneys. Shapiro Kreisman & Assoc is a law firm.

3}:Belczak and Herbas were with the law firm of Shapiro Kreisman that represented

PHH Mortgage in the foreclosure matter (Cook County Chancery Court Case 2010-

CH-48036) which final order granting sale of Foster's condo located at 1212 West

Sherwin in Chicago was entered on August 3, 2017.This court is advised that Foster

has all of the 2800 pages of documents in that matter and can bring these to this

Honorable Court within a week.

4):However Res Judicata does not apply in this filing as there are thousands of cases that were decided in state courts that were decided differently in federal courts.

Moreover this in filed under a different claim.

5):  Foster and his late wife Halina Foster owned a huge 2800 square foot condo property  located at 1212 West Sherwin, Unit 2 in Chicago. It was purchased **for cash** in 2001 for $425,000, and the Fosters made significant improvements totaling $40,000 to the property in the first two years of owning the property.

6):  In 2004, they took out a "no doc" $285,000 mortgage with Cendant Mortgage on the condo. The mortgage was then transferred to PHH.

7):  Foster called PHH Mortgage about getting six months forbearance in February 2010. Foster was told that he needed to be caught up in his mortgage, after which he would be able to get six months forbearance. That is precisely what Foster did. 8):And over the next six months, Foster repeatedly called PHH Mortgage to get a confirmation in writing that he had gotten such, but no confirmation ever came.

9): Eventually in September 2010, he called PHH corporate and was told that PHH was no longer offering "that type of program",  and that he was going to be sued for foreclosure.

10): And on November 9, 2010, that is precisely what happened**.**

11): With most mortgages as was the case with Foster's mortgage, there are three required documents that are necessary to foreclose on a property. They have very specific language and very specific purposes. The first document is a **Notice of Intent to Foreclose,** which says that a certain amount of money has not been paid, and if the money has not been paid by a certain date, a law suit **may** be filed.

12): The second document is a **Notice of Intent to Accelerate**, which advises the mortgagee what monies are due and owing and that if the monies are not paid, that the full amounts due on the note will be accelerated with all monies in the note coming due.

13): The third document is a **Notice of Acceleration** , which means that the entire amount of the loan is due and payable (i.e accelerated), but there is almost always a redemption provision wherein the mortgagee can pay all back due monies owed on the loan plus various other costs as legal fees, and the loan is once again restored to its previous status.

14:) There were repeated assertions by PHH in various documents and even in what was essentially testimony in court by Thomas Belczak that Foster was given a required **Notice of Acceleration** pertaining to his mortgage foreclosure by PHH, which requirement was repeatedly acknowledged as such by PHH and which topic of both the **Notice of Acceleration** and a **Notice of Intent to Accelerate** was referenced numerous times in Foster's foreclosure action that lasted nearly SEVEN YEARS. To this day, Foster has never received a **Notice of Acceleration nor a Notice of Intent to Accelerate.**.

15): At an oral argument on January 28, 2015 with the Foster's attorneys and a court reporter present, Belczak is specifically recorded by the court reporter as saying,"…Again, I have the acceleration letter. I have an affidavit from my client saying they sent it.", to which the trial Judge Daniel Patrick Brennan responds: "I do think this acceleration letter has been  around for a while. He [Foster] raised the issue a long time ago."

Both Judge Brennan and Belczak were flagrant liars. There is not a single scrap of paper in the 2788 page Record that says **Notice of Acceleration** or even **Notice of Intent to Accelerate** both of which were **required** documents.

16): Moreover, there were repeated claims by PHH that the **Notice of Intent to Foreclose** (sometimes referred to by other lenders as a default notice) was the same document as a **Notice of Acceleration** and/or the **Notice of Acceleration**.

17): It is not. These are three separate and distinct documents, which distinction is readily acknowledged and known not only by lawyers nationwide who practice in this area but by phone representatives who interact with the public on behalf of any numbers of lenders/ holders of mortgages/servicers of mortgages.

18): It is certainly true, that a **Notice of Intent to Foreclose** was sent to Foster on April 6, 2010.

19): But while lack of either a **Notice of Acceleration** or a **Notice of Intent to Accelerate** was the **only** matter that needed to be dispositive in this matter such that summary judgment should have been granted in Foster's favor, the issues detailed below are relevant and further demonstrate just how filthy dirty PHH AND Judge Brennan's actions were in this matter.

20): PHH took 6 years and 9 days from the initial filing date in the foreclosure law suit to move forward with a **Third Motion for Sale** wherein they previously did not move forward on two prior Motions for Sale, for which there has never been any explanation as to why they waited that long or needed to file a **Third Motion for Sale**.

21): Nevertheless, in doing so they self-destructed along the way by presenting different contradictory/profoundly damaging information in each or the three Motions

for Sale during which PHH brought forth four different robo signers (all of whom claimed to be officers of PHH Mortgage where robo signer claims of **Notice of Acceleration** had two different dates, neither of which matched the acceleration date that is consistent with a detailed analysis of an all-important **Ledger** that was presented in the Third Motion for Sale and which detailed analysis of the **Ledger** was officially presented by Foster in response to the **Third Motion for Sale**, and which claims of acceleration dates were also directly contradicted by the actual records in the **Ledger** that was presented in the **Third Motion for Sale**, and which records also supported the **Detailed Analysis** by Foster of the **Ledger** that for the first time accompanied the **Third Motion for Sale**.

22): One of the rulings in this matter which pertained to Foster making clear that there was no **Notice of Intent to Accelerate** nor a **Notice of Acceleration** occurred on March 29, 2017, and which ruling led to the sale of Foster's property was by Circuit Court of Cook County Judge Daniel Patrick Brennan and was in OPEN DEFIANCE of the State of Illinois Appellate Court First Districts ruling in **Cathay Bank v. Accetturo 2016 Il App (1st) 152783** September 30, 2016, where the trial court judge was none other than The Honorable Daniel Patrick Brennan, and which opinion had already "came down" before Judge Brennan's ruling. **The Cathay court made clear that a Notice of Intent to Foreclose is not a Notice of Intent to Accelerate is not a Notice of Acceleration, and that the language of that Contract required that all three be filed as does the language and circumstances of Foster's contract.**

23): Therefore, this piece of human garbage/degenerate criminal scum bag Daniel Patrick Brennan actually defied the Illinois Appellate Court's ruling that pertained to

the same identical matter involving him. As a result, this essentially makes this a court de novo

24): Belczak, further claimed that there was a third date of acceleration, which was the date of the filing of the law suit, which was November 9, 2010.

25): Belczak also wrote in a same sentence that a **Notice of Intent to Foreclose**, which is what was actually filed on April 6, 2010 was the same item as a **Notice of Acceleration** was the same document as a **Notice of Intent to Accelerate.**

26): As of the filing of the foreclosure lawsuit on November 9, 2010, PHH took 6 years and 9 days to move forward with a Motion for Sale where they previously did not move forward on two prior Motions for Sale, for which there has never been any explanation to any court as to why they waited that long or needed to file a third Motion for Sale. (Of the over 120,000 foreclosure filings in Cook County during the time period of 2008 to 2016 this is almost certainly the longest time to file a Motion for Sale especially when there wasn't a single deposition, interrogatory that was filed or even a bankruptcy that was filed.)

27): The purpose of this delay was that PHH knew that Foster owed no money, that Foster knew that Foster owed no money, that Foster knew that neither a **Notice of Intent to Accelerate** nor a **Notice of Acceleration** was sent, and that if word got out in Cook County among other PHH mortgagees, there would be deep damage done to PHH

27): At one part in the process during the years 2014 and 2015, Belczak spent enormous time and energy in court trying to dispute Foster's claim that he was given forbearance by a telephone representative of PHH located in India, when all he needed

to do was to present an affidavit from PHH that it had no phone representatives in India. Yet in a document presented in the **Third Motion for Sale** 6 years and 9 days after the filing of the law suit it was made clear in a signed and sworn affidavit that **PHH did contact Foster by phone pertaining to an agreement of forbearance whereas in a previous signed and sworn affidavit included with the Second Motion for Sale, it was denied that PHH had contacted Foster.**

28): PHH brought forth four different robo signers whose claims of acceleration had two different dates, neither of which matched the acceleration date that was consistent with a detailed analysis of a **Ledger** that was officially presented in the Third Motion for Sale, and which motion was directly contradicted by the actual records that were presented in the **Ledger**. In that Third Motion for Sale, Belczak further claimed that there was a third date of acceleration, which was the date of the filing of the law suit on November 9, 2010. (This 11 page **Ledger** is attached to this complaint as Exhibit 1. The official title/heading of the **Ledger** is " **Customer Account Activity Statement**".

29): Belczak further wrote in the same sentence that a **Notice of Intent to Foreclose** was the same item as a **Notice of Acceleration**.

30): **Belczak** also wrote "Notwithstanding the Defendant's burden to plead and prove his affirmative defenses, the Plaintiff attaches hereto as Summary Judgment Exhibit "VI" an affidavit of Siwatu Wilson, Ms. Wilson avers that the **Notice of Acceleration** (emphasis added) was sent to the property address and a copy of said notice was kept as a part of the Plaintiffs business records. Plaintiff's Supporting Affidavit and copy of the **Notice of Intent to Accelerate** (emphasis added) affirmatively establish that said notice was sent to the Defendant.**" ,** Yet, **neither document is in the Record**.

31): And Ms, Wilson followed a near identical  tactic in her Affidavit Of Mailing wherein she wrote "On April 6,2010, PHH mailed a Notice of Intent to Foreclose Letter to Scott R. Foster at 1212 W. Sherwin, Unit #2 , Chicago, Illinois 60626.  The Notice of Intent to Accelerate Letter attached hereto as Exhibit 'A-1' is a true and accurate copy of the letter sent to Scott R. Foster on April 6, 2010."  Yet, there is no Notice of Intent to Accelerate. **So she has two different names for the same document in two consecutive sentences.**

32): A detailed analysis of the **Ledger** by Foster that was first put before the trial court in response to  **PHH's 368 page Motion for Default, Judgment of Foreclosure and Sale, Motion for Order Appointing Selling Officer and Motion for Summary Judgment** showed overwhelming evidence that Foster was and is telling the truth with respect to his having gotten forbearance and combined with the complete absence of **Notice of Acceleration** and **Notice of Intent to Accelerate** the analysis makes clear that Foster was entitled to damages as the result of his losses due to the defendant's absolutely knowing that Foster was given forbearance on March 1, 2010

33): To repeat. There has not been a single scrap of  paper in the 2788 page Record that says **Notice of Acceleration** or even **Notice of Intent to Accelerate**,

34): To repeat in a matter such as this foreclosure, there are three required documents. The first is a **Notice Of Intent to Foreclose**, which is dated as of April 6, 2010, and notwithstanding numerous claims to the contrary Foster has never disputed the authenticity of the document or the date of the document

35): But there is No Required Document named a **Notice of Acceleration** nor is there a Required Document named **Notice of Intent to Accelerate** both of which by the admission of its own lawyers PHH was required to send to Foster.

36): Foster also pointed out that there is simply no possible way or reason that the trial court Judge Daniel Patrick Brennan should have ruled that the Foster needed to know the names of the PHH representatives who promised him his forbearance on the mortgage of his condo at 1212 West Sherwin in Chicago during a number of telephone calls during the period between February 2010 and March 2010 as this would negate every single criminal prosecution and civil cause of action for telephone fraud throughout the United States simply because pursuant to Federal Trade Commission Regulations, telephone representatives are not required to give their names when making such phone calls. Support for this position is made **clearly** in both the writing and oral argument comments by three United States Supreme Court Justices in **Illinois ex rel. Madigan v. Telemarketing Assocs., 538 U.S. 600, (2003**), both of which Foster and his attorneys supplied to the trial court.

37): It should be noted that the $25,000 spent for legal expenses by Foster in his defense in this matter was paid to the firm of RDS Law, which is the husband and wife team of Joanne Sweeny and Bob Sweeny. Joanne Sweeny was on the team at Jenner and Block that won the largest jury verdict on behalf of an individual in the history of the United States of America, and in 2016 Bob Sweeny won the largest jury verdict in a defamation of character law suit in the history of Illinois. The Sweenys wanted Foster to settle the matter because there was no way in their opinion that Judge Brennan was going to be fair. Foster kept fighting.

97

38): Foster pointed out to the trial court that here were two issues (**Buyback Demand** and **Dual Tracking**. both of which pertain to the handling of "Fannie Mae" (Federal National Mortgage Association) backed loans that pertain to this property. 39):

    **Buyback Demand**. Specifically, if a mortgage originator/retail bank mishandled a Fannie Mae or Freddie Mac mortgage/loan, it became the mortgage originator/retail bank's responsibility for the loan and therefore the mortgage originator's/retail bank's loss. Again. This requirement is called a **"Buyback Demand"**. A **Buyback Demand** would be initiated by either Fannie Mae or Freddie Mac when the originating entity (mortgage originator/retail bank) did not follow guidelines in the underwriting manuals of Fannie Mae or Freddie Mac. It is the **Buyback Demand** that is what precipitated the fraud committed in this matter. This will clearly prove to be relevant in Foster's case, which unquestionably involved flagrantly criminal behavior. If the loan was not purchased by the mortgage originator/retail bank via a **Buyback Demand**, and the loan went into default, it became a **Mortgage Backed Security** guaranteed by the federal government, which losses were/are paid for by the federal government. Therefore, there was an **enormous incentive** for the mortgage originator/retail bank to do everything possible to "stick" Fannie or Freddie and therefore the federal government) with a loan that it had mishandled. As the result of the well-known drop in home prices not only in the Chicago area but throughout the nation and the other problems with the economy in 2010 there was a flood of foreclosures that resulted in huge losses being taken by Fannie Mae and Freddie Mac which losses were borne by the United States of America in the form of Mortgage Backed Securities. .It should be noted that low quality mortgage backed securities had

98

played a major role in the above referenced Subprime Mortgage Crisis that began in 2007 ,and that by 2010, there was little further tolerance in the United States Government for further Mortgage Backed Security losses, which unquestionably contributed to the fraud outlined herein. But by 2012, the market for high quality Mortgage Backed Securities had recovered and was a profit center for US mortgage lenders/retail banks

40): Foster also made clear to the court the concept of **Dual Tracking**

> A): Dual Tracking occurred when borrowers who called their lenders/servicers and were promised by phone forbearance. Forbearance was promised to people who were told to get behind on their loans to make them eligible for a modification. And when they got behind they were **simultaneously** put into a foreclosure track as well.

> (B): Belatedly, on May 1, 2013 the Illinois Supreme Court instituted rules to prevent **Dual Tracking** as well as other lender abuses, which were reflected in Illinois Supreme Court Rule 113, which pertains to Practice and Procedure in Mortgage Foreclosure Cases and Illinois Supreme Court Rule 114, which rules pertain to Loss Mitigation. Thus, it is important to know that in the United States during when Foster was Dual Tracked, **Dual Tracking** was NOT illegal. For the United States overall, the Consumer Financial Protection Bureau, which was established by the **Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010**, issued mortgage servicing rules that, after being codified into

federal law, went into effect as of January 10, 2014. These mortgage

servicing rules restricted but did not eliminate **Dual Tracking**.

41): Foster pointed out to the trial court the importance of the passage of **Dodd
Frank and a specific provision in Dodd Frank which read.** "SEC. 1401.
DEFINITIONS….(2) MORTGAGE ORIGINATOR.—The term 'mortgage
originator'—…(G) does not include a servicer or servicer employees, agents and
contractors, including but not limited to those who offer or negotiate terms of a
residential mortgage loan for purposes of renegotiating, modifying, replacing and
subordinating principal of existing mortgages where borrowers are behind in their
payments, in default or have a reasonable likelihood of being in default or falling
behind."

42): And what this resulted in was illegal retro application of Foster wherein Foster

had been granted forbearance but that unknown to Foster at the time Foster had been put

exclusively in the foreclosure track  And the only time, that Foster discovered this was

when he was presented with a Ledger of his account in November, 2016.

43): The **Ledger** which was included in the 368 page **Plaintiffs Motion for Default,**

**Judgment of Foreclosure and Sale, Motion for Order Appointing Selling Officer and**

**Motion for Summary Judgment** that was filed  on November 16, 2016 which Ledger

directly undercuts the three Affidavits of Due and Owing that were provided and sworn

to by three different PHH robo signers.

44): The last two Affidavits of Due and Owing were identical with respect the

miscalculation of acceleration charges claimed  and  not only does the first Affidavit of

Due and Owing contradict the second and third Affidavits of Due and Owing, but all

three are undercut by the subsequent detailed forensic analysis  by Foster of the all-

important **Ledger** contained in the huge 368 page **Motion for Default, Judgment of**

100

Foreclosure and Sale, Motion for Order Appointing Selling Officer and Motion for Summary Judgment.

45): The **Ledger** shows that there was a retroactive application of the above provision of **Dodd Frank..**

**(N.B. The Ledger is included in the Appendix, but none of the other documents that are referenced are included in the Appendix)**

A summary of the **Ledger** that was released and related documents and filings are as follows:

46): The ledger shows monthly payments made by Scott Foster and his late wife Halina, from the beginning of the loan in 2004. There is always a number code that accompanies any monthly payment or other charge that was made. Because the terms of the monthly payment did not change for seven years, and the foreclosure claim was not filed until the sixth year of the loan, the monthly payment amount never changed nor did the code. But there were times, when Foster did not pay his mortgage payment on time even in 2009. The code for that charge was always the same. Then, at the end of February, 2010, the ledger makes clear that Foster was three mortgage payments behind, and that on March 25, 2010, he made three payments of $ 1276.35, which means that he was behind one payment as of March 1, 2010, (as he was instructed to be by PHH) which would be his March 2010 payment, which would be the **first month** of the six month's forbearance that he was promised. The ledger shows that there were four late payment charges due at that time. But because Foster had been put into a **dual tracking** status there is an ongoing monthly late charge for a late payment , and that charge is the same

amount and the same code as that leveled for previous late charges. This charge and code only lasted until **before** the passage of **Dodd Frank** on July 21, 2010. After that date of July 21, 2010 the coding changes and the amount of charge changes,

46): And that change in coding and change in amount charged is consistent with the acceleration of the loan, which acceleration is consistent with the passage of Dodd Frank, which as noted did not assign any liability to any improperly performed modification done by a third party AFTER the date of the passage of Dodd Frank.

47): In turn, this contradicts the three various acceleration times/explanations that PHH has given, And the change in codes supports Foster's claim that he got forbearance, but that the forbearance was cut short by one month.

48): And from there the law suit was not filed against Foster until after September 21, 2010 when PHH realized that because it had chosen to accelerate the loan on Foster's account, it could not offer a longer or different forbearance because of the new requirements by Fannie Mae that were announced on September 21, 2010. And why was the loan NOT revealed as being accelerated when it was, which was just after the passage of Dodd Frank? Because that would have tipped of Fannie Mae as to what PHH was actually doing! And it also would have tipped off Foster as to the fraud that had occurred.

49): The greatest problem for PHH is that the ledger not only contradicts the three Affidavits of Due and Owing but it also supports Foster's account of what happened **to perfection**

50): The first Affidavit of Due and Owing submitted has the correct amount of pre acceleration charges that correspond to the exact penny in the ledger, which in turn supports Foster's claim that he received forbearance until the passage of Dodd Frank ,

while the second and third Affidavits of Due and Owing have amounts that do not correspond to the pre acceleration amounts that are shown in the ledger and therefore do not correspond to the date when the loan was accelerated. Moreover, the amounts claimed as pre acceleration charges in the second and third affidavits of Due and Owing are such that the acceleration had to have occurred on the Date that the **Notice of Intent to Foreclose was filed on April 6, 2010**, while the Mortgage makes clear that the earliest an acceleration could have (but not necessarily) occurred was 30 days later, which in turn means that there should have been at the very least one pre acceleration charge added.

51):The trial court was advised that in the initial (first) '**Plaintiffs Motion for Default, Judgment of Foreclosure and Sale and Motion for Order Appointing Selling Officer,** which was filed on January 13, 2012 but for which PHH never moved forward, there was included an "Affidavit of Indebtedness and Amounts Due and Owing," (heretofore referenced as **Affidavit of Due and Owing #1,** which was signed by Robbins and indicated that he was an "Assistant Vice President" at PHH.

52):    Foster would subsequently challenge the assertion that Robbins was an "Assistant Vice President" of PHH when he asserted that Robbins was a document signer who lived in Florida.

53):    In the **Affidavit of Due and Owing #1** from Nial Robbins, Robbins listed Pre Acceleration Late Charges at $529.91 (Pre acceleration charges are just that. They refer to charges that are levied **before** the acceleration of a mortgage, wherein the entire mortgage is called in as due and the mortgagee has a limited time in which to pay all sums due as of that date.) Furthermore, Robbins wrote, "The borrowers were due for the March 1, 2010 monthly payment when the complaint herein was filed. The Plaintiff has

elected to accelerate the loan making the entire balance due and owing pursuant to the terms of the loan documents." Robbins assertion that the complaint against Foster was filed on March 1, 2010 was clearly not true as the complaint was filed on November 8, 2010 not eight months before in March 1, 2010.

54): But Foster later pointed out that the word "when" is defined as 1) at or during the time that... .or 2) after which; and just then (implying suddenness). So the Robbins document with respect to the date of the filing of the complaint against Foster was and is a lie. But since there was no Ledger of any sort presented until October 7, 2014 when the second Motion for Sale was filed (and subsequently withdrawn) Foster had no way of knowing in early 2012 at the time Robbins Affidavit was presented just how much a pre acceleration charge was on a monthly basis, and therefore how a pre acceleration charge was calculated.

55): Indeed, on October 6, 2014, Foster's Attorneys filed pursuant to a court order **Defendant's Counterclaim**. And as noted above one day later , on October 7, 2014, Attorney Thomas Belczak on behalf of PHH filed "**Plaintiff's Motion for Default Judgment of Foreclosure and Sale, Motion for Order Appointing Selling Officer, Motion for Summary Judgment and Notice of Change of Law Firm.** To believe that the timing of the filing of this motion is coincidental is to believe in the tooth fairy.

56:) This was the second **Motion for Order Appointing Selling Officer**. Attached to this Motion was **Affidavit of Amounts Due and Owing #2** William Bellows (as did Nial Robbins) identified himself as an Assistant Vice President at PHH Mortgage. Also attached to this Motion was the **Ledger** of Foster's account. The Ledger is unquestionably the most important document in this matter. Nevertheless, because PHH

once again failed to move forward on this motion, there was no reason for Foster or his attorneys to look at the **Ledger** with any attention to detail.

57:) Finally, PHH filed the same Ledger along with the **third** Affidavit of Due and Owing filed by Daneisha Hunt as part of PHH's **368 page Motion for Default, Judgment of Foreclosure and Sale, Motion for Order Appointing Selling Officer and Motion for Summary Judgment.**

58): Because it was for the first time before the court in a Motion that was to be reviewed by the court, it was only then that Foster provided an all-important detailed analysis of the entire ledger, which **Ledger** was analyzed in detail in Foster's brief titled **Defendant's Response Brief to Plaintiffs Motion For Summary Judgment As to the Plaintiff's Complaint and Motion for Summary Judgment on the Defendant's Affirmative Defense.**

59): And a summary of this detailed, very specific and very important analysis/"smoking gun" that is provided at is as follows: 60): One of the columns is titled "Interest Amount" Under this column titled "Interest Amount" are numerous entries for $1276.56, which amount corresponds to Foster's monthly payment. Under the column "Transaction Code, there is always the number "172" or number "173", which both correspond to the payment of $1276.56 or once again, the monthly payment. The number "172" or "173" under the transaction code section corresponds to his monthly payment as well. One of the columns is titled "Fees Assessed" Under the column "Fees Assessed", there are numerous entries with the amount of $63.82 or $63.81. These correspond with a "Transaction Code" number of "152." That charge and the number correspond to a late fee being charged by PHH. Most importantly, these late fees correspond to pre

105

acceleration/late charges. **Clearly, there can be NO pre acceleration/late charges if a loan has already been accelerated**.

60):     The reason Foster is certain these are pre acceleration/late charges is because all three Affidavits refer to the specific monthly amount with this  number as pre acceleration/late charges, even though they are also called late fees. As such, Foster is referring to this as pre acceleration/late charges. The first time this fee was entered was on February 16, 2005, albeit not consecutively until March 1, 2010, and the last time was on July 18, 2010, just before Mr. Obama signed into law **Dodd Frank** on July 21, 2010. This is extremely important and is part of the "smoking gun" as this means that until **Dodd Frank**, Foster's charges as recorded on his Ledger were pre acceleration/late charges. And of course, this corresponds to the time period wherein Foster insists he had forbearance until the passage of Dodd Frank, only after which his mortgage was accelerated (Both Code 152, and the amounts of either 63.82 or $63.81 will be referenced as a pre acceleration/late charges code and pre acceleration/late charges respectively.)

61):     One of the columns is titled "Transaction Code" for which there are three different codes and amounts Under the column "Transaction Code" is the number "132". This code first appears on February 23, 2010 with a charge of $13.25, after which there is no such code or charge until August 24, 2010. But then this code begins to run consecutively from August 24, 2010, and it runs without interruption on a monthly basis until very end of the document on February 24, 2014. The amount of this charge is (with the exception of the first charge of $13.25) $11.25, and it corresponds to charges that were made AFTER the acceleration of the mortgage actually began, which acceleration corresponded not to the forbearance period of six months but to the passage of Dodd

106

Frank, which occurred one month before the end of the promised Forbearance Period in August 2010. This code and accompanying charges is extremely important as this is a charge for the acceleration of the mortgage after the mortgage has been accelerated. This code and accompanying charge is also part of the "smoking gun" in this case as this means that only AFTER the enactment of Dodd Frank were Foster's charges changed to acceleration charges. (Both Code 132, and the amount of $11.25 will be referenced as the acceleration code and the charges for acceleration). Moreover, the first time the code was entered on February 23, 2010 is consistent with Foster's claim that he was given forbearance after he got caught up on his mortgage such that forbearance began in March 2010. PHH calls this a fee for "checking occupancy." The Ledger further shows two extremely important pieces of information with respect to Foster's record. Specifically, on March 25, 2010, there were three payments credited to Foster's account of $1276.35 each, which payments were for the months of December 2009, January 2010, and February 2010. Therefore, the payment of these three months is utterly consistent with Foster's assertion that he was told he needed to be caught up first before he could begin his forbearance as of his March payment. (These three payments are coded as 173, which is the standard monthly payment code and which payment amount was made from the very beginning of the mortgage in 2004 pursuant to the terms of the mortgage. As noted, only after the signing of Dodd Frank into law on July 21, 2010 was there (with one prior exception on February 23, 2010) an acceleration charge of Foster's mortgage, which charge was $11.25, and which monthly charge was first levied on August 24, 2010, which would have been the sixth month of forbearance. (The above referenced exception of February 23, 2010 will be addressed shortly in this brief)

107

62):    The pre acceleration/late charges on Bellows Affidavit (Affidavit Due and Owing #2) were listed **not** as $529.91 as they had been on the Nial Robbins Affidavit (Affidavit of Due and Owing #1) but instead as $274.68. As noted above, the code for the pre acceleration/late charges/late fees is 152. And the amount of pre acceleration/late charges/late fees listed along with another charge in the Ledger is within one penny of the Bellows Affidavit, ONLY with respect to pre acceleration/late charges/late fees prior to the Notice of Intent to Foreclose, which is dated April 6, 2010 and which amount on the Notice of Intent to Foreclose is listed $274.68.

63):    Specifically, the $274.68 on Bellows Affidavit is a combination of four pre acceleration/late charges/late fees of $63.61 apiece, which totals $254.44. These four pre acceleration/late charges/late fee charges are on December 16, 2009, January 19, 2010, February 16, 2010, and March 15, 2010. Plus, there is a "suspense amount" that is coded 173 (payment of interest that is a credit of $44.38, which date of credit is November 18, 2009. And when the $44.38 is deducted from a fifth pre acceleration/late charges charge of $63.61, which is dated November 16, 2009, the amount is one penny short of the $274.68. Therefore, the amount referenced by Bellows is unquestionably for charges before April 6, 2010 ONLY--when there are unquestionably pre acceleration/late charges after April 6, 2010 that Bellows unquestionably should have added.

64):    But there is another charge and code that occurred during this time, which charge makes it even clearer that Foster was unquestionably given forbearance after having gotten caught up on his mortgage by paying for December 2009 through February 2010. This is a SINGLE charge of $13.25 that is coded 132, which code number corresponds to ACCELERATION charges that are also listed continuously in the Ledger beginning in

108

August 2010 and, which charges were assessed on a monthly basis until the end of the Ledger in 2014. The date of this acceleration charge of $13.25 is February 23, 2010. But then on March 25, 2010, Foster made the aforementioned three monthly payments, and the charges went back to being pre acceleration/late charges/late fee charges until August 24, 2010. Thus, this gives further credence to Foster's claim that his mortgage was not accelerated until August 24, 2010. And it unquestionably makes clear that Foster was given forbearance, or the acceleration charge would not have been changed back to a pre acceleration/late charge. Rather there would have been continuous acceleration charges starting at the end of March rather than the renewal of pre acceleration/late fee charges in March 2010

65): Furthermore, the Notice of Intent to Foreclose that is included with Bellows submission means that with the exception of one further pre acceleration/late charge going forward after April 6, 2010 there should be no further pre acceleration/late charges/late fee charges. Why? Because any subsequent charges made after the mortgage was accelerated would of necessity be acceleration charges. But that is not what occurred as there were clearly three pre acceleration/late charges of $63.61 on Foster's account for June (16th) 2010, and July (16th) 2010 as well as May (17th ) 2010. Clearly, there could not and would not have been pre acceleration/late fee charges for May 2010, June, 2010, and July, 2010 if the mortgage had been accelerated in May, 2010 as would have happened if the Notice of Intent to Foreclose had been followed 30 days after it was served. Rather, the Ledger refutes Bellows Affidavit with respect to his claim of when acceleration began, and the Ledger makes clear that the acceleration charges began only on August 24, 2010, when $11.25 was charged with a code of 132. Therefore, the

109

primary deficiency of Bellows Affidavit is that he does not have the correct amount of pre acceleration charges in his Affidavit which charges end on July 18, 2010 but instead he cuts short the amount of pre acceleration/late charges as of April 6, 2010. And even then, he is one month short because the clear language of the Notice of Intent to Foreclose in relevant part states,... "In the event you do not cure the default in full within THIRTY (30) days from the date of this letter (as provided by the terms of the mortgage, payment of the current principal balance will be accelerated and foreclosure proceedings will be initiated."

66): Nevertheless, Bellows Affidavit unquestionably refutes Robbins claim that there was $529.91 in pre acceleration/late charges as of March 1, 2010. Obviously it means the Robbins' claim that the law suit against Foster was filed on or about March 1, 2010 is false as clearly, it is simply not possible for Foster to have had $529.91 in pre acceleration/late charges on or about March 1, 2010, when the pre acceleration/late charges in Bellows Affidavit were listed as $274.68 on April 6, 2010, and Bellows amount is accurate to within one penny as of that date only. 67):Therefore, with respect to the accurate calculation of all pre acceleration/late fee charges, Robbins is accurate to the penny as to what actual pre acceleration/late fee charges actually were. 68):However, Robbins is lying about the date upon which the law suit was filed and therefore the last date upon which the last pre acceleration/late charge was added to Foster's Ledger. (By contrast, Bellows is lying about the total amount of pre acceleration/late charges as well as the last date upon which a pre acceleration/late charge was added to Foster's Ledger as is Robbins.)

110

69):    The calculation that shows how Robbins arrived at the amount of $529.91 is as follows: It should be first noted that as of November 13, 2009, there were no pre acceleration/late fee charges due on Foster's Ledger because those pre acceleration/late fee charges on Foster's account that had previously been listed as pre acceleration/late fee charges were paid on that date. This is because on this date, there was $382.66 paid by Foster, which payment went to paying six previous pre acceleration/late fee charges that totaled $381.66. Therefore, only those pre acceleration late fees/charges that came after this date could be included with Robbins calculation.

70):    And that is exactly what occurred. Because after this date there accumulated $574.29 in pre acceleration/late fees. (nine charges of $63.81 apiece.). The first such charge was on November 16, 2010, and the last such charge was on July 16, 2010

71):    And if one deducts 44.38 that was deducted from Foster's Ledger on November 18, 2009 two days AFTER the first pre acceleration/late fee that was added to Robbins' calculation on November 16, 2010, from the above amount of $574.29, the remaining amount is $529.91, which is the exact amount in Robbins calculation. (Please note that The $44.38 is coded as a "Suspense Amount".

72):    As such, this is a profoundly damning calculation that shows clear criminal intent by Robbins. Why? Because Robbins knew enough NOT to include the ACCELERATION charge of $13.25 on February 23, 2010, and of course, he did not include the acceleration charges that ran consecutively as of August 23, 2010. Rather the charges he calls pre acceleration/late fees and for which he charges Foster on his Affidavit of Due and Owing end as of July 16, 2010 which date is five days before Dodd Frank was passed. And most importantly, Robbins writing makes clear that the specific

monthly charges that Robbins identifies as late fees were actually charged at a point much later than the March 1, 2010 date that Robbins claimed was when the foreclosure suit was filed against Foster. And it is no later than March 2010 when Robbins Affidavit indicates all pre acceleration charges had accrued. Therefore, Robbins was referring to the Notice of Intent to Foreclose, which did reference March 1, 2010 but was not served until 37 days later.

