UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Scott Rydin Foster | ) | |
| | ) | |
| Plaintiff, | ) | Case No: 1:20-cv-4230 |
| | ) | |
| v. | ) | Hon. Rebecca Pallmeyer |
| | ) | |
| PHH Mortgage; et al. | ) | Mag. Judge Jeffrey Cole |
| | ) | |
| Defendants. | ) | |
| | ) | |

**AMENDED COMPLAINT**

1. Relator Scott Foster ("Foster"), by and through his undersigned attorney, brings this False Claims Act ("FCA") Complaint, on behalf of the United States of America, and against the named Defendants.

2. *Qui tam* plaintiff Foster seeks through this action to recover all available damages, civil penalties, and other relief for the violations alleged herein in every jurisdiction to which Defendant's misconduct has extended.

NATURE OF THE CASE

3. This is a claim to recover damages and civil penalties on behalf of the United States of America under 31 U.S.C. §§ 3729-32 ("FCA").

I. THE FCA

4. The FCA, which has existed since the Civil War, was substantially amended in 1986 and again in 2009 and 2010. Congress amended the FCA in 1986 to enhance the

    Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as a primary tool for combating government fraud, needed modernization. The amendments create incentives for individuals to come forward with information about fraud against the Government without fear of reprisals or Government inaction, and enable the use of private legal resources to prosecute fraud claims on the Government's behalf.

5. The FCA, as amended, provides that any person who knowingly submits a false or fraudulent claim to the United States Government for payment or approval is liable for a civil penalty of not less than $5,500 and not more than $11,000 for each false claim, plus three times the amount of damages sustained by the government for each claim. See 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3. The Act further allows any "person," including corporations and non-profit organizations, having knowledge of a false or fraudulent claim against the government to bring an action in federal district court for himself or itself and for the United States of America, and to share in any recovery. The complaint is to be filed under seal for 60 days (without service on the defendant during the 60-day period) while the government conducts an investigation without the defendant's knowledge and determines whether to join the suit. Upon filing the complaint, the relator-plaintiff must soon thereafter file a statement disclosing all material evidence and information supporting the complaint with the Attorney General of the United States.

6. The FCA provides that any person who knowingly causes a false claim to be submitted to the Government is liable for a civil penalty of between $5,500 and

$11,000 per claim plus three times the amount of damages the Government sustained. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3. For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person, . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *Id*. at §(b). "[N]o proof of specific intent to defraud is required" for a successful claim under the FCA. *Id*.

II.  THE PARTIES

7. Foster, the Relator herein, is a licensed real estate broker in Illinois and has been since 2005. One of the areas of specialty in Mr. Foster's real estate practice was and continues to be short sales. Foster was also a foreclosed upon homeowner. On November 16, 2016, during Foster's foreclosure case, the foreclosing lender, PHH Mortgage, one of the defendants herein, submitted a document – a ledger – that Foster analyzed and led to his discovery of the complained about FCA violations below. Foster's situation was nearly congruous to the clients he represented in short sales.

8. Foster closed 133 short sales and assisted/consulted other agents on an additional 70 short sales. Foster's short sale clients held mortgages that were owned/held by the other Defendant banks (Aurora Bank Bank of America, CitiBank, JP Morgan Chase Bank, Met Life Bank, PNC Bank, Sovereign Bank, Sun Trust Bank, US Bank, Wells Fargo Bank, GMAC Mortgage (Ally Financial), and HSBC Finance Group) herein.

III.  JURISDICTION AND VENUE

9. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1345, and 31 U.S.C. § 3732.

10. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) & (c), and 31 U.S.C. § 3732, because Defendants regularly conducted business in the State of Illinois.

IV.     THE WRONGDOING ALLEGED

11. This FCA claim pertains to a specific type of mortgage fraud committed by the named defendants with respect to mortgages "backed" by two Government Sponsored Entities: Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac").

12. Shortly prior to the passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which was effectuated on July 21, 2010, a common method of mortgagors seeking modification and/or forbearances with lenders/servicers was over the phone with representatives of the lender/servicer. These were rarely, if ever, verified by mail or e-mail.