73): Furthermore, this analysis raises the question as to why Robbins did not submit either a Ledger or Notice of Intent to Foreclose. The monthly charges to which Robbins refers are correct as to amounts. But because no Ledger was submitted by Robbins the context of his calculation is missing and with good reason. Why did Robbins do it this way? Because Robbins **unquestionably** knew when the actual acceleration of the mortgage began because his own numbers/accounting substantiate the fact that the acceleration of the mortgage began only after July 21, 2010!

74): Therefore, Bellows lied about the amount and final date of the pre acceleration charges so as to cover-up the last date of such a charge because the correct last date of that charge is proof positive of Foster's version, which that he was given forbearance. And Robbins lied about the date of the lawsuit so as to similarly cover up for the dates upon which the late charges were assessed. 75): And why did Bellows use the phrase "Late charges Prior to the Acceleration of the Subject Loan" and not include the all-important acceleration charge of $13.25 on February 23, 2010? Because that charge showed that Foster did for a short time have his loan accelerated, but that the acceleration was withdrawn when Foster was given Forbearance.

112

76): It is this simple. Either the Ledger and Notice of Intent to Foreclose are willful lies/forgeries or the three Affidavits are willful lies/forgeries. Absent some sort of proof to the contrary, the Ledger is unquestionably correct and accurate. And the Notice of Intent to Foreclose is also an accurate document. Thus, the issue becomes what to make of the three **Affidavits of Due and Owing**, because perforce **Affidavit of Due and Owing #1** is a lie with **respect Affidavits of Due and Owing #2 and #3** because these two **Affidavits of Due and Owing** are identical as to amount of pre acceleration charge. **Most importantly, if even a mere one of the three Affidavits of Due and Owing is correct, then the Ledger and the Notice of Intent to Foreclose are both lies/, simply because none of the three Affidavits of Due and Owing are consistent with either the Letter of Intent or the Ledger**

77): **And from there the ultimate question needs to be asked of PHH. Why was Foster's mortgage accelerated after the passage of Dodd Frank? The answer is that the intent of both these two lies is to cover-up the fact that the real beginning of acceleration began after the passage of Dodd Frank on July 21, 2010, and that no liability would be assigned to PHH under the provisions of Dodd Frank. If this is not true, why otherwise would they BOTH lie?**

78): Thus, there is no question that the release of the Ledger supports with no contradiction whatsoever, Foster's assertion that he was given forbearance as of the March 1, 2010 payment due date, and that to get forbearance, he needed to be caught up in his monthly payments, and that his mortgage was only permanently accelerated after the passage of Dodd Frank on July 21, 2010, at which time his forbearance was cut short

by one month because of PHH's action taken in response to the passage of Dodd Frank on July 21, 2010.

79): Finally, as noted there is the claim by PHH's Attorney Tom Belczak that the Notice of Acceleration was the filing of the law suit on November 8, 2010 Therefore Tom Belczak has two different Notices of Acceleration 7 months and 4 days apart!

80): The Notice of Intent to Foreclose, which Foster readily acknowledges was sent on April 6, 2010 and for which it makes no difference whether Foster received it states in its entirety:

> *Dear Customer (s): The mortgage on your property is in default for the March 01, 2010 payment and is now 2 months past due. At this writing, the TOTAL AMOUNT required to cure your default is $2,552.76. To AVOID FORECLOSURE, we are demanding that you make a payment in CERTIFIED FUNDS" for the total amount due.*
>
> *In addition, please be advised as of the date of this letter $274.67 in late charges have also accrued. In the event you do not cure the default in full within THIRTY (30)days from the date of this letter (as provided by the terms of the mortgage) payment of the current principal balance will be accelerated and foreclosure proceedings will be initiated.*
>
> *"**You are further informed you have the right to reinstate this loan after acceleration pursuant to, and subject to, the provisions and limitations of said Mortgage** (emphasis added) and that you have a right to bring a court action asserting the nonexistence of a default, or any other defense you may have to foreclosure and sale."*

114

*If you disagree with the assertion that a default has occurred or the*

*calculation of the amount required to cure the default, you may contact us at*

*1 800 330 0421. This is an attempt to collect a debt, any information*

*obtained will be used for that purpose.*

81): The document titled **"Mortgage"** is ubiquitous throughout the Record appearing at least 25 times.

Section 19 of the Mortgage reads in its entirety:

*Borrower's Right to Reinstate After Acceleration. If Borrower meets*

*certain conditions, Borrower shall have the right to have enforcement of*

*this Security Instrument discontinued at any time prior to the earliest of:*

*(a) five days before sale of the Property pursuant to Section 22 of this*

*Security Instrument; (b) such other period as Applicable Law might*

*specify for the termination of Borrower's right to reinstate; or (c) entry of*

*a judgment enforcing this Security Instrument. Those conditions are that*

*Borrower: (a) pays Lender all sums which **then would be due** (emphasis*

added) *under this Security Instrument and the Note **as if no acceleration***

***had occurred;** (emphasis added) (b) cures any default of any other*

*covenants or agreements; (c) pays all expenses incurred in enforcing this*

*Security Instrument, including, but not limited to, reasonable attorneys'*

*fees, property inspection and valuation fees, and other fees incurred for*

*the purpose of protecting Lender's interest in the Property and rights*

*under this Security Instrument; and (d) takes such action as Lender may*

*reasonably require to assure that Lender's interest in the Property and*

115

*rights under this Security Instrument, and Borrower's obligation to pay*

*the sums secured by this Security Instrument, shall continue unchanged*

*unless as otherwise provided under Applicable Law. Lender may require*

*that Borrower pay such reinstatement sums and expenses in one or more*

*of the following forms, as selected by Lender: (a) cash; (b) money order;*

*(c) certified check, bank check, treasurer's check or cashier's check,*

*provided any such check is drawn upon an institution whose deposits are*

*insured by a federal agency, instrumentality or entity; or (d) Electronic*

*Funds Transfer. Upon reinstatement by Borrower, this Security Instrument*

*and obligations secured hereby shall remain fully effective as if no*

*acceleration had occurred. However, this right to reinstate shall not apply*

*in the case of acceleration under Section 18.*

82):  Obviously to enforce the above section PHH would have had to have

notified Foster as to how much money Foster would have had to pay the Lender

pertaining to all sums *which "**then would be due** (emphasis added) under the Security*

*Instrument and the Note **as if no acceleration had occurred;** (emphasis added)"*. And

do that, the absent Notice of Intent to Accelerate and absen Note of Acceleration

would have had to have been filed.

83):  Moreover, Section 15 of the Mortgage states in relevant part:

*15 Notices:  All notices given by Borrower or Lender in connection  with*

*this security instrument must be in writing. Any notice to Borrower in*

*connection with this Security Instrument shall be deemed to have been*

> *given to Borrower when mailed by first class mail or when actually*
>
> *delivered to Borrower's home address if sent by other means…*

84): So even if there had been no forbearance given to Foster there would not only be a Notice of Acceleration required prior to the filing of the foreclosure law suit, but there also would have been required an entry of the mailing of the Notice of Acceleration.

85): Section 22 of the Mortgage reads in its entirety:

> *Acceleration; Remedies. Lender shall give notice to Borrower **prior** (emphasis added) to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument but not **prior** (emphasis added) to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, **not less** (emphasis added) than 30 days from the date the notice is given to Borrower, by which the debt must be cured; and (d) that failure to cure the default on or before the date specified in the notice **may** (emphasis added) result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate **after** acceleration (emphasis added) and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option **may** (emphasis added) require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this security Instrument by judicial proceeding.*

> *Lender shall be entitled to collect all expenses incurred pursuing the remedies
> provided in this Section 22, including, but not limited to, reasonable attorneys'
> fees and costs of title evidence.*

86):     This "right to reinstate after acceleration" is made explicit and is verbatim in the above referenced part of the Mortgage.

87):     Moreover, because as already noted in the above argument PHH has repeatedly stated/misstated, the loan was accelerated long before the law suit was filed so there is no way that the filing of the law suit is by itself the Notice of Acceleration.

88):     Not only was there no Notice of Acceleration, but the very language of what is required in the Notice of Acceleration by itself eliminates two of the three claimed dates of acceleration by PHH. Therefore this raises the issue of condition precedent, which of course is generally defined as "…an event or state of affairs that is required before something else will occur. In contract law, a condition precedent is an event which must occur, unless its non-occurrence is excused, before performance under a contract becomes due, i.e. before any contractual duty exists."

89):     The first two dates of Acceleration eliminated are the claimed amounts due in the three Affidavits of Due and Owing Bellows as well as the identical numbers provided by Denisha Hunt which eliminates one date. As already noted, the Acceleration Date of the pre acceleration charges of both Hunt's and Bellows affidavit would mean that the Notice of Intent to Foreclose is the same date as the Acceleration Notice Date. And Robbins' claim in his Affidavit of Due and Owing is deficient because Robbins claimed that the mortgage was accelerated even before the Notice of Intent to Foreclose was filed.

(Obviously a mortgage cannot be accelerated 38 days before there is a document that says it **may** first be accelerated.)

90): And it is truly insane for Tom Belczak to make a dual claim that that the Notice of Intent to Foreclose of April 6, 2010 is the same document as a claimed Notice of Acceleration and that the Notice of Acceleration was the filing of the law suit on November 8, 2010.

91): Furthermore on October 30, 2014 Foster's attorneys filed **Defendant's Motion for Leave to Amend Answer to Add Affirmative Defenses.**

92): In that document is the following affirmative defense that is most relevant to this filing:

"Plaintiff failed to perform conditions precedent to the initiation of this action and/or for acceleration of payment allegedly due, **including failing to serve an acceleration notice** (emphasis added). As a result, defendant has been denied a good faith opportunity, pursuant to the mortgage and the servicing obligations of the plaintiff, to avoid acceleration and this foreclosure."

93): Then on December 1, 2014 Foster's attorneys filed **Defendant's Response to Plaintiff's 2-615 Motion to Dismiss Defendant's Counter-Complaint** And in that Motion, there is contained the following writing:

"Plaintiff first argues that 'Mr. Foster failed to identify the term of the contract breached and failed to allege any damages.' That is patently false. Mr. Foster's claim clearly states that the contract has an **acceleration clause** (Emphasis added) that Plaintiff breached and that he suffered damages as a result — specifically failing to be put on notice that Plaintiff, which had directed him to fall behind on

119

his mortgage payments, was going to sue for the entirety of the mortgage thereby giving him no opportunity to cure any problem before being sued in a court of law. The whole purpose of the **acceleration notice** (Emphasis added) is to give the mortgagee an opportunity to make any back payments before the entirety of the mortgage becomes due and owing — should a lender intend to take that route. Had he had the notice, Mr. Foster could have made the six months of back payments. Plaintiff's failure to notify him, as required by the contract, prevented him from curing any breach and landed him in the middle of a lawsuit that he is forced to defend."

94): So there is no question that the lack of an acceleration clause was repeatedly raised by Foster's attorneys and as early as his **Motion to Dismiss** wherein Foster specifically wrote ": Defendant has NO recollection of having received any such notice to cure via first class mail. (This is noted in Defendant's notarized statement attached as Exhibit B.)" .Nevertheless, this motion was denied on July 3, 2012.

95): And as already noted, the lies would continue in oral argument on January 28, 2015:

MR. BELCZAK: …Again, I have the acceleration letter. I have an affidavit from my client saying they sent it.

And at the same oral argument Judge Brennan says: "**I do think this acceleration letter has been around for a while. He [Foster] raised the issue a long time ago**."

96): And there were further lies in **Plaintiff's Response to the Affirmative Defenses** wherein PHH responded to the following:

"15: PHH had a contractual duty to provide Mr. Foster with an acceleration notice.

RESPONSE: *Plaintiff admits that the subject mortgage requires the Plaintiff to submit an acceleration letter prior to accelerating the mortgage and filing a complaint to foreclose. Plaintiff affirmatively asserts that a* **Notice of Intent to Foreclose** *was sent to Scott Foster of April 6, 2010*

97): Obviously a Notice of Intent to Foreclose is NOT a Notice of Acceleration NOR a Notice of Intent to Accelerate.

98): Moreover, Foster also filed **Motion to Compel Plaintiff to Produce a copy of the acceleration letter that it claims to have sent in its "Motion for Summary Judgment on the Defendant's Affirmative Defense(s)"** That motion was never ruled upon

99): Moreover, PHH never produced documents pertaining to Foster's original extremely detailed document request that was presented in court. These requests included ": Please describe plaintiffs policies and procedures for filing a foreclosure notice on a residential loan"

100): On November 29, 2016, there was filed the Third Motion for sale , when as noted, the prior two Motions for Sale were never followed up upon by PHH but were just left to languish. The third Motion for Sale was titled **Plaintiffs Motion for Default, Judgment of Foreclosure and Sale, Motion for Order Appointing Selling Officer and Motion for Summary Judgment as to Plaintiff's Complaint**. Remarkably, this Motion was filed six years and 9 days after the initial filing of the law suit seeking foreclosure on

121

November 8 2010 . The most significant part of this massive filing is the **Motion for Summary Judgment as to the Plaintiff's Complaint**

101):   Also part of this motion is the following writing:

"Notwithstanding the Defendant's burden to plead and prove his affirmative defenses, the Plaintiff attaches hereto as Summary Judgment Exhibit "VI" an affidavit of Siwatu Wilson, Ms. Wilson avers that the **Notice of Acceleration** (emphasis added) was sent to the property address and a copy of said notice was kept as a part of the Plaintiffs business records. Plaintiff's Supporting Affidavit and copy of the **Notice of Intent to Accelerate** (emphasis added) affirmatively establish that said notice was sent to the Defendant."

102):   **Clearly, Belczak  wrote in the same sentence  that the Notice of Acceleration is the same document as a Notice of Intent to Accelerate. And to once again repeat there is neither document in the Record on Appeal.**

103:   Ms, Wilson followed a similar tactic in her Affidavit Of Mailing wherein she wrote:

"On April 6,2010, PHH mailed a Notice of Intent to Foreclose Letter to Scott R. Foster at 1212 W. Sherwin, Unit #2 , Chicago, Illinois 60626. The Notice of Intent to Accelerate Letter attached hereto as Exhibit 'A-1' is a true and accurate copy of the letter sent to Scott R. Foster on April 6, 2010."

103):   So she has two different names for the same document in two consecutive sentences. **As such, there is a clear conspiracy involving PHH and the plaintiff attorneys with was the third Robo Signer of an Affidavit of Due and Owing.!**

122

104): `It is also with this filing (the third Motion for Sale) that first appears two of the most shocking revelations in this matter. Specifically, with the previously referenced Affidavit of Due and Owing by Bellows, there was also a document titled **Loss Mitigation Forbearance**. And on that document is the following entry:

> "I have performed or caused to be performed a review of the records maintained in the ordinary course of the business of my employer relating to the subject mortgage loan, and based upon that review, the subject mortgage loan is eligible for the following loss mitigation programs."

105): And there is a checklist of seven different programs including Forbearance, which is checked. Then there is a second checklist which reads:

> "For each of the programs listed above, the following steps have been taken by the mortgagee to comply with its obligations under such program"

106): And the third entry reads:

> "Mortgagee offered loss mitigation/foreclosure alternative options to borrower(s) when communicating to borrower(s) over the phone"

107:) In this affidavit, Bellows did **NOT** check that box, which is to say that PHH denied ever communicating with Foster over the phone on any matter including Forbearance. This document is dated April 28, 2014 and it was presented to the court on October 7, 2014.

108): But there is a second identical affidavit format submitted by Denisha Hunt, which is dated March 22, 2016 (almost two years later), and in that instance, the document also has a check for Forbearance, but in this instance the box that includes the phrase

"Mortgagee offered loss mitigation/foreclosure alternative options to borrower(s) when communicating to borrower(s) over the phone" is **CHECKED.**

109): Yet, PHH and its attorneys previously both denied any phone contact with Foster and repeatedly fought the repeated claim of Foster made that phone calls there were phone calls made granting forbearance, yet now 6 years and 9 days into the law suit, PHH admitted to just that.

110): In the same filing, there is an **Affidavit Of Amounts Due And Owing t**hat is authored by Denisha Hunt (This is the third Affidavit of Due and Owing to which Foster has previously referred ). On the top line of there is an entry that reads. "Late Charges Accrued Prior to the Acceleration of the subject loan" And the amount entered is $274.67, which is identical to that or Bellows.

111): But within this filing is a heading labelled "Supporting Documentation", and there is a series of entries that read "Late Charges" Each late charge is documented. And the last entry is on July 16, 2010, and those cumulative late charges are $510.48. **Clearly, there cannot be late charges on a loan that has been accelerated.** This information also demonstrates that Foster was granted forbearance by PHH, which was cut short by PHH because of the passage of Dodd-Frank and more importantly that no acceleration of the loan occurred until after the late charge of July 16, 2010.

112): On January 12, 2017 Foster filed a **Motion to File An Amended Affirmative Defense.** It simply stated: "On January 11, 2016, Foster became aware of a significant amount of material that unquestionably strengthens and supports his affirmative defense in this matter. Accordingly Foster would like to have 28 days to file this additional information." On February 1, 2017 his motion was denied.

113): On February 1, 2017 Foster also filed a **Motion Instanter to Compel Plaintiff to Produce a copy of a Document It Claims to be a "Notice of Intent to Accelerate**

114): Foster also filed a **Motion Instanter to Compel Plaintiff to Produce a copy of the acceleration letter that it claims to have sent in its "Motion for Summary Judgment on the Defendant's Affirmative Defense(s)"**

115): Foster filed a **Motion to seek Leave of Court to file a third Amended Defense** where he makes it clear that he is presenting new material.

116): Foster filed **Motion to Compel Plaintiff to Produce a copy of the acceleration letter that it claims to have sent in its "Motion for Summary Judgment on the Defendant's Affirmative Defense**(s)

117): Foster filed a **Motion to Compel Plaintiff to Produce a copy of a Document It Claims to be a "Notice of Intent to Accelerate"**

118): The only result of these Motions was an order appointing a selling officer and ultimate subsequent sale order.

119): Obviously this new evidence should have allowed a Third affirmative defense as well as an additional counterclaim, especially when it is the Third Motion for Sale with new documents having been filed by the movant.

120): The entry of the order of final judgment in this matter was August 3, 2017.

121): Post final judgement Herbas sent Foster a communication stating that he would ask his client to drop the deficiency judgment allegedly owed by Foster if Foster was inclined to make such a request.

122): While this exhausting and incredibly expensive law suit was going on, Foster was also sued for the possession of his condo by the other two unit owners in the building Brusek and Wohl. They were represented by Attorney Ellis Levin.

123): Prior to the filing of the law suit, there was a notice that was to have been sent to Foster, which was not sent, which in turn meant that Levin would need to restart the process, which would take another two months. What Levin did however was have Terry Wohl claim at a condo meeting that Foster's name was no longer on the mailbox downstairs in this 3 unit building and that the mailman (recently retired Billy Sykes) had asked if Foster still lived in the building. At this meeting for which Foster still has a recording, Foster asked Wohl how long his name had been missing from the mailbox Wohl replied about a month. Foster immediately knew that this was a lie, because as a real estate broker he was sending out about 250 pieces a day to potential short sale clients, and he was getting back about 50 pieces of mail a day. Moreover, he checked with Billy, and Billy said that Foster's name was missing for a couple of days. Billy knew Foster well because he knew that Foster's brother Grady was a former Chief Economist for the United States Postal Service who had spent his entire career after graduating from Stanford Law School with the Postal Service. Like Foster, Grady was an Evans Scholar (at the University of Wisconsin who graduated from UW Madison in 1975 (the same year Mitchell Mars graduated as an Evans Scholar from Marquette.) Foster was an Evans Scholar at Northwestern.

122): With Levin as their attorney, Brusek and Wohl filed a law suit that went to trial on the sole issue of whether Foster has stolen slightly more than $2000 from the treasury when he was the buildings treasurer. Foster made it clear at this meeting that was

XXXXXXXXXXXXX

## **Incident that Delayed the Filing of This Claim by Three Years**

As noted, Foster and his daughter Lucy have been homeless since mid 2016. And

as further noted, Foster was only able to discover the fraud committed by PHH in

November 2016 . Shortly thereafter, Foster learned of the False Claim Act. And

shortly after that, Foster called DOJ—Civil Division and spoke with an attorney

who had prevailed in an appeal. Foster does not recall the attorney's name but

Foster recalls the attorney telling Foster that he would look for the arrival of

Foster's FCA filing.. Foster then set about completing the laborious task of putting

together the pieces of his FCA claim as well as other legal documents.

And Foster was at first truly lucky because as an alum of Northwestern, Foster was

allowed full access to Northwestern's Main Library, which unquestionably is his

favorite building in the world. So Foster brought his one bag of belongings with

his daughter to the Library, where he had free computer access, and Foster would

work on his material, take a shower at the Norris Center Student Union, and he and

Lucy would eat at the nearby 43 year old restaurant of his best friend in high

school, which is now known as "Dave's New Kitchen". Plus they would do what

many Chinese students in particular did. They slept on couches in the library.

Foster was NOT the only homeless alum who was living at the Library. One was a

woman about 75 suffering from dementia who was at one time a lawyer who was

128

with her boyfriend. The library closed at 4:00 in the morning with the exception of finals week when it was open for 24 hours. Foster was doing research that required him to utilize the University Archives, part of which is in the Deering Library Section of the Library. And in doing so, he encountered a woman named Suzette Radford who was a supervisor in the Library. She made it very clear that she was unhappy with the presence of Lucy in the Library as Foster routinely assigned Lucy homework utilizing various areas of the Library.

There came a time when Foster went to his currency exchange to cash his social security check, and when he returned Lucy was surrounded by members of Northwestern University's Police Department.

Foster was told that he was being removed from the Library because he had sexually harassed an employee of the Library. That was a flagrant lie, and Foster was never allowed to confront his accuser, if there really was such a person. He and Lucy were put in the back of a locked squad car where they were driven to a homeless shelter that had no room, and which shelter Foster would never have lived at given its horrible reputation. So Foster and Lucy went back to sleeping at Dunkin Donuts, where the owner always treated Foster with respect. But Foster was not a effective and he had to spend a lot more money on food, and then after that he drove for Lyft and Uber, and lived at a local motel, where the time spent doing that put him in a position where he did not finish the work needed to file this claim. For the record, Foster has sexually harassed one women as an adult, by mildly inappropriately touching her when he was 23.

In the interim time, Foster has been injured seriously in an auto accident and suffered an aggravation of his brain trauma, and he will most likely need a knee replacement.

The good news is that he will soon collect enough money in a settlement that he and Lucy can put down a year's rent and pay for their items in storage such that they are no longer homeless, and he can quickly grow his business where his social skills and even greater knowledge of Chicago that has resulted from him driving for Uber will undoubtedly lead him to having a $300K plus income, wherein Foster has set his sights on beating his father's record of having worked full time until he was 84.

**Foster's legal writing in an Illinois Appellate Court Case that "came down" in 1993 and ultimately contributed to the legal foundation of the revelation of Catholic clergy sexual abuse of young males, which revelations came to light in 2005 and which legal principles subsequently morphed into the "Me Too Movement....**

Foster's full name is Scott Rydin Foster. The Rydin is his grandmother's maiden name and there is lineage in Sweden where a Rydin was given Knighthood by the King of Sweden. He is so proud of that name, that this is the same middle name of his daughter Lucy. Unfortunately, if one looks up the name Scott Rydin Foster on Google the first item that will come up is Foster v Plaut, 252 Ill. App. 3d 692. And if one were to look up that case, it shows that Scott Rydin Foster had a compression fracture of his thoracic spine that was diagnosed

130

as schizophrenia in 1973, and that he filed his lawsuit in the matter in 1989 for which there is no apparent reason. In short, the ruling totally goons Foster. The truth is that Foster suffered along with his compression fracture of the spine a closed head injury that was so severe, he had a condition known as "objective tinnitus" that was itself so severe that there was a person who is still alive today who heard the noises coming from Foster's ear without the aid of a microphone.

This condition was diagnosed as delusional and schizophrenia by a truly evil psychiatrist named Truman Esau who had just written a book in 1973 on "curing" schizophrenia by using Family Regression Therapy wherein the "schizophrenic" was regressed into one's early childhood and then reparented by one's parents. Currently, to Foster's knowledge, there is no therapist in the United States that practices this therapy.

The relevant (and utterly meaningful) part of Foster's appeal was that the reason Foster did not discover his cause of action on a timely basis was that he was coerced into not further inquiring his injury as the direct result of a threat made to involuntarily hospitalize him when he expressed his opinion that an "abstract" written by Esau that was sent to a succeeding psychiatrist and purported to be an accurate representation of his treatment when it did not, and which release of his actual records in 1989 revealed just that. Therefore, this was an issue of both hiding records as well as coercion not to seek treatment.

In about 2004, Foster's late wife Halina had three friends who were "rebel" lawyers in the Catholic Church where there was "rumblings" about the Catholic Church having concealed clerical sexual abuse of underage children and that these

131

victims were coerced into not coming forward. So Halina passed on Foster'

Appellate briefs to her friends after which she was told that it had been passed on

to the appropriate parties for the Plaintiffs. There was some further discussion

about the work being passed on to the "Me Too Movement" a year later, but

Foster has no specific knowledge of it having been done so.

Finally, there was an investigation done of private psychiatric hospitals

that appeared on the front page of the **Chicago Tribune** in the late 1980s about

abuses wherein young adults were given the most harsh diagnosis possible in

order to maximize the inpatient stay, and the subsequent health insurance benefits

paid. The articles provided the names of various private psychiatric hospitals. And

the private hospital that had the longest stay was Old Orchard Hospital in Skokie,

Illinois whose "medical director" was none other than Truman Esau. (Foster was

never hospitalized under Esau's "care".) The lead author of these articles was the

great John Kass who is still the preeminent columnist for the Chicago Tribune.

While the Appellate Court Reply Brief is still in storage, Foster has a copy of the

initial brief, and Foster would be deeply honored to present this brief to DOJ.

Repeat: While the Appellate Court Reply Brief is still in storage, Foster has a

copy of the initial brief, and Foster would be deeply honored to present this brief

to DOJ.

For the record, Foster has never been arrested, was last drunk in 1974, last high on

marijuana in 1975, never took any illegal drugs other than marijuana, last smoked

cigarettes in 1973, quit coffee in 1976 with the exception of one year recently, has

not had meat. chocolate or dairy in the last two years, avoids wheat for all but a

few days a year, and loves to eat Sushi and other fresh fish as well as organic fruits and vegetables. His sole remaining sin is fresh oatmeal cookies. He is however still somewhat overweight, which stems back to the time when his late wife Halina had her stomach resectioned into an esophagus when her esophagus was surgically removed, which in turn required her to eat as many as 8 tiny meals a day to maintain the her weight of 100 pounds when her previous weight was 130 pounds. And Foster would eat with her to encourage her to keep eating.. But now that Lucy is 16, Foster can take the time to walk/hobble six miles a day, and he fully expects to lose more weight as he transitions from driving Uber to real estate.

**Wherefore** Scott Rydin Foster hereby prays that this matter be accepted by the United States of America as a valid False Claim Act claim, and that Foster be compensated 25 percent of all monies recovered.

Respectfully Submitted

_____          _____

Scott Rydin Foster                                           Date



## Exhibit 1

Third Quarter of the 2010 **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data**

Comptroller of the Currency
Administrator of National Banks

US Department of the Treasury

Office of Thrift Supervision
US Department of the Treasury

# OCC and OTS Mortgage Metrics Report

Disclosure of National Bank and Federal Thrift Mortgage Loan Data

## Third Quarter 2010

Office of the Comptroller of the Currency
Office of Thrift Supervision
Washington, D.C.

December 2010

## Contents

Executive Summary .......................................................................................................... 4

Home Equity Loans .......................................................................................................... 9

About Mortgage Metrics ................................................................................................. 10

New in This Report ......................................................................................................... 11

Definitions and Method .................................................................................................. 11

**PART I: Mortgage Performance** ................................................................................. 14

Overall Mortgage Portfolio ............................................................................................. 14

Overall Mortgage Performance ...................................................................................... 15

Performance of Government-Guaranteed Mortgages .................................................... 16

Performance of GSE Mortgages .................................................................................... 17

Seriously Delinquent Mortgages, by Risk Category ...................................................... 18

Mortgages 30–59 Days Delinquent, by Risk Category .................................................. 19

**PART II: Home Retention Actions** ............................................................................ 20

**A. Loan Modifications, Trial-Period Plans, and Payment Plans** ............................ 21

Newly Initiated Home Retention Actions ....................................................................... 21

HAMP Modifications and Trial-Period Plans, by Investor and Risk Category ............... 22

Newly Initiated Home Retention Actions Relative to Newly Initiated Foreclosures ..... 23

Types of Modification Actions ........................................................................................ 24

Types of HAMP Modification Actions ............................................................................ 25

Types of Modification Actions, by Risk Category .......................................................... 26

Types of Modification Actions, by Investor and Product Type ...................................... 27

Types of HAMP Modification Actions, by Investor and Product Type .......................... 28

Changes to Monthly Payments Resulting From Modification ........................................ 29

Changes to Monthly Payments Resulting From Modifications, by Quarter ................... 30

Changes to Monthly Payments Resulting From HAMP Modifications, by Quarter ....... 31

Average Change to Monthly Payments Resulting From Modifications, by Quarter ...... 32

**B. Modified Loan Performance** ................................................................................. 33

Re-Default Rates of Modified Loans: 60 or More Days Delinquent .............................. 33

Re-Default Rates of Modified Loans: 30 or More Days Delinquent .............................. 34

Re-Default Rates of Modified Loans: 90 or More Days Delinquent........................... 35

Re-Default Rate, by Investor (60 or More Days Delinquent)..................................... 36

Performance of HAMP Modifications Compared With Other Modifications ............... 37

**C. Modified Loan Performance, by Change in Monthly Payments......................... 38**

Re-Default Rates of Loans by Change in Payment ..................................................... 39

60+ Delinquency at 6 Months After Modification by Change to Monthly Payments... 40

Status of Mortgages Modified in 2008-2010 ............................................................... 41

**Part III: Home Forfeiture Actions:  Foreclosures, Short Sales, and Deed-in-Lieu-of-Foreclosure Actions ........................................................................ 42**

Completed Foreclosures and Other Home Forfeiture Actions ................................... 42

Newly Initiated Foreclosures....................................................................................... 43

Foreclosures in Process .............................................................................................. 44

Completed Foreclosures.............................................................................................. 45

Home Retention Actions Relative to Forfeiture Actions, by Risk Category ................ 46

**Appendixes.......................................................................................................................... 47**

Appendix A—New Loan Modifications ....................................................................... 47

Appendix B—New Trial-Period Plans ......................................................................... 48

Appendix C—New Payment Plans ............................................................................. 49

Appendix D—Breakdown of Individual and Combination Modification Actions.......... 50

Appendix E—Mortgage Modification Data by State.................................................... 52

**Index of Tables .................................................................................................................... 62**

**Index of Figures .................................................................................................................. 65**

### Executive Summary

This *OCC and OTS Mortgage Metrics Report* for the third quarter of 2010 provides performance data on first-lien residential mortgages serviced by national banks and federally regulated thrifts. The mortgages in this portfolio comprise 64 percent of all mortgages outstanding in the United States—33.3 million loans totaling almost $6 trillion in principal balances. The report provides information on their performance through September 30, 2010.

Mortgage delinquency levels remained elevated and foreclosures (new, in process, and completed) increased during the third quarter of 2010. New home retention actions (modifications, trial-period plans, and payment plans) decreased during the quarter. The overall credit quality of the portfolio of first-lien mortgages serviced by the largest national banks and thrifts remained steady during the third quarter of 2010 after showing some improvement during the previous two quarters.

Data included in this report covers mortgage-related activities of national banks and thrifts through the end of the third quarter of 2010, and do not reflect activities related to the foreclosure processing irregularities that surfaced late in the third quarter of 2010.

### Key Findings From This Report

- The percentage of mortgages that were current and performing remained unchanged from the previous quarter at 87.4 percent of the total servicing portfolio, indicating no change in overall credit quality. However, foreclosures in process, up 6 percent since the prior quarter and 12 percent from one year ago, reached a new high of 3.6 percent of the total serviced portfolio.

- Seriously delinquent mortgages—mortgages that were 60 or more days delinquent or delinquent loans to bankrupt borrowers—declined across all risk categories to 5.8 percent of the serviced portfolio overall. Although elevated from historic norms, this third consecutive quarterly decline in serious delinquencies brought them to their lowest level in more than a year. The decrease in seriously delinquent mortgages is due to a combination of loan modifications and an increasing number of seriously delinquent mortgages progressing to foreclosure.

- At 3.2 percent of the portfolio, early stage delinquencies—mortgages that were 30 to 59 days delinquent—increased across all risk categories during the quarter but were down from a year ago. Early stage delinquencies have ranged between 2.8 percent and 3.4 percent of the portfolio since the fourth quarter of 2008 when they reached a two-year high of 3.5 percent. Regulators will continue to monitor increases in early stage delinquencies as an early indicator of portfolio performance trends.

- Servicers implemented 470,321 new home retention actions during the third quarter of 2010, almost twice the 244,840 home forfeiture actions—completed foreclosures, new short sales, and new deed-in-lieu-of-foreclosure actions. However, the number of home retention actions—modifications, trial-period plans, and payment plans—decreased during the quarter while the number of newly initiated foreclosures, foreclosures in process, and completed foreclosures increased. Completed foreclosures, which have risen for six consecutive quarters, are expected to continue rising as servicers and borrowers exhaust home retention options to assist borrowers with seriously delinquent mortgages.

- Home retention activity included 233,853 permanent modifications during the third quarter, a 12.5 percent decrease from the previous quarter. New trial-period plans also decreased during the quarter—down 26.2 percent from the previous quarter. Since the beginning of 2008, servicers have implemented nearly 1.75 million loan modifications.