13. Forbearance was promised to people who were told to get behind on their loans to make them eligible for a modification. When they got behind, they were simultaneously put into a foreclosure track as well. This is known as dual-tracking and is further explained below.

14. The importance of the passage of Dodd-Frank, was that a section in Dodd-Frank read that the term "mortgage originator … does not include a servicer or servicer employees, agents and contractors, including but not limited to those who offer or negotiate terms of a residential mortgage loan for purposes of renegotiation, modifying, replacing and subordinating principal of existing mortgages where borrowers are behind in their payments, in default or have a reasonable likelihood of being in default or falling behind." *Dodd-Frank, §1401(2)(G)*.

15. Thus, servicers were excluded under the "mortgage originator" umbrella and any promises/agreements made over the phone were not attributable to the "mortgage originator" (i.e. the named bank defendants) after the passage of Dodd-Frank.

16. However, the group affected by the fraud alleged herein is/are the individuals, like Foster, who were telephonically promised a forbearance by servicers during the six month period prior to the passage of Dodd-Frank (the relevant time period) – when servicers were not excluded from mortgage originator agency liability.

17. Ultimately, by placing Mortgagors in foreclosure, lenders/servicers were able to claim that a loan was immediately due and tack on fees and other costs that added to the amount due.

18. This tactic made it nearly financially impossible for Mortgagors to cure any alleged default(s) on their loans, causing them to seek a short sale or ultimately lose their property to judicial sale.

19. As a real estate professional dealing almost exclusively with clients seeking short-sales, Foster heard these experiences first-hand, time after time:

    a. Mortgagors would call their lender/servicer to seek forbearance on their loan.

    b. They were told that they were being given forbearance.

    c. The forbearance was not confirmed in writing; and subsequently after the passage of Dodd Frank, the lenders often even denied that a verbal promise over the phone of forbearance had been given.

    d. As a result, Foster's client then had only three alternatives:

        i. Foreclosure; wherein one not only lost possession of one's property but owed whatever remaining balance had accrued as the result of the

      property being sold as well as associated costs such as legal fees that had been added. Typically, these costs exceeded one hundred thousand dollars and resulted in profound damage being done to the mortgage holder's life in general and one's credit rating. Thus, making a future home purchase improbable for at least five years.

ii. The second alternative was to complete a short sale, wherein the mortgage holder's property was sold but the difference between the sale price net proceeds and the amount that was owed was written off by mortgage originator/retail bank, and ultimately Freddie Mac or Fannie Mae – i.e. the Government Entities. The party that executed the short sale had a significantly better credit profile than if one had gone into foreclosure to the extent that the short sale seller was under certain circumstances able to purchase a new residence in slightly over two years.

iii. The third alternative was, in most instances, no alternative at all. This "alternative" was for the mortgagee to apply for some sort of loan modification with respect to payment terms and keep one's property. The roadblock to this alternative was that the negative credit that had already resulted from the mortgagee's previous failure to receive the promised forbearance and subsequently being placed in foreclosure almost always resulted in the applicant failing to receive loan modification.

20. A short sale was often the best alternative for these clients, and that is what Foster proceeded to attempt to accomplish on behalf of his clients.

21. However, these short sales also resulted in significant losses for the United States of America because the properties were sold at, arguably, the lowest value possible according to the Case-Shiller Index – also shown below.

22. By definition, short sales are deals where the lender/servicer accepts less money than is owed. Properties at judicial sales would go for under "market value." This diminished the value of the mortgages backed by Fannie Mae and Freddie Mac and they ended up receiving less money than they could have received – by allowing the as promised forbearance – but for the actions of the Defendants

23. Therefore, had a forbearance been given as originally promised over the phone, the loans backed by United States would have remained in place. At the very least, a foreclosure/short-sale would not have occurred until the value of the property rebounded. Instead, the United States lost tens of thousands of dollars per short sale transaction.

## FACTUAL ALLEGATIONS

24. The "Great Recession" provided a perfect storm that allowed this fraud to occur.

25. The first part of the storm was the measure of single-family housing prices prior to, during, and shortly after the passage of Dodd-Frank.