- More than 88 percent of modifications implemented during the quarter decreased monthly principal and interest payments. More than 54 percent of those modifications reduced payments by 20 percent or more. On average, modifications during the second quarter reduced borrowers' monthly principal and interest payments by $396. Home Affordable Modification Program (HAMP) modifications implemented during the quarter reduced payments by an average of $585.

- More recent modifications that emphasized sustainability and affordability continued to outperform modifications implemented earlier.

*Mortgage Performance*

- The percentage of current and performing mortgages—87.4 percent of the total portfolio—remained unchanged from the previous quarter, but was slightly higher than the 87.2 percent reported a year ago (see table 9).

- The percentage of mortgages that was seriously delinquent—5.8 percent—was the lowest in more than five quarters, down 6.4 percent from the previous quarter and down 7.2 percent from a year ago (see table 12). New modifications as well as the number of seriously delinquent loans progressing to foreclosure contributed to the decline.

- Loans 30 to 59 days delinquent increased 4.3 percent from the previous quarter to 3.2 percent of the total portfolio (see table 13).

- Government-guaranteed mortgages performed worse than the overall portfolio. While decreasing slightly from the previous quarter, the percentage of current and performing government-guaranteed mortgages increased 2.6 percent from a year ago. Of those mortgages, 85.1 percent were current and performing at the end of the third quarter (see table 10). Increased origination of these loans continued in the third quarter, with government-guaranteed mortgages composing 19 percent of the total portfolio.

- Mortgages serviced for Fannie Mae and Freddie Mac (GSEs) performed better than the overall portfolio because of their higher concentration of prime mortgages. Of the GSE mortgages, 92.3 percent were current and performing at the end of the third quarter (see table 11). Loans serviced for the two GSEs made up 61 percent of the total portfolio.

*Home Retention Actions: Loan Modifications, Trial-Period Plans, and Payment Plans*

- Servicers implemented 470,321 new home retention actions—loan modifications, trial-period plans, and payment plans—during the quarter. This represents a 17.0 percent decline from the previous quarter. HAMP modifications decreased by 45.7 percent during the quarter while other modifications increased by 10.1 percent. New HAMP trial plans decreased by 33.2 percent, and other trial-period plans decreased 21.0 percent from the previous quarters (see table 1). Servicers report that this decline resulted from requirements to obtain, verify, and analyze borrower income before beginning a trial period plan and the falling number of borrowers who are eligible for existing modification programs.

| Table 1. Number of New Home Retention Actions | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y % Change |
| Other Modifications | 130,464 | 102,820 | 129,572 | 159,073 | 175,063 | 10.1% | 34.2% |
| HAMP Modifications | 783 | 21,878 | 100,301 | 108,257 | 58,790 | -45.7% | 7,408.3% |
| Other Trial-Period Plans | 127,902 | 95,250 | 87,143 | 88,919 | 70,264 | -21.0% | -45.1% |
| HAMP Trial-Period Plans | 272,709 | 258,905 | 184,171 | 65,484 | 43,739 | -33.2% | -84.0% |
| Payment Plans | 163,551 | 121,722 | 120,439 | 145,157 | 122,465 | -15.6% | -25.1% |
| Total | 695,409 | 600,575 | 621,626 | 566,890 | 470,321 | -17.0% | -32.4% |

- Following the prescribed sequence of actions established by HAMP, which is also generally followed in other modification programs, servicers capitalized missed payments and fees in 87.5 percent of all modifications made during the third quarter and reduced interest rates in 86.2 percent of modifications. Term extensions were used in 57.4 percent of all modifications, principal deferrals in 10.1 percent, and principal reductions in 4.5 percent (see table 18). Principal deferral was used in 24.6 percent of HAMP modifications, while principal reduction was used in 10.2 percent of the HAMP modifications (see table 19).

- Overall, servicers reduced principal and interest payments in 88.2 percent of all loan modifications made during the quarter, and they reduced payments by 20 percent or more in 54.1 percent of those modifications (see table 23). As in previous quarters, nearly all HAMP modifications implemented during the third quarter reduced borrower principal and interest payments, and 76.0 percent reduced monthly payments by 20 percent or more (see table 24).

- Modifications made during the third quarter reduced monthly principal and interest payments by an average of $396. HAMP modifications made during the quarter reduced payments by an average of $585, compared with other modifications that reduced average monthly payments by $332. The average savings in monthly payments resulting from loan modifications has increased 53.7 percent from a year ago (see table 25).

### Modified Loan Performance

- Servicers modified 1,506,025 loans from the beginning of 2008 through the second quarter of 2010. At the end of the third quarter of 2010, 48.0 percent of these modifications remained current or were paid off. Another 10.2 percent were 30 to 59 days delinquent. Almost 24 percent of the modifications were seriously delinquent, 9.4 percent were in the process of foreclosure, and 4.2 percent had completed the foreclosure process (see table 2).

- Modifications that reduced payments by 10 percent or more performed better than modifications that reduced payments by less than 10 percent. At the end of the third quarter, 58.9 percent of modifications that reduced payments by 10 percent or more were current and performing, compared with the 33.4 percent of modifications that reduced payments by less than 10 percent (see table 2).

| Table 2. Status of Mortgages Modified in 2008–2010 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total | Current | 30–59 Days Delinquent | Seriously Delinquent | Foreclosures in Process | Completed Foreclosures | Paid Off | No Longer in the Portfolio* |
| 2008 | 421,322 | 25.8% | 7.5% | 29.9% | 14.5% | 10.2% | 2.5% | 9.5% |
| 2009 | 587,500 | 43.5% | 10.0% | 27.7% | 10.9% | 3.3% | 0.9% | 3.8% |
| 2010** | 497,203 | 68.7% | 12.6% | 14.4% | 3.2% | 0.2% | 0.2% | 0.8% |
| Total | 1,506,025 | 46.9% | 10.2% | 23.9% | 9.4% | 4.2% | 1.1% | 4.4% |
| Modifications That Reduced Payments by 10 Percent or More | | | | | | | | |
| Modifications That Reduced Payments by 10% or More | 794,686 | 58.9% | 10.4% | 17.9% | 6.4% | 2.1% | 0.6% | 3.7% |
| Modifications That Reduced Payments by Less Than 10 Percent | | | | | | | | |
| Modifications That Reduced Payments by Less Than 10% | 711,339 | 33.4% | 9.9% | 30.6% | 12.6% | 6.6% | 1.7% | 5.2% |

*Processing constraints prevented some servicers from reporting the reason for removal from the portfolio.
**Includes only modifications implemented during the first two quarters of 2010 that have been in effect at least three months.

- More recent modifications have performed better than earlier modifications every quarter since the end of the first quarter of 2009, though the rate of improvement appears to be moderating. At 6 months after modification, 20.2 percent of the modifications made in the fourth quarter of 2009 were seriously delinquent compared with 33.5 percent of the modifications made during the second quarter of 2009 (see table 3). This trend of lower delinquency rates following modification corresponds with the increasing emphasis on repayment sustainability through reduction of the borrower's monthly payment, verified borrower income, and payment affordability relative to income.

| Table 3. Modified Loans 60 or More Days Delinquent | | | | |
|---|---|---|---|---|
| Modification Date | 3 Months After Modification | 6 Months After Modification | 9 Months After Modification | 12 Months After Modification* |
| Second Quarter 2009 | 18.7% | 33.5% | 40.8% | 43.1% |
| Third Quarter 2009 | 14.7% | 27.7% | 32.7% | 36.7% |
| Fourth Quarter 2009 | 11.3% | 20.2% | 27.6% | -- |
| First Quarter 2010 | 11.2% | 19.1% | -- | -- |
| Second Quarter 2010 | 10.5% | -- | -- | -- |

*All re-default data are based on modified loans that remain in effect at the specified amount of time after the modification. All loans that have been repaid in full, refinanced, or sold, or have completed the foreclosure process are removed from the calculation. Data include only modifications that have had time to age the indicated number of months.

- HAMP modifications performed better than other modifications implemented during the same periods at the end of the third quarter of 2010. At 6 months after modification, the re-default rate for HAMP modifications, measured as 60 or more days delinquent at 6 months after the modification, was about half that of other modifications for loans modified during the fourth quarter 2009 and first quarter 2010 (see table 32). These lower post-modification delinquency rates reflect HAMP's emphasis on the affordability of monthly payments relative to borrower income, verification of income, and completion of a successful trial payment period.

- Modified mortgages held in the servicers' portfolios performed better than modified mortgages serviced for others. This variance may result from differences in modification programs, servicers' additional flexibility to modify mortgage terms, and the underlying quality of loans serviced for different investors. Modified government-guaranteed mortgages had the highest delinquency rates at 6, 9, and 12 months following modification, consistent with their higher overall delinquency rates (see table 4).

| Table 4. Re-Default Rates for Portfolio Loans and Loans Serviced for Others (60 or More Days Delinquent)* | | | | |
|---|---|---|---|---|
| Investor Loan Type | 3 Months After Modification | 6 Months After Modification | 9 Months After Modification | 12 Months After Modification |
| Fannie Mae | 15.2% | 27.6% | 42.5% | 52.5% |
| Freddie Mac | 16.2% | 28.7% | 44.2% | 55.8% |
| Government-Guaranteed | 21.6% | 42.9% | 55.9% | 62.3% |
| Private | 28.1% | 42.1% | 52.5% | 58.2% |
| Portfolio Loans | 9.2% | 18.2% | 24.8% | 30.1% |
| Overall | 20.0% | 33.8% | 44.7% | 51.4% |

*Data include all modifications implemented since January 1, 2008 that have had time to age the indicated number of months.

## *Modified Loan Performance, by Change in Monthly Payments*

- Modifications that decreased monthly payments consistently had lower re-default rates than modifications that left payments unchanged or increased payments. After 6 months, 14.6 percent of modifications implemented since the second quarter of 2009 that decreased monthly payments by 20 percent or more were seriously delinquent. In contrast, 28.1 percent of modifications that left payments unchanged and 42.6 percent of modifications that increased payments were seriously delinquent (see table 5). While lower payments reduce monthly cash flows to investors, the payments may result in longer-term sustainability.

| Table 5. 60+ Delinquency at 6 Months After Modification by Change to Monthly Payments | | | | | | |
|---|---|---|---|---|---|---|
| | Decreased by 20% or More | Decreased by 10% to Less Than 20% | Decreased by Less Than 10% | Unchanged | Increased | Overall |
| Second Quarter 2009 | 20.9% | 35.0% | 39.9% | 34.9% | 52.9% | 33.6% |
| Third Quarter 2009 | 18.1% | 30.1% | 31.9% | 30.9% | 39.9% | 27.7% |
| Fourth Quarter 2009 | 11.4% | 21.2% | 27.1% | 12.3% | 37.6% | 20.1% |
| First Quarter 2010 | 11.7% | 21.2% | 28.4% | 33.4% | 37.7% | 19.1% |
| Overall | 14.6% | 26.3% | 31.8% | 28.1% | 42.6% | 24.4% |

*Data include all modifications that have had time to age the indicated number of months.

## *Foreclosures and Other Home Forfeiture Actions*

- Newly initiated foreclosures increased 31.2 percent from the previous quarter and 3.7 percent from a year ago, reflecting the large number of seriously delinquent mortgages and loans in process of foreclosure progressing toward foreclosure sale. Foreclosures in process increased 4.5 percent from the previous quarter and 10.1 percent from a year ago. More than

1.2 million mortgages were in the process of foreclosure at the end of the third quarter of 2010 (See table 6).

| Table 6. New Foreclosures and Foreclosures in Process | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
| Newly Initiated Foreclosures | 369,209 | 312,520 | 369,944 | 291,758 | 382,751 | 31.2% | 3.7% |
| Foreclosures in Process | 1,091,620 | 1,079,386 | 1,170,874 | 1,149,461 | 1,201,622 | 4.5% | 10.1% |

- Completed foreclosures and other home forfeiture actions totaled 244,840 during the third quarter of 2010, an increase of 11.2 percent from the previous quarter and an increase of 62.6 percent from a year ago. While HAMP and proprietary foreclosure prevention programs are designed to help a significant number of distressed homeowners, these programs are not expected to help all delinquent borrowers. Servicers indicated that completed foreclosures and other home forfeiture actions are likely to increase as alternatives for seriously delinquent borrowers are exhausted and loans in process of foreclosure proceed to foreclosure sale (see table 7).

| Table 7. Completed Foreclosures and Other Home Forfeiture Actions | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
| Completed Foreclosures | 118,606 | 128,859 | 152,882 | 162,904 | 186,854 | 14.7% | 57.5% |
| New Short Sales | 30,766 | 37,584 | 41,031 | 55,441 | 56,257 | 1.5% | 82.9% |
| New Deed-in-Lieu-of-Foreclosure Actions | 1,233 | 1,054 | 1,202 | 1,753 | 1,729 | -1.4% | 40.2% |
| Total | 150,605 | 167,497 | 195,115 | 220,098 | 244,840 | 11.2% | 62.6% |

### Home Equity Loans

The following paragraphs update information included in the previous report regarding the performance and risk of home equity loans. At the end of the third quarter of 2010, the unpaid balance of home equity loans held by national banks that were 30 or more days past due was $22.1 billion, or 3.9 percent of these loans. Thrifts reported $1.26 billion in unpaid balances of home equity loans that were 30 or more days past due, or 2.9 percent of these loans.

Because junior liens behind troubled first-lien mortgages are also likely at risk, the OCC directed large banks to consider inherent risk in junior-lien repayment capacity and collateral protection and to reserve appropriately even if the junior lien is current and performing. At the end of September 2010, the estimated size of the "at-risk" portfolio among national banks was less than $30 billion, out of a potential total home equity loan portfolio of $414 billion.

Examiners review loan-loss reserve and charge-off analysis at the largest banks each quarter and are confident that home equity reserves and charge-off practices are adequate. The largest national bank lenders increased loan-loss reserves related to their home equity portfolios from $9.3 billion in the first quarter of 2008 to $29.6 billion in the third quarter of 2010. Since January 2008, national banks have recognized $53.4 billion in losses from home equity portfolios according to the federal financial call report, more than 11 times the losses recognized

over the previous five year period  Thrifts recognized more than $4.9 billion in home equity losses during that same period.

HAMP and its Second-Lien Modification Program (2MP) require junior-lien holders to offer modifications on the second if the borrower qualifies for a modification on the first motgage. The major home equity lenders, which are included in this report, participate in both HAMP and 2MP.

Home equity loan information is not a regular feature of this report, which focuses on first-lien mortgages, and it is not expected to be included in future reports.

### About Mortgage Metrics

The *OCC and OTS Mortgage Metrics Report* presents data on first-lien residential mortgages serviced by national banks and thrifts, focusing on credit performance, loss mitigation efforts, and foreclosures. The OCC and the OTS collect these data from the eight national banks and one thrift with the largest mortgage-servicing portfolios among national banks and thrifts.[1]  The data represent 64 percent of all first-lien residential mortgages outstanding in the country.  More than 91 percent of the mortgages in the portfolio were serviced for third parties because of loan sales and securitization.  At the end of September 2010, the reporting institutions serviced 33.3 million first-lien mortgage loans, totaling more than $5.8 trillion in outstanding balances.

The loans reflected in this report represent a large percentage of the overall mortgage industry, but they do not represent a statistically random sample of all mortgage loans.  The characteristics of these loans differ from the overall population of mortgages.  This report does not attempt to quantify or adjust for known seasonal effects that occur within the mortgage industry.

In addition to providing information to the public, the data support the supervision of national bank and thrift mortgage practices.  Examiners use the data to help assess emerging trends, identify anomalies, compare servicers with peers, evaluate asset quality and necessary loan-loss reserves, and evaluate loss mitigation actions.

The report promotes the use of standardized terms and elements, which allow better comparisons across the industry and over time.  The report uses standardized definitions for prime, Alt-A, and subprime mortgages based on commonly used credit score ranges.

The OCC, the OTS, and the participating institutions devote significant resources to ensuring that the information is reliable and accurate.  Steps to ensure the validity of the data include comparisons with institutions' quarterly call and thrift financial reports, with internal quality reviews conducted by the banks and thrifts, and with data supplied by participating banks and aggregated by an external vendor to support this report.  Data sets of this size and scope inevitably suffer from a degree of inconsistency, missing data, and other imperfections.  This report notes cases in which data anomalies may have affected the results.  The OCC and the OTS

---

[1] The eight banks are Bank of America, JPMorgan Chase, Citibank, HSBC, MetLife, PNC, U.S. Bank, and Wells Fargo.  The thrift is OneWest Bank (formerly IndyMac).  Merrill Lynch FSB was merged into Bank of America in November 2009. MetLife Bank replaced First Tennessee as a reporting institution in January 2010.  Wachovia Bank was merged into Wells Fargo National Bank in March 2010.

require previous data submissions to be adjusted when errors and omissions are detected. In some cases, data presented in this report reflect resubmissions from institutions that restate and correct earlier information.

### New in This Report

The OCC and OTS continuously improve this report by developing and reporting additional data and analysis that responds to the needs of financial supervisors and policy makers as well as public interest. In this report, the agency added mortgage modification data by state in Appendix E. Developed over several quarters, this data also fulfills reporting requirements in the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203).

Table 48 presents the number and percentage of HAMP modifications and other modifications in each state during the third quarter of 2010. Tables 49 and 50 present the number and percentage of each type of action included in modifications made during the quarter in each state. Tables 51 and 52 present the number and percentage of each type of action included in combination modifications made during the quarter in each state. Tables 53 and 54 present the number and percentage of modifications made during the quarter in each state by the amount of change in the borrowers monthly principal and interest payment. Tables 55 and 56 present the number and percentage of modifications made in the first quarter of 2010 that were 60 or more days delinquent or in process of foreclosure at the end of the third quarter (re-defaults.)

### Definitions and Method

The report uses standard definitions for three categories of mortgage creditworthiness based on the following ranges of borrowers' credit scores at the time of origination:

- **Prime**—660 and above.
- **Alt-A**—620 to 659.
- **Subprime**—below 620.

Approximately 13 percent of mortgages in the portfolio were not accompanied by credit scores and are classified as "other." This group includes a mix of prime, Alt-A, and subprime mortgages. In large part, the lack of credit scores results from acquisitions of portfolios from third parties for which borrower credit scores at origination were not available.

Additional definitions include:

- **Completed foreclosures**—Ownership of properties transferred to servicers or investors. The ultimate result is the loss of borrowers' homes because of nonpayment.
- **Deed-in-lieu-of-foreclosure actions**—Actions in which borrowers transfer ownership of the properties (deeds) to servicers in full satisfaction of the outstanding mortgage debt to lessen the adverse impact of the debt on borrowers' credit records. Deed-in-lieu-of-foreclosure actions typically have less adverse impact than foreclosure on borrowers' credit records.
- **Foreclosures in process**—Number of mortgages for which servicers have begun formal foreclosure proceedings but have not yet completed the process resulting in the loss of

borrowers' homes. The foreclosure process varies by state and can take 15 months or more to complete. Many foreclosures in process never result in the loss of borrowers' homes because servicers simultaneously pursue other loss mitigation actions and borrowers may act to return their mortgages to current and performing status.

- **Government-guaranteed mortgages**—All mortgages with an explicit guaranty from the U.S. government, including the Federal Housing Administration (FHA), the Department of Veterans Affairs (VA), and certain other departments. These loans may be held in pools backing Government National Mortgage Association (Ginnie Mae) securities or owned by and/or securitized through different investors.

- **Home retention actions**—Loan modifications, trial-period plans, and payment plans that allow borrowers to retain ownership and occupancy of their homes while attempting to return the loans to a current and performing status.

- **Loan modifications**—Actions that contractually change the terms of mortgages with respect to interest rates, maturity, principal, or other terms of the loan.

- **Newly initiated foreclosures**—Mortgages for which the servicers initiate formal foreclosure proceedings during the month. Many newly initiated foreclosures do not result in the loss of borrowers' homes because servicers simultaneously pursue other loss mitigation actions and borrowers may act to return their mortgages to current and performing status.

- **Payment plans**—Short- to medium-term changes in scheduled terms and payments to return mortgages to a current and performing status.

- **Payment option adjustable rate mortgages (ARMs)**—Mortgages that allow borrowers to choose a monthly payment that may reduce principal, pay interest only, or result in negative amortization, in which some amount of unpaid interest is added to the principal balance of the loan and results in an increased amount owed.

- **Principal deferral modifications**—Modifications that remove a portion of the principal from the amount used to calculate monthly principal and interest payments for a set period. The deferred amount becomes due at the end of the loan term.

- **Principal reduction modifications**—Modifications that permanently forgive a portion of the principal amount owed on a mortgage.

- **Re-default rates**—Percentage of modified loans that subsequently become delinquent or enter the foreclosure process. As alternative measures of delinquency, this report presents re-default rates using 30, 60, and 90 or more days delinquent and in process of foreclosure but focuses most often on the 60-day-delinquent measure. All re-default data presented in this report are based on modified loans that remain in effect at the specified amount of time after the modification. All loans that have been repaid in full, refinanced, or sold, or have completed the foreclosure process are removed from the calculation.

Data include only modifications that have had time to age the indicated number of months following the modification.[2]

- **Seriously delinquent loans**—Mortgages that are 60 or more days past due and all mortgages held by bankrupt borrowers whose payments are 30 or more days past due.

- **Short sales**—Sales of the mortgaged properties at prices that net less than the total amount due on the mortgages. Servicers and borrowers negotiate repayment programs, forbearance, or forgiveness for any remaining deficiency on the debt. Short sales typically have less adverse impact than foreclosure on borrowers' credit records.

- **Trial-period plans**—Home retention actions that allow borrowers to demonstrate capability and willingness to pay their modified mortgages for a set period of time. The action becomes a permanent loan modification following the successful completion of the trial period.

Loan delinquencies are reported using the Mortgage Bankers Association convention that a loan is past due when a scheduled payment is unpaid for 30 days or more. The statistics and calculated ratios are based on the number of loans rather than on the dollar amount outstanding.

Percentages are rounded to one decimal unless the result is less than 0.1 percent, which is rounded to two decimal places. The report uses whole numbers when approximating.

In tables throughout this report, the quarters are indicated by the last day of the quarter (e.g., 6/30/10), quarter-to-quarter changes are shown under the column "1Q %Change," and year-to-year changes are shown under the column "1Y %Change."

In tables throughout this report, percentages shown under "1Q %Change" and "1Y %Change" are calculated using unrounded values for each quarter. Calculating these percentages from the rounded values shown in the table may yield materially different values.

*Mortgage Metrics Report* data may not agree with other published data because of timing delays in updating servicer-processing systems.

---

[2] Some servicers have offered modification programs that do not reset or "re-age" delinquency status following modification. Loans in this category represent a small percentage of total loan modifications.

## *PART I: Mortgage Performance*

Part I describes the performance of the overall mortgage portfolio, the performance of government-guaranteed mortgages, mortgages serviced for the government-sponsored enterprises (GSEs), and each loan risk category.

### *Overall Mortgage Portfolio*

At the end of the third quarter of 2010, the size of the servicing portfolio declined slightly to 33.3 million loans totaling more than $5.8 trillion in unpaid principal balances. The composition of the portfolio remained generally steady with 69 percent prime, 11 percent Alt-A, 8 percent subprime, and 12 percent other loans.

| Table 8. Overall Mortgage Portfolio | | | | | |
|---|---|---|---|---|---|
| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 |
| Total Servicing (Millions) | $5,998,986 | $5,952,423 | $5,947,548 | $5,907,917 | $5,811,107 |
| Total Servicing (Number of Loans) | 34,024,601 | 33,824,889 | 33,895,628 | 33,747,459 | 33,326,073 |
| Composition (Percentage of All Mortgages in the Portfolio) | | | | | |
| Prime | 68% | 68% | 68% | 69% | 69% |
| Alt-A | 10% | 11% | 11% | 11% | 11% |
| Subprime | 8% | 8% | 8% | 8% | 8% |
| Other | 14% | 13% | 14% | 13% | 12% |
| Composition (Number of Loans in Each Risk Category of the Portfolio) | | | | | |
| Prime | 23,064,371 | 23,136,115 | 23,034,396 | 23,152,805 | 23,003,175 |
| Alt-A | 3,524,305 | 3,560,656 | 3,567,635 | 3,615,409 | 3,590,974 |
| Subprime | 2,774,027 | 2,758,613 | 2,667,582 | 2,618,823 | 2,550,622 |
| Other | 4,661,898 | 4,369,505 | 4,626,015 | 4,360,422 | 4,181,302 |

*Percentages may not total 100 percent because of rounding.

### *Figure 1.* Portfolio Composition

Percentage of All Mortgage Loans in the Portfolio
Third Quarter 2010



## *Overall Mortgage Performance*

The percentage of current and performing mortgages remained unchanged from the previous quarter at 87.4 percent. Early delinquencies, mortgages 30 to 59 days delinquent, were 3.2 percent of the portfolio—up from 3.1 percent at the end of the previous quarter but down from 3.4 percent a year ago. The percentage of seriously delinquent mortgages fell to 5.8 percent—down from 6.2 percent at the end of the previous quarter and down from 6.2 percent a year ago. Foreclosures in process increased to 3.6 percent of the total portfolio—up from 3.4 percent at the end of the previous quarter and 3.2 percent a year ago.

| Table 9. Overall Portfolio Performance (Percentage of Mortgages in the Portfolio) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
| Current and Performing | 87.2% | 86.4% | 87.3% | 87.4% | 87.4% | 0.1%* | 0.3% |
| 30–59 Days Delinquent | 3.4% | 3.4% | 2.8% | 3.1% | 3.2% | 4.3% | -6.2% |
| The Following Three Categories Are Classified as Seriously Delinquent: | | | | | | | |
| 60–89 Days Delinquent | 1.6% | 1.6% | 1.3% | 1.3% | 1.3% | 4.7% | -14.3% |
| 90 or More Days Delinquent | 3.9% | 4.7% | 4.5% | 4.1% | 3.6% | -12.4% | -9.1% |
| Bankruptcy 30 or More Days Delinquent | 0.7% | 0.8% | 0.8% | 0.8% | 0.9% | 6.5% | 18.4% |
| *Subtotal for Seriously Delinquent* | **6.2%** | **7.1%** | **6.5%** | **6.2%** | **5.8%** | **-6.4%** | **-7.2%** |
| Foreclosures in Process | 3.2% | 3.2% | 3.5% | 3.4% | 3.6% | 5.9% | 12.4% |
| (Number of Mortgages in the Portfolio) | | | | | | | |
| Current and Performing | 29,666,568 | 29,217,743 | 29,574,953 | 29,490,635 | 29,143,015 | -1.2% | -1.8% |
| 30–59 Days Delinquent | 1,154,825 | 1,138,822 | 939,306 | 1,030,522 | 1,061,246 | 3.0% | -8.1% |
| The Following Three Categories Are Classified as Seriously Delinquent: | | | | | | | |
| 60–89 Days Delinquent | 529,845 | 525,071 | 424,534 | 430,217 | 444,769 | 3.4% | -16.1% |
| 90 or More Days Delinquent | 1,332,228 | 1,604,014 | 1,525,662 | 1,371,346 | 1,185,957 | -13.5% | -11.0% |
| Bankruptcy 30 or More Days Delinquent | 249,515 | 259,853 | 260,299 | 275,278 | 289,464 | 5.2% | 16.0% |
| *Subtotal for Seriously Delinquent* | **2,111,588** | **2,388,938** | **2,210,495** | **2,076,841** | **1,920,190** | **-7.5%** | **-9.1%** |
| Foreclosures in Process | 1,091,620 | 1,079,386 | 1,170,874 | 1,149,461 | 1,201,622 | 4.5% | 10.1% |

*Unrounded numbers yield a slight increase during the quarter.



**Figure 2. Overall Portfolio Performance**

### *Performance of Government-Guaranteed Mortgages*

The percentage of current government-guaranteed mortgages decreased during the quarter to 85.1. Serious delinquencies increased to 6.9 percent of government-guaranteed mortgages—up from 6.8 percent at the end of the previous quarter but down from 8.2 percent a year ago. The percentage of government-guaranteed mortgages that were 30 to 59 days delinquent increased to 5.3 percent—up from 5.1 percent from the previous quarter but down from 6.3 percent a year ago. Foreclosures in process remained steady from the previous quarter at 2.7 percent—but up from 2.5 percent a year ago. Government-guaranteed mortgages continue to increase as a portion of the overall servicing portfolio and represent 19 percent of the portfolio. About 79 percent of these loans were FHA loans, 16 percent were VA loans, and 5 percent were other government-guaranteed mortgages. More than 84 percent of these mortgages were in pools of loans backing Ginnie Mae securities.

| Table 10. Performance of Government-Guaranteed Mortgages (Percentage)* | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
| Current and Performing | 83.0% | 82.7% | 85.4% | 85.3% | 85.1% | -0.2% | 2.6% |
| 30–59 Days Delinquent | 6.3% | 5.9% | 4.5% | 5.1% | 5.3% | 2.9% | -16.8% |
| The Following Three Categories Are Classified as Seriously Delinquent: | | | | | | | |
| 60–89 Days Delinquent | 2.6% | 2.6% | 1.8% | 2.0% | 2.2% | 9.5% | -18.1% |
| 90 or More Days Delinquent | 4.4% | 5.0% | 4.2% | 3.8% | 3.7% | -2.8% | -16.0% |
| Bankruptcy 30 or More Days Delinquent | 1.1% | 1.1% | 1.0% | 1.0% | 1.0% | 1.5% | -2.9% |
| *Subtotal for Seriously Delinquent* | 8.2% | 8.6% | 7.0% | 6.8% | 6.9% | 1.4% | -14.9% |
| Foreclosures in Process | 2.5% | 2.8% | 3.1% | 2.7% | 2.7% | -1.7% | 6.3% |
| Performance of Government-Guaranteed Mortgages (Number) | | | | | | | |
| Current and Performing | 4,376,413 | 4,602,510 | 4,991,326 | 5,230,076 | 5,344,688 | 2.2% | 22.1% |
| 30–59 Days Delinquent | 333,614 | 331,188 | 261,986 | 313,456 | 330,353 | 5.4% | -1.0% |
| The Following Three Categories Are Classified as Seriously Delinquent: | | | | | | | |
| 60–89 Days Delinquent | 139,019 | 142,114 | 105,019 | 120,931 | 135,618 | 12.1% | -2.4% |
| 90 or More Days Delinquent | 233,914 | 277,617 | 247,105 | 235,057 | 234,106 | -0.4% | 0.1% |
| Bankruptcy 30 or More Days Delinquent | 56,848 | 59,499 | 59,084 | 63,232 | 65,756 | 4.0% | 15.7% |
| *Subtotal for Seriously Delinquent* | 429,781 | 479,230 | 411,208 | 419,220 | 435,480 | 3.9% | 1.3% |
| Foreclosures in Process | 132,713 | 153,637 | 179,948 | 166,843 | 167,975 | 0.7% | 26.6% |

*Percentages may not total 100 because of rounding.