26. At the beginning of the "Great Recession" (December 2007), the Case Shiller Index was 185.[1] This December 2007 reading followed a Case Shiller Index peak reading

---

[1] The Case Shiller Index as normalized to 100 beginning in January 2000.

of 206 in April of 2006 – an increase of 85 percent in a mere eight years. By contrast, the rate of inflation in the United States had risen a mere 20 percent during the time-period of 2000 to 2007. Therefore, the combination of these two statistics strongly suggested that housing prices would decrease, which is precisely what happened. By the end of the Great Recession, the Case Shiller Index had declined from the aforementioned 185 to 141 by June 2009. *See S&P/Case-Shiller U.S. National Home Price Index,* https://fred.stlouisfed.org/series/CSUSHPINSA, accessed December 10, 2020).

27. Six months prior to the effective date of Dodd-Frank, the Case Shiller Index was 146. *See Id.* The six-month date is relevant because most, if not all, phone forbearances were for a six-month period.

28. When Dodd-Frank became effective, the Case Shiller Index remained at 146. *See Id.*

29. By the end of 2010, the Case Shiller dropped to 142.

30. The Case Shiller Index would record its lowest index number in March 2012 at 136 That this lowest reading occurred this month is consistent with the disposal of foreclosure and short sales prompted by the named Defendants. Specifically in judicial foreclosure states, it typically took a minimum of two months to notify the mortgagee that the loan was being foreclosed upon and 15 months to complete the foreclosure. This meant that the affected group would on average be foreclosed upon 17 months after July 2010, which is March 2012. The lowest point in the Case Shiller Index was March 2012 at 136, which was the lowest it had been since January 2003 – and it has not even been close to that low since. Therefore, the Case Shiller low point

correlates to the actions taken by the defendants in response to the passage of Dodd Frank.

31. The second part of the perfect storm was a method called Dual Tracking.

32. Dual Tracking occurred when borrowers called their lenders/servicers within the six-month time frame prior to the effective date of Dodd-Frank and were promised, over the phone, a forbearance.

33. Borrowers were advised to get behind or miss a payment to enter a "forbearance track." These borrowers were then promised that their loans would be eligible for modification. However, these borrowers were simultaneously put into a "foreclosure track;" hence, the "dual-tracking."

34. Given that the individuals affected by the Defendants' actions had nothing more than a telephonic promise of forbearance, which was later denied, the Mortgagor was portrayed as being in default and was foreclosed upon.

35. The third part of the perfect storm was "buyback demand."

36. Specifically, if a mortgage originator/retail bank "mishandled" a Fannie Mae or Freddie Mac mortgage/loan, it became the mortgage originator/retail bank's responsibility for the loan and therefore the mortgage originator's/retail bank's loss. This requirement is called a "Buyback Demand". It is also referred to as a "Put Back."

37. A Buyback Demand would be initiated by either Fannie Mae or Freddie Mac when the originating entity (mortgage originator/retail bank) did not follow guidelines in the underwriting manuals of Fannie Mae or Freddie Mac. This demand is what precipitated the fraud complained of here. If the loan was not purchased by the

mortgage originator/retail bank via a Buyback Demand, and the loan went into default, it became a Mortgage-Backed Security guaranteed by the federal government. The losses, if any, were then/are paid for by the federal government.

38. Therefore, there was an enormous incentive for the mortgage originator/retail bank to do everything possible to "stick" Fannie or Freddie (and therefore the federal government) with a loan that it had mishandled because they would not need to cover the loss.

39. The drop in home values/prices throughout the nation (as well as other economic issues) led to a flood of foreclosures. These foreclosures led to short/judicial sales where the sale price was not only well below the original value of the loan but also well below "market value." These losses were taken by Fannie Mae and Freddie Mac which losses were borne by the United States of America in the form of Mortgage-Backed Securities.[2]

40. The fourth part of the perfect storm was the passage of Dodd-Frank and how Dodd-Frank defined – or rather negatively defined – a mortgage originator. A mortgage originator was NOT "a servicer or servicer employees, agents and contractors, including but not limited to those who offer or negotiate terms of a residential mortgage loan for purposes of renegotiating, modifying, replacing and subordinating principal of existing mortgages where borrowers are behind in their payments, in default or have a reasonable likelihood of being in default or falling behind." *Dodd-Frank, §1401(2)(G)*.