#### *Figure 3.* **Performance of Government-Guaranteed Mortgages**



### Performance of GSE Mortgages

GSE mortgages continued to perform better than the overall portfolio because they include more prime mortgages than mortgages serviced for other investors. Current and performing GSE loans increased to 92.3 percent, compared with 87.4 percent for the overall portfolio and 85.1 percent for government-guaranteed mortgages. The percentage of GSE mortgages that were 30 to 59 days delinquent increased to 2.2 percent—up from 2.1 percent at the end of the previous quarter but steady from a year ago. Seriously delinquent GSE mortgages declined to 3.1 percent—down from 3.8 percent at the end of the previous quarter and 3.9 percent from a year ago. Foreclosures in process, however, increased to 2.5 percent—up from 2.1 percent at the end of the previous quarter and 1.8 percent from a year ago. GSE mortgages made up 61 percent of the overall servicing portfolio. Of the GSE mortgages, about 58 percent were serviced for Fannie Mae, and 42 percent were serviced for Freddie Mac.

| Table 11. Performance of GSE Mortgages (Percent) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
| Current and Performing | 92.1% | 91.3% | 91.8% | 92.0% | 92.3% | 0.3% | 0.2% |
| 30–59 Days Delinquent | 2.2% | 2.3% | 1.9% | 2.1% | 2.2% | 4.6% | -2.8% |
| The Following Three Categories Are Classified as Seriously Delinquent: | | | | | | | |
| 60–89 Days Delinquent | 1.0% | 1.0% | 0.8% | 0.8% | 0.8% | 1.6% | -14.5% |
| 90 or More Days Delinquent | 2.5% | 3.1% | 3.1% | 2.5% | 1.8% | -28.6% | -29.6% |
| Bankruptcy 30 or More Days Delinquent | 0.4% | 0.4% | 0.4% | 0.5% | 0.5% | 9.9% | 29.9% |
| *Subtotal for Seriously Delinquent* | *3.9%* | *4.6%* | *4.3%* | *3.8%* | *3.1%* | *-17.2%* | *-19.8%* |
| Foreclosures in Process | 1.8% | 1.8% | 2.0% | 2.1% | 2.5% | 14.4% | 34.9% |
| Performance of GSE Mortgages (Number) | | | | | | | |
| Current and Performing | 19,775,288 | 19,361,573 | 19,471,020 | 19,282,071 | 18,877,065 | -2.1% | -4.5% |
| 30–59 Days Delinquent | 480,320 | 490,139 | 404,565 | 435,687 | 444,871 | 2.1% | -7.4% |
| The Following Three Categories Are Classified as Seriously Delinquent: | | | | | | | |
| 60–89 Days Delinquent | 210,156 | 212,754 | 179,974 | 172,604 | 171,249 | -0.8% | -18.5% |
| 90 or More Days Delinquent | 538,299 | 667,075 | 648,649 | 517,496 | 360,798 | -30.3% | -33.0% |
| Bankruptcy 30 or More Days Delinquent | 84,192 | 89,985 | 91,482 | 97,024 | 104,146 | 7.3% | 23.7% |
| *Subtotal for Seriously Delinquent* | *832,647* | *969,814* | *920,105* | *787,124* | *636,193* | *-19.2%* | *-23.6%* |
| Foreclosures in Process | 390,664 | 391,042 | 420,049 | 449,458 | 502,019 | 11.7% | 28.5% |

*Figure 4. Performance of GSE Mortgages*



### *Seriously Delinquent Mortgages, by Risk Category*

Serious delinquencies declined for the third consecutive quarter to 5.8 percent of the overall servicing portfolio—the lowest level since the end of June 2009. The number of seriously delinquent loans declined across all risk categories during the quarter. The percentage of prime mortgages that were seriously delinquent was 3.4 percent—down from 3.7 percent at the end of the previous quarter and 3.6 percent from a year ago. Subprime serious delinquencies at 18.9 percent declined from 19.4 percent at the end of the previous quarter and from 20.1 percent a year ago. Overall, about 191,000 fewer loans were seriously delinquent compared with a year ago.

| Table 12. Seriously Delinquent Mortgages | | | | | | | |
|---|---|---|---|---|---|---|---|
| (Percentage of Mortgages in Each Category) | | | | | | | |
| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
| Prime | 3.6% | 4.2% | 4.1% | 3.7% | 3.4% | -9.2% | -6.5% |
| Alt-A | 12.0% | 13.5% | 12.2% | 11.3% | 10.7% | -5.6% | -10.7% |
| Subprime | 20.1% | 22.4% | 20.0% | 19.4% | 18.9% | -2.5% | -6.2% |
| Other | 6.3% | 7.2% | 6.6% | 6.7% | 6.5% | -2.9% | 3.9% |
| Overall | 6.2% | 7.1% | 6.5% | 6.2% | 5.8% | -6.4% | -7.2% |
| (Number of Mortgages in Each Category) | | | | | | | |
| Prime | 838,083 | 976,183 | 935,167 | 866,422 | 781,237 | -9.8% | -6.8% |
| Alt-A | 422,277 | 479,506 | 436,663 | 409,826 | 384,300 | -6.2% | -9.0% |
| Subprime | 558,419 | 617,601 | 533,301 | 507,425 | 481,784 | -5.1% | -13.7% |
| Other | 292,809 | 315,648 | 305,364 | 293,168 | 272,869 | -6.9% | -6.8% |
| Total | 2,111,588 | 2,388,938 | 2,210,495 | 2,076,841 | 1,920,190 | -7.5% | -9.1% |

### *Figure 5.* Seriously Delinquent Mortgages

Percentage of Mortgages in Each Category



### Mortgages 30–59 Days Delinquent, by Risk Category

The proportion of early stage delinquencies—mortgages 30 to 59 days delinquent—increased across all risk categories during the third quarter but were down from a year ago. Overall, 3.2 percent of the total portfolio was 30 to 59 days delinquent at the end of the quarter—up from 3.1 percent at the end of the previous quarter but down from 3.4 percent a year ago.

| Table 13. Mortgages 30–59 Days Delinquent | | | | | | | |
|---|---|---|---|---|---|---|---|
| (Percentage of Mortgages in Each Category) | | | | | | | |
| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
| Prime | 1.8% | 1.9% | 1.6% | 1.7% | 1.7% | 4.1%* | -5.4% |
| Alt-A | 6.5% | 6.5% | 5.3% | 6.0% | 6.4% | 6.9% | -1.4% |
| Subprime | 10.2% | 10.0% | 8.3% | 9.5% | 9.9% | 3.8% | -3.5% |
| Other | 4.7% | 4.5% | 3.6% | 4.1% | 4.3% | 5.0% | -8.1% |
| Overall | 3.4% | 3.4% | 2.8% | 3.1% | 3.2% | 4.3% | -6.2% |
| (Number of Mortgages in Each Category) | | | | | | | |
| Prime | 420,000 | 432,188 | 360,385 | 382,963 | 396,214 | 3.5% | -5.7% |
| Alt-A | 230,077 | 232,609 | 190,767 | 217,629 | 231,098 | 6.2% | 0.4% |
| Subprime | 284,251 | 275,235 | 221,157 | 249,387 | 252,136 | 1.1% | -11.3% |
| Other | 220,497 | 198,790 | 166,997 | 180,543 | 181,798 | 0.7% | -17.6% |
| Total | 1,154,825 | 1,138,822 | 939,306 | 1,030,522 | 1,061,246 | 3.0% | -8.1% |

*Unrounded numbers yield an increase during the quarter.



**Figure 6. Mortgages 30–59 Days Delinquent**

Percentage of Mortgages in Each Category

## *PART II: Home Retention Actions*

Home retention actions include loan modifications, in which servicers modify one or more
mortgage contract terms; trial-period plans, in which the loans will be converted to modifications
upon successful underwriting and completion of the trial periods; and payment plans, in which
no terms are contractually modified, but borrowers are given time to catch up on missed
payments. All of these actions are intended to enable the borrower to attain payment
sustainability and retain the home.

## A. Loan Modifications, Trial-Period Plans, and Payment Plans

### *Newly Initiated Home Retention Actions*

During the third quarter of 2010, servicers implemented 470,321 new home retention actions—
loan modifications, trial-period plans, and payment plans. Servicers implemented 233,853
modifications during the quarter, a 12.5 percent decrease from the previous quarter. The decline
is largely the result of a 45.7 percent drop in HAMP modifications from the previous quarter,
which eclipsed the 10.1 percent increase in other modifications. Total home retention actions
declined 17.0 percent from the prior quarter. During the past five quarters, servicers have
initiated 2,954,821 home retention actions—987,001 modifications, 1,294,486 trial-period plans,
and 673,334 payment plans.

| Table 14. Number of New Home Retention Actions | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y % Change |
| Other Modifications | 130,464 | 102,820 | 129,572 | 159,073 | 175,063 | 10.1% | 34.2% |
| HAMP Modifications | 783 | 21,878 | 100,301 | 108,257 | 58,790 | -45.7% | 7408.3% |
| Other Trial-Period Plans | 127,902 | 95,250 | 87,143 | 88,919 | 70,264 | -21.0% | -45.1% |
| HAMP Trial-Period Plans | 272,709 | 258,905 | 184,171 | 65,484 | 43,739 | -33.2% | -84.0% |
| Payment Plans | 163,551 | 121,722 | 120,439 | 145,157* | 122,465 | -15.6% | -25.1% |
| Total | 695,409 | 600,575 | 621,626 | 566,890 | 470,321 | -17.0% | -32.4% |

*Servicer resubmission of second quarter 2010 data to conform to reporting standard resulted in a 52,623 increase in
new payment plans reported for the quarter.

#### *Figure 7.* Number of New Home Retention Actions



## HAMP Modifications and Trial-Period Plans, by Investor and Risk Category

Servicers implemented 58,790 HAMP modifications during the third quarter of 2010, down 45.7 percent from the 108,257 implemented during the previous quarter. Approximately 50 percent of HAMP modifications made in the third quarter of 2010 went to mortgages serviced for Fannie Mae and Freddie Mac. Prime loans received about half of all HAMP modifications, while subprime loans received less than a quarter of these modification actions.

**Table 15. HAMP Modifications, by Investor and Risk Category**
(Modifications Implemented in the Third Quarter of 2010)

|  | Fannie Mae | Freddie Mac | Government-Guaranteed | Portfolio | Private | Total |
|---|---|---|---|---|---|---|
| Prime | 8,957 | 8,709 | 95 | 7,133 | 4,671 | 29,565 |
| Alt-A | 3,010 | 2,707 | 205 | 3,692 | 2,327 | 11,941 |
| Subprime | 2,002 | 1,406 | 690 | 4,461 | 3,255 | 11,814 |
| Other | 1,894 | 853 | 144 | 1,052 | 1,527 | 5,470 |
| Total | 15,863 | 13,675 | 1,134 | 16,338 | 11,780 | 58,790 |

Servicers implemented 43,739 new HAMP trial-period plans during the quarter, a decrease of 33.2 percent from the 65,484 trial plans initiated in the previous quarter. Prime mortgages, which represent 68 percent of the total portfolio and the risk category with the largest number of past-due loans, received more than half of the HAMP trial-period plans implemented during the quarter. Alt-A and subprime mortgages received less than a quarter of the HAMP trial plans implemented during the quarter. More than 43 percent of HAMP trial-period plans initiated during the second quarter were for Fannie Mae or Freddie Mac mortgages.

**Table 16. HAMP Trial-Period Plans, by Investor and Risk Category**
(Trial Plans Implemented in the Third Quarter of 2010)

|  | Fannie Mae | Freddie Mac | Government-Guaranteed | Portfolio | Private | Total |
|---|---|---|---|---|---|---|
| Prime | 6,471 | 5,353 | 7 | 5,711 | 5,858 | 23,400 |
| Alt-A | 1,988 | 1,529 | 4 | 2,794 | 2,401 | 8,716 |
| Subprime | 1,182 | 713 | 2 | 3,320 | 2,846 | 8,063 |
| Other | 1,307 | 492 | 3 | 638 | 1,120 | 3,560 |
| Total | 10,948 | 8,087 | 16 | 12,463 | 12,225 | 43,739 |

### *Newly Initiated Home Retention Actions Relative to Newly Initiated Foreclosures*

Newly initiated home retention actions relative to newly initiated foreclosure actions declined during the third quarter largely because of both the 17.0 percent decline in home retention actions and the 31.2 percent increase in newly initiated foreclosure actions. Servicers continued to implement more new home retention actions than new foreclosures overall.

| Table 17. Percentage of Newly Initiated Home Retention Actions by Risk Category | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
| Prime | 165.9% | 171.0% | 151.9% | 154.0% | 102.1% | -33.7% | -38.5% |
| Alt-A | 207.1% | 219.8% | 189.5% | 218.2% | 129.4% | -40.7% | -37.5% |
| Subprime | 224.8% | 248.2% | 201.7% | 273.4% | 159.2% | -41.8% | -29.2% |
| Other | 181.8% | 148.3% | 140.6% | 198.7% | 136.3% | -31.4% | -25.0% |
| Overall | 188.4% | 192.2% | 168.0% | 194.3% | 122.9% | -36.8% | -34.8% |
| Number of Newly Initiated Home Retention Actions | 695,409 | 600,575 | 621,626 | 566,890* | 470,321 | -17.0% | -32.4% |
| Number of Newly Initiated Foreclosures | 369,209 | 312,520 | 369,944 | 291,758 | 382,751 | 31.2% | 3.7% |

*Servicer resubmission of second quarter 2010 data to conform to reporting standard resulted in a 52,623 increase in new payment plans reported for the quarter.

### *Figure 8. Newly Initiated Home Retention Actions by Risk Category*



Percentage of Newly Initiated Foreclosures

### Types of Modification Actions

The types of modification actions or combinations of actions have different effects on the borrowers' mortgage structures and monthly principal and interest payments. Different actions may, over time, have different effects on the long-term sustainability of mortgages. Servicers generally use a combination of actions when modifying mortgages, with more than 90 percent of modifications implemented during the third quarter changing more than one of the original loan terms. Servicers capitalized missed fees and payments in 87.5 percent of all modifications made during the third quarter of 2010, reduced interest rates in 86.2 percent of the modified mortgages, and extended the loan maturity in 57.4 percent of all modifications. Servicers deferred repayment of some portion of the principal balance in 10.1 percent of all modifications, while principal reduction was used in 4.5 percent of modifications made in the quarter. Because most modifications changed more than one term, the total of the individual actions exceeds 100 percent of total modifications. Appendix D presents additional detail on combination modifications.

**Table 18.** Changes in Loan Terms for Modifications Made Through the Third Quarter of 2010
(Percentage of Total Modifications in Each Category)

| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
|---|---|---|---|---|---|---|---|
| Capitalization | 68.2% | 83.1% | 91.4% | 93.9% | 87.5% | -6.8% | 28.2% |
| Rate Reduction | 81.1% | 84.8% | 85.6% | 86.9% | 86.2% | -0.7% | 6.3% |
| Rate Freeze | 2.7% | 1.7% | 1.6% | 4.3% | 1.9% | -55.4% | -28.7% |
| Term Extension | 47.4% | 45.4% | 45.7% | 51.7% | 57.4% | 11.1% | 21.2% |
| Principal Reduction | 13.0% | 6.8% | 1.9% | 2.2% | 4.5% | 106.2% | -65.3% |
| Principal Deferral | 3.1% | 6.2% | 10.1% | 10.5% | 10.1% | -4.0% | 227.9% |
| Not Reported* | 1.9% | 1.2% | 0.4% | 0.6% | 2.0% | 253.0% | 8.4% |
| (Number of Changes in Each Category) | | | | | | | |
| Capitalization | 89,553 | 103,604 | 210,153 | 250,959 | 204,624 | -18.5% | 128.5% |
| Rate Reduction | 106,443 | 105,705 | 196,754 | 232,229 | 201,688 | -13.2% | 89.5% |
| Rate Freeze | 3,512 | 2,173 | 3,701 | 11,442 | 4,463 | -61.0% | 27.1% |
| Term Extension | 62,156 | 56,647 | 104,997 | 138,080 | 134,250 | -2.8% | 116.0% |
| Principal Reduction | 17,090 | 8,435 | 4,464 | 5,866 | 10,581 | 80.4% | -38.1% |
| Principal Deferral | 4,040 | 7,676 | 23,289 | 28,106 | 23,601 | -16.0% | 484.2% |
| Not Reported* | 2,447 | 1,512 | 915 | 1,531 | 4,727 | 208.8% | 93.2% |

*Processing constraints at some servicers prevented them from aggregating and reporting specific modified term(s).

## Types of HAMP Modification Actions

HAMP modifications follow a prescribed series of actions to attain a targeted monthly mortgage payment. Consistent with modification actions overall and the prescribed order of actions required by HAMP, capitalization of missed payments and fees, interest rate reductions, and term extensions were the prevailing actions on HAMP modifications. Principal deferral, another prescribed action in the HAMP hierarchy, was used in 24.6 percent of HAMP modifications during the third quarter of 2010 compared with 20.5 percent in the previous quarter, although the number of such modifications declined substantially. The use of principal reduction increased to 10.2 percent of all HAMP modifications implemented during the quarter, compared with 3.1 percent during the previous quarter.

**Table 19.** Changes in Loan Terms for HAMP Modifications Made Permanent Through the Third Quarter of 2010

| | Total Number of Changes in Each Category | | | | Percentage of Modifications in Each Category | | | |
|---|---|---|---|---|---|---|---|---|
| | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 12/31/09 (of 21,878) | 3/31/10 (of 100,301) | 6/30/10 (of 108,257) | 9/30/2010 (of 58,790) |
| Capitalization | 21,538 | 97,688 | 106,961 | 56,210 | 98.4% | 97.4% | 98.8% | 95.6% |
| Rate Reduction | 21,321 | 94,167 | 101,211 | 56,402 | 97.5% | 93.9% | 93.5% | 95.9% |
| Rate Freeze | 35 | 150 | 1,148 | 83 | 0.2% | 0.1% | 1.1% | 0.1% |
| Term Extension | 11,070 | 46,415 | 53,253 | 32,744 | 50.6% | 46.3% | 49.2% | 55.7% |
| Principal Reduction | 22 | 162 | 3,342 | 6,011 | 0.1% | 0.2% | 3.1% | 10.2% |
| Principal Deferral | 5,984 | 19,340 | 22,218 | 14,454 | 27.4% | 19.3% | 20.5% | 24.6% |
| Not Reported* | 154 | 167 | 78 | 151 | 0.7% | 0.2% | 0.1% | 0.3% |

*Processing constraints at some servicers prevented them from aggregating and reporting specific modified term(s).

### Types of Modification Actions, by Risk Category

Servicers use a combination of actions when modifying mortgages, and no single action can be identified as the primary component of a successful modification. Modifications across all risk categories predominantly featured interest rate reduction and term extension in addition to the capitalization of past-due interest and fees. Because most modifications changed more than one term, the number of individual features changed exceeds the total number of modified loans in each risk category. The mix of capitalization, rate reduction, and term extension in modified mortgages did not differ significantly among prime, Alt-A, and subprime mortgages. Principal deferral was used more extensively in modifications of prime mortgages than other risk categories to attain sustainable monthly payments relative to the borrowers' income level in accordance with HAMP and other modification program guidelines.

| Table 20. Changes in Loan Terms for Modifications, by Risk Category in Third Quarter 2010 | | | | | |
|---|---|---|---|---|---|
| (Percentage of Total Modifications in Each Category) | | | | | |
|  | Prime | Alt-A | Subprime | Other | Overall |
| Capitalization | 82.7% | 89.5% | 90.4% | 95.9% | 87.5% |
| Rate Reduction | 83.3% | 86.6% | 89.8% | 89.4% | 86.2% |
| Rate Freeze | 1.3% | 2.1% | 2.1% | 3.3% | 1.9% |
| Term Extension | 56.0% | 56.2% | 58.3% | 62.7% | 57.4% |
| Principal Reduction | 6.3% | 4.4% | 3.2% | 0.9% | 4.5% |
| Principal Deferral | 13.7% | 8.8% | 5.8% | 7.6% | 10.1% |
| Not Reported* | 3.1% | 1.8% | 0.9% | 0.8% | 2.0% |
| (Number of Changes in Each Category) | | | | | |
| Total Mortgages Modified | 103,331 | 45,827 | 55,328 | 29,367 | 233,853 |
| Capitalization | 85,458 | 40,996 | 50,004 | 28,166 | 204,624 |
| Rate Reduction | 86,047 | 39,686 | 49,697 | 26,258 | 201,688 |
| Rate Freeze | 1,330 | 983 | 1,184 | 966 | 4,463 |
| Term Extension | 57,820 | 25,735 | 32,274 | 18,421 | 134,250 |
| Principal Reduction | 6,522 | 2,013 | 1,774 | 272 | 10,581 |
| Principal Deferral | 14,124 | 4,048 | 3,185 | 2,244 | 23,601 |
| Not Reported* | 3,158 | 817 | 503 | 249 | 4,727 |

*Processing constraints at some servicers prevented them from reporting specific modified term(s).

### *Types of Modification Actions, by Investor and Product Type*

Modifications of mortgages serviced for the GSEs—Fannie Mae and Freddie Mac—accounted for 44.2 percent of third quarter modifications. Mortgages serviced for private investors received 20.3 percent of all modifications, while government-guaranteed loans received 17.6 percent. Mortgages held in servicer portfolios received 17.9 percent of third quarter modifications. Table 21 shows the distribution of the types of modification actions by investor. Because modifications often change more than one term, the number exceeds the total number of modified loans for each investor.

Interest rate reduction, on loans that may also include the capitalization of missed payments and fees, remained the primary type of modification for all investors and product types, with term extension used in a majority of GSE, government-guaranteed, and portfolio modifications. Principal deferral, one of the actions prescribed by HAMP and other modification programs, was increasingly used in GSE, private investor, and portfolio modifications to attain sustainable monthly payments relative to the borrowers' income level. Principal reduction was used almost exclusively for loans held in portfolio.

| Table 21. Type of Modification Action, by Investor, in Third Quarter 2010 | | | | | | |
|---|---|---|---|---|---|---|
| (Percentage of Total Modifications in Each Category) | | | | | | |
| | Fannie Mae | Freddie Mac | Government-Guaranteed | Private Investor | Portfolio | Overall |
| Capitalization | 98.3% | 98.2% | 99.6% | 78.8% | 58.8% | 87.5% |
| Rate Reduction | 91.1% | 78.7% | 97.1% | 87.5% | 70.8% | 86.2% |
| Rate Freeze | 2.2% | 2.9% | 0.4% | 2.0% | 2.0% | 1.9% |
| Term Extension | 51.0% | 67.4% | 81.0% | 38.8% | 59.6% | 57.4% |
| Principal Reduction | 0.0% | 0.0% | 0.0% | 0.2% | 25.1% | 4.5% |
| Principal Deferral | 11.7% | 12.6% | 0.1% | 11.5% | 13.8% | 10.1% |
| Not Reported* | 0.2% | 0.3% | 0.2% | 1.2% | 9.1% | 2.0% |
| (Number of Changes in Each Category) | | | | | | |
| Total Mortgages Modified | 74,311 | 29,051 | 41,177 | 47,568 | 41,746 | 233,853 |
| Capitalization | 73,032 | 28,534 | 41,009 | 37,488 | 24,561 | 204,624 |
| Rate Reduction | 67,682 | 22,852 | 39,978 | 41,603 | 29,573 | 201,688 |
| Rate Freeze | 1,644 | 842 | 183 | 939 | 855 | 4,463 |
| Term Extension | 37,928 | 19,590 | 33,363 | 18,469 | 24,900 | 134,250 |
| Principal Reduction | 4 | 2 | 0 | 111 | 10,464 | 10,581 |
| Principal Deferral | 8,659 | 3,669 | 30 | 5,486 | 5,757 | 23,601 |
| Not Reported* | 185 | 91 | 80 | 554 | 3,817 | 4,727 |

*Processing constraints at some servicers prevented them from reporting specific modified term(s).

### *Types of HAMP Modification Actions, by Investor and Product Type*

Of the 58,790 HAMP modifications implemented in the third quarter, 50.1 percent were on GSE— Fannie Mae and Freddie Mac mortgages, 27.8 percent were on mortgages held in servicers' portfolios, and 20.0 percent were on mortgages serviced for private investors. Consistent with overall modification actions, interest rate reduction on modifications that included capitalization of past-due interest and fees and often term extension were the prevailing actions among HAMP modifications. Principal deferral was used in a significant number of HAMP modifications for all investors other than government-guaranteed loans. Principal reduction was used almost exclusively for loans held in portfolio.

| Table 22. Type of HAMP Modification Action by Investor in Second Quarter 2010 | | | | | | |
|---|---|---|---|---|---|---|
| (Percentage of Total Modifications in Each Category) | | | | | | |
| | Fannie Mae | Freddie Mac | Government-Guaranteed | Private Investor | Portfolio | Overall |
| Capitalization | 97.1% | 97.1% | 98.0% | 99.4% | 90.0% | 95.6% |
| Rate Reduction | 94.4% | 94.8% | 99.2% | 96.0% | 98.1% | 95.9% |
| Rate Freeze | 0.0% | 0.2% | 0.0% | 0.2% | 0.2% | 0.1% |
| Term Extension | 54.4% | 57.6% | 47.1% | 32.4% | 72.8% | 55.7% |
| Principal Reduction | 0.0% | 0.0% | 0.0% | 0.4% | 36.5% | 10.2% |
| Principal Deferral | 21.5% | 20.8% | 0.0% | 31.4% | 27.5% | 24.6% |
| Not Reported* | 0.4% | 0.3% | 0.3% | 0.2% | 0.2% | 0.3% |
| (Number of Changes in Each Category) | | | | | | |
| Total Mortgages Modified | 15,863 | 13,675 | 1,134 | 11,780 | 16,338 | 58,790 |
| Capitalization | 15,408 | 13,284 | 1,111 | 11,707 | 14,700 | 56,210 |
| Rate Reduction | 14,976 | 12,961 | 1,125 | 11,310 | 16,030 | 56,402 |
| Rate Freeze | 6 | 27 | 0 | 25 | 25 | 83 |
| Term Extension | 8,632 | 7,881 | 534 | 3,811 | 11,886 | 32,744 |
| Principal Reduction | 1 | 1 | 0 | 52 | 5,957 | 6,011 |
| Principal Deferral | 3,417 | 2,851 | 0 | 3,700 | 4,486 | 14,454 |
| Not Reported* | 59 | 42 | 3 | 22 | 25 | 151 |

*Processing constraints at some servicers prevented them from reporting specific modified term(s).

## Changes to Monthly Payments Resulting From Modification

The previous sections of this report describe the types of modification actions across risk categories, investors, and product types. This section describes the effect of those changes on borrowers' monthly principal and interest payments.

Modifications that decrease payments occur when servicers elect to lower interest rates, extend the amortization period, or forgive or defer principal. The reduced payments can make mortgages more affordable and more sustainable over time. However, the lower payments also result in less monthly cash flow and interest income to the mortgage investor.

Mortgage modifications may increase monthly payments when borrowers and servicers agree to add past-due interest, advances for taxes or insurance, and other fees to the loan balances and re-amortize the new balances over the remaining life of the mortgages. The interest rate or maturity of the loans may be changed on these modifications but not enough to offset the increase in payment caused by the additional capitalized principal. Modifications may also result in increased monthly payments when interest rates or principal payments on adjustable rate mortgages and option ARMs are reset higher but by less than the amount indicated in the original mortgage contracts.

Modifications that increase payments may be appropriate when borrowers experience temporary cash flow or liquidity problems or have reasonable prospects to make the higher payments to repay the debt over time. However, during periods of prolonged economic stress, this strategy carries additional risk, underscoring the importance of verifying borrowers' income and debt payment ability so that borrowers and servicers have confidence that the modifications will be sustainable.

Servicers also modify some mortgages that leave principal and interest payments unchanged. This occurs, for example, when servicers "freeze" current interest rates and payments instead of allowing them to increase to levels required by the original mortgage contracts.

### Changes to Monthly Payments Resulting From Modifications, by Quarter

More than 88 percent of all modifications in the third quarter lowered monthly principal and interest payments. More than 54 percent of the modifications reduced the payment by 20 percent or more. Another 18 percent reduced the payment by 10 percent to 20 percent. Modifications that resulted in a higher payment declined slightly to 8.1 percent of all third quarter modifications.

**Table 23. Changes in Monthly Principal and Interest Payments Resulting From Modifications**
(Percentage of Modifications in Each Category)*

| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
|---|---|---|---|---|---|---|---|
| Decreased by 20% or More | 37.2% | 42.3% | 54.6% | 55.9% | 54.1% | -3.1% | 45.6% |
| Decreased by 10% to Less Than 20% | 18.4% | 19.1% | 17.7% | 17.8% | 18.0% | 1.6% | -1.9% |
| Decreased by Less Than 10% | 24.5% | 21.0% | 14.9% | 16.3% | 16.0% | -1.7% | -34.6% |
| **Subtotal for Decreased** | **80.1%** | **82.4%** | **87.3%** | **90.0%** | **88.2%** | **-1.9%** | **10.1%** |
| Unchanged | 3.6% | 4.6% | 2.9% | 1.9% | 3.7% | 96.9% | 3.1% |
| Increased | 16.3% | 13.0% | 9.9% | 8.2% | 8.1% | -0.8% | -50.4% |
| **Subtotal for Unchanged and Increased** | **19.9%** | **17.6%** | **12.7%** | **10.0%** | **11.8%** | **17.4%** | **-40.8%** |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | | |
| (Number of Modifications in Each Category) | | | | | | | |
| Decreased by 20% or More | 48,352 | 51,956 | 125,036 | 148,803 | 125,301 | -15.8% | 159.1% |
| Decreased by 10% to Less Than 20% | 23,915 | 23,494 | 40,557 | 47,258 | 41,743 | -11.7% | 74.5% |
| Decreased by Less Than 10% | 31,867 | 25,739 | 34,119 | 43,413 | 37,097 | -14.5% | 16.4% |
| Subtotal for Decreased | **104,134** | **101,189** | **199,712** | **239,474** | **204,141** | **-14.8%** | **96.0%** |
| Unchanged | 4,651 | 5,591 | 6,589 | 4,984 | 8,532 | 71.2% | 83.4% |
| Increased | 21,254 | 15,975 | 22,585 | 21,760 | 18,761 | -13.8% | -11.7% |
| Subtotal for Unchanged and Increased | **25,905** | **21,566** | **29,174** | **26,744** | **27,293** | **2.1%** | **5.4%** |
| Total | 130,039 | 122,755 | 228,886 | 266,218 | 231,434 | -13.1% | 78.0% |

*Payment change information was not reported on 1,208 in the third quarter of 2009, 1,943 in the fourth quarter of 2009, 987 in the first quarter of 2010, 1,112 in the second quarter of 2010, and 2,419 in the third quarter of 2010.

**Figure 9. Changes in Monthly Principal and Interest Payments**



Percentage of Modifications in Each Category

Increased   ■ Unchanged   Decreased

### *Changes to Monthly Payments Resulting From HAMP Modifications, by Quarter*

Consistent with the HAMP emphasis on promoting sustainable payments, nearly all HAMP modifications reduced monthly payments, with 76.0 percent reducing payments by more than 20 percent. In addition to achieving lower payments, HAMP attempts to increase payment sustainability by targeting monthly housing payments at 31 percent of borrowers' income. Performance data on other modifications show that reduced monthly payments result in lower re-default rates over time, and that the greater the decrease in payment, the lower the rate of subsequent re-default.

*Table 24.* **Changes in Monthly Principal and Interest Payments Resulting From HAMP Modifications**
(Percentage of HAMP Modifications)*

| | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change |
|---|---|---|---|---|---|
| Decreased by 20% or More | 81.6% | 78.2% | 78.4% | 76.0% | -3.1% |
| Decreased by 10% to Less Than 20% | 10.8% | 12.6% | 12.5% | 13.3% | 6.6% |
| Decreased by Less Than 10% | 6.2% | 7.6% | 7.9% | 8.8% | 11.4% |
| **Subtotal for Decreased** | **98.6%** | **98.4%** | **98.8%** | **98.1%** | **-0.7%** |
| Unchanged | 1.2% | 1.5% | 0.7% | 0.3% | -59.2% |
| Increased | 0.2% | 0.1% | 0.5% | 1.6% | 235.0% |
| **Subtotal for Unchanged and Increased** | **1.4%** | **1.6%** | **1.2%** | **1.9%** | **62.6%** |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | |

| (Number of HAMP Modifications) | | | | | |
|---|---|---|---|---|---|
| | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change |
| Decreased by 20% or More | 17,601 | 78,295 | 84,731 | 44,528 | -47.4% |
| Decreased by 10% to Less Than 20% | 2,338 | 12,620 | 13,487 | 7,803 | -42.1% |
| Decreased by Less Than 10% | 1,333 | 7,580 | 8,522 | 5,150 | -39.6% |
| Subtotal for Decreased | 21,272 | 98,495 | 106,740 | 57,481 | -46.1% |
| Unchanged | 264 | 1,489 | 746 | 165 | -77.9% |
| Increased** | 40 | 74 | 527 | 958 | 81.8% |
| Subtotal for Unchanged and Increased | 304 | 1,563 | 1,273 | 1,123 | -11.8% |
| Total | 21,576 | 100,058 | 108,013 | 58,604 | -45.7% |

*Payment change information was not reported on 302 HAMP modifications in the fourth quarter of 2009, 243 in the first quarter of 2010, 244 in the second quarter of 2010, and 186 in the third quarter of 2010.

**A small number of HAMP modifications, like other modifications, may increase the borrowers' monthly principal and interest payment when loans with a previous interest-only or partial payment are modified to amortize the loan over its remaining term. While the principal and interest portion of the payment might increase, the total payment will reflect a housing expense ratio of 31 percent as specified by HAMP.

## *Average Change to Monthly Payments Resulting From Modifications, by Quarter*

Modifications made during the third quarter reduced monthly principal and interest payments by an average of $396. HAMP modifications made during the quarter reduced payments by an average of $585, compared with other modifications that reduced average monthly payments by $332 overall. The emphasis on repayment sustainability through reduced monthly payments has resulted in the average monthly savings increasing 53.7 percent from a year ago.

**Table 25. Average Change in Monthly Payments Resulting From Modifications**

| All Modifications | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
|---|---|---|---|---|---|---|---|
| Decreased by 20% or More | ($622)* | ($624) | ($663) | ($695) | ($673) | -3.3% | 8.1% |
| Decreased by 10% to Less Than 20% | ($198) | ($185) | ($189) | ($187) | ($188) | 0.7% | -5.4% |
| Decreased by Less Than 10% | ($56) | ($62) | ($67) | ($68) | ($59) | -13.0% | 5.8% |
| Unchanged | -- | -- | -- | -- | -- | -- | -- |
| Increased | $146 | $154 | $163 | $132 | $139 | 5.3% | -4.8% |
| Overall | ($258) | ($293) | ($389) | ($422) | ($396) | -6.2% | 53.7% |
| **Other Modifications** | | | | | | | |
| Decreased by 20% or More | ($620) | ($569) | ($581) | ($647) | ($643) | -0.6% | 3.7% |
| Decreased by 10% to Less Than 20% | ($198) | ($181) | ($174) | ($174) | ($181) | 4.2% | -8.7% |
| Decreased by Less Than 10% | ($56) | ($61) | ($62) | ($64) | ($55) | -13.7% | -0.8% |
| Unchanged | -- | -- | -- | -- | -- | -- | -- |
| Increased* | $146 | $154 | $164 | $131 | $138 | 5.7% | -5.2% |
| Overall | ($255) | ($221) | ($233) | ($296) | ($332) | 12.3% | 30.0% |
| **HAMP Modifications** | | | | | | | |
| Decreased by 20% or More | ($795) | ($732) | ($711) | ($732) | ($726) | -0.8% | -8.7% |
| Decreased by 10% to Less Than 20% | ($216) | ($221) | ($223) | ($219) | ($217) | -0.8% | 0.6% |
| Decreased by Less Than 10% | ($73) | ($81) | ($85) | ($83) | ($82) | -1.2% | 12.4% |
| Unchanged | -- | -- | -- | -- | -- | -- | -- |
| Increased** | -- | $140 | $78 | $172 | $149 | -13.5% | |
| Overall | ($719) | ($626) | ($591) | ($607) | ($585) | -3.6% | -18.6% |

*Parentheses indicates that, on average, borrowers' monthly payments decreased by the amount enclosed within the parentheses.