---

[2] These concepts of dual tracking and buyback demand were explained to Foster by Charlie Eck, a former president of the National Association of Mortgage Brokers.

41. Basically, this allowed "mortgage originators" to use "servicers" and not have said services be held to same standards/relegations as the mortgage originator. However, this was only put into play after the passage of Dodd-Frank. Hence, any lender/servicer that promised a mortgage forbearance over the phone – and later reneged – was an agent of the mortgage originator *prior* to Dodd-Frank. Therefore, mortgage originators were allowed to renege on these "forbearance promises" *after* the passage of Dodd-Frank, leading to a foreclosure, and ultimately to a reduced foreclosure/short sale price of the property. The government had to bear the amount of the loss on those sales that dealt with loans backed by Freddie Mac/Fannie Mae.

42. The fifth-part of the perfect storm is the single family residential loan market during and around the relevant time period. During this time, 20,313,000 mortgages were backed either by Fannie Mae or Freddie Mac. See *OCC and OTS Mortgage Metrics Report Disclosure of National Bank and Federal Thrift Mortgage Loan Data Third Quarter 2010* (the "Mortgage Metrics Report")*,* at page 5 (accessible at https://www.occ.gov/publications-and-resources/publications/mortgage-metrics-reports/files/mortgage-metrics-report-q3-2010.html).

43. The third quarter of 2010 saw a 31.2 percent increase in foreclosure filings from the previous quarter. *Id.*, at p. 8.

44. Modified mortgages held in the servicers' portfolios performed better than modified mortgages serviced for others thus demonstrating that lenders/servicers were more careful with their own money. *Id.*

45. This trend of increased newly filed foreclosures continued in the fourth quarter (albeit with a decrease in percentage relative to the third quarter spike because, in many

instances, it took some time to file a foreclosure action even after the forbearance was no longer honored). Only after the fourth quarter of 2010 would there be an expected drop in newly initiated foreclosures -- which is precisely what happened.

46. Newly initiated home retention actions relative to newly initiated foreclosure actions declined during the third quarter largely because of both the 17.0 percent decline in home retention actions and the 31.2 percent increase in newly initiated foreclosure actions. This reflects not only the increase in newly filed foreclosures, but it simultaneously reflects the lack of home retention, which in part reflects forbearances being retracted during the all-important Third Quarter 2010. *Id*., at page 42.

47. During this time, agents of Mortgage Originators and/or servicers testified before congress that that they signed, and in some cases backdated, thousands of documents claiming personal knowledge of facts about mortgages that they did not actually know to be true. *See CONGRESSIONAL OVERSIGHT PANEL NOVEMBER OVERSIGHT REPORT EXAMINING THE CONSEQUENCES OF MORTGAGE IRREGULARITIES FOR FINANCIAL STABILITY AND FORECLOSURE MITIGATION* (the "Oversight Report") (accessible at https://www.govinfo.gov/content/pkg/CPRT-111JPRT61835/pdf/CPRT-111JPRT61835.pdf), page 1.

48. This practice of robo-signing was used widely but servicers were more willing to foreclose if they were not bearing the full costs of a properly executed foreclosure. *Oversight Report*, page 3. Again, servicers did not bear the full costs of loans that were backed by Fannie Mae and Freddie Mac.

49. Banks were alleged to have "misrepresented the quality of many loans sold for securitization. Banks found to have provided misrepresentations could be required to repurchase any affected mortgages. Because millions of these mortgages are in default or foreclosure, the result could be extensive capital losses if such repurchase risk is not adequately reserved." *Oversight Report*, page 3.