**Some modifications may increase the borrowers' monthly principal and interest payment when past-due interest, advances for taxes or insurance and other fees are added to the loan balance, or when loans with a previous interest-only or partial payment are modified to amortize the loan over its remaining term.

## B. Modified Loan Performance

### *Re-Default Rates of Modified Loans: 60 or More Days Delinquent*

More recent modifications continued to perform better than earlier modifications, continuing the improving trend noted in previous quarters. The better performance of more recent modifications corresponds with the ongoing emphasis on lowering monthly payments and improving payment sustainability.

| Table 26. Modified Loans 60 or More Days Delinquent | | | | |
|---|---|---|---|---|
| Modification Date | 3 Months After Modification | 6 Months After Modification | 9 Months After Modification | 12 Months After Modification |
| Second Quarter 2009 | 18.7% | 33.5% | 40.8% | 43.1% |
| Third Quarter 2009 | 14.7% | 27.7% | 32.7% | 36.7% |
| Fourth Quarter 2009 | 11.3% | 20.2% | 27.6% | -- |
| First Quarter 2010 | 11.2% | 19.1% | -- | -- |
| Second Quarter 2010 | 10.5% | -- | -- | -- |

*All re-default data is based on modified loans that remain in effect at the specified amount of time after the modification. All loans that have been repaid in full, refinanced, or sold, or have completed the foreclosure process are removed from the calculation. Data include only modifications that have had time to age the indicated number of months.



*Figure 10.* **Modified Loans 60 or More Days Delinquent**

### *Re-Default Rates of Modified Loans:  30 or More Days Delinquent*

Re-default rates measured at 30 or more days delinquent provide an early indicator of mortgages that may need additional attention to prevent more serious delinquency or foreclosure. Modifications made since the second quarter of 2009 consistently show lower 30-day re-default rates than previous modifications as a result of the increased emphasis on sustainability.

| Table 27.  Modified Loans 30 or More Days Delinquent | | | | |
|---|---|---|---|---|
| Modification Date | 3 Months After Modification | 6 Months After Modification | 9 Months After Modification | 12 Months After Modification |
| Second Quarter 2009 | 34.2% | 47.5% | 52.6% | 54.4% |
| Third Quarter 2009 | 29.8% | 40.6% | 44.5% | 47.6% |
| Fourth Quarter 2009 | 24.5% | 33.7% | 40.4% | -- |
| First Quarter 2010 | 23.6% | 32.3% | -- | -- |
| Second Quarter 2010 | 23.5% | -- | -- | -- |

*Data include only modifications that have had time to age the indicated number of months.



**Figure 11.  Modified Loans 30 or More Days Delinquent**

### *Re-Default Rates of Modified Loans: 90 or More Days Delinquent*

The percentage of modified mortgages that were 90 or more days delinquent after modification was naturally lower than shorter-term delinquency measures. As with other measures of modification sustainability, more recent modifications have outperformed previous vintages of loan modifications.

| Table 28. Modified Loans 90 or More Days Delinquent | | | | |
|---|---|---|---|---|
| Modification Date | 3 Months After Modification | 6 Months After Modification | 9 Months after Modification | 12 Months After Modification |
| Second Quarter 2009 | 9.6% | 24.4% | 33.3% | 36.6% |
| Third Quarter 2009 | 6.4% | 19.8% | 25.5% | 29.8% |
| Fourth Quarter 2009 | 5.4% | 13.2% | 20.2% | -- |
| First Quarter 2010 | 6.1% | 12.2% | -- | -- |
| Second Quarter 2010 | 4.7% | -- | -- | -- |

*Data include only modifications that have had time to age the indicated number of months.

**Figure 12. Modified Loans 90 or More Days Delinquent**



### *Re-Default Rate, by Investor (60 or More Days Delinquent)*

Modifications on mortgages held in the servicers' own portfolios performed better than modifications on mortgages serviced for others. Re-default rates for government-guaranteed mortgages were highest over time, corresponding to the higher risk associated with those mortgages. The lower re-default rates for portfolio mortgages may reflect differences in modification programs and additional flexibility to modify terms for greater sustainability. Consistent with trends shown elsewhere, recent vintages of modifications performed better than earlier modifications. After 6 months, 19.1 percent of mortgages modified in 2010 were 60 or more days delinquent, compared with 32.1 percent of modifications made in 2009 and 45.4 percent of modifications made in 2008 (see tables 29, 30, and 31).

**Table 29.** Re-Default Rates for Portfolio Loans and Loans Serviced for Others Modified in 2008 (60 or More Days Delinquent)*

| Investor Loan Type | 3 Months After Modification | 6 Months After Modification | 9 Months After Modification | 12 Months After Modification |
|---|---|---|---|---|
| Fannie Mae | 30.2% | 44.9% | 54.1% | 59.5% |
| Freddie Mac | 22.7% | 40.0% | 51.2% | 57.5% |
| Government-Guaranteed | 32.5% | 53.6% | 63.7% | 67.8% |
| Private | 36.8% | 49.1% | 56.1% | 61.2% |
| Portfolio Loans | 16.2% | 27.9% | 35.0% | 40.0% |
| Overall | 31.7% | 45.4% | 53.2% | 58.2% |

**Table 30.** Re-Default Rates for Portfolio Loans and Loans Serviced for Others Modified in 2009 (60 or More Days Delinquent)*

| Investor Loan Type | 3 Months After Modification | 6 Months after Modification | 9 Months after Modification | 12 Months After Modification |
|---|---|---|---|---|
| Fannie Mae | 17.9% | 31.3% | 37.7% | 48.0% |
| Freddie Mac | 28.3% | 36.5% | 41.5% | 54.7% |
| Government-Guaranteed | 23.4% | 42.2% | 51.7% | 58.2% |
| Private | 28.0% | 40.7% | 48.7% | 54.8% |
| Portfolio Loans | 7.1% | 15.2% | 20.9% | 25.6% |
| Overall | 19.9% | 32.1% | 39.4% | 45.9% |

**Table 31.** Re-Default Rates for Portfolio Loans and Loans Serviced for Others Modified in 2010 (60 or More Days Delinquent)*

| Investor Loan Type | 3 Months After Modification | 6 Months After Modification | 9 Months After Modification | 12 Months After Modification |
|---|---|---|---|---|
| Fannie Mae | 11.2% | 17.1% | -- | -- |
| Freddie Mac | 7.7% | 13.2% | -- | -- |
| Government-Guaranteed | 13.2% | 30.2% | -- | -- |
| Private | 12.3% | 20.5% | -- | -- |
| Portfolio Loans | 7.3% | 13.9% | -- | -- |
| Overall | 10.8% | 19.1% | -- | -- |

*Data include all modifications implemented during 2010 that have aged the indicated number of months.

### *Performance of HAMP Modifications Compared With Other Modifications*

HAMP modifications were performing better than other modifications implemented during the same periods at the end of the third quarter of 2010. These lower post-modification delinquency rates reflect HAMP's emphasis on the affordability of monthly payments relative to the borrower's income, verification of income, and completion of a successful trial payment period.

| Table 32. Performance of HAMP Modifications Compared with Other Modifications* | | | | |
|---|---|---|---|---|
| (60 or More Days Delinquent) | | | | |
| | Number of Modifications | 3 Months After Modification | 6 Months After Modification | 9 Months After Modification |
| HAMP Fourth Quarter 2009 | 21,878 | 7.7% | 10.6% | 14.4% |
| Other Fourth Quarter 2009 | 102,820 | 12.0% | 22.2% | 30.3% |
| HAMP First Quarter 2010 | 100,301 | 10.6% | 12.6% | -- |
| Other First Quarter 2010 | 129,572 | 11.6% | 24.1% | -- |
| HAMP Second Quarter 2010 | 108,257 | 8.1% | -- | -- |
| Other Second Quarter 2010 | 159,073 | 12.1% | -- | -- |

*Data include all modifications that have had time to age the indicated number of months.

*Figure 13.* **Performance of HAMP Modifications Compared With Other Modifications**



(60 or More Days Delinquent)

■ HAMP Fourth Quarter 2009    ■ Other Fourth Quarter 2009    ■ HAMP First Quarter 2010
☐ Other First Quarter 2010    ☐ HAMP Second Quarter 2010    ■ Other Second Quarter 2010

## C. Modified Loan Performance, by Change in Monthly Payments

Many factors influence mortgage delinquencies, including employment status, amount of homeowner equity, total homeowner debt, life-changing events, and poor initial underwriting.

Similar factors drive re-default rates of modified mortgages. However, the data in this section consistently show that re-default rates have been lower for modifications that reduce monthly payments. The data also show that the larger the reduction in monthly payment, the lower the subsequent re-default rate. Lower recent re-default rates may also result from the increased emphasis of HAMP and other modification programs to lower monthly payments relative to the borrower's income and ability to repay, as well as verification of income and completion of a successful trial period.

For servicers and investors, determining the optimal type of modification often requires weighing the reduction in cash flow from loan terms that reduce monthly principal and interest payments, along with the possible costs of delaying foreclosure, against the potential for longer-term sustainability of the payments and ultimate repayment of the mortgage.

### Re-Default Rates of Loans by Change in Payment

The following tables present the re-default rates, measured as 60 or more days delinquent, for modifications made since January 1, 2008. Data show re-default rates decreased as reduction in monthly principal and interest payments increased. Also, the re-default rates were lower among modifications made in 2009 and 2010 compared with 2008 modifications, likely reflecting servicer emphasis on repayment sustainability and the borrower's ability to repay the debt.

| Table 33. Re-Default Rates of Loans Modified in 2008 by Change in Payment | | | | |
|---|---|---|---|---|
| (60 or More Days Delinquent)* | | | | |
| | 3 Months After Modification | 6 Months After Modification | 9 Months After Modification | 12 Months After Modification |
| Decreased by 20% or More | 15.8% | 26.0% | 33.4% | 39.5% |
| Decreased by 10% to Less Than 20% | 20.9% | 33.1% | 41.6% | 48.2% |
| Decreased by Less Than 10% | 24.0% | 40.7% | 50.3% | 56.0% |
| Unchanged | 47.4% | 56.8% | 62.5% | 65.9% |
| Increased | 35.4% | 54.7% | 63.8% | 69.0% |
| Total | 31.6% | 45.2% | 53.0% | 58.1% |

| Table 34. Re-Default Rates of Loans Modified in 2009 by Change in Payment | | | | |
|---|---|---|---|---|
| (60 or More Days Delinquent)* | | | | |
| | 3 Months After Modification | 6 Months after Modification | 9 Months After Modification | 12 Months After Modification |
| Decreased by 20% or More | 11.1% | 19.5% | 25.4% | 31.7% |
| Decreased by 10% to Less Than 20% | 16.1% | 29.8% | 37.8% | 44.1% |
| Decreased by Less Than 10% | 17.9% | 34.2% | 42.9% | 48.3% |
| Unchanged | 46.7% | 51.4% | 56.6% | 62.0% |
| Increased | 26.6% | 46.6% | 56.0% | 61.2% |
| Total | 19.8% | 32.1% | 39.4% | 45.9% |

| Table 35. Re-Default Rates of Loans Modified in 2010 by Change in Payment | | | | |
|---|---|---|---|---|
| (60 or More Days Delinquent)* | | | | |
| | 3 Months After Modification | 6 Months After Modification | 9 Months After Modification | 12 Months after Modification |
| Decreased by 20% or More | 7.8% | 11.7% | -- | -- |
| Decreased by 10% to Less Than 20% | 10.7% | 21.2% | -- | -- |
| Decreased by Less Than 10% | 14.5% | 28.4% | -- | -- |
| Unchanged | 25.2% | 33.4% | -- | -- |
| Increased | 19.1% | 37.7% | -- | -- |
| Total | 10.8% | 19.1% | -- | -- |

*Data include all modifications implemented during 2010 that have aged the indicated number of months. Data do not include modifications for which payment change was not reported.

### 60+ Delinquency at 6 Months After Modification by Change to Monthly Payments

Modifications that significantly reduce monthly principal and interest payments consistently performed better than modifications that increase monthly payment unchanged. Modifications with the greatest decrease in monthly payment consistently had the lowest re-default rates. More recent modifications have also tended to perform better than earlier modifications as servicers have increasingly emphasized lower monthly payments and payment sustainability when modifying loan terms.

**Table 36.  60+ Delinquency at 6 Months After Modification by Change to Monthly Payments**

|  | Decreased by 20% or More | Decreased by 10% to Less Than 20% | Decreased by Less Than 10% | Unchanged | Increased | Overall |
|---|---|---|---|---|---|---|
| Second Quarter 2009 | 20.9% | 35.0% | 39.9% | 34.9% | 52.9% | 33.6% |
| Third Quarter 2009 | 18.1% | 30.1% | 31.9% | 30.9% | 39.9% | 27.7% |
| Fourth Quarter 2009 | 11.4% | 21.2% | 27.1% | 12.3% | 37.6% | 20.1% |
| First Quarter 2010 | 11.7% | 21.2% | 28.4% | 33.4% | 37.7% | 19.1% |
| Overall | 14.6% | 26.3% | 31.8% | 28.1% | 42.6% | 24.4% |

*Data include all modifications that have had time to age the indicated number of months.  Data do not include modifications for which payment change data was not reported.

**Figure 14.  60+ Delinquency at 6 Months After Modification by Change to Monthly Payments**



Months after Modification

■ Second Quarter 2009   ■ Third Quarter 2009   ☐ Fourth Quarter 2009   ■ First Quarter 2010   ■ Overall

OCC and OTS Mortgage Metrics Report, Third Quarter 2010

### Status of Mortgages Modified in 2008-2010

Servicers implemented 421,322 loan modifications in 2008, 587,500 in 2009, and 497,203 in the first two quarters of 2010, for a total of 1,506,025 loan modifications during this period. Of these modifications, 46.9 percent were current and performing on their modified terms at the end of the third quarter of 2010. Another 1.1 percent were paid off. Less than half were delinquent, in process of foreclosure or had completed the foreclosure process. Modifications that reduced borrowers' monthly payments by 10 percent or more performed significantly better than modifications that reduced payments less than 10 percent, increased the payments, or left the payments unchanged. Of the nearly 794,686 modifications that reduced payments by 10 percent or more, 58.9 percent were current and performing at the end of the second quarter, compared with 33.4 percent of modifications that reduced payments less than 10 percent.

Modifications on mortgages held in the servicers' own portfolio and those serviced for GSEs performed better than modifications of mortgages serviced for other investors. At the end of the third quarter 2010, 58.9 percent of modifications of loans held in servicer portfolios and 58.7 percent of modifications made to GSE mortgages were current and performing, compared with 36.8 percent of modifications on mortgages held by other investors.

| Table 37. Status of Modified Mortgages in 2008-2010 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total | Current | 30-59 Days Delinquent | Seriously Delinquent | Foreclosures in Process | Completed Foreclosures | Paid Off | No Longer in the Portfolio* |
| 2008 | 421,322 | 25.8% | 7.5% | 29.9% | 14.5% | 10.2% | 2.5% | 9.5% |
| 2009 | 587,500 | 43.5% | 10.0% | 27.7% | 10.9% | 3.3% | 0.9% | 3.8% |
| 2010** | 497,203 | 68.7% | 12.6% | 14.4% | 3.2% | 0.2% | 0.2% | 0.8% |
| Total | 1,506,025 | 46.9% | 10.2% | 23.9% | 9.4% | 4.2% | 1.1% | 4.4% |
| Modifications That Reduced Payments by 10 Percent or More | | | | | | | | |
| Modifications That Reduced Payments by 10% or More | 794,686 | 58.9% | 10.4% | 17.9% | 6.4% | 2.1% | 0.6% | 3.7% |
| ModificationsThat Reduced Payments by Less than 10 Percent | | | | | | | | |
| Modifications That Reduced Payments by Less than 10% | 711,339 | 33.4% | 9.9% | 30.6% | 12.6% | 6.6% | 1.7% | 5.2% |
| Status of Modifications by Major Investor Categories | | | | | | | | |
| Portfolio | 309,359 | 58.9% | 8.4% | 15.6% | 7.1% | 2.2% | 1.4% | 6.4% |
| GSE | 381,013 | 58.7% | 10.8% | 15.1% | 8.8% | 3.4% | 0.9% | 2.3% |
| Other*** | 815,653 | 36.8% | 10.5% | 31.2% | 10.5% | 5.3% | 1.1% | 4.6% |

*Processing constraints at some servicers prevented reporting on some loans they no longer serviced. These loans may have been refinanced or paid in full, transferred or sold to another entity, or removed from the servicing system through foreclosure, short sale, or a deed-in-lieu-of-foreclosure action.

**Includes only modifications implemented during the first two quarters of 2010 that have been in effect at least three months.

***Includes all government-guaranteed and private investor mortgages.

## *Part III: Home Forfeiture Actions: Foreclosures, Short Sales, and Deed-in-Lieu-of-Foreclosure Actions*

### *Completed Foreclosures and Other Home Forfeiture Actions*

Home forfeiture actions—foreclosure sales, short sales, and deed-in-lieu-of-foreclosure actions—totaled 244,840 during the third quarter of 2010, an increase of 11.2 percent from the previous quarter and an increase of 62.6 percent from a year ago. Completed foreclosures increased to 186,854—14.7 percent from the previous quarter and 57.5 percent from a year ago. Short sales increased slightly during the quarter and remained less than 23 percent of home forfeiture actions overall. Deed-in-lieu-of-foreclosure actions remained a very small portion of home forfeiture actions. While home forfeiture actions increased in the third quarter, servicers implemented almost twice as many home retention actions—loan modifications, trial-period plans, and payment plans—as home forfeiture actions.

While HAMP and proprietary foreclosure prevention programs are designed to help a significant number of distressed homeowners, these programs are not expected to help all delinquent borrowers. In this regard, servicers indicated that completed foreclosures and other home forfeiture actions are likely to continue rising as alternatives for seriously delinquent borrowers are exhausted and loans in process of foreclosure proceed to foreclosure sale.

| Table 38. Completed Foreclosures and Other Home Forfeiture Actions | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 9/30/09 | 12/31/09 | 03/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
| Completed Foreclosures | 118,606 | 128,859 | 152,882 | 162,904 | 186,854 | 14.7% | 57.5% |
| New Short Sales | 30,766 | 37,584 | 41,031 | 55,441 | 56,257 | 1.5% | 82.9% |
| New Deed-in-Lieu-of-Foreclosure Actions | 1,233 | 1,054 | 1,202 | 1,753 | 1,729 | -1.4% | 40.2% |
| Total | 150,605 | 167,497 | 195,115 | 220,098 | 244,840 | 11.2% | 62.6% |
| Newly Initiated Home Retention Actions Relative to Completed Foreclosures and Other Home Forfeiture Actions | 461.7% | 358.6% | 318.6% | 257.6% | 192.1% | -25.4% | -58.4% |

### *Newly Initiated Foreclosures*

Foreclosure actions are initiated when modifications or alternate workout solutions cannot be arranged. The number of newly initiated foreclosures increased by 31.2 percent, to 382,751, during the third quarter of 2010, the highest level in more than a year. Servicers indicated that new foreclosure actions are likely to continue rising as alternatives for seriously delinquent borrowers are exhausted.

| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
|---|---|---|---|---|---|---|---|
| Prime | 179,087 | 147,419 | 173,764 | 142,920 | 183,741 | 28.6% | 2.6% |
| Alt-A | 69,566 | 56,399 | 68,451 | 53,140 | 72,859 | 37.1% | 4.7% |
| Subprime | 81,721 | 63,400 | 79,209 | 54,534 | 72,424 | 32.8% | -11.4% |
| Other | 38,835 | 45,302 | 48,520 | 41,164 | 53,727 | 30.5% | 38.3% |
| Total | 369,209 | 312,520 | 369,944 | 291,758 | 382,751 | 31.2% | 3.7% |

*Table 39.* Number of Newly Initiated Foreclosures

*Figure 15.* Number of Newly Initiated Foreclosures



### *Foreclosures in Process*

The number of loans in process of foreclosure increased by 4.5 percent from the previous quarter to 1,201,622, reflecting the increasing number of newly initiated foreclosures and the increase in time required to complete foreclosures. The ratio of foreclosures in process to total serviced mortgages was highest for subprime mortgages at 9.0 percent and lowest for prime mortgages at 2.5 percent. Many mortgages remain in process of foreclosure for longer periods than historical norms, as borrowers and servicers seek other resolutions. In addition, the amount of time required to process foreclosures has increased because of the volume of foreclosures in process.

| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
|---|---|---|---|---|---|---|---|
| **Table 40. Foreclosures in Process** | | | | | | | |
| Percentage of Foreclosures in Process Relative to Mortgages in That Risk Category | | | | | | | |
| Prime | 2.3% | 2.3% | 2.4% | 2.4% | 2.5% | 4.8% | 7.9% |
| Alt-A | 5.8% | 5.6% | 6.0% | 5.9% | 6.3% | 6.9% | 7.4% |
| Subprime | 7.9% | 7.8% | 8.6% | 8.4% | 9.0% | 7.3% | 14.0% |
| Other | 2.7% | 3.1% | 3.6% | 3.6% | 3.9% | 8.4% | 45.8% |
| Total | 3.2% | 3.2% | 3.5% | 3.4% | 3.6% | 5.9% | 12.4% |
| Number of Foreclosures in Process | | | | | | | |
| Prime | 540,762 | 527,792 | 561,692 | 559,168 | 582,063 | 4.1% | 7.6% |
| Alt-A | 205,343 | 199,254 | 213,649 | 211,713 | 224,782 | 6.2% | 9.5% |
| Subprime | 220,106 | 216,519 | 230,503 | 220,825 | 230,813 | 4.5% | 4.9% |
| Other | 125,409 | 135,821 | 165,030 | 157,755 | 163,964 | 3.9% | 30.7% |
| Total | 1,091,620 | 1,079,386 | 1,170,874 | 1,149,461 | 1,201,622 | 4.5% | 10.1% |



*Figure 16.* **Number of Foreclosures in Process**

### *Completed Foreclosures*

Completed foreclosures increased to 186,854 during the third quarter of 2010, up 14.7 percent from the previous quarter and up 57.5 percent from a year ago. The increase in completed foreclosures resulted from the large number of foreclosures in process that continued to progress toward foreclosure sale. Foreclosures are completed when ownership of the properties transfers to the servicers or investors. Completed foreclosures are expected to continue rising as the large number of seriously delinquent mortgages and foreclosures in process work through the system.

| *Table 41.* Completed Foreclosures | | | | | | | |
|---|---|---|---|---|---|---|---|
| Percentage of Completed Foreclosures Relative to Mortgages in That Risk Category | | | | | | | |
| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
| Prime | 0.3% | 0.3% | 0.3% | 0.3% | 0.4% | 21.4% | 68.2% |
| Alt-A | 0.6% | 0.7% | 0.8% | 0.8% | 0.9% | 21.2% | 57.1% |
| Subprime | 0.8% | 0.9% | 1.0% | 1.0% | 1.2% | 18.9% | 60.4% |
| Other | 0.4% | 0.4% | 0.5% | 0.6% | 0.6% | -5.6% | 50.0% |
| Total | 0.3% | 0.4% | 0.5% | 0.5% | 0.6% | 16.2% | 60.8% |
| Number of Completed Foreclosures | | | | | | | |
| Prime | 57,739 | 62,243 | 76,207 | 80,258 | 96,836 | 20.7% | 67.7% |
| Alt-A | 21,176 | 23,286 | 26,802 | 28,154 | 33,888 | 20.4% | 60.0% |
| Subprime | 21,162 | 24,425 | 27,704 | 26,951 | 31,208 | 15.8% | 47.5% |
| Other | 18,529 | 18,905 | 22,169 | 27,541 | 24,922 | -9.5% | 34.5% |
| Total | 118,606 | 128,859 | 152,882 | 162,904 | 186,854 | 14.7% | 57.5% |

*Figure 17.* **Number of Completed Foreclosures**

### *Home Retention Actions Relative to Forfeiture Actions, by Risk Category*

Home retention actions relative to home forfeitures declined across all risk categories during the third quarter as the number of home forfeitures increased and the number of home retention actions decreased. Notwithstanding this decline, servicers initiated almost twice as many home retention actions as home forfeiture actions during the third quarter.

| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
|---|---|---|---|---|---|---|---|
| Prime | 379.7% | 287.9% | 253.6% | 185.6% | 137.7% | -25.8% | -63.7% |
| Alt-A | 554.4% | 428.7% | 395.6% | 322.6% | 226.1% | -29.9% | -59.2% |
| Subprime | 748.0% | 555.2% | 504.0% | 465.5% | 314.4% | -32.5% | -58.0% |
| Other | 323.4% | 296.3% | 256.7% | 243.8% | 241.7% | -0.9% | -25.3% |
| Overall | 461.7% | 358.6% | 318.6% | 257.6% | 192.1% | -25.4% | -58.4% |

**Table 42. Newly Initiated Home Retention Actions**
(Percentage of Completed Foreclosures and Other Home Forfeiture Actions)



***Figure 18.* Newly Initiated Home Retention Actions**

(Percentage of Completed Foreclosures and Other Home Forfeiture Actions)

### *Appendixes*

### *Appendix A—New Loan Modifications*

New loan modifications decreased by 12.5 percent to 233,853 during the third quarter of 2010. New modifications decreased across all risk categories except "Other" during the quarter.

| Table 43. Number of New Loan Modifications | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
| Prime | 50,002 | 47,530 | 96,010 | 110,326 | 103,331 | -6.3% | 106.7% |
| Alt-A | 28,780 | 27,584 | 48,625 | 55,744 | 45,827 | -17.8% | 59.2% |
| Subprime | 44,452 | 39,883 | 63,959 | 73,146 | 55,328 | -24.4% | 24.5% |
| Other | 8,013 | 9,701 | 21,279 | 28,114 | 29,367 | 4.5% | 266.5% |
| Total | 131,247 | 124,698 | 229,873 | 267,330 | 233,853 | -12.5% | 78.2% |

*Figure 19.* **Number of New Loan Modifications**



■ 9/30/09 ■ 12/31/09 3/31/10 ■ 6/30/10 ■ 9/30/10

### *Appendix B—New Trial-Period Plans*

Trial-period plans become permanent modifications following the successful completion of the trial period. Servicers initiated 114,003 trial-period plans during the third quarter of 2010, 5.0 percent less than in the previous quarter. Declines in new trial-period plans were recorded across all risk categories, a continuation of trends sustained over the past several quarters. Servicers reported that the decline in new trial plans resulted from fewer eligible borrowers and requirements to obtain and review borrower financial documentation before starting a new trial plan.

| *Table 44.* Number of New Trial Period Plans | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
| Prime | 183,368 | 158,664 | 123,176 | 63,397 | 45,144 | -28.8% | -75.4% |
| Alt-A | 81,693 | 72,127 | 55,375 | 32,053 | 22,396 | -30.1% | -72.6% |
| Subprime | 95,709 | 88,607 | 64,350 | 41,586 | 29,661 | -28.7% | -69.0% |
| Other | 39,841 | 34,757 | 28,413 | 17,367 | 16,802 | -3.3% | -57.8% |
| Total | 400,611 | 354,155 | 271,314 | 154,403 | 114,003 | -26.1% | -71.5% |

*Figure 20.* Number of New Trial-Period Plans



### *Appendix C—New Payment Plans*

New payment plans decreased by 15.6 percent to 122,465 during the third quarter of 2010. Decreases were reported across all risk categories as servicers emphasized other home retention actions instead of shorter-term payment plans. Table 45 includes numbers that have been corrected from the second quarter report, which incorrectly included both payment plans and trial-period plans.

| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
|---|---|---|---|---|---|---|---|
| Prime | 63,682 | 45,892 | 44,778 | 46,360 | 39,073 | -15.7% | -38.6% |
| Alt-A | 33,564 | 24,264 | 25,703 | 28,129 | 26,035 | -7.4% | -22.4% |
| Subprime | 43,567 | 28,849 | 31,445 | 34,342 | 30,285 | -11.8% | -30.5% |
| Other | 22,738 | 22,717 | 18,513 | 36,326 | 27,072 | -25.5% | 19.1% |
| Total | 163,551 | 121,772 | 120,439 | 145,157 | 122,465 | -15.6% | -25.1% |

*Table 45. Number of New Payment Plans\**

*Servicer resubmission of second quarter 2010 data to conform to reporting standard resulted in a 52,623 increase in new payment plans reported for the quarter.



*Figure 21.* **Number of New Payment Plans**

### Appendix D—Breakdown of Individual and Combination Modification Actions

Servicers generally use a combination of actions to achieve payment sustainability when modifying a mortgage. Servicers changed more than one loan term in more than 90 percent of all modifications implemented during the third quarter of 2010.

**Table 46. Changes in Terms Made for Modifications Made Through the Third Quarter of 2010**

| (Percentage of Modifications in Each Category) | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
|---|---|---|---|---|---|---|---|
| Combination* | 81.2% | 86.9% | 86.8% | 92.7% | 90.2% | -2.7% | 11.0% |
| Capitalization | 8.5% | 8.6% | 9.6% | 4.4% | 3.5% | -20.4% | -58.7% |
| Rate Reduction | 7.3% | 2.1% | 1.9% | 1.2% | 1.2% | -7.1% | -84.2% |
| Rate Freeze | 0.3% | 0.4% | 0.8% | 0.4% | 0.2% | -59.5% | -43.7% |
| Term Extension | 0.8% | 0.7% | 0.4% | 0.6% | 2.1% | 284.1% | 184.2% |
| Principal Reduction | 0.0% | 0.0% | 0.0% | 0.0% | 0.6% | 0.0% | 27,812.2% |
| Principal Deferral | 0.0% | 0.0% | 0.1% | 0.2% | 0.2% | 40.7% | 808.5% |
| Not Reported** | 1.9% | 1.2% | 0.4% | 0.6% | 2.0% | 253.0% | 8.4% |
| **(Number of Changes in Each Category)** | | | | | | | |
| Combination* | 106,607 | 108,365 | 199,475 | 247,718 | 210,822 | -14.9% | 97.8% |
| Capitalization | 11,166 | 10,695 | 22,094 | 11,797 | 8,219 | -30.3% | -26.4% |
| Rate Reduction | 9,640 | 2,632 | 4,344 | 3,341 | 2,715 | -18.7% | -71.8% |
| Rate Freeze | 366 | 543 | 1,829 | 1,036 | 367 | -64.6% | 0.3% |
| Term Extension | 986 | 901 | 902 | 1,486 | 4,993 | 236.0% | 406.4% |
| Principal Reduction | 3 | 0 | 10 | 0 | 1,492 | 0.0% | 49,633.3% |
| Principal Deferral | 32 | 50 | 304 | 421 | 518 | 23.0% | 1518.8% |
| Not Reported** | 2,447 | 1,512 | 915 | 1,531 | 4,727 | 208.8% | 93.2% |
| All Modifications | 131,247 | 124,698 | 229,873 | 267,330 | 233,853 | -12.5% | 78.2% |

*Combination modifications result in a change to two or more loan terms. All other modification types detailed in this table involve only the individual listed action.

**Processing constraints at some servicers prevented them from reporting specific modified term(s).

The following table reports the specific actions included in the combination modifications presented in the previous table. More than 93 percent of the 210,822 combination modifications implemented in the third quarter of 2010 included capitalization of missed fees and payments, more than 94 percent included interest rate reduction, and more than 60 percent included an extension of the loan maturity. Principal deferral was included in 10.9 percent of the combination modifications implemented during the third quarter of 2010, and principal was reduced in 4.3 percent of these modifications. Because combination modifications changed more than one term, the total of the individual actions exceeds 100 percent of total combination modifications.

| Table 47. Changes in Terms for Combination Modifications Made Through the Third Quarter of 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| (Percentage of Modifications in Each Category) | | | | | | | |
| | 9/30/09 | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 1Q %Change | 1Y %Change |
| Capitalization | 73.5% | 85.7% | 94.3% | 96.5% | 93.2% | -3.5% | 26.7% |
| Rate Reduction | 90.8% | 95.1% | 96.5% | 92.4% | 94.4% | 2.1% | 3.9% |
| Rate Freeze | 3.0% | 1.5% | 0.9% | 4.2% | 1.9% | -53.7% | -34.2% |
| Term Extension | 57.4% | 51.4% | 52.2% | 55.1% | 61.3% | 11.2% | 6.9% |
| Principal Reduction | 16.0% | 7.8% | 2.2% | 2.4% | 4.3% | 82.1% | -73.1% |
| Principal Deferral | 3.8% | 7.0% | 11.5% | 11.2% | 10.9% | -2.0% | 191.2% |
| Total Number of Changes in Each Category | | | | | | | |
| Capitalization | 78,387 | 92,909 | 188,059 | 239,162 | 196,405 | -17.9% | 150.6% |
| Rate Reduction | 96,803 | 103,073 | 192,410 | 228,888 | 198,973 | -13.1% | 105.5% |
| Rate Freeze | 3,146 | 1,630 | 1,872 | 10,406 | 4,096 | -60.6% | 30.2% |
| Term Extension | 61,170 | 55,746 | 104,095 | 136,594 | 129,257 | -5.4% | 111.3% |
| Principal Reduction | 17,087 | 8,435 | 4,454 | 5,866 | 9,089 | 54.9% | -46.8% |
| Principal Deferral | 4,008 | 7,626 | 22,985 | 27,685 | 23,083 | -16.6% | 475.9% |

OCC and OTS Mortgage Metrics Report Third Quarter 2010

### *Appendix E—Mortgage Modification Data by State*

The following tables present certain mortgage modification data by state, the District of Columbia, and U.S. territories (included in the category labeled "other"). Developed over several quarters, this data fulfills reporting requirements in the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203).