50. If a misrepresentation or other breach was found, "and the breach materially and adversely affects the value of a loan, which can be as simple as reducing its market value, the offending loan is to be ''put-back'' to the sponsor, meaning that the sponsor is required to repurchase the loan for the outstanding principal balance plus any accrued interest." *Oversight Report*, page 18

51. The Oversight Report stated that a 2010 study by Amherst Mortgage Securities showed that while private mortgage insurers were rescinding coverage on a substantial percentage of the loans they insured because of violations of representation and warranties, there was very little put-back activity by servicers, even though one would expect relatively similar rates. *Oversight Report*, page 19. Nevertheless, Fannie and Freddie had already been actively engaged in efforts to put-back nonconforming loans to the originators/sponsors of the loans they guaranteed. *Oversight Report*, page 26. This thus demonstrates a profound incentive for the defendants to not reveal to Fannie Mae or Freddie Mac their fraudulent conduct.

52. The risk from mortgage put-backs was potentially the biggest source of instability for the banks when dealing with mortgages. *Oversight Report*, page 43.

53. As of June 2010, as of June 2010, 63 percent of foreclosures occurred on homes where the loan was either owned or guaranteed by government investors such as

Fannie Mae and Freddie Mac. *Oversight Report*, page 48. By the time of the Oversight Report, Government Sponsored Entities had forced banks to repurchase $12.4 billion in mortgages. *Oversight Report*, page 55.

54. Given the amount already repurchased, and the potential liability for more repurchasing, the named defendants had every incentive to hide or not disclose the fraud they help perpetrate during the relevant time-period herein.

55. Finally, the last part of the perfect storm was the foreclosure cases themselves.

56. Foster, personally, had a complaint of foreclosure filed against him in November of 2010 by PHH Mortgage, now wholly owned by Ocwen Loan Servicing.

57. This foreclosure was filed despite Foster receiving forbearance over the telephone on March 1, 2010

58. During the foreclosure matter, Foster was tendered a ledger by the Plaintiff that Foster analyzed. Foster noticed that the coding in the ledger recognized that a forbearance was given. However, PHH proffered testimony through affidavits that it was not.

59. PHH further claimed that documents that must be given to the borrower prior to initiating a foreclosure were given when (but never produced) despite Foster's sworn assertations otherwise.

60. Given that the Oversight Report acknowledged rampant robo-signing during this period, the likelihood that documentation provided in actual foreclosure cases being inauthentic or false is high. This is especially true in matters were Defendants were defaulted.

## COUNT I

### False Claims Act 31 U.S.C. §3729(a)(1)(a)

61. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

62. The scheme outlined by the allegations above show that the Defendants caused mortgagors to either go into foreclosure or short sell residential property by dishonoring promises of forbearance.

63. Ultimately, the mortgagors' residential property that was secured by mortgages, which were backed by Freddie Mac and Fannie Mae, was sold at nearly the lowest return possible as shown above.

64. The loss was borne by the government since it backed Fannie Mae and Freddie Mac.

65. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(a).

## COUNT II

### False Claims Act 31 U.S.C. §3729(a)(1)(b)

66. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

67. The scheme outlined by the allegations above show that the Defendants caused mortgagors to either go into foreclosure or short sell residential property by dishonoring promises of forbearance.

68. Ultimately, the mortgagors' residential property that was secured by mortgages, which were backed by Freddie Mac and Fannie Mae, was sold at nearly the lowest return possible as shown above.

69. The loss was borne by the government since it backed Fannie Mae and Freddie Mac

70. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(b).

## PRAYER FOR RELIEF

WHEREFORE, the Relator, on behalf of himself and the United States of America, prays:

A. That this Court enter judgment under Counts I and II against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions in violating the Federal False Claims Act, plus all applicable federal statutory penalties;

B. That the Relator be awarded all costs incurred, reasonable attorneys' fees and expenses;

C. That in the event the United States, intervenes at the time this action is unsealed and proceeds with this action, that Relator be awarded 25% of the proceeds of this action or settlement of the claims in Counts I-II.

D. That the United States and Relator receive all relief, both at law and equity, to which they are entitled.

Respectfully submitted,

Eryk Folmer

Eryk Folmer
119 S. Emerson St., #241
Mt. Prospect, IL 60056

Telephone: (312) 854-7030
eryk@folmerlaw.com
ARDC No. 6299786