Table 48 presents the number and percentage of HAMP modifications and other modifications in each state during the third quarter of 2010. Tables 49 and 50 present the number and percentage of each type of action included in modifications made during the quarter in each state. Tables 51 and 52 present the number and percentage of each type of action included in combination modifications made during the quarter in each state. Tables 53 and 54 present the number and percentage of modifications made during the quarter in each state, by the amount of change in the borrowers monthly principal and interest payment. Tables 55 and 56 present the number and percentage of modifications made in the first quarter of 2010 that were 60 or more days delinquent or in process of foreclosure at the end of the third quarter (re-defaults.)

**Table 48: Number and Percentage of Mortgage Modifications**
Modifications Implemented in the Third Quarter of 2010

| States | HAMP Modifications Total | HAMP Modifications % of State Total | Other Modifications Total | Other Modifications % of State Total | Total Modifications Total | Total Modifications % of Total |
|---|---|---|---|---|---|---|
| Total | 58,790 | 25.1% | 175,063 | 74.9% | 233,853 | 100.0% |
| Alabama | 292 | 12.4% | 2,070 | 87.6% | 2,362 | 1.0% |
| Alaska | 17 | 10.4% | 146 | 89.6% | 163 | 0.1% |
| Arizona | 2,577 | 30.0% | 6,020 | 70.0% | 8,597 | 3.7% |
| Arkansas | 108 | 14.3% | 645 | 85.7% | 753 | 0.3% |
| California | 17,480 | 34.7% | 32,927 | 65.3% | 50,407 | 21.6% |
| Colorado | 695 | 20.2% | 2,744 | 79.8% | 3,439 | 1.5% |
| Connecticut | 618 | 25.4% | 1,816 | 74.6% | 2,434 | 1.0% |
| Delaware | 159 | 19.5% | 656 | 80.5% | 815 | 0.3% |
| Florida | 6,411 | 27.0% | 17,355 | 73.0% | 23,766 | 10.2% |
| Georgia | 1,919 | 16.7% | 9,585 | 83.3% | 11,504 | 4.9% |
| Hawaii | 208 | 27.8% | 541 | 72.2% | 749 | 0.3% |
| Idaho | 218 | 22.8% | 737 | 77.2% | 955 | 0.4% |
| Illinois | 3,354 | 28.6% | 8,355 | 71.4% | 11,709 | 5.0% |
| Indiana | 438 | 13.3% | 2,854 | 86.7% | 3,292 | 1.4% |
| Iowa | 124 | 12.1% | 899 | 87.9% | 1,023 | 0.4% |
| Kansas | 131 | 14.6% | 768 | 85.4% | 899 | 0.4% |
| Kentucky | 188 | 13.9% | 1,160 | 86.1% | 1,348 | 0.6% |
| Louisiana | 220 | 11.8% | 1,639 | 88.2% | 1,859 | 0.8% |
| Maine | 111 | 20.2% | 438 | 79.8% | 549 | 0.2% |
| Maryland | 1,754 | 25.7% | 5,071 | 74.3% | 6,825 | 2.9% |
| Massachusetts | 1,253 | 30.1% | 2,903 | 69.9% | 4,156 | 1.8% |
| Michigan | 1,430 | 20.1% | 5,687 | 79.9% | 7,117 | 3.0% |
| Minnesota | 1,141 | 27.2% | 3,050 | 72.8% | 4,191 | 1.8% |
| Mississippi | 182 | 16.4% | 927 | 83.6% | 1,109 | 0.5% |
| Missouri | 617 | 19.4% | 2,566 | 80.6% | 3,183 | 1.4% |
| Montana | 58 | 17.9% | 266 | 82.1% | 324 | 0.1% |
| Nebraska | 69 | 11.6% | 524 | 88.4% | 593 | 0.3% |
| Nevada | 1,464 | 31.2% | 3,226 | 68.8% | 4,690 | 2.0% |
| New Hampshire | 232 | 24.6% | 711 | 75.4% | 943 | 0.4% |
| New Jersey | 1,914 | 26.0% | 5,453 | 74.0% | 7,367 | 3.2% |
| New Mexico | 136 | 16.2% | 702 | 83.8% | 838 | 0.4% |
| New York | 2,984 | 32.4% | 6,225 | 67.6% | 9,209 | 3.9% |
| North Carolina | 1,012 | 15.1% | 5,668 | 84.9% | 6,680 | 2.9% |
| North Dakota | 10 | 12.3% | 71 | 87.7% | 81 | 0.0% |
| Ohio | 1,109 | 17.2% | 5,342 | 82.8% | 6,451 | 2.8% |
| Oklahoma | 124 | 11.7% | 939 | 88.3% | 1,063 | 0.5% |
| Oregon | 590 | 23.4% | 1,927 | 76.6% | 2,517 | 1.1% |
| Pennsylvania | 1,166 | 20.9% | 4,426 | 79.1% | 5,592 | 2.4% |
| Rhode Island | 240 | 33.0% | 487 | 67.0% | 727 | 0.3% |
| South Carolina | 497 | 16.3% | 2,548 | 83.7% | 3,045 | 1.3% |
| South Dakota | 24 | 17.3% | 115 | 82.7% | 139 | 0.1% |
| Tennessee | 478 | 15.1% | 2,689 | 84.9% | 3,167 | 1.4% |
| Texas | 1,367 | 11.7% | 10,290 | 88.3% | 11,657 | 5.0% |
| Utah | 505 | 23.7% | 1,624 | 76.3% | 2,129 | 0.9% |
| Vermont | 23 | 10.4% | 198 | 89.6% | 221 | 0.1% |
| Virginia | 1,325 | 24.0% | 4,185 | 76.0% | 5,510 | 2.4% |
| Washington | 1,096 | 25.2% | 3,250 | 74.8% | 4,346 | 1.9% |
| Washington, DC | 117 | 28.7% | 290 | 71.3% | 407 | 0.2% |
| West Virginia | 79 | 17.8% | 365 | 82.2% | 444 | 0.2% |
| Wisconsin | 474 | 21.2% | 1,758 | 78.8% | 2,232 | 1.0% |
| Wyoming | 27 | 15.9% | 143 | 84.1% | 170 | 0.1% |
| Other | 25 | 23.4% | 82 | 76.6% | 107 | 0.0% |

**Table 49: Number of Mortgage Modification Actions**
Modifications Implemented in the Third Quarter of 2010

| States | Capitalization | Rate Reduction or Freeze | Term Extension | Principal Reduction | Principal Deferral | Combination | Not Reported | Total Modifications |
|---|---|---|---|---|---|---|---|---|
| Total | 8,219 | 3,082 | 4,993 | 1,492 | 518 | 210,822 | 4,727 | 233,853 |
| Alabama | 111 | 32 | 93 | 0 | 1 | 2,120 | 5 | 2,362 |
| Alaska | 12 | 1 | 0 | 0 | 0 | 149 | 1 | 163 |
| Arizona | 265 | 116 | 137 | 58 | 12 | 7,822 | 187 | 8,597 |
| Arkansas | 33 | 2 | 0 | 0 | 0 | 712 | 6 | 753 |
| California | 1,013 | 880 | 2,269 | 771 | 239 | 43,387 | 1,848 | 50,407 |
| Colorado | 140 | 50 | 55 | 11 | 9 | 3,127 | 47 | 3,439 |
| Connecticut | 128 | 18 | 31 | 1 | 5 | 2,222 | 29 | 2,434 |
| Delaware | 37 | 5 | 11 | 0 | 5 | 752 | 5 | 815 |
| Florida | 709 | 339 | 547 | 326 | 36 | 20,961 | 848 | 23,766 |
| Georgia | 398 | 91 | 129 | 8 | 15 | 10,745 | 118 | 11,504 |
| Hawaii | 20 | 8 | 10 | 1 | 1 | 705 | 4 | 749 |
| Idaho | 41 | 15 | 17 | 2 | 2 | 869 | 9 | 955 |
| Illinois | 353 | 133 | 111 | 30 | 8 | 10,931 | 143 | 11,709 |
| Indiana | 181 | 30 | 33 | 0 | 1 | 3,017 | 30 | 3,292 |
| Iowa | 68 | 11 | 7 | 0 | 0 | 928 | 9 | 1,023 |
| Kansas | 54 | 7 | 9 | 0 | 2 | 820 | 7 | 899 |
| Kentucky | 63 | 15 | 28 | 0 | 0 | 1,225 | 17 | 1,348 |
| Louisiana | 97 | 17 | 25 | 0 | 0 | 1,712 | 8 | 1,859 |
| Maine | 29 | 6 | 9 | 0 | 2 | 498 | 5 | 549 |
| Maryland | 267 | 82 | 69 | 19 | 31 | 6,268 | 89 | 6,825 |
| Massachusetts | 174 | 43 | 56 | 3 | 3 | 3,821 | 56 | 4,156 |
| Michigan | 319 | 91 | 142 | 89 | 1 | 6,218 | 257 | 7,117 |
| Minnesota | 195 | 57 | 79 | 10 | 7 | 3,780 | 63 | 4,191 |
| Mississippi | 52 | 9 | 11 | 0 | 1 | 1,030 | 6 | 1,109 |
| Missouri | 160 | 40 | 23 | 3 | 1 | 2,921 | 35 | 3,183 |
| Montana | 13 | 7 | 2 | 0 | 0 | 299 | 3 | 324 |
| Nebraska | 29 | 7 | 9 | 0 | 0 | 543 | 5 | 593 |
| Nevada | 134 | 52 | 56 | 87 | 13 | 4,178 | 170 | 4,690 |
| New Hampshire | 57 | 9 | 14 | 3 | - | 852 | 8 | 943 |
| New Jersey | 248 | 57 | 69 | 6 | 17 | 6,903 | 67 | 7,367 |
| New Mexico | 38 | 10 | 10 | 0 | 0 | 773 | 7 | 838 |
| New York | 296 | 113 | 109 | 5 | 26 | 8,519 | 141 | 9,209 |
| North Carolina | 329 | 95 | 152 | 1 | 6 | 6,049 | 48 | 6,680 |
| North Dakota | 6 | 1 | 3 | 0 | 0 | 71 | - | 81 |
| Ohio | 251 | 101 | 88 | 11 | 4 | 5,936 | 60 | 6,451 |
| Oklahoma | 50 | 10 | 5 | 0 | 1 | 988 | 9 | 1,063 |
| Oregon | 88 | 35 | 17 | 13 | 14 | 2,323 | 27 | 2,517 |
| Pennsylvania | 317 | 78 | 50 | 4 | 9 | 5,100 | 34 | 5,592 |
| Rhode Island | 37 | 7 | 5 | 3 | 0 | 668 | 7 | 727 |
| South Carolina | 148 | 39 | 62 | 1 | 1 | 2,754 | 40 | 3,045 |
| South Dakota | 6 | 2 | 3 | 0 | 0 | 128 | - | 139 |
| Tennessee | 135 | 42 | 62 | 0 | 1 | 2,904 | 23 | 3,167 |
| Texas | 510 | 80 | 64 | 1 | 4 | 10,956 | 42 | 11,657 |
| Utah | 70 | 24 | 18 | 1 | 1 | 1,995 | 20 | 2,129 |
| Vermont | 13 | 10 | 10 | 0 | 0 | 185 | 3 | 221 |
| Virginia | 213 | 95 | 124 | 8 | 24 | 4,975 | 71 | 5,510 |
| Washington | 149 | 65 | 100 | 10 | 13 | 3,938 | 71 | 4,346 |
| Washington, DC | 27 | 3 | 14 | 2 | 0 | 353 | 8 | 407 |
| West Virginia | 21 | 6 | 11 | 0 | 0 | 402 | 4 | 444 |
| Wisconsin | 103 | 32 | 30 | 4 | 2 | 2,037 | 24 | 2,232 |
| Wyoming | 11 | 4 | 5 | 0 | 0 | 147 | 3 | 170 |
| Other | 1 | 0 | 0 | 0 | 0 | 106 | 0 | 107 |

| Table 50: Percentage of Mortgage Modification Actions Modifications Implemented in the Third Quarter of 2010 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| States | Capitalization | Rate Reduction or Freeze | Term Extension | Principal Reduction | Principal Deferral | Combination | Not Reported | Total Modifications |
| Total | 3.5% | 1.3% | 2.1% | 0.6% | 0.2% | 90.2% | 2.0% | 233,853 |
| Alabama | 4.7% | 1.4% | 3.9% | 0.0% | 0.0% | 89.8% | 0.2% | 2,362 |
| Alaska | 7.4% | 0.6% | 0.0% | 0.0% | 0.0% | 91.4% | 0.6% | 163 |
| Arizona | 3.1% | 1.3% | 1.6% | 0.7% | 0.1% | 91.0% | 2.2% | 8,597 |
| Arkansas | 4.4% | 0.3% | 0.0% | 0.0% | 0.0% | 94.6% | 0.8% | 753 |
| California | 2.0% | 1.7% | 4.5% | 1.5% | 0.5% | 86.1% | 3.7% | 50,407 |
| Colorado | 4.1% | 1.5% | 1.6% | 0.3% | 0.3% | 90.9% | 1.4% | 3,439 |
| Connecticut | 5.3% | 0.7% | 1.3% | 0.0% | 0.2% | 91.3% | 1.2% | 2,434 |
| Delaware | 4.5% | 0.6% | 1.3% | 0.0% | 0.6% | 92.3% | 0.6% | 815 |
| Florida | 3.0% | 1.4% | 2.3% | 1.4% | 0.2% | 88.2% | 3.6% | 23,766 |
| Georgia | 3.5% | 0.8% | 1.1% | 0.1% | 0.1% | 93.4% | 1.0% | 11,504 |
| Hawaii | 2.7% | 1.1% | 1.3% | 0.1% | 0.1% | 94.1% | 0.5% | 749 |
| Idaho | 4.3% | 1.6% | 1.8% | 0.2% | 0.2% | 91.0% | 0.9% | 955 |
| Illinois | 3.0% | 1.1% | 0.9% | 0.3% | 0.1% | 93.4% | 1.2% | 11,709 |
| Indiana | 5.5% | 0.9% | 1.0% | 0.0% | 0.0% | 91.6% | 0.9% | 3,292 |
| Iowa | 6.6% | 1.1% | 0.7% | 0.0% | 0.0% | 90.7% | 0.9% | 1,023 |
| Kansas | 6.0% | 0.8% | 1.0% | 0.0% | 0.2% | 91.2% | 0.8% | 899 |
| Kentucky | 4.7% | 1.1% | 2.1% | 0.0% | 0.0% | 90.9% | 1.3% | 1,348 |
| Louisiana | 5.2% | 0.9% | 1.3% | 0.0% | 0.0% | 92.1% | 0.4% | 1,859 |
| Maine | 5.3% | 1.1% | 1.6% | 0.0% | 0.4% | 90.7% | 0.9% | 549 |
| Maryland | 3.9% | 1.2% | 1.0% | 0.3% | 0.5% | 91.8% | 1.3% | 6,825 |
| Massachusetts | 4.2% | 1.0% | 1.3% | 0.1% | 0.1% | 91.9% | 1.3% | 4,156 |
| Michigan | 4.5% | 1.3% | 2.0% | 1.3% | 0.0% | 87.4% | 3.6% | 7,117 |
| Minnesota | 4.7% | 1.4% | 1.9% | 0.2% | 0.2% | 90.2% | 1.5% | 4,191 |
| Mississippi | 4.7% | 0.8% | 1.0% | 0.0% | 0.1% | 92.9% | 0.5% | 1,109 |
| Missouri | 5.0% | 1.3% | 0.7% | 0.1% | 0.0% | 91.8% | 1.1% | 3,183 |
| Montana | 4.0% | 2.2% | 0.6% | 0.0% | 0.0% | 92.3% | 0.9% | 324 |
| Nebraska | 4.9% | 1.2% | 1.5% | 0.0% | 0.0% | 91.6% | 0.8% | 593 |
| Nevada | 2.9% | 1.1% | 1.2% | 1.9% | 0.3% | 89.1% | 3.6% | 4,690 |
| New Hampshire | 6.0% | 1.0% | 1.5% | 0.3% | 0.0% | 90.3% | 0.8% | 943 |
| New Jersey | 3.4% | 0.8% | 0.9% | 0.1% | 0.2% | 93.7% | 0.9% | 7,367 |
| New Mexico | 4.5% | 1.2% | 1.2% | 0.0% | 0.0% | 92.2% | 0.8% | 838 |
| New York | 3.2% | 1.2% | 1.2% | 0.1% | 0.3% | 92.5% | 1.5% | 9,209 |
| North Carolina | 4.9% | 1.4% | 2.3% | 0.0% | 0.1% | 90.6% | 0.7% | 6,680 |
| North Dakota | 7.4% | 1.2% | 3.7% | 0.0% | 0.0% | 87.7% | 0.0% | 81 |
| Ohio | 3.9% | 1.6% | 1.4% | 0.2% | 0.1% | 92.0% | 0.9% | 6,451 |
| Oklahoma | 4.7% | 0.9% | 0.5% | 0.0% | 0.1% | 92.9% | 0.8% | 1,063 |
| Oregon | 3.5% | 1.4% | 0.7% | 0.5% | 0.6% | 92.3% | 1.1% | 2,517 |
| Pennsylvania | 5.7% | 1.4% | 0.9% | 0.1% | 0.2% | 91.2% | 0.6% | 5,592 |
| Rhode Island | 5.1% | 1.0% | 0.7% | 0.4% | 0.0% | 91.9% | 1.0% | 727 |
| South Carolina | 4.9% | 1.3% | 2.0% | 0.0% | 0.0% | 90.4% | 1.3% | 3,045 |
| South Dakota | 4.3% | 1.4% | 2.2% | 0.0% | 0.0% | 92.1% | 0.0% | 139 |
| Tennessee | 4.3% | 1.3% | 2.0% | 0.0% | 0.0% | 91.7% | 0.7% | 3,167 |
| Texas | 4.4% | 0.7% | 0.5% | 0.0% | 0.0% | 94.0% | 0.4% | 11,657 |
| Utah | 3.3% | 1.1% | 0.8% | 0.0% | 0.0% | 93.7% | 0.9% | 2,129 |
| Vermont | 5.9% | 4.5% | 4.5% | 0.0% | 0.0% | 83.7% | 1.4% | 221 |
| Virginia | 3.9% | 1.7% | 2.3% | 0.1% | 0.4% | 90.3% | 1.3% | 5,510 |
| Washington | 3.4% | 1.5% | 2.3% | 0.2% | 0.3% | 90.6% | 1.6% | 4,346 |
| Washington, DC | 6.6% | 0.7% | 3.4% | 0.5% | 0.0% | 86.7% | 2.0% | 407 |
| West Virginia | 4.7% | 1.4% | 2.5% | 0.0% | 0.0% | 90.5% | 0.9% | 444 |
| Wisconsin | 4.6% | 1.4% | 1.3% | 0.2% | 0.1% | 91.3% | 1.1% | 2,232 |
| Wyoming | 6.5% | 2.4% | 2.9% | 0.0% | 0.0% | 86.5% | 1.8% | 170 |
| Other | 0.9% | 0.0% | 0.0% | 0.0% | 0.0% | 99.1% | 0.0% | 107 |

| States | Capitalization | Interest Rate Reduction or Freeze | Term Extension | Principal Reduction | Principal Deferral | Total Combination Modifications |
|---|---|---|---|---|---|---|
| Total | 196,405 | 202,749 | 129,257 | 9,089 | 23,083 | 210,822 |
| Alabama | 1,867 | 2,063 | 1,356 | 0 | 71 | 2,120 |
| Alaska | 149 | 142 | 104 | 0 | 2 | 149 |
| Arizona | 7,432 | 7,483 | 4,653 | 446 | 1,059 | 7,822 |
| Arkansas | 709 | 687 | 437 | 0 | 15 | 712 |
| California | 38,186 | 41,335 | 25,756 | 6,202 | 8,303 | 43,387 |
| Colorado | 2,997 | 3,018 | 1,904 | 28 | 177 | 3,127 |
| Connecticut | 2,143 | 2,159 | 1,300 | 28 | 212 | 2,222 |
| Delaware | 694 | 727 | 460 | 5 | 32 | 752 |
| Florida | 19,416 | 20,158 | 12,874 | 1,063 | 3,100 | 20,961 |
| Georgia | 10,327 | 10,430 | 6,812 | 26 | 735 | 10,745 |
| Hawaii | 653 | 684 | 360 | 3 | 71 | 705 |
| Idaho | 812 | 826 | 498 | 10 | 58 | 869 |
| Illinois | 10,487 | 10,563 | 6,854 | 195 | 1,549 | 10,931 |
| Indiana | 2,890 | 2,905 | 1,953 | 2 | 95 | 3,017 |
| Iowa | 845 | 876 | 586 | 0 | 38 | 928 |
| Kansas | 773 | 786 | 509 | 1 | 30 | 820 |
| Kentucky | 1,096 | 1,183 | 766 | 0 | 39 | 1,225 |
| Louisiana | 1,633 | 1,650 | 1,062 | 0 | 43 | 1,712 |
| Maine | 450 | 481 | 292 | - | 28 | 498 |
| Maryland | 6,001 | 6,013 | 3,515 | 92 | 594 | 6,268 |
| Massachusetts | 3,680 | 3,685 | 2,159 | 54 | 407 | 3,821 |
| Michigan | 5,905 | 5,963 | 3,819 | 72 | 560 | 6,218 |
| Minnesota | 3,596 | 3,574 | 2,385 | 38 | 363 | 3,780 |
| Mississippi | 963 | 1,004 | 655 | 2 | 35 | 1,030 |
| Missouri | 2,797 | 2,823 | 1,735 | 8 | 182 | 2,921 |
| Montana | 277 | 284 | 194 | 0 | 14 | 299 |
| Nebraska | 509 | 516 | 371 | 0 | 15 | 543 |
| Nevada | 4,039 | 3,997 | 2,463 | 201 | 593 | 4,178 |
| New Hampshire | 787 | 821 | 487 | 7 | 67 | 852 |
| New Jersey | 6,635 | 6,678 | 4,273 | 106 | 716 | 6,903 |
| New Mexico | 717 | 749 | 461 | 3 | 34 | 773 |
| New York | 8,139 | 8,276 | 4,946 | 67 | 1,101 | 8,519 |
| North Carolina | 5,519 | 5,859 | 4,025 | 7 | 235 | 6,049 |
| North Dakota | 59 | 68 | 49 | 0 | 3 | 71 |
| Ohio | 5,568 | 5,722 | 3,794 | 11 | 281 | 5,936 |
| Oklahoma | 957 | 957 | 630 | 1 | 27 | 988 |
| Oregon | 2,181 | 2,235 | 1,400 | 51 | 199 | 2,323 |
| Pennsylvania | 4,825 | 4,901 | 3,168 | 15 | 261 | 5,100 |
| Rhode Island | 640 | 642 | 392 | 13 | 84 | 668 |
| South Carolina | 2,551 | 2,665 | 1,667 | 6 | 155 | 2,754 |
| South Dakota | 114 | 120 | 86 | 1 | 7 | 128 |
| Tennessee | 2,655 | 2,824 | 1,871 | 0 | 113 | 2,904 |
| Texas | 10,600 | 10,659 | 7,604 | 19 | 281 | 10,956 |
| Utah | 1,900 | 1,930 | 1,201 | 32 | 133 | 1,995 |
| Vermont | 120 | 175 | 135 | 0 | 7 | 185 |
| Virginia | 4,566 | 4,750 | 3,049 | 146 | 413 | 4,975 |
| Washington | 3,699 | 3,786 | 2,362 | 107 | 308 | 3,938 |
| Washington, DC | 338 | 339 | 167 | 9 | 35 | 353 |
| West Virginia | 338 | 386 | 239 | 1 | 19 | 402 |
| Wisconsin | 1,935 | 1,946 | 1,285 | 11 | 166 | 2,037 |
| Wyoming | 131 | 140 | 97 | 0 | 7 | 147 |
| Other | 105 | 106 | 37 | 0 | 11 | 106 |

**Table 51: Number of Modification Actions in Combination Actions**
Modifications Implemented in the Third Quarter of 2010

| | | **Table 52:** Percentage of Modification Actions in Combination Actions | | | | |
| | | Modifications Implemented in the Third Quarter of 2010 | | | | |
| States | Capitalization | Interest Rate Reduction or Freeze | Term Extension | Principal Reduction | Principal Deferral | Total Combination Modifications |
|---|---|---|---|---|---|---|
| Total | 93.2% | 96.2% | 61.3% | 4.3% | 10.9% | 210,822 |
| Alabama | 88.1% | 97.3% | 64.0% | 0.0% | 3.3% | 2,120 |
| Alaska | 100.0% | 95.3% | 69.8% | 0.0% | 1.3% | 149 |
| Arizona | 95.0% | 95.7% | 59.5% | 5.7% | 13.5% | 7,822 |
| Arkansas | 99.6% | 96.5% | 61.4% | 0.0% | 2.1% | 712 |
| California | 88.0% | 95.3% | 59.4% | 14.3% | 19.1% | 43,387 |
| Colorado | 95.8% | 96.5% | 60.9% | 0.9% | 5.7% | 3,127 |
| Connecticut | 96.4% | 97.2% | 58.5% | 1.3% | 9.5% | 2,222 |
| Delaware | 92.3% | 96.7% | 61.2% | 0.7% | 4.3% | 752 |
| Florida | 92.6% | 96.2% | 61.4% | 5.1% | 14.8% | 20,961 |
| Georgia | 96.1% | 97.1% | 63.4% | 0.2% | 6.8% | 10,745 |
| Hawaii | 92.6% | 97.0% | 51.1% | 0.4% | 10.1% | 705 |
| Idaho | 93.4% | 95.1% | 57.3% | 1.2% | 6.7% | 869 |
| Illinois | 95.9% | 96.6% | 62.7% | 1.8% | 14.2% | 10,931 |
| Indiana | 95.8% | 96.3% | 64.7% | 0.1% | 3.1% | 3,017 |
| Iowa | 91.1% | 94.4% | 63.1% | 0.0% | 4.1% | 928 |
| Kansas | 94.3% | 95.9% | 62.1% | 0.1% | 3.7% | 820 |
| Kentucky | 89.5% | 96.6% | 62.5% | 0.0% | 3.2% | 1,225 |
| Louisiana | 95.4% | 96.4% | 62.0% | 0.0% | 2.5% | 1,712 |
| Maine | 90.4% | 96.6% | 58.6% | 0.0% | 5.6% | 498 |
| Maryland | 95.7% | 95.9% | 56.1% | 1.5% | 9.5% | 6,268 |
| Massachusetts | 96.3% | 96.4% | 56.5% | 1.4% | 10.7% | 3,821 |
| Michigan | 95.0% | 95.9% | 61.4% | 1.2% | 9.0% | 6,218 |
| Minnesota | 95.1% | 94.6% | 63.1% | 1.0% | 9.6% | 3,780 |
| Mississippi | 93.5% | 97.5% | 63.6% | 0.2% | 3.4% | 1,030 |
| Missouri | 95.8% | 96.6% | 59.4% | 0.3% | 6.2% | 2,921 |
| Montana | 92.6% | 95.0% | 64.9% | 0.0% | 4.7% | 299 |
| Nebraska | 93.7% | 95.0% | 68.3% | 0.0% | 2.8% | 543 |
| Nevada | 96.7% | 95.7% | 59.0% | 4.8% | 14.2% | 4,178 |
| New Hampshire | 92.4% | 96.4% | 57.2% | 0.8% | 7.9% | 852 |
| New Jersey | 96.1% | 96.7% | 61.9% | 1.5% | 10.4% | 6,903 |
| New Mexico | 92.8% | 96.9% | 59.6% | 0.4% | 4.4% | 773 |
| New York | 95.5% | 97.1% | 58.1% | 0.8% | 12.9% | 8,519 |
| North Carolina | 91.2% | 96.9% | 66.5% | 0.1% | 3.9% | 6,049 |
| North Dakota | 83.1% | 95.8% | 69.0% | 0.0% | 4.2% | 71 |
| Ohio | 93.8% | 96.4% | 63.9% | 0.2% | 4.7% | 5,936 |
| Oklahoma | 96.9% | 96.9% | 63.8% | 0.1% | 2.7% | 988 |
| Oregon | 93.9% | 96.2% | 60.3% | 2.2% | 8.6% | 2,323 |
| Pennsylvania | 94.6% | 96.1% | 62.1% | 0.3% | 5.1% | 5,100 |
| Rhode Island | 95.8% | 96.1% | 58.7% | 1.9% | 12.6% | 668 |
| South Carolina | 92.6% | 96.8% | 60.5% | 0.2% | 5.6% | 2,754 |
| South Dakota | 89.1% | 93.8% | 67.2% | 0.8% | 5.5% | 128 |
| Tennessee | 91.4% | 97.2% | 64.4% | 0.0% | 3.9% | 2,904 |
| Texas | 96.8% | 97.3% | 69.4% | 0.2% | 2.6% | 10,956 |
| Utah | 95.2% | 96.7% | 60.2% | 1.6% | 6.7% | 1,995 |
| Vermont | 64.9% | 94.6% | 73.0% | 0.0% | 3.8% | 185 |
| Virginia | 91.8% | 95.5% | 61.3% | 2.9% | 8.3% | 4,975 |
| Washington | 93.9% | 96.1% | 60.0% | 2.7% | 7.8% | 3,938 |
| Washington, DC | 95.8% | 96.0% | 47.3% | 2.5% | 9.9% | 353 |
| West Virginia | 84.1% | 96.0% | 59.5% | 0.2% | 4.7% | 402 |
| Wisconsin | 95.0% | 95.5% | 63.1% | 0.5% | 8.1% | 2,037 |
| Wyoming | 89.1% | 95.2% | 66.0% | 0.0% | 4.8% | 147 |
| Other | 99.1% | 100.0% | 34.9% | 0.0% | 10.4% | 106 |

**Table 53: Changes in Monthly Principal and Interest Payments by State (Number)**
Number of Modifications Implemented in the Third Quarter of 2010

| States | Decreased by 20% or More | Decreased by 10% to Less Than 20% | Decreased by Less Than 10% | Unchanged | Increased | Not Reported | Total Modifications |
|---|---|---|---|---|---|---|---|
| Total - All States | 125,301 | 41,743 | 37,097 | 8,532 | 18,761 | 2,419 | 233,853 |
| Alabama | 1,085 | 537 | 407 | 95 | 223 | 15 | 2,362 |
| Alaska | 59 | 49 | 37 | 1 | 17 | - | 163 |
| Arizona | 4,997 | 1,369 | 1,288 | 288 | 578 | 77 | 8,597 |
| Arkansas | 324 | 196 | 140 | 7 | 80 | 6 | 753 |
| California | 27,999 | 5,949 | 8,275 | 4,072 | 3,471 | 641 | 50,407 |
| Colorado | 1,505 | 802 | 705 | 80 | 323 | 24 | 3,439 |
| Connecticut | 1,373 | 420 | 363 | 48 | 207 | 23 | 2,434 |
| Delaware | 376 | 204 | 148 | 22 | 58 | 7 | 815 |
| Florida | 14,119 | 3,281 | 3,519 | 982 | 1,652 | 213 | 23,766 |
| Georgia | 5,764 | 2,730 | 1,844 | 143 | 893 | 130 | 11,504 |
| Hawaii | 471 | 130 | 85 | 9 | 41 | 13 | 749 |
| Idaho | 473 | 200 | 165 | 24 | 83 | 10 | 955 |
| Illinois | 7,109 | 1,898 | 1,526 | 190 | 889 | 97 | 11,709 |
| Indiana | 1,353 | 823 | 650 | 55 | 386 | 25 | 3,292 |
| Iowa | 429 | 236 | 197 | 19 | 132 | 10 | 1,023 |
| Kansas | 381 | 201 | 182 | 25 | 105 | 5 | 899 |
| Kentucky | 552 | 340 | 286 | 25 | 130 | 15 | 1,348 |
| Louisiana | 811 | 418 | 328 | 34 | 255 | 13 | 1,859 |
| Maine | 284 | 112 | 78 | 13 | 56 | 6 | 549 |
| Maryland | 3,633 | 1,223 | 1,143 | 137 | 594 | 95 | 6,825 |
| Massachusetts | 2,450 | 710 | 559 | 79 | 319 | 39 | 4,156 |
| Michigan | 3,750 | 1,264 | 1,221 | 229 | 585 | 68 | 7,117 |
| Minnesota | 2,311 | 729 | 659 | 130 | 337 | 25 | 4,191 |
| Mississippi | 511 | 266 | 198 | 18 | 110 | 6 | 1,109 |
| Missouri | 1,635 | 697 | 481 | 53 | 294 | 23 | 3,183 |
| Montana | 161 | 82 | 46 | 5 | 27 | 3 | 324 |
| Nebraska | 282 | 147 | 78 | 10 | 68 | 8 | 593 |
| Nevada | 2,783 | 738 | 702 | 165 | 255 | 47 | 4,690 |
| New Hampshire | 555 | 162 | 119 | 16 | 85 | 6 | 943 |
| New Jersey | 4,149 | 1,272 | 1,109 | 145 | 603 | 89 | 7,367 |
| New Mexico | 428 | 206 | 115 | 7 | 75 | 7 | 838 |
| New York | 5,951 | 1,387 | 1,011 | 182 | 536 | 142 | 9,209 |
| North Carolina | 3,170 | 1,598 | 1,088 | 142 | 633 | 49 | 6,680 |
| North Dakota | 43 | 20 | 7 | 3 | 8 | - | 81 |
| Ohio | 2,986 | 1,447 | 1,201 | 120 | 647 | 50 | 6,451 |
| Oklahoma | 425 | 284 | 197 | 14 | 134 | 9 | 1,063 |
| Oregon | 1,407 | 467 | 346 | 93 | 184 | 20 | 2,517 |
| Pennsylvania | 2,806 | 1,175 | 891 | 88 | 566 | 66 | 5,592 |
| Rhode Island | 429 | 111 | 98 | 15 | 69 | 5 | 727 |
| South Carolina | 1,493 | 660 | 471 | 46 | 310 | 65 | 3,045 |
| South Dakota | 71 | 31 | 24 | 1 | 12 | - | 139 |
| Tennessee | 1,480 | 810 | 533 | 69 | 253 | 22 | 3,167 |
| Texas | 5,026 | 3,288 | 1,992 | 107 | 1,167 | 77 | 11,657 |
| Utah | 1,062 | 499 | 354 | 40 | 166 | 8 | 2,129 |
| Vermont | 107 | 39 | 33 | 11 | 26 | 5 | 221 |
| Virginia | 2,755 | 1,104 | 987 | 176 | 438 | 50 | 5,510 |
| Washington | 2,230 | 815 | 686 | 211 | 334 | 70 | 4,346 |
| Washington DC | 213 | 66 | 63 | 13 | 43 | 9 | 407 |
| West Virginia | 228 | 77 | 80 | 9 | 46 | 4 | 444 |
| Wisconsin | 1,158 | 417 | 344 | 52 | 242 | 19 | 2,232 |
| Wyoming | 77 | 36 | 26 | 13 | 15 | 3 | 170 |
| Other | 72 | 21 | 12 | 1 | 1 | - | 107 |

**Table 54: Changes in Monthly Principal and Interest Payments (Percentage)**
Percentage of Modifications Implemented During the Third Quarter of 2010

| States | Decreased by 20% or More | Decreased by 10% to Less Than 20% | Decreased by Less Than 10% | Unchanged | Increased | Not Reported | Total Modifications |
|---|---|---|---|---|---|---|---|
| Total | 53.6% | 17.9% | 15.9% | 3.6% | 8.0% | 1.0% | 233,853 |
| Alabama | 45.9% | 22.7% | 17.2% | 4.0% | 9.4% | 0.6% | 2,362 |
| Alaska | 36.2% | 30.1% | 22.7% | 0.6% | 10.4% | 0.0% | 163 |
| Arizona | 58.1% | 15.9% | 15.0% | 3.4% | 6.7% | 0.9% | 8,597 |
| Arkansas | 43.0% | 26.0% | 18.6% | 0.9% | 10.6% | 0.8% | 753 |
| California | 55.5% | 11.8% | 16.4% | 8.1% | 6.9% | 1.3% | 50,407 |
| Colorado | 43.8% | 23.3% | 20.5% | 2.3% | 9.4% | 0.7% | 3,439 |
| Connecticut | 56.4% | 17.3% | 14.9% | 2.0% | 8.5% | 0.9% | 2,434 |
| Delaware | 46.1% | 25.0% | 18.2% | 2.7% | 7.1% | 0.9% | 815 |
| Florida | 59.4% | 13.8% | 14.8% | 4.1% | 7.0% | 0.9% | 23,766 |
| Georgia | 50.1% | 23.7% | 16.0% | 1.2% | 7.8% | 1.1% | 11,504 |
| Hawaii | 62.9% | 17.4% | 11.3% | 1.2% | 5.5% | 1.7% | 749 |
| Idaho | 49.5% | 20.9% | 17.3% | 2.5% | 8.7% | 1.0% | 955 |
| Illinois | 60.7% | 16.2% | 13.0% | 1.6% | 7.6% | 0.8% | 11,709 |
| Indiana | 41.1% | 25.0% | 19.7% | 1.7% | 11.7% | 0.8% | 3,292 |
| Iowa | 41.9% | 23.1% | 19.3% | 1.9% | 12.9% | 1.0% | 1,023 |
| Kansas | 42.4% | 22.4% | 20.2% | 2.8% | 11.7% | 0.6% | 899 |
| Kentucky | 40.9% | 25.2% | 21.2% | 1.9% | 9.6% | 1.1% | 1,348 |
| Louisiana | 43.6% | 22.5% | 17.6% | 1.8% | 13.7% | 0.7% | 1,859 |
| Maine | 51.7% | 20.4% | 14.2% | 2.4% | 10.2% | 1.1% | 549 |
| Maryland | 53.2% | 17.9% | 16.7% | 2.0% | 8.7% | 1.4% | 6,825 |
| Massachusetts | 59.0% | 17.1% | 13.5% | 1.9% | 7.7% | 0.9% | 4,156 |
| Michigan | 52.7% | 17.8% | 17.2% | 3.2% | 8.2% | 1.0% | 7,117 |
| Minnesota | 55.1% | 17.4% | 15.7% | 3.1% | 8.0% | 0.6% | 4,191 |
| Mississippi | 46.1% | 24.0% | 17.9% | 1.6% | 9.9% | 0.5% | 1,109 |
| Missouri | 51.4% | 21.9% | 15.1% | 1.7% | 9.2% | 0.7% | 3,183 |
| Montana | 49.7% | 25.3% | 14.2% | 1.5% | 8.3% | 0.9% | 324 |
| Nebraska | 47.6% | 24.8% | 13.2% | 1.7% | 11.5% | 1.3% | 593 |
| Nevada | 59.3% | 15.7% | 15.0% | 3.5% | 5.4% | 1.0% | 4,690 |
| New Hampshire | 58.9% | 17.2% | 12.6% | 1.7% | 9.0% | 0.6% | 943 |
| New Jersey | 56.3% | 17.3% | 15.1% | 2.0% | 8.2% | 1.2% | 7,367 |
| New Mexico | 51.1% | 24.6% | 13.7% | 0.8% | 8.9% | 0.8% | 838 |
| New York | 64.6% | 15.1% | 11.0% | 2.0% | 5.8% | 1.5% | 9,209 |
| North Carolina | 47.5% | 23.9% | 16.3% | 2.1% | 9.5% | 0.7% | 6,680 |
| North Dakota | 53.1% | 24.7% | 8.6% | 3.7% | 9.9% | 0.0% | 81 |
| Ohio | 46.3% | 22.4% | 18.6% | 1.9% | 10.0% | 0.8% | 6,451 |
| Oklahoma | 40.0% | 26.7% | 18.5% | 1.3% | 12.6% | 0.8% | 1,063 |
| Oregon | 55.9% | 18.6% | 13.7% | 3.7% | 7.3% | 0.8% | 2,517 |
| Pennsylvania | 50.2% | 21.0% | 15.9% | 1.6% | 10.1% | 1.2% | 5,592 |
| Rhode Island | 59.0% | 15.3% | 13.5% | 2.1% | 9.5% | 0.7% | 727 |
| South Carolina | 49.0% | 21.7% | 15.5% | 1.5% | 10.2% | 2.1% | 3,045 |
| South Dakota | 51.1% | 22.3% | 17.3% | 0.7% | 8.6% | 0.0% | 139 |
| Tennessee | 46.7% | 25.6% | 16.8% | 2.2% | 8.0% | 0.7% | 3,167 |
| Texas | 43.1% | 28.2% | 17.1% | 0.9% | 10.0% | 0.7% | 11,657 |
| Utah | 49.9% | 23.4% | 16.6% | 1.9% | 7.8% | 0.4% | 2,129 |
| Vermont | 48.4% | 17.6% | 14.9% | 5.0% | 11.8% | 2.3% | 221 |
| Virginia | 50.0% | 20.0% | 17.9% | 3.2% | 7.9% | 0.9% | 5,510 |
| Washington | 51.3% | 18.8% | 15.8% | 4.9% | 7.7% | 1.6% | 4,346 |
| Washington, DC | 52.3% | 16.2% | 15.5% | 3.2% | 10.6% | 2.2% | 407 |
| West Virginia | 51.4% | 17.3% | 18.0% | 2.0% | 10.4% | 0.9% | 444 |
| Wisconsin | 51.9% | 18.7% | 15.4% | 2.3% | 10.8% | 0.9% | 2,232 |
| Wyoming | 45.3% | 21.2% | 15.3% | 7.6% | 8.8% | 1.8% | 170 |
| Other | 67.3% | 19.6% | 11.2% | 0.9% | 0.9% | 0.0% | 107 |

| | Table 55: Number of Re-Defaults for Loans Modified in the First Quarter of 2010 | | | | | | |
|---|---|---|---|---|---|---|---|
| | (60 or More Days Delinquent After 6 Months by Changes in Monthly Principal and Interest Payments) | | | | | | |
| States | Decreased by 20% or More | Decreased by 10% to Less Than 20% | Decreased by Less Than 10% | Unchanged | Increased | Not Reported | Total Modifications |
| Total | 14,419 | 8,497 | 9,570 | 2,074 | 8,390 | 209 | 43,159 |
| Alabama | 139 | 129 | 188 | 42 | 135 | 1 | 634 |
| Alaska | 5 | 11 | 14 | 4 | 11 | 0 | 45 |
| Arizona | 733 | 298 | 392 | 82 | 243 | 3 | 1,751 |
| Arkansas | 61 | 43 | 49 | 16 | 57 | 5 | 231 |
| California | 2,465 | 916 | 1,014 | 280 | 1,111 | 38 | 5,824 |
| Colorado | 172 | 128 | 207 | 40 | 170 | 3 | 720 |
| Connecticut | 169 | 93 | 103 | 26 | 92 | 3 | 486 |
| Delaware | 55 | 38 | 49 | 7 | 23 | 1 | 173 |
| Florida | 1,667 | 705 | 679 | 216 | 671 | 27 | 3,965 |
| Georgia | 642 | 575 | 657 | 114 | 423 | 15 | 2,426 |
| Hawaii | 37 | 9 | 20 | 1 | 28 | 0 | 95 |
| Idaho | 63 | 44 | 58 | 6 | 54 | 1 | 226 |
| Illinois | 771 | 356 | 453 | 85 | 347 | 6 | 2,018 |
| Indiana | 200 | 219 | 213 | 40 | 168 | 2 | 842 |
| Iowa | 61 | 46 | 57 | 15 | 54 | 0 | 233 |
| Kansas | 53 | 52 | 61 | 10 | 70 | 1 | 247 |
| Kentucky | 98 | 87 | 81 | 22 | 85 | 0 | 373 |
| Louisiana | 117 | 87 | 84 | 31 | 104 | 2 | 425 |
| Maine | 52 | 31 | 20 | 8 | 25 | 0 | 136 |
| Maryland | 472 | 272 | 297 | 63 | 210 | 14 | 1,328 |
| Massachusetts | 304 | 125 | 133 | 35 | 145 | 3 | 745 |
| Michigan | 504 | 352 | 326 | 61 | 293 | 3 | 1,539 |
| Minnesota | 273 | 167 | 183 | 26 | 151 | 5 | 805 |
| Mississippi | 84 | 52 | 89 | 15 | 74 | 1 | 315 |
| Missouri | 255 | 162 | 173 | 32 | 175 | 2 | 799 |
| Montana | 19 | 14 | 25 | 3 | 16 | 0 | 77 |
| Nebraska | 48 | 33 | 34 | 2 | 34 | 0 | 151 |
| Nevada | 382 | 137 | 144 | 24 | 148 | 4 | 839 |
| New Hampshire | 55 | 26 | 30 | 9 | 47 | 0 | 167 |
| New Jersey | 488 | 253 | 260 | 70 | 236 | 4 | 1,311 |
| New Mexico | 65 | 39 | 46 | 13 | 39 | 1 | 203 |
| New York | 495 | 270 | 251 | 83 | 196 | 6 | 1,301 |
| North Carolina | 405 | 371 | 424 | 68 | 306 | 10 | 1,584 |
| North Dakota | 4 | 2 | 6 | 0 | 10 | 0 | 22 |
| Ohio | 328 | 282 | 328 | 68 | 292 | 3 | 1,301 |
| Oklahoma | 64 | 61 | 91 | 17 | 98 | 3 | 334 |
| Oregon | 153 | 77 | 101 | 22 | 84 | 2 | 439 |
| Pennsylvania | 409 | 247 | 257 | 49 | 284 | 2 | 1,248 |
| Rhode Island | 64 | 24 | 31 | 11 | 24 | 1 | 155 |
| South Carolina | 154 | 116 | 149 | 46 | 157 | 7 | 629 |
| South Dakota | 8 | 6 | 11 | 0 | 16 | 0 | 41 |
| Tennessee | 203 | 176 | 213 | 36 | 130 | 5 | 763 |
| Texas | 653 | 779 | 902 | 115 | 750 | 6 | 3,205 |
| Utah | 118 | 71 | 125 | 18 | 69 | 1 | 402 |
| Vermont | 17 | 4 | 7 | 2 | 5 | 0 | 35 |
| Virginia | 330 | 200 | 193 | 52 | 195 | 12 | 982 |
| Washington | 269 | 162 | 178 | 50 | 165 | 2 | 826 |
| Washington, DC | 18 | 17 | 12 | 3 | 22 | 0 | 72 |
| West Virginia | 28 | 18 | 21 | 6 | 22 | 0 | 95 |
| Wisconsin | 181 | 108 | 123 | 27 | 113 | 4 | 556 |
| Wyoming | 5 | 4 | 7 | 3 | 11 | 0 | 30 |
| Other | 4 | 3 | 1 | 0 | 2 | 0 | 10 |

Case 1:20-cv-04230 Document 1 Filed 07/27/20 Page 195 of 219 PageID #:295

| | Decreased by 20% or More | Decreased by 10% to Less Than 20% | Decreased by Less Than 10% | Unchanged | Increased | Not Reported | Total Modifications |
|---|---|---|---|---|---|---|---|
| **Table 56:** Re-Default Rates for Loans Modified in the First Quarter of 2010 (Percentage) (60 or More Days Delinquent After 6 Months by Changes in Monthly Principal and Interest Payments) | | | | | | | |
| **States** | | | | | | | |
| Total | 11.7% | 21.2% | 28.4% | 33.4% | 37.7% | 25.7% | 19.1% |
| Alabama | 15.1% | 24.5% | 36.1% | 37.5% | 41.8% | 33.3% | 26.4% |
| Alaska | 8.3% | 24.4% | 30.4% | 80.0% | 39.3% | 0.0% | 24.5% |
| Arizona | 11.9% | 20.1% | 31.5% | 36.1% | 38.8% | 11.1% | 17.9% |
| Arkansas | 18.0% | 22.9% | 30.1% | 53.3% | 41.9% | 71.4% | 26.8% |
| California | 8.6% | 16.0% | 21.1% | 24.7% | 31.7% | 26.0% | 13.2% |
| Colorado | 10.8% | 17.8% | 29.6% | 31.3% | 37.5% | 33.3% | 20.0% |
| Connecticut | 11.5% | 20.3% | 27.6% | 34.2% | 37.1% | 60.0% | 18.4% |
| Delaware | 14.6% | 25.3% | 32.2% | 25.0% | 31.1% | 50.0% | 22.1% |
| Florida | 12.1% | 22.0% | 27.0% | 38.8% | 38.2% | 34.2% | 18.1% |
| Georgia | 13.6% | 25.1% | 34.1% | 40.7% | 43.7% | 31.9% | 23.7% |
| Hawaii | 9.2% | 11.7% | 30.3% | 12.5% | 45.9% | 0.0% | 15.4% |
| Idaho | 11.9% | 23.4% | 31.2% | 20.7% | 47.4% | 50.0% | 21.5% |
| Illinois | 11.8% | 21.1% | 31.8% | 34.3% | 39.0% | 19.4% | 18.7% |
| Indiana | 15.3% | 24.8% | 28.9% | 37.0% | 36.1% | 22.2% | 24.0% |
| Iowa | 14.4% | 21.0% | 30.2% | 41.7% | 32.1% | 0.0% | 22.4% |
| Kansas | 12.4% | 23.1% | 29.9% | 27.8% | 37.6% | 16.7% | 22.8% |
| Kentucky | 17.7% | 24.1% | 31.0% | 33.8% | 38.8% | 0.0% | 25.5% |
| Louisiana | 17.5% | 25.5% | 26.3% | 41.9% | 41.6% | 66.7% | 25.7% |
| Maine | 15.6% | 24.4% | 23.0% | 47.1% | 37.3% | 0.0% | 21.6% |
| Maryland | 12.6% | 21.0% | 27.7% | 37.5% | 39.2% | 41.2% | 19.4% |
| Massachusetts | 11.8% | 18.5% | 24.5% | 28.9% | 36.5% | 16.7% | 17.2% |
| Michigan | 13.0% | 22.8% | 28.0% | 31.3% | 38.4% | 20.0% | 20.4% |
| Minnesota | 11.5% | 21.7% | 27.4% | 23.0% | 33.6% | 38.5% | 18.4% |
| Mississippi | 17.4% | 22.1% | 35.2% | 30.6% | 46.0% | 100.0% | 26.6% |
| Missouri | 15.5% | 21.3% | 28.0% | 24.4% | 37.6% | 20.0% | 22.0% |
| Montana | 12.8% | 19.4% | 41.0% | 30.0% | 29.1% | 0.0% | 22.1% |
| Nebraska | 18.9% | 23.4% | 28.6% | 11.1% | 42.0% | 0.0% | 24.6% |
| Nevada | 11.6% | 21.2% | 27.9% | 25.0% | 41.5% | 16.7% | 17.1% |
| New Hampshire | 11.8% | 16.8% | 24.2% | 32.1% | 47.0% | 0.0% | 19.1% |
| New Jersey | 11.6% | 21.5% | 28.4% | 43.2% | 37.8% | 12.9% | 18.4% |
| New Mexico | 15.0% | 21.8% | 31.9% | 56.5% | 36.8% | 25.0% | 22.9% |
| New York | 10.0% | 20.8% | 27.4% | 37.7% | 36.0% | 18.2% | 16.4% |
| North Carolina | 13.6% | 25.1% | 32.3% | 33.3% | 40.9% | 14.1% | 23.3% |
| North Dakota | 11.4% | 9.5% | 31.6% | 0.0% | 28.6% | 0.0% | 19.1% |
| Ohio | 12.3% | 21.4% | 27.7% | 36.0% | 36.9% | 14.3% | 21.1% |
| Oklahoma | 16.4% | 21.2% | 34.7% | 40.5% | 42.4% | 37.5% | 27.4% |
| Oregon | 11.7% | 17.9% | 27.9% | 37.3% | 36.1% | 28.6% | 18.3% |
| Pennsylvania | 14.6% | 21.8% | 27.0% | 28.5% | 38.9% | 14.3% | 21.5% |
| Rhode Island | 11.9% | 19.0% | 28.4% | 36.7% | 38.7% | 20.0% | 17.8% |
| South Carolina | 11.3% | 20.5% | 28.0% | 50.5% | 42.3% | 38.9% | 21.4% |
| South Dakota | 10.8% | 17.6% | 28.2% | 0.0% | 53.3% | 0.0% | 22.8% |
| Tennessee | 14.3% | 24.7% | 32.4% | 30.5% | 35.9% | 33.3% | 23.2% |
| Texas | 16.9% | 24.3% | 33.3% | 41.1% | 41.7% | 20.7% | 27.0% |
| Utah | 12.4% | 20.2% | 33.2% | 35.3% | 32.7% | 50.0% | 20.7% |
| Vermont | 13.3% | 11.1% | 30.4% | 25.0% | 16.7% | 0.0% | 15.6% |
| Virginia | 11.1% | 18.5% | 21.5% | 30.4% | 36.6% | 36.4% | 17.2% |
| Washington | 12.4% | 21.3% | 28.8% | 39.1% | 38.6% | 18.2% | 20.0% |
| Washington, DC | 11.5% | 21.3% | 23.1% | 42.9% | 41.5% | 0.0% | 20.6% |
| West Virginia | 12.3% | 17.6% | 26.9% | 26.1% | 32.4% | 0.0% | 19.0% |
| Wisconsin | 14.7% | 24.7% | 28.9% | 27.3% | 34.9% | 44.4% | 22.0% |
| Wyoming | 10.0% | 11.8% | 22.6% | 75.0% | 45.8% | 0.0% | 21.0% |
| Other | 22.2% | 20.0% | 16.7% | 0.0% | 66.7% | 0.0% | 23.8% |

### *Index of Tables*

*Table 1.* Number of New Home Retention Actions.................................................................. 6

*Table 2.* Status of Mortgages Modified in 2008–2010 .......................................................... 7

*Table 3.* Modified Loans 60 or More Days Delinquent........................................................... 7

*Table 4.* Re-Default Rates for Portfolio Loans and Loans Serviced for Others ............................ 8

*Table 5.* 60+ Delinquency at 6 Months After Modification by Change to Monthly Payments..... 8

*Table 6.* New Foreclosures and Foreclosures in Process........................................................... 9

*Table 7.* Completed Foreclosures and Other Home Forfeiture Actions ..................................... 9

*Table 8.* Overall Mortgage Portfolio...................................................................................... 14

*Table 9.* Overall Portfolio Performance.................................................................................. 15

*Table 10.* Performance of Government-Guaranteed Mortgages (Percentage)*.......................... 16

*Table 11.* Performance of GSE Mortgages (Percent) ............................................................... 17

*Table 12.* Seriously Delinquent Mortgages ............................................................................ 18

*Table 13.* Mortgages 30–59 Days Delinquent ........................................................................ 19

*Table 14.* Number of New Home Retention Actions................................................................ 21

*Table 15.* HAMP Modifications, by Investor and Risk Category............................................... 22

*Table 16.* HAMP Trial-Period Plans, by Investor and Risk Category......................................... 22

*Table 17.* Percentage of Newly Initiated Home Retention Actions by Risk Category............... 23

*Table 18.* Changes in Loan Terms for Modifications Made Through the
Third Quarter of 2010............................................................................................................ 24

*Table 19.* Changes in Loan Terms for HAMP Modifications Made Permanent
Through the Third Quarter of 2010 ....................................................................................... 25

*Table 20.* Changes in Loan Terms for Modifications, by Risk Category in
Third Quarter 2010 ............................................................................................................... 26

*Table 21.* Type of Modification Action, by Investor, in Third Quarter 2010.............................. 27

*Table 22.* Type of HAMP Modification Action by Investor in Second Quarter 2010 ................ 28

*Table 23.* Changes in Monthly Principal and Interest Payments
Resulting From Modifications ................................................................................................ 30

*Table 24.* Changes in Monthly Principal and Interest Payments Resulting From HAMP
Modifications ........................................................................................................................ 31

*Table 25.* Average Change in Monthly Payments Resulting From Modifications...................... 32

*Table 26.* Modified Loans 60 or More Days Delinquent.......................................................... 33

*Table 27.* Modified Loans 30 or More Days Delinquent................................................................ 34

*Table 28.* Modified Loans 90 or More Days Delinquent................................................................ 35

*Table 29.* Re-Default Rates for Portfolio Loans and Loans Serviced for Others
Modified in 2008........................................................................................................................... 36

*Table 30.* Re-Default Rates for Portfolio Loans and Loans Serviced for Others ........................ 36

*Table 31.* Re-Default Rates for Portfolio Loans and Loans Serviced for Others ........................ 36

*Table 32.* Performance of HAMP Modifications Compared with Other Modifications* ........... 37

*Table 33.* Re-Default Rates of Loans Modified in 2008 by Change in Payment ........................ 39

*Table 34.* Re-Default Rates of Loans Modified in 2009 by Change in Payment ........................ 39

*Table 35.* Re-Default Rates of Loans Modified in 2010 by Change in Payment ........................ 39

*Table 36.* 60+ Delinquency at 6 Months After Modification by Change to
Monthly Payments ........................................................................................................................ 40

*Table 37.* Status of Modified Mortgages in 2008–2010 .............................................................. 41

*Table 38.* Completed Foreclosures and Other Home Forfeiture Actions .................................... 42

*Table 39.* Number of Newly Initiated Foreclosures..................................................................... 43

*Table 40.* Foreclosures in Process................................................................................................ 44

*Table 41.* Completed Foreclosures .............................................................................................. 45

*Table 42.* Newly Initiated Home Retention Actions.................................................................... 46

*Table 43.* Number of New Loan Modifications............................................................................ 47

*Table 44.* Number of New Trial-Period Plans ............................................................................. 48

*Table 45.* Number of New Payment Plans*................................................................................. 49

*Table 46.* Changes in Terms Made for Modifications Made Through the
Third Quarter of 2010................................................................................................................... 50

*Table 47.* Changes in Terms for Combination Modifications Made Through the
Third Quarter of 2010................................................................................................................... 51

*Table 48:* Number and Percentage of Mortgage Modifications .................................................. 53

*Table 49:* Number of Mortgage Modification Actions................................................................ 54

*Table 50:* Percentage of Mortgage Modification Actions ........................................................... 55

*Table 51:* Number of Modification Actions in Combination Actions......................................... 56

*Table 52:* Percentage of Modification Actions in Combination Actions .................................... 57

*Table 53:* Changes in Monthly Principal and Interest Payments (Number)................................ 58

*Table 54:* Changes in Monthly Principal and Interest Payments (Percentage) ........................... 59

*Table 55:* Number of Re-Defaults for Loans Modified in the First Quarter of 2010 .................. 60

*Table 56:* Re-Default Rates for Loans Modified in the First Quarter of 2010 (Percentage) ....... 61

### *Index of Figures*

*Figure 1.* Portfolio Composition............................................................................... 14

*Figure 2.* Overall Portfolio Performance ................................................................... 15

*Figure 3.* Performance of Government-Guaranteed Mortgages.................................. 16

*Figure 4.* Performance of GSE Mortgages ................................................................ 17

*Figure 5.* Seriously Delinquent Mortgages............................................................... 18

*Figure 6.* Mortgages 30–59 Days Delinquent............................................................ 19

*Figure 7.* Number of New Home Retention Actions.................................................. 21

*Figure 8.* Newly Initiated Home Retention Actions by Risk Category....................... 23

*Figure 9.* Changes in Monthly Principal and Interest Payments ................................ 30

*Figure 10.* Modified Loans 60 or More Days Delinquent........................................... 33

*Figure 11.* Modified Loans 30 or More Days Delinquent........................................... 34

*Figure 12.* Modified Loans 90 or More Days Delinquent........................................... 35

*Figure 13.* Performance of HAMP Modifications Compared With Other Modifications........... 37

*Figure 14.* 60+ Delinquency at 6 Months After Modification by
Change to Monthly Payments........................................................................................ 40

*Figure 15.* Number of Newly Initiated Foreclosures.................................................. 43

*Figure 16.* Number of Foreclosures in Process ......................................................... 44

*Figure 17.* Number of Completed Foreclosures ......................................................... 45

*Figure 18.* Newly Initiated Home Retention Actions................................................. 46

*Figure 19.* Number of New Loan Modifications ........................................................ 47

*Figure 20.* Number of New Trial-Period Plans .......................................................... 48

*Figure 21.* Number of New Payment Plans................................................................ 49



## Exhibit 2

Newly Initiated Foreclosures, Page 43 of First Quarter of the 2011 **OCC**

**and OTS Mortgage Metrics Report Disclosure of National Bank and Federal**

**Thrift Mortgage Loan Data**, which page pertained to Newly Initiated

Foreclosures for the past four quarters

## *Newly Initiated Foreclosures*

Servicers initiate foreclosure actions at defined stages of loan delinquency. However, final foreclosure sales only proceed if servicers and borrowers cannot arrange a permanent loss mitigation action, modification, or alternate workout solution. Newly initiated foreclosures decreased by 11.3 percent to 312,404 during the first quarter of 2011 (see table 38). This decrease can be attributed to the continued decline in serious delinquencies as well as the increase in new trial-period plans during the quarter.

| Table 38. Number of Newly Initiated Foreclosures | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 3/31/10 | 6/30/10 | 9/30/10 | 12/31/10 | 3/31/11 | 1Q %Change | 1Y %Change |
| Prime | 173,764 | 142,920 | 183,714 | 172,715 | 144,812 | -16.2% | -16.7% |
| Alt-A | 68,451 | 53,140 | 72,875 | 66,467 | 58,509 | -12.0% | -14.5% |
| Subprime | 79,209 | 54,533 | 72,445 | 68,117 | 62,489 | -8.3% | -21.1% |
| Other | 48,520 | 41,164 | 53,748 | 45,019 | 46,594 | 3.5% | -4.0% |
| Total | 369,944 | 291,757 | 382,782 | 352,318 | 312,404 | -11.3% | -15.6% |

**Figure 15. Number of Newly Initiated Foreclosures**



**Exhibit 3**

Newly Initiated Foreclosures, Page 44 of Third Quarter of the 2011 **OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data**, which page pertained to Newly Initiated Foreclosures for the past four quarters.

### Newly Initiated Foreclosures

Servicers initiate foreclosure actions at defined stages of loan delinquency. However, final foreclosure sales only proceed if servicers and borrowers cannot arrange a permanent loss mitigation action, modification, or alternate workout solution. Newly initiated foreclosures increased by 21.1 percent to 347,726 during the third quarter of 2011 (see table 40).

| Table 40. Number of Newly Initiated Foreclosures | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 9/30/10 | 12/31/10 | 3/31/11 | 6/30/11 | 9/30/11 | 1Q %Change | 1Y %Change |
| Prime | 189,959 | 174,534 | 144,742 | 136,119 | 158,632 | 16.5% | -16.5% |
| Alt-A | 74,880 | 67,149 | 58,474 | 52,064 | 64,215 | 23.3% | -14.2% |
| Subprime | 73,129 | 68,415 | 62,459 | 58,229 | 78,852 | 35.4% | 7.8% |
| Other | 56,388 | 45,847 | 46,560 | 40,750 | 46,027 | 12.9% | -18.4% |
| Total | 394,356 | 355,945 | 312,235 | 287,162 | 347,726 | 21.1% | -11.8% |

**Figure 15.** Number of Newly Initiated Foreclosures


## Exhibit 4

New Retention Actions for the past five quarters, Page 21 of First Quarter

of the 2011 **OCC and OTS Mortgage Metrics Report Disclosure of National**

**Bank and Federal Thrift Mortgage Loan Data**,

## A. Loan Modifications, Trial-Period Plans, and Payment Plans

### New Home Retention Actions

Servicers implemented 557,451 new home retention actions—loan modifications, trial-period plans, and payment plans—during the first quarter of 2011 (see table 13). The number of home retention actions increased 17.4 percent from the previous quarter but decreased 10.5 percent from a year ago. Servicers implemented 159,873 modifications during the quarter—down 23.4 percent from the previous quarter. However, other trial-period plans and HAMP trial-period plans increased in the first quarter, with servicers implementing 238,755 new trial-period plans—a 78.1 percent increase from the previous quarter. Payment plans also increased by 20.3 percent during the first quarter to 158,823. During the past five quarters, servicers have initiated 2.7 million home retention actions—1.1 million modifications, 918,000 trial-period plans, and more than 674,000 payment plans.

| Table 13. Number of New Home Retention Actions | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 3/31/10 | 6/30/10 | 9/30/10 | 12/31/10 | 3/31/11 | 1Q %Change | 1Y %Change |
| Other Modifications | 129,491 | 158,886 | 174,341 | 152,362 | 106,570 | -30.1% | -17.7% |
| HAMP Modifications | 100,226 | 108,075 | 58,342 | 56,340 | 53,303 | -5.4% | -46.8% |
| Other Trial-Period Plans | 89,613 | 90,567 | 71,719 | 81,034 | 181,099 | 123.5% | 102.1% |
| HAMP Trial-Period Plans | 183,464 | 65,114 | 44,666 | 53,058 | 57,656 | 8.7% | -68.6% |
| Payment Plans | 119,900 | 144,207 | 119,041 | 131,984 | 158,823 | 20.3% | 32.5% |
| Total | 622,694 | 566,849 | 468,109 | 474,778 | 557,451 | 17.4% | -10.5% |

#### Figure 8. Number of New Home Retention Actions


**Exhibit 5**

**Exhibit 5**: Page 41 Fourth Quarter of the 2010 **OCC and OTS Mortgage**

**Metrics Report Disclosure of National Bank and Federal Thrift Mortgage**

**Loan Data.**

### Part III: Home Forfeiture Actions: Foreclosures, Short Sales, and Deed-in-Lieu-of-Foreclosure Actions

#### Completed Foreclosures and Other Home Forfeiture Actions

Home forfeiture actions—foreclosure sales, short sales, and deed-in-lieu-of-foreclosure actions—totaled 146,132 during the fourth quarter of 2010, a decrease of 40.3 percent from the previous quarter and 14.7 percent from a year ago. Completed foreclosures decreased to 95,067—down 49.1 percent from the previous quarter and 28.3 percent from a year ago. Short sales also decreased during the quarter but made up one-third of all home forfeiture actions. Deed-in-lieu-of-foreclosure actions remained a very small portion of home forfeiture actions. Servicers implemented more than three times as many home retention actions—loan modifications, trial-period plans, and payment plans—as home forfeiture actions during the fourth quarter of 2010. A moratorium on foreclosure processing by several of the largest servicers during the fourth quarter of 2010 contributed to the decrease in completed foreclosures. Completed foreclosure volume is expected to increase in the first quarter of 2011 as moratoria are lifted and the increased volume of pending foreclosures is processed.

While HAMP and proprietary foreclosure prevention programs are designed to help a significant number of distressed homeowners, these programs are not expected to help all delinquent borrowers. In this regard, servicers indicated that completed foreclosures and other home forfeiture actions are likely to continue rising as alternatives for seriously delinquent borrowers are exhausted, loans in process of foreclosure proceed to foreclosure sale, and servicers and borrowers work through the reduced, but still elevated, volume of seriously delinquent loans.

| Table 37. Completed Foreclosures and Other Home Forfeiture Actions | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 12/31/09 | 3/31/10 | 6/30/10 | 9/30/10 | 12/31/10 | 1Q %Change | 1Y %Change |
| Completed Foreclosures | 132,625 | 157,733 | 168,256 | 186,854 | 95,067 | -49.1% | -28.3% |
| New Short Sales | 37,584 | 41,031 | 55,441 | 56,257 | 48,980 | -12.9% | 30.3% |
| New Deed-in-Lieu-of-Foreclosure Actions | 1,054 | 1,202 | 1,753 | 1,729 | 2,085 | 20.6% | 97.8% |
| Total | 171,263 | 199,966 | 225,450 | 244,840 | 146,132 | -40.3% | -14.7% |
| Newly Initiated Home Retention Actions Relative to Completed Foreclosures and Other Home Forfeiture Actions | 351.1% | 310.9% | 251.4% | 191.3% | 324.0% | 69.3% | -7.7% |

**Exhibit 6**

**Ledger**

DATE          03/07/2014

TI

## CUSTOMER ACCOUNT ACTIVITY STATEMENT

MORT NAME      SCOTT FOSTER
STREET         1212 W SHERWIN AVE
CITY STATE ZIP CHICAGO, IL 60626

LOAN NUMBER.

ACTIVITY FOR PERIOD 01/31/2004 - 12/31/2004

| Loan Number | Transaction Date | Transaction Code | Due Date | Fees Assessed | Fees Paid | Suspense Amount | Principal Amount | Interest Amount | Escrow Amount | Advance Amount | Total Amount | Principal Balance | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0026567768 | 01/01/2004 | | | | | | | | | | | 0.00 | |
| 0026567768 | 11/03/2004 | 142 | | 0.00 | 0.00 | 0.00 | ######## | 0.00 | 0.00 | 0.00 | ######## | 285000.00 | |
| 0026567768 | 11/09/2004 | 143 | | 0.00 | 0.00 | 0.00 | 0.00 | -42.55 | 0.00 | 0.00 | 0.00 | 285000.00 | |
| 0026567768 | 11/10/2004 | 170 | 12/01/2004 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 285000.00 | |
| 0026567768 | 12/10/2004 | 172 | 12/01/2004 | 0.00 | 0.00 | 0.00 | 0.00 | 1278.56 | 0.00 | 0.00 | 1276.56 | 285000.00 | |
| 0026567768 | 12/31/2004 | | | | | | | | | | | 285000.00 | |

A326

DATE        03/07/2014

CUSTOMER ACCOUNT ACTIVITY STATEMENT

MORT NAME    SCOTT FOSTER
STREET       1212 W SHERWIN AVE
CITY STATE ZIP  CHICAGO  IL  60626

LOAN NUMBER:

ACTIVITY FOR PERIOD 01/01/2005 - 12/31/2005

| Loan Number | Transaction Date | Transaction Code | Due Date | Fees Assessed | Fees Paid | Suspense Amount | Principal Amount | Interest Amount | Escrow Amount | Advance Amount | Total Amount | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0026567768 | 01/01/2005 | | | | | | | | | | | 285000.00 |
| 0026567768 | 01/18/2005 | 172 | 01/01/2005 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 02/16/2005 | 152 | | 63.82 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 63.82 | 285000.00 |
| 0026567768 | 02/18/2005 | 172 | 02/01/2005 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 03/18/2005 | 152 | | 63.82 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 63.82 | 285000.00 |
| 0026567768 | 03/18/2005 | 172 | 03/01/2005 | 0.00 | 0.20 | 0.00 | 0.00 | 1276.76 | 0.00 | 0.00 | 1276.76 | 285000.00 |
| 0026567768 | 03/18/2005 | 72 | | -0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -0.20 | 285000.00 |
| 0026567768 | 04/13/2005 | 172 | 04/01/2005 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | -0.01 | 0.00 | 1276.55 | 285000.00 |
| 0026567768 | 05/16/2005 | 172 | 05/01/2005 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 05/16/2005 | 32 | | -63.82 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -63.82 | 285000.00 |
| 0026567768 | 06/16/2005 | 172 | 06/01/2005 | 0.00 | 1.99 | 0.00 | 0.00 | 1276.56 | 0.01 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 06/16/2005 | 72 | | -1.99 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -1.99 | 285000.00 |
| 0026567768 | 07/07/2005 | 172 | 07/01/2005 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 08/16/2005 | 172 | 08/01/2005 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 09/13/2005 | 172 | 09/01/2005 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 10/06/2005 | 172 | 10/01/2005 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 11/10/2005 | 172 | 11/01/2005 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 12/12/2005 | 172 | 12/01/2005 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 12/31/2005 | | | | | | | | | | | 285000.00 |

A 727

DATE        03/07/2014

CUSTOMER ACCOUNT ACTIVITY STATEMENT

MORT NAME    SCOTT FOSTER
STREET       1212 W SHERWIN AVE
CITY STATE ZIP   CHICAGO IL, 60626

LOAN NUMBER:

### ACTIVITY FOR PERIOD 01/01/2006 - 12/31/2006

| Loan Number | Transaction Date | Transaction Code | Due Date | Fees Assessed | Fees Paid | Suspense Amount | Principal Amount | Interest Amount | Escrow Amount | Advance Amount | Total Amount | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | 285000.00 |
| 0026567768 | 01/01/2006 | | | | | | | 1276.56 | | | 1276.56 | 285000.00 |
| 0026567768 | 01/11/2006 | 172 | 01/01/2006 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 02/13/2006 | 172 | 02/01/2006 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 03/13/2006 | 172 | 03/01/2006 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 04/10/2006 | 172 | 04/01/2006 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 05/12/2006 | 172 | 05/01/2006 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 06/08/2006 | 172 | 06/01/2006 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 07/13/2006 | 172 | 07/01/2006 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 08/15/2006 | 172 | 08/01/2006 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 09/14/2006 | 172 | 09/01/2006 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 20.00 | 285000.00 |
| 0026567768 | 09/26/2006 | 132 | | 20.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 285000.00 |
| 0026567768 | 10/12/2006 | 172 | 10/01/2006 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1296.56 | 285000.00 |
| 0026567768 | 11/15/2006 | 172 | 11/01/2006 | 0.00 | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -20.00 | 285000.00 |
| 0026567768 | 11/15/2006 | 72 | | -20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.58 | 285000.00 |
| 0026567768 | 12/13/2006 | 172 | 12/01/2006 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | | 285000.00 |
| 0026567768 | 12/31/2006 | | | | | | | | | | | |



DATE        03/07/2014

## CUSTOMER ACCOUNT ACTIVITY STATEMENT

MORT NAME   SCOTT FOSTER
STREET      1212 W SHERWIN AVE
CITY STATE ZIP   CHICAGO, IL 60626

LOAN NUMBER: ▮▮▮▮▮

### ACTIVITY FOR PERIOD 01/01/2007 - 12/31/2007

| Loan Number | Transaction Date | Transaction Code | Due Date | Fees Assessed | Fees Paid | Suspense Amount | Principal Amount | Interest Amount | Escrow Amount | Advance Amount | Total Amount | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0026567768 | 01/01/2007 | | | | | | | | | | | 265000.00 |
| 0026567768 | 01/19/2007 | 172 | 01/01/2007 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 265000.00 |
| 0026567768 | 02/16/2007 | 152 | | 63.82 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 63.82 | 265000.00 |
| 0026567768 | 02/20/2007 | 172 | 02/01/2007 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 265000.00 |
| 0026567768 | 03/09/2007 | 172 | 03/01/2007 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | -0.56 | 0.00 | 1276.00 | 265000.00 |
| 0026567768 | 04/09/2007 | 172 | 04/01/2007 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 265000.00 |
| 0026567768 | 05/09/2007 | 172 | 05/01/2007 | 0.00 | 0.00 | 0.56 | 0.00 | 0.00 | 0.00 | 0.00 | 0.56 | 265000.00 |
| 0026567768 | 05/16/2007 | 173 | 06/01/2007 | 0.00 | 0.00 | 0.56 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 265000.00 |
| 0026567768 | 05/17/2007 | 173 | 06/01/2007 | 0.00 | 0.56 | 0.56 | 0.00 | 0.00 | 0.00 | 0.00 | -0.56 | 265000.00 |
| 0026567768 | 05/17/2007 | 73 | | -0.56 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 265000.00 |
| 0026567768 | 05/18/2007 | 147 | 06/01/2007 | 0.00 | -0.56 | 0.56 | 0.00 | 0.00 | 0.00 | 0.00 | 0.58 | 265000.00 |
| 0026567768 | 05/18/2007 | 47 | | 0.56 | 0.00 | -0.56 | 0.00 | 0.00 | 0.56 | 0.00 | 0.00 | 265000.00 |
| 0026567768 | 05/21/2007 | 170 | 06/01/2007 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.56 | 0.00 | 0.00 | 1276.56 | 265000.00 |
| 0026567768 | 06/13/2007 | 172 | 06/01/2007 | 0.00 | 0.00 | 0.00 | 0.00 | 1278.56 | 0.00 | 0.00 | 1382.01 | 265000.00 |
| 0026567768 | 07/05/2007 | 172 | 07/01/2007 | 0.00 | 105.45 | 0.00 | 20.00 | 0.00 | 0.00 | 0.00 | 20.00 | 284980.00 |
| 0026567768 | 07/05/2007 | 175 | 08/01/2007 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -105.45 | 284980.00 |
| 0026567768 | 07/05/2007 | 72 | | 105.45 | 0.00 | 0.00 | 0.00 | 1276.47 | 0.00 | 0.00 | 1276.47 | 284980.00 |
| 0026567768 | 08/01/2007 | 172 | 08/01/2007 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.47 | 0.00 | 0.00 | 1276.47 | 284980.00 |
| 0026567768 | 09/11/2007 | 172 | 09/01/2007 | 0.00 | 0.00 | 0.00 | 0.00 | 1278.47 | 0.00 | 0.00 | 1276.47 | 284960.00 |
| 0026567768 | 10/12/2007 | 172 | 10/01/2007 | 0.00 | 0.00 | 0.00 | 0.00 | 1278.47 | 0.00 | 0.00 | 1276.47 | 284980.00 |
| 0026567768 | 11/13/2007 | 172 | 11/01/2007 | 0.00 | 0.00 | 0.00 | 20.00 | 0.00 | 0.00 | 0.00 | 20.00 | 284960.00 |
| 0026567768 | 11/13/2007 | 175 | 12/01/2007 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | 1278.38 | 284980.00 |
| 0026567768 | 12/10/2007 | 172 | 12/01/2007 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 284959.91 |
| 0026567768 | 12/10/2007 | 175 | 01/01/2008 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.09 | 284959.91 |
| 0026567768 | 12/31/2007 | | | | | | | | | | | 284959.91 |

A 342

DATE      03/07/2014

CUSTOMER ACCOUNT ACTIVITY STATEMENT

MORT NAME      SCOTT FOSTER
STREET         1212 W SHERWIN AVE
CITY STATE ZIP CHICAGO, IL, 60626

LOAN NUMBER

ACTIVITY FOR PERIOD 01/01/2008 - 12/31/2008

| Loan Number | Transaction Date | Transaction Code | Due Date | Fees Assessed | Fees Paid | Suspense Amount | Principal Amount | Interest Amount | Escrow Amount | Advance Amount | Total Amount | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0026567768 | 01/01/2008 | | | | | | | | | | | 264959.91 |
| 0026567768 | 01/08/2008 | 172 | 01/01/2008 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.36 | 0.00 | 0.00 | 1276.38 | 264959.91 |
| 0026567768 | 02/13/2008 | 172 | 02/01/2008 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | 1276.38 | 264959.91 |
| 0026567768 | 03/13/2008 | 172 | 03/01/2008 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.36 | 0.00 | 0.00 | 1276.36 | 264959.91 |
| 0026567768 | 04/09/2008 | 172 | 04/01/2008 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.36 | 0.00 | 0.00 | 1276.38 | 264959.91 |
| 0026567768 | 05/12/2008 | 172 | 05/01/2008 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.36 | 0.00 | 0.00 | 1276.38 | 264959.91 |
| 0026567768 | 06/16/2008 | 172 | 06/01/2008 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.36 | 0.00 | 0.00 | 1276.38 | 264959.91 |
| 0026567768 | 07/16/2008 | 172 | 07/01/2008 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.36 | 0.00 | 0.00 | 1276.38 | 264959.91 |
| 0026567768 | 08/12/2008 | 172 | 08/01/2008 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.36 | 0.00 | 0.00 | 1276.36 | 264959.91 |
| 0026567768 | 09/11/2008 | 172 | 09/01/2008 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | 1276.36 | 264959.91 |
| 0026567768 | 10/14/2008 | 172 | 10/01/2008 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | 1276.36 | 264959.91 |
| 0026567768 | 11/10/2008 | 172 | 11/01/2008 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.36 | 0.00 | 0.00 | 1276.38 | 264959.91 |
| 0026567768 | 12/11/2008 | 172 | 12/01/2008 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | 1276.38 | 264959.91 |
| 0026567768 | 12/31/2008 | | | | | | | | | | | 264959.91 |

A 330

DATE     03/07/2014

## CUSTOMER ACCOUNT ACTIVITY STATEMENT

MORT NAME    SCOTT FOSTER
STREET         1212 W SHERWIN AVE
CITY STATE ZIP   CHICAGO, IL 60626

LOAN NUMBER ▮▮▮▮▮▮▮

ACTIVITY FOR PERIOD 01/01/2009 - 12/31/2009

| Loan Number | Transaction Date | Transaction Code | Due Date | Fees Assessed | Fees Paid | Suspense Amount | Principal Amount | Interest Amount | Escrow Amount | Advance Amount | Total Amount | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0026567768 | 01/01/2009 | | | | | | | | | | | 284959.91 |
| 0026567768 | 01/12/2009 | 172 | 01/01/2009 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | 1276.38 | 284959.91 |
| 0026567768 | 02/10/2009 | 172 | 02/01/2009 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | 1276.38 | 284959.91 |
| 0026567768 | 03/16/2009 | 172 | 03/01/2009 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | 1276.38 | 284959.91 |
| 0026567768 | 04/16/2009 | 172 | 04/01/2009 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | 63.81 | 284959.91 |
| 0026567768 | 05/16/2009 | 152 | | 63.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 63.81 | 284959.91 |
| 0026567768 | 06/16/2009 | 152 | | 63.81 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | 2552.76 | 284959.91 |
| 0026567768 | 07/07/2009 | 173 | 05/01/2009 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | 0.00 | 284959.91 |
| 0026567768 | 07/07/2009 | 173 | 06/01/2009 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 63.81 | 284959.91 |
| 0026567768 | 07/16/2009 | 152 | | 63.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 63.81 | 284959.91 |
| 0026567768 | 08/17/2009 | 152 | | 63.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2552.76 | 284959.91 |
| 0026567768 | 09/15/2009 | 173 | 07/01/2009 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | 0.00 | 284959.91 |
| 0026567768 | 09/15/2009 | 173 | 08/01/2009 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | 63.81 | 284959.91 |
| 0026567768 | 09/16/2009 | 152 | | 63.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 63.81 | 284959.91 |
| 0026567768 | 10/16/2009 | 152 | | 63.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 44.38 | 284959.91 |
| 0026567768 | 11/13/2009 | 173 | 09/01/2009 | 0.00 | 0.00 | 44.38 | 0.00 | 0.00 | 0.00 | 0.00 | 382.86 | 284959.91 |
| 0026567768 | 11/13/2009 | 173 | 09/01/2009 | 0.00 | 382.86 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 20.00 | 284959.91 |
| 0026567768 | 11/13/2009 | 173 | 09/01/2009 | 0.00 | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 284959.91 |
| 0026567768 | 11/13/2009 | 173 | 09/01/2009 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | 1276.38 | 284959.91 |
| 0026567768 | 11/13/2009 | 173 | 10/01/2009 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | -382.86 | 284959.91 |
| 0026567768 | 11/13/2009 | 73 | | -382.86 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -20.00 | 284959.91 |
| 0026567768 | 11/13/2009 | 73 | | -20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 63.81 | 284959.91 |
| 0026567768 | 11/16/2009 | 152 | | 63.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 284959.91 |
| 0026567768 | 11/16/2009 | 173 | 11/01/2009 | 0.00 | 44.38 | -44.38 | 0.00 | 0.00 | 0.00 | 0.00 | -44.38 | 284959.91 |
| 0026567768 | 11/16/2009 | 73 | | -44.38 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 63.81 | 284959.91 |
| 0026567768 | 12/16/2009 | 152 | | 63.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 284959.91 |
| 0026567768 | 12/16/2009 | 173 | 11/01/2009 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | | 284959.91 |
| 0026567768 | 12/31/2009 | | | | | | | | | | | 284959.91 |

A331

DATE       03/07/2014

## CUSTOMER ACCOUNT ACTIVITY STATEMENT

MORT NAME      SCOTT FOSTER
STREET         1212 W SHERWIN AVE
CITY STATE ZIP  CHICAGO, IL 60626

LOAN NUMBER: ▮▮▮▮▮▮

### ACTIVITY FOR PERIOD 01/01/2010 - 12/01/2010

| Loan Number | Transaction Date | Transaction Code | Due Date | Fees Assessed | Fees Paid | Suspense Amount | Principal Amount | Interest Amount | Escrow Amount | Advance Amount | Total Amount | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0026567768 | 01/01/2010 | | | | | | | | | | | 284959.91 |
| 0026567768 | 01/19/2010 | 152 | | 63.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 63.81 | 284959.91 |
| 0026567768 | 02/16/2010 | 152 | | 63.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 63.81 | 284959.91 |
| 0026567768 | 02/23/2010 | 132 | | 13.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 13.25 | 284959.91 |
| 0026567768 | 03/16/2010 | 152 | | 63.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 63.81 | 284959.91 |
| 0026567768 | 03/25/2010 | 173 | 12/01/2009 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | 1276.38 | 284959.91 |
| 0026567768 | 03/25/2010 | 173 | 01/01/2010 | 0.00 | 0.00 | 0.00 | 0.00 | 1278.38 | 0.00 | 0.00 | 1278.38 | 284959.91 |
| 0026567768 | 03/25/2010 | 173 | 02/01/2010 | 0.00 | 0.00 | 0.00 | 0.00 | 1276.38 | 0.00 | 0.00 | 1276.38 | 284959.91 |
| 0026567768 | 03/25/2010 | 173 | 03/01/2010 | 0.00 | 17.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 17.50 | 284959.91 |
| 0026567768 | 03/25/2010 | 73 | | -17.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -17.50 | 284959.91 |
| 0026567768 | 04/16/2010 | 152 | | 63.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 63.81 | 284959.91 |
| 0026567768 | 05/17/2010 | 152 | | 63.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 63.81 | 284959.91 |
| 0026567768 | 06/16/2010 | 152 | | 63.81 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 63.81 | 284959.91 |
| 0026567768 | 07/18/2010 | 152 | | 63.81 | 0.00 | 0.00 | 0.00 | 0.50 | 0.00 | 0.00 | 63.81 | 284959.91 |
| 0026567768 | 08/24/2010 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 |
| 0026567768 | 09/01/2010 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 |
| 0026567768 | 09/30/2010 | 312 | 02/01/2008 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -2235.31 | 0.00 | 0.00 | 284959.91 |
| 0026567768 | 09/30/2010 | 312 | 06/01/2008 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -2235.31 | 0.00 | 0.00 | 284959.91 |
| 0026567768 | 09/30/2010 | 312 | 02/01/2009 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -2217.39 | 0.00 | 0.00 | 284959.91 |
| 0026567768 | 09/30/2010 | 312 | 08/01/2009 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -2303.26 | 0.00 | 0.00 | 284959.91 |
| 0026567768 | 09/30/2010 | 312 | 02/01/2010 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -2432.32 | 0.00 | 0.00 | 284959.91 |
| 0026567768 | 09/30/2010 | 301 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -1394.88 | 0.00 | 0.00 | 284959.91 |
| 0026567768 | 10/11/2010 | 312 | 06/01/2009 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -2203.26 | 0.00 | 0.00 | 284959.91 |
| 0026567768 | 10/12/2010 | 164 | 03/31/2010 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2303.26 | 0.00 | 0.00 | 284959.91 |
| 0026567768 | 10/26/2010 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 284959.91 |
| 0026567768 | 11/16/2010 | 312 | 08/01/2010 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -2351.44 | 0.00 | 0.00 | 284959.91 |
| 0026567768 | 11/23/2010 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 |
| 0026567768 | 12/21/2010 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 |
| 0026567768 | 12/31/2010 | | | | | | | | | | | 284959.91 |

A 332

DATE 03/07/2014

THE MORTGAGE SERVICE CENTER
4001 LEADENHALL ROAD
MT LAUREL, NJ 08054

## CUSTOMER ACCOUNT ACTIVITY STATEMENT

MORT NAME: SCOTT FOSTER
STREET: 1212 W SHERWIN AVE
CITY STATE ZIP: CHICAGO IL 60626

LOAN NUMBER

ACTIVITY FOR PERIOD 01/01/2011 - 12/31/2011

| Loan Number | Transaction Date | Transaction Code | Due Date | Fees Assessed | Fees Paid | Suspense Amount | Principal Amount | Interest Amount | Escrow Amount | Advance Amount | Total Amount | Principal Balance | Escrow Balance | Advance Balance | Suspense Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0026567768 | 01/01/2011 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284059.91 | -15059.69 | 0.00 | 0.00 |
| 0026567768 | 01/24/2011 | 173 | 03/01/2010 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1394.66 | 1394.66 | 284059.91 | -15059.69 | 0.00 | 0.00 |
| 0026567768 | 02/02/2011 | 166 | 03/01/2010 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2235.31 | 0.00 | 284959.91 | -15059.03 | 0.00 | 0.00 |
| 0026567768 | 02/03/2011 | 166 | 03/01/2010 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2235.31 | 0.00 | 284959.91 | 11438.72 | 0.00 | 0.00 |
| 0026567768 | 02/03/2011 | 166 | 03/01/2010 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2203.26 | 0.00 | 284959.91 | -9264.41 | 0.00 | 0.00 |
| 0026567768 | 02/03/2011 | 168 | 03/01/2010 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2217.33 | 0.00 | 284959.91 | -7001.15 | 0.00 | 0.00 |
| 0026567768 | 02/03/2011 | 166 | 03/01/2010 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2432.32 | 0.00 | 284959.91 | -4783.16 | 0.00 | 0.00 |
| 0026567768 | 02/03/2011 | 166 | 03/01/2010 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2549.18 | 0.00 | 284959.91 | -2351.44 | 0.00 | 0.00 |
| 0026567768 | 02/10/2011 | 312 | 02/01/2011 | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 | 284959.91 | -4900.82 | 0.00 | 0.00 |
| 0026567768 | 02/11/2011 | 132 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -2235.31 | 0.00 | 284959.91 | -4900.82 | 0.00 | 0.00 |
| 0026567768 | 02/22/2011 | 312 | 02/01/2008 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -2235.31 | 0.00 | 284959.91 | -7136.13 | 0.00 | 0.00 |
| 0026567768 | 02/22/2011 | 312 | 04/01/2008 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -2217.30 | 0.00 | 284959.91 | -9353.44 | 0.00 | 0.00 |
| 0026567768 | 02/22/2011 | 312 | 02/01/2009 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -2203.26 | 0.00 | 284959.91 | -11556.83 | 0.00 | 0.00 |
| 0026567768 | 02/22/2011 | 312 | 04/01/2010 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -7432.32 | 0.00 | 284959.91 | -13792.09 | 0.00 | 0.00 |
| 0026567768 | 02/22/2011 | 312 | 02/01/2010 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 284959.91 | -16224.41 | 0.00 | 0.00 |
| 0026567768 | 02/22/2011 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | -2473.36 | 11.25 | 284959.91 | -16224.41 | 0.00 | 0.00 |
| 0026567768 | 02/22/2011 | 301 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 284959.91 | -16047.77 | 0.00 | 0.00 |
| 0026567768 | 03/22/2011 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -16047.77 | 125.00 | 0.00 |
| 0026567768 | 04/14/2011 | 630 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 125.00 | 0.00 | 284959.91 | -16047.77 | 175.00 | 0.00 |
| 0026567768 | 04/14/2011 | 630 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00 | 0.00 | 284959.91 | -16047.77 | 225.00 | 0.00 |
| 0026567768 | 04/14/2011 | 630 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00 | 0.00 | 284959.91 | -16047.77 | 325.00 | 0.00 |
| 0026567768 | 04/14/2011 | 630 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 0.00 | 284959.91 | -16047.77 | 525.00 | 0.00 |
| 0026567768 | 04/14/2011 | 632 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 200.00 | 0.00 | 284959.91 | -16047.77 | 620.00 | 0.00 |
| 0026567768 | 04/14/2011 | 632 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 85.00 | 0.00 | 284959.91 | -16047.77 | 670.00 | 0.00 |
| 0026567768 | 04/14/2011 | 632 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00 | 0.00 | 284859.91 | -16047.77 | 1054.00 | 0.00 |
| 0026567768 | 04/14/2011 | 632 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 384.00 | 0.00 | 284658.91 | -16047.77 | 1102.00 | 0.00 |
| 0026567768 | 04/14/2011 | 632 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 48.00 | 0.00 | 284959.91 | -16047.77 | 1857.00 | 0.00 |
| 0026567768 | 04/14/2011 | 632 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 755.00 | 0.00 | 284959.91 | -16047.77 | 2807.00 | 0.00 |
| 0026567768 | 04/14/2011 | 632 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 350.00 | 0.00 | 284959.91 | -16047.77 | 2247.00 | 0.00 |
| 0026567768 | 04/14/2011 | 632 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140.00 | 0.00 | 284959.91 | -16047.77 | 2347.00 | 0.00 |
| 0026567768 | 04/21/2011 | 632 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -16047.77 | 2347.00 | 0.00 |
| 0026567768 | 04/21/2011 | 132 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 284959.91 | -16047.77 | 2347.00 | 0.00 |
| 0026567768 | 05/03/2011 | 620 | | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1170.00 | 5.00 | 284959.91 | -16047.77 | 2347.00 | 0.00 |
| 0026567768 | 05/19/2011 | 132 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 284959.91 | -16047.77 | 3517.00 | 0.00 |
| 0026567768 | 05/26/2011 | 137 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -16047.77 | 3517.00 | 0.00 |
| 0026567768 | 06/23/2011 | 164 | 03/01/2010 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 284959.91 | -16355.89 | 3517.00 | 0.00 |
| 0026567768 | 07/06/2011 | 132 | | 20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 291.58 | 20.00 | 284959.99 | -16355.89 | 3517.00 | 0.00 |
| 0026567768 | 07/26/2011 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.99 | -16355.89 | 3517.00 | 0.00 |
| 0026567768 | 09/27/2011 | 132 | 08/01/2011 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2464.36 | 0.00 | 284959.99 | -20820.25 | 3517.00 | 0.00 |
| 0026567768 | 10/06/2011 | 317 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 284959.91 | -20820.25 | 3517.00 | 0.00 |
| 0026567768 | 10/25/2011 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -20820.25 | 3517.00 | 0.00 |
| 0026567768 | 11/13/2011 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -20820.25 | 3517.00 | 0.00 |
| 0026567768 | 12/30/2011 | 132 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 284959.91 | -20820.25 | 3517.00 | 0.00 |
| 0026567768 | 12/31/2011 | 132 | | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 | 284959.91 | -20820.25 | 3517.00 | 0.00 |

A333

TH

DATE       03/07/2014

## CUSTOMER ACCOUNT ACTIVITY STATEMENT

MORT NAME     SCOTT FOSTER
STREET        1212 W SHERWIN AVE
CITY STATE ZIP  CHICAGO, IL, 60626

LOAN NUMBER

ACTIVITY FOR PERIOD 01/01/2012 - 12/31/2012

| Loan Number | Transaction Date | Transaction Code | Due Date | Fees Assessed | Fees Paid | Suspense Amount | Principal Amount | Interest Amount | Escrow Amount | Advance Amount | Total Amount | Principal Balance | E B. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | 284959.91 | -20- |
| 0026567768 | 01/01/2012 | | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -20 |
| 0026567768 | 01/24/2012 | 132 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -2757.56 | 0.00 | 0.00 | 284959.91 | -23 |
| 0026567768 | 02/09/2012 | 312 | 02/01/2012 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -23 |
| 0026567768 | 02/21/2012 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -23 |
| 0026567768 | 03/27/2012 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 | 284959.91 | -23 |
| 0026567768 | 04/18/2012 | 132 | | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -23 |
| 0026567768 | 05/01/2012 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -23 |
| 0026567768 | 05/22/2012 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 87.50 | 0.00 | 284959.91 | -23 |
| 0026567768 | 06/01/2012 | 630 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 297.50 | 0.00 | 284959.91 | -23 |
| 0026567768 | 06/01/2012 | 630 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -23 |
| 0026567768 | 06/26/2012 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | -2366.43 | 0.00 | 0.00 | 284959.91 | -25 |
| 0026567768 | 07/09/2012 | 312 | 08/01/2012 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 175.00 | 0.00 | 284959.91 | -25 |
| 0026567768 | 07/18/2012 | 630 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 175.00 | 0.00 | 284959.91 | -25 |
| 0026567768 | 07/18/2012 | 630 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -25 |
| 0026567768 | 07/24/2012 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -25 |
| 0026567768 | 08/31/2012 | 132 | | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 | 284959.91 | -25 |
| 0026567768 | 09/12/2012 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -25 |
| 0026567768 | 10/01/2012 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -25 |
| 0026567768 | 10/23/2012 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -25 |
| 0026567768 | 11/29/2012 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 284959.91 | -25 |
| 0026567768 | 12/31/2012 | | | | | | | | | | | | |

N374

C 731

TH

DATE          03/07/2014

## CUSTOMER ACCOUNT ACTIVITY STATEMENT

MORT NAME      SCOTT FOSTER
STREET         1212 W SHERWIN AVE
CITY STATE ZIP CHICAGO, IL, 60626

LOAN NUMBER:

### ACTIVITY FOR PERIOD 01/01/2013 - 12/31/2013

| Loan Number | Transaction Date | Transaction Code | Due Date | Fees Assessed | Fees Paid | Suspense Amount | Principal Amount | Interest Amount | Escrow Amount | Advance Amount | Total Amount | Principal Balance | E B |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | 284959.91 | -25 |
| 0026567768 | 01/01/2013 | | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -25 |
| 0026567768 | 01/03/2013 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 284959.91 | -28 |
| 0026567768 | 01/28/2013 | 132 | 02/01/2013 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -2818.19 | 0.00 | 0.00 | 284959.91 | -28 |
| 0026567768 | 02/05/2013 | 312 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -28 |
| 0026567768 | 02/27/2013 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -28 |
| 0026567768 | 04/01/2013 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.00 | 284959.91 | -28 |
| 0026567768 | 04/22/2013 | 132 | | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -28 |
| 0026567768 | 04/30/2013 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -28 |
| 0026567768 | 05/29/2013 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 284959.91 | -29 |
| 0026567768 | 06/20/2013 | 132 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -709.33 | 0.00 | 11.25 | 284959.91 | -29 |
| 0026567768 | 07/09/2013 | 312 | 08/01/2013 | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -29 |
| 0026567768 | 07/23/2013 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8.00 | 284959.91 | -29 |
| 0026567768 | 08/22/2013 | 132 | | 6.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -29 |
| 0026567768 | 09/11/2013 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -29 |
| 0026567768 | 09/19/2013 | 132 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 262.50 | 0.00 | 284959.91 | -29 |
| 0026567768 | 10/25/2013 | 132 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 175.00 | 0.00 | 284959.91 | -29 |
| 0026567768 | 11/04/2013 | 630 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 87.50 | 0.00 | 284959.91 | -29 |
| 0026567768 | 11/04/2013 | 630 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 87.50 | 0.00 | 284959.91 | -29 |
| 0026567768 | 11/04/2013 | 630 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -29 |
| 0026567768 | 11/04/2013 | 630 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 262.50 | 0.00 | 284959.91 | -29 |
| 0026567768 | 11/25/2013 | 132 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -29 |
| 0026567768 | 12/11/2013 | 630 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 284959.91 | -29 |
| 0026567768 | 12/23/2013 | 132 | | | | | | | | | | | |
| 0026567768 | 12/31/2013 | | | | | | | | | | | | |

DATE     03/07/2014

## CUSTOMER ACCOUNT ACTIVITY STATEMENT

MORT NAME     SCOTT FOSTER
STREET     1212 W SHERWIN AVE
CITY STATE ZIP   CHICAGO, IL 60626

LOAN NUMBER

**ACTIVITY FOR PERIOD 01/01/2014 - 03/07/2014**

| Loan Number | Transaction Date | Transaction Code | Due Date | Fees Assessed | Fees Paid | Suspense Amount | Principal Amount | Interest Amount | Escrow Amount | Advance Amount | Total Amount | Principal Balance | B |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | 284959.91 | -25 |
| 0026567766 | 01/01/2014 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 437.50 | 0.00 | 284959.91 | -25 |
| 0026567766 | 01/06/2014 | 630 | | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -25 |
| 0026567768 | 01/27/2014 | 132 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1940.14 | 0.00 | 0.00 | 284959.91 | -31 |
| 0026567768 | 02/06/2014 | 312 | 02/01/2014 | 11.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.25 | 284959.91 | -31 |
| 0026567768 | 02/24/2014 | 132 | | | | | | | | | | 284959.91 | -31 |
| 0026567768 | 03/07/2014 | | | | | | | | | | | | |

A 336

C 733