## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SCOTT RYDIN FOSTER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-4230 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| PHH MORTGAGE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

In the aftermath of the global financial crisis, home values plummeted and foreclosures spiked. Scott Foster, the relator in this *qui tam* case, had a front row seat at the bursting of the housing bubble. Foster is a real estate broker specializing in short sales. And his home was foreclosed upon in 2010.

The complaint alleges that mortgage lenders and servicers – the defendant banks in this lawsuit – engaged in a scheme to defraud mortgagors and the United States during the financial crisis. He alleged that the banks orally promised homeowners that they would put their loans in forbearance. But the banks later reneged and placed the loans in default. As a result, the properties securing these loans were foreclosed on or sold below market value in a short sale.

The mortgage loans at issue were held by Fannie Mae and Freddie Mac, two government-sponsored entities that bought mortgages and later sold them as mortgage-backed securities. According to Foster, if Defendants had fulfilled their forbearance promises, the foreclosures and short sales would not have taken place, and the homes would not have sold at historically low prices. As a result, Foster says that Fannie Mae and Freddie Mac, and thus the United States, paid a pretty penny.

Foster later filed this *qui tam* suit, bringing two claims under the False Claims Act. Currently before the Court is Defendants' motion to dismiss. The motion is granted.

## Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

This case is about mortgage fraud that banks allegedly committed in the aftermath of the global financial crisis. *See* Second Am. Cplt., at ¶¶ 12–24 (Dckt. No. 34).

Relator Scott Foster is a real estate broker in Illinois. *Id.* at ¶ 7. He has worked in the real estate industry since 2005 and specializes in short sales. *Id.* Defendants are banks that made promises about notes or mortgages involved in short sales that Foster closed or consulted on. *Id.* at ¶ 9. Foster also personally experienced a foreclosure. Defendant PHH Mortgage – now wholly owned by Ocwen Loan Servicing – foreclosed on Foster's home in 2010. *Id.* at ¶¶ 7, 57.

The complaint focuses on mortgages backed by two government-sponsored enterprises: the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). *Id.* at ¶ 12. By way of background, Fannie Mae and Freddie Mac "are federally chartered, privately owed corporations." *See Fed. Nat'l Mortg. Ass'n v. City of Chicago*, 874 F.3d 959, 960 (7th Cir. 2017). "They were created by Congress to bolster the housing market by establishing a secondary mortgage market." *Id.*

Fannie and Freddie buy mortgage loans from third party lenders, bundle or pool the mortgages, and then sell securities backed by the mortgages. *Id.* If a mortgagor defaults, Fannie

Mae or Freddie Mac forecloses on the property securing the loan, takes title, and eventually sells the property to a private buyer. *Id.* According to Foster, Fannie Mae and Freddie Mac held the mortgage loans at issue here. *See* Second Am. Cplt., at ¶ 12 (Dckt. No. 34).

Despite Fannie Mae and Freddie Mac holding the mortgages, the original bank lenders and loan servicers communicated with the mortgagors. *Id.* at ¶ 13. Defendants originated the loans, talked with mortgagors about the loans, and managed the loans. *Id.* at ¶¶ 9, 13, 20. At the end of the day, Fannie and Freddie held the loans, but Defendants serviced them.

According to Foster, in the six months before passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") in July 2010, mortgagors would often talk to the banks on the phone about their repayment options. *Id.* at ¶ 13.

Homeowners frequently called the defendant banks to seek modification or forbearance on their loans. *Id.* at ¶¶ 13, 20. The banks orally promised to place the mortgagors' loans in forbearance, allowing mortgagors to temporarily stop making payments. *Id.* at ¶¶ 13–14, 20. And when they promised forbearance, the banks also told mortgagors "to get behind on their loans to make them eligible for modification." *Id.* at ¶ 14. In other words, Defendants told mortgagors to stop paying their loans to get on a "forbearance track." *Id.*

But the banks did not confirm these forbearance promises in writing. *Id.* at ¶ 20. And when mortgagors fell behind on their loan payments, Defendants placed the loans in more than just a forbearance track. Through a process called "dual-tracking," they simultaneously placed the loans in both a "forbearance track" *and* a "foreclosure track." *Id.* at ¶ 34.

Then, Defendants reneged on their forbearance promises and denied that they ever made oral promises. *Id.* at ¶ 20. At that point, they declared the mortgages in default. *Id.* at ¶ 35. That about-face left mortgagors in a lurch, leaving them with three options: (1) foreclosure, (2) a

3

short sale, or (3) loan modification. *Id.* at ¶ 20. The three options shared something in common: they were all bad.

The first option, foreclosure, meant that mortgagors lost their property and potentially owed on the mortgage loan if the loan balance exceeded the sale price of the foreclosed home. *Id.* And foreclosure often profoundly damaged the mortgagor's credit score. *Id.*

The second option, a short sale, wasn't much better. In a short sale, the mortgagor and the lender agree to sell the property for less than the balance of the mortgage loan. *Id.* The lender would then write off the difference between the outstanding loan balance and the sale price. *Id.* Short sales do not affect a mortgagor's credit as much as a foreclosure, but a mortgagor still ends up losing their home. *Id.*

The third option, a loan modification, "was, in most instances, no alternative at all." *Id.* Because the lender placed the mortgagor in default and on the "foreclosure track," applicants' credit suffered a hit. And that, in turn, led lenders to reject mortgagors' applications for loan modification. *Id.*

According to Foster, "[a] short sale was often the best alternative for these clients," and he helped his clients with those sales. *Id.* at ¶ 21. But Defendants' bait-and-switch – promising forbearance, and then forcing a foreclosure or a short sale – created a timing problem that Foster says cost "the United States tens of thousands of dollars per short sale." *Id.* at ¶ 24.

Foster alleges that "the affected group would on average be foreclosed upon 17 months after July 2010, which is March 2012." *Id.* at ¶ 31. But in March 2012, home prices were at a historic low. *Id.* So, if Defendants had honored the oral forbearance promises, the loans "would have remained in place" and "[a]t the very least, a foreclosure/short-sale would not have occurred until the value of the property rebounded." *Id.* And since Fannie Mae and Freddie Mac

held the mortgages in the form of mortgage-backed securities, they bore the losses from these short sales. *Id.* at ¶ 40 ("These losses were taken by Fannie Mae and Freddie Mac which losses were borne by the United States of America in the form of Mortgage-Backed Securities.").

Foster alleges that he experienced this scheme first-hand. He claims that "he received forbearance over the telephone on March 1, 2010." *Id.* at ¶ 58. And, as confirmation of that fact, PHH Mortgage tendered a ledger that coded his loan as in forbearance. *Id.* at ¶ 59. But in November 2010, PHH Mortgage filed a complaint of foreclosure against him. *Id.* at ¶ 57. PHH Mortgage claimed that it never offered forbearance to Foster, and it supported its position through affidavits. *Id.*

Based on his first-hand experience, Foster came to believe that PHH Mortgage and the other Defendants had engaged in a conspiracy to defraud the government and consumers. *Id.* at ¶¶ 12–24.

Ten years later, in July 2020, Foster filed this lawsuit. *See* Cplt. (Dckt. No. 1). After amending the complaint twice, Foster eventually alleged two violations of the False Claims Act. *See* Am. Cplt. (Dckt. No. 27); Second Am. Cplt. (Dckt. No. 34).

In both counts, Foster claims that Defendants' scheme "caused mortgagors to either go into foreclosure or short sell residential property by dishonoring promises of forbearance." *See* Second Am. Cplt., at ¶¶ 63, 68 (Dckt. No. 34). "[T]he mortgagors' residential property that was secured by mortgages, which were backed by Freddie Mac and Fannie Mae, was sold at nearly the lowest return possible." *Id.* at ¶¶ 64, 69.

Foster alleges that, as a result, Defendants presented false claims to the government in violation of 31 U.S.C. § 3729(a)(1)(a) (Count I), and made or used false records and statements to get their false claims paid in violation of 31 U.S.C. § 3729(a)(1)(b) (Count II).

5

Defendants, in turn, moved to dismiss. *See* Defs.' Mtn. to Dismiss (Dckt. No. 79).

## Analysis

Foster brings two claims under the False Claims Act. "First enacted in 1863 to combat rampant fraud and price-gouging in Civil War defense contracts," the False Claims Act "creates a right of action under which private parties may, on behalf of the federal government, bring lawsuits alleging fraud." *Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 272 (7th Cir. 2016); *United States v. Molina Healthcare of Illinois, Inc.*, 17 F.4th 732, 739 (7th Cir. 2021); *see also* 31 U.S.C. § 3730(b).

"The actions go by the hoary Latin term '*qui tam*'" and "[t]he party seeking to represent the government's interest is called a 'relator.'" *Molina Healthcare*, 17 F.4th at 739. If a relator succeeds in proving the claim, the relator receives a percentage – typically a substantial share – of the recovery. *Id.*; *see also* 31 U.S.C. § 3730(d).

"The Act makes it unlawful knowingly (1) to present or cause to be presented a false or fraudulent claim for payment to the United States, (2) to make or use a false record or statement material to a false or fraudulent claim, or (3) to use a false record or statement to conceal or decrease an obligation to pay money to the United States." *Molina Healthcare*, 17 F.4th at 739.

Here, Foster alleges that Defendants presented or caused to be presented a false or fraudulent claim for payment (Count I), and made or used a false record or statement material to a false claim (Count II). *See* Second Am. Cplt. (Dckt. No. 34).

Defendants contend that Foster's claims fail for four reasons. First, the banks maintain that the False Claims Act's public disclosure bar prohibits his claims. *See* Defs.' Mem., at 6–21 (Dckt. No. 80). Second, they argue the claims are time-barred under the False Claims Act's statute of limitations. *Id.* at 21–23. Third, they say that Foster fails to state a claim. *Id.* at 23–

6

32. And fourth, they contend Foster's claims have been released for certain defendants. *Id.* at 32–36.

The Court does not need to address all of the arguments, because two of them are more than enough to dismiss the complaint. The Act's public disclosure bar applies, and thus deprives the Court of jurisdiction. And even if this Court had jurisdiction, the complaint fails to satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.

## I. Public Disclosure Bar

Defendants move to dismiss Foster's claims, arguing that they are barred by the False Claims Act's public disclosure bar. *See* Defs.' Mem., at 6 (Dckt. No. 80). While the False Claims Act allows plaintiffs to sue on behalf of the government, it "also seeks to prevent parasitic lawsuits by 'opportunistic plaintiffs who have no significant information to contribute of their own.'" *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 716 (7th Cir. 2017) (quoting *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 283 (2010)).

To prevent these parasitic suits, Congress enacted a statutory public disclosure bar. *See* 31 U.S.C. § 3730(e)(4). That bar prohibits claims under the False Claims Act based on publicly disclosed allegations if the plaintiff is not the original source of the information. *Id.* Specifically, the text of the statute provides:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed –
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

7

(iii) from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

*Id.*

"Congress enacted the public-disclosure bar because '[w]here a public disclosure has occurred, [the relevant governmental] authority is already in a position to vindicate society's interests, and a *qui tam* action would serve no purpose.'" *See Bellevue*, 867 F.3d at 716 (quoting *United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 495 (7th Cir. 2003)). If the cat is already out of the bag, there is no need to reward a latecomer with a finder's fee.

Although perhaps counterintuitive, "[i]n this circuit, the public disclosure bar is routinely raised through a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *United States ex rel. Graziosi v. R1 RCM, Inc.*, 2019 WL 861368, at *5 (N.D. Ill. 2019). The jurisdictional hook stems from a 2007 Supreme Court decision. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 467–68 (2007) ("Here the jurisdictional nature of the original-source requirement is clear *ex visceribus verborum*.").

But in March 2010, Congress amended the statute and changed the language that the Supreme Court had relied upon. *See Bellevue*, 867 F.3d at 717. "Since then, some circuits have held that the 2010 version of the statute is not jurisdictional, but the Seventh Circuit has repeatedly declined to decide the issue." *R1 RCM*, 2019 WL 861368, at *5; *see also Bellevue*, 867 F.3d at 717; *Cause of Action*, 815 F.3d at 271 n.5.

In any event, the 2010 amendment to the public disclosure bar is not retroactive. The applicable version of the statute is the one that was "in force when the events underlying the suit took place." *Cause of Action*, 815 F.3d at 273 n.6. If the underlying conduct both pre-dated and

post-dated the amendment, then the pre-amendment version applies. *See Bellevue*, 867 F.3d at 717–18.

Here, Defendants argue that the alleged conduct took place both before and after the amendment. So, as they see it, the bar is jurisdictional, and the claims should be dismissed under Rule 12(b)(1). *See* Defs.' Mem., at 7 (Dckt. No. 80). The Court agrees.

In the second amended complaint, Foster describes the "relevant time period" as the "six month period prior to the passage of Dodd-Frank." *See* Second Am. Cplt., at ¶ 17 (Dckt. No. 34). Dodd-Frank passed in July 2010. So, under the complaint, the "relevant time period" is January to July, 2010.

In those six months, the banks orally promised forbearance to mortgagors. *Id.* The banks later broke those promises, foreclosing and short selling the mortgaged homes instead. *Id.* at ¶ 20. Foster alleges "that the affected group would on average be foreclosed upon 17 months after July 2010, which is March 2012." *Id.* at ¶ 31.

So, the thrust of Foster's case is that banks made false promises in early 2010, which they later broke, and the broken promises led to foreclosures and short sales in 2012. Defendants point to these allegations as evidence that the underlying conduct both pre- and post-dated the March 2010 amendment. *See* Defs.' Mem., at 7 (Dckt. No. 80).

In response, Foster says that "Defendants confuse the timeframe that Foster alleges that violations of the False Claim[s] Act ("FCA") occurred." *See* Pl.'s Resp., at 1 (Dckt. No. 84). Foster argues that Defendants wrongly view the forbearance promises as the underlying conduct, instead of the "claim for payment(s) made to the government, which is what gives rise to an actionable FCA claim." *Id.*

Foster tries to add more facts to support this theory of the relevant timeline. He asserts that "[m]any, if not all, of Foster's short sale clients went to sale after 2013" and that his "judicial sale was approved on August 3, 2017." *Id.* at 2, 9. As a result, Foster argues that Defendants' relevant conduct occurred after the March 2010 amendment (meaning the statutory change to the public disclosure bar).

Defendants object to Foster's new factual allegations about the timing of the short sales and foreclosures. *See* Defs.' Reply, at 3 (Dckt. No. 85). While a plaintiff can present new facts in response to a motion to dismiss, he can only do so if the new facts are "consistent with the well-pleaded complaint." *See Arquero v. Dart*, 2022 WL 595730, at *6 (N.D. Ill. 2022) (quoting *Dixon v. County of Cook*, 819 F.3d 343, 349 (7th Cir. 2016)). Here, the idea that the short sales occurred sometime after 2013, and even as late as 2017, is not consistent with the complaint.

Instead, Foster's complaint specifically alleged "that the affected group would on average be foreclosed upon 17 months after July 2010, which is March 2012." *See* Second Am. Cplt., at ¶ 31 (Dckt. No. 34). After all, an important part of Foster's allegations is that the affected homes sold through a foreclosure and a short sale when home prices were at a historic low. *Id.*; *see also id.* at ¶ 24. That timing is key to the case, because Foster alleges that home prices would have rebounded from those low points if Defendants had not committed the fraud. *Id.* at ¶ 24. As a result, Foster's new facts in the brief do not save the day.

Anyway, it does not matter whether the Court considers Foster's new assertions. Either way, at least some of the conduct in this fraudulent scheme – the promises for forbearance – occurred before the amendment in March 2010. Again, the case is about false promises "during the six month period prior to the passage of Dodd-Frank." *See* Second Am. Cplt., at ¶ 17 (Dckt.

No. 34). That's the "relevant time period." *Id.* So, at least two months of wrongful conduct (*i.e.,* January and February 2010) took place before the March 2010 amendment went into effect.

In fact, the false promise to Foster himself was made when the statute was jurisdictional. The complaint alleges that Foster received forbearance over the phone on March 1, 2010. *Id.* at ¶ 58. But the statutory amendment went into effect a few weeks later on March 23, 2010. In other words, the public disclosure bar was jurisdictional when the bank falsely promised forbearance to Foster.

In his brief, Foster takes a narrow view of the fraudulent conduct, arguing that it is limited solely to false claims for payment. *See* Pl.'s Resp., at 1 (Dckt. No. 84). But his second amended complaint makes clear that the alleged conduct included the forbearance promises that resulted in the eventual short sales and foreclosures. *See* Second Am. Cplt., at ¶¶ 12–24, 63–66 (Dckt. No. 34). Without those promises, the foreclosures and sales never would have occurred.

Other courts similarly have not limited the underlying conduct solely to false claims for payment. *See, e.g.*, *Peck v. CIT Bank, N.A.*, 2020 WL 6781799, at *3 (N.D. Ill. 2020). As a result, the Court determines that the conduct alleged in the complaint took place both before and after the jurisdictional line in the sand in March 2010. So the pre-amendment version of the statute governs. *See Bellevue*, 867 F.3d at 717.

The public disclosure bar is jurisdictional because at least some of the conduct took place when the rule was jurisdictional. The next question is whether the public disclosure bar applies at all.

"Determining whether to apply the public-disclosure bar requires the court to complete a three-step inquiry." *Bellevue*, 867 F.3d at 718. First, the Court "examine[s] whether the relator's allegations have been 'publicly disclosed.'" *Id.* (quoting *Cause of Action*, 815 F.3d at 274). "If

so," the court "next ask[s] whether the lawsuit is 'based upon,' *i.e.*, 'substantially similar to' the publicly disclosed allegations." *Id.* (quoting *Cause of Action*, 815 F.3d at 274). "If it is, the public-disclosure bar precludes the action unless 'the relator is an original source of the information upon which the lawsuit is based.'" *Id.* (quoting *Cause of Action*, 815 F.3d at 274) (quotation marks omitted). The burden of proof is on the relator at every step of the analysis. *Id.*

Turning to the first step, under the False Claims Act, a public disclosure occurs when "the critical elements exposing the transaction as fraudulent are placed in the public domain." *See Cause of Action*, 815 F.3d at 274.

Defendants say that several sources of publicly available information – including two mortgage fraud complaints from 2012, consent judgments involving the Defendants, and a federal Congressional Oversight Report – serve as the basis for Foster's allegations. *See* Defs.' Mem., at 9–12 (Dckt. No. 80). Each document was either publicly filed in a federal case or was part of a federal report. And it appears that the documents would have exposed the alleged transactions as fraudulent.

The 2012 mortgage fraud complaints allege that J.P. Morgan Chase, Bank of America, Wells Fargo, and HSBC Finance Corporation (among other banks) used unfair, deceptive, and unlawful loan modification practices. *See United States v. Bank of Am. Corp.*, at ¶ 58 (Dckt. No. 80-1); *United States v. HSBC N. Am. Holdings Inc.*, at ¶ 55 (Dckt. No. 80-2). According to those complaints, the banks provided false or misleading information to consumers when referring loans to foreclosure, when initiating foreclosure while the borrower was actively pursuing loss mitigation, and while scheduling and conducting foreclosure sales during loan modification periods. *See United States v. Bank of Am. Corp.*, at ¶ 58 (Dckt. No. 80-1); *United States v. HSBC N. Am. Holdings Inc.*, at ¶ 55 (Dckt. No. 80-2). And to cap it off, those

12

complaints alleged that the banks "inappropriately dual-track[ed] foreclosure and loan modification activities, and fail[ed]to communicate with borrowers with respect to foreclosure activities." *See United States v. Bank of Am. Corp.*, at ¶ 64 (Dckt. No. 80-1); *United States v. HSBC N. Am. Holdings Inc.*, at ¶ 56 (Dckt. No. 80-2).

In other words, much like in this case, the complaints alleged that banks made false or misleading statements to consumers about their loan options – such as forbearance or modification – and subsequently "dual-tracked" loans for foreclosure and modification.

The consent judgments with J.P. Morgan Chase, Bank of America, Wells Fargo, HSBC (and other banks) made similar disclosures about the banks' deficiencies. Those consent judgments covered the banks' shortcomings in modification and loss mitigation (in extensions, forbearances, and short sales, for example), dual-tracking, and communication with borrowers about foreclosure. *See* Consent Judgment 1, at 224–25 (Dckt. No. 80-3); Consent Judgment 2, at 225–26 (Dckt. No. 80-4); Consent Judgment 3, at 224 (Dckt. No. 80-5); Consent Judgment 4, at 166–67 (Dckt. No. 80-6).

And the Oversight Report, which Foster expressly relied on in his complaint, described the loan servicers' practice of "robo-signing" documents – including foreclosure documents – without personal knowledge about the underlying mortgage. *See* Congressional Oversight Report, at 1 (Dckt. No. 80-14); *see also* Second Am. Cplt., at ¶¶ 48–54 (Dckt. No. 34). It also disclosed that the government was aware that short sales resulted in a diminution in home values. *Id.* at 52 n.229 ("A short sale occurs when a servicer allows a homeowner to sell the home with the understanding that the proceeds from the sale may be less than is owed on the mortgage.").

So, documents in the public domain disclosed that banks made false statements to mortgagors about their loan options (including about forbearance), dual-tracked loans in

forbearance and modification, and eventually foreclosed on and short sold homes at a loss. Foster's complaint parroted back what the public already knew.

Nonetheless, Foster maintains that his allegations have not been publicly disclosed. *See* Pl.'s Resp., at 8 (Dckt. No. 84). But his arguments are not always consistent.

In his sur-reply, for example, Foster argues that "[t]he consent judgments show that the Defendants were on notice that their conduct was fraudulent, yet they continued to take mis-serviced and mishandled loans to the point of short sale or judicial sale." *See* Pl.'s Sur-Reply, at 2 (Dckt. No. 89). But this argument seems to show that "the critical elements exposing the transaction as fraudulent [were] placed in the public domain." *See Cause of Action*, 815 F.3d at 274. After all, according to Foster, Defendants knew, by way of publicly available consent judgments, that they were committing fraud, and continued to commit it.

Even if Foster's argument in his sur-reply is not an admission that his allegations have been publicly disclosed, his other arguments are no more persuasive.

To start, he says that the information in the public domain did not involve Fannie Mae and Freddie Mac loans. *Id.* at 9. But he does not back it up with a citation. The mortgage fraud complaints were not limited to certain types of loans, and the consent judgments associated with the complaints clearly covered servicing activities of "mortgage loans for single-family residential homeowners." *See, e.g.*, Consent Judgment 1, at 223 (Dckt. No. 80-3). They did not single out one type of mortgage loan. Fannie and Freddie loans appear to be included, especially given their outsized footprints in the mortgage loan industry.

Foster also says that the information in the public domain detailed behavior between 2011 and 2013, while his allegations are about later conduct. *See* Pl.'s Resp., at 9 (Dckt. No. 84). But as previously discussed, the core of Foster's case is the notion that Defendants lied

14

in 2010, leading to foreclosures and short sales later (largely in 2012). That is the exact period detailed in the consent orders. So, this argument doesn't move the needle either.

Finally, Foster says that the information in the public domain does "not discuss the gaps of value sought to be recovered when these mis-serviced loans were brought to judicial/short sale and the lender sought recoupment of loss of value that it had intrinsically caused." *Id.* In essence, Foster says that it was common knowledge that the banks committed fraud, but the final piece of the puzzle (requesting payment) was not in the public domain.

Importantly, the public disclosure bar does not require all elements to be in the public domain. Instead, allegations are publicly disclosed if "the critical elements exposing the transaction as fraudulent are placed in the public domain." *See Cause of Action*, 815 F.3d at 274. Here, there was ample information in the public domain about both the underlying fraudulent scheme and the short sales. That is enough.

At the second step, the Court must determine whether Foster's allegations are "substantially similar" to the publicly disclosed allegations. "There are several factors courts consider in determining whether this standard is met: whether relators present genuinely new and material information beyond what has been publicly disclosed; whether relators allege 'a different kind of deceit'; whether relators' allegations require 'independent investigation and analysis to reveal any fraudulent behavior'; 'whether relators' allegations involve an entirely different time period than the publicly disclosed allegations; and whether relators 'supplied vital facts not in the public domain[.]'" *Bellevue*, 867 F.3d at 719 (quoting *Cause of Action*, 815 F.3d at 281).

Foster's allegations do not present new information. Instead, he alleges the exact kind of deceit already disclosed. And while Foster argues that his allegations involve a different time

period, as previously discussed, the Court disregards his new timing allegations. The time period referenced in the complaint is the exact time period that the publicly disclosed allegations deal with.

Finally, turning to the third step, "[r]elators can avoid the public disclosure bar if they can demonstrate that they are the 'original source' of the information upon which the allegations were based." *See Peck*, 2020 WL 6781799, at *5 (quoting *Bellevue*, 867 F.3d at 720). A relator can do so by showing that they have "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions," and that they "voluntarily provided the information to the Government" before filing their case. *See* 31 U.S.C. § 3730(e)(4)(B).

Foster does not allege any facts indicating that he voluntarily provided his knowledge to the government before filing this action. Foster also does not claim to be the original source.

In sum, Foster merely regurgitates, repackages, and repeats allegations that already saturated the public domain through a variety of complaints, consent degrees, and other documents. The allegations are substantially similar to the information publicly disclosed, and he was not the original source. It's not a new bulletin. It's old news. He offers breaking news a decade after the fact.

As a result, the public disclosure bar requires dismissal of his claim, and this Court lacks subject matter jurisdiction. The Court dismisses Foster's claims under Rule 12(b)(1).[1]

## II. Failure to State a Claim

The jurisdictional problem is the biggest problem. But it isn't the only problem. The complaint does not plead a fraud claim with particularity.

---

[1] Even if the public disclosure bar were not jurisdictional, this Court would apply it anyway, and thus would dismiss the complaint on non-jurisdictional grounds.

The False Claims Act is an anti-fraud statute, so the heightened pleading requirements of Rule 9(b) apply. *See United States ex rel. Gross v. AIDS Rsch. All.-Chicago*, 415 F.3d 601, 603 (7th Cir. 2005). Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud." *See* Fed. R. Civ. P. 9(b). In other words, Foster must allege the "who, what, when, where, and how" of the circumstances surrounding the fraud. *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citation omitted); *see also United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009).

Foster alleges violations of two sections of the False Claims Act. Again, Count I alleges that Defendants "knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval," in violation of 31 U.S.C. § 3729(a)(1)(a). *See* Second Am. Cplt., at ¶ 66 (Dckt. No. 34). Count II alleges that Defendants "knowingly made, used, or caused to be made or used false records and statements to get false or fraudulent claims paid or approved by the United States Government," in violation of 31 U.S.C. § 3729(a)(1)(b). *Id.* at ¶ 71.

Foster's claims fail to satisfy Rule 9(b)'s pleading standard for a simple reason: Foster fails to allege that any of the Defendants submitted a false or fraudulent claim to the government. "The essential condition of [a False Claims Act] violation is the actual submission of a false or fraudulent claim." *See U.S. ex rel. Brooks v. Wells Fargo Bank N.A.*, 2019 WL 1125834, at *2 (N.D. Ill. 2019); *see also Mason v. Medline Indus., Inc.*, 731 F. Supp. 2d 730, 736 (N.D. Ill. 2010).

A relator cannot merely "'describe a private scheme in detail but then . . . allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the government.'"

17

*United States ex rel. Dolan v. Long Grove Manor, Inc.*, 2014 WL 3583980, at *3 (N.D. Ill. 2014) (quoting *United States ex rel. Clausen v. Lab'y Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002)).  In other words, a "complaint must have 'some indicia of reliability' that an actual false claim was submitted to the government for payment."  *Brooks*, 2019 WL 1125834, at *2 (quoting *Dolan*, 2014 WL 3583980, at *5).

The claim must be submitted *to the government.*  The False Claims Act attaches liability only for false claims presented to the government or when government money is spent.  Liability attaches when false claims are presented to an officer, employee, or agent of the United States. *See* 31 U.S.C. § 3729(b)(2)(A)(i).  In addition, liability attaches when false claims are presented to another recipient if (1) the requested money will be spent on the government's behalf or to advance a government interest and (2) the government has or will provide any portion of the requested money.  *See* 31 U.S.C. § 3729(b)(2)(A)(ii); *see also Brooks*, 2019 WL 1125834, at *3; *United States ex rel. Frawley v. McMahon*, 2015 WL 115763, at *9 (N.D. Ill. 2015).  The key concept is that the payment is on the government's dime.

"The [False Claims Act] does not apply to fraud against *any* federal grantee; it requires that the *specific money* or property claimed must be intended to 'be spent or used on the Government's behalf or to advance a Government interest and the government provide at least a portion of the money requested.'"  *Garg v. Covanta Holding Corp.*, 478 F. App'x 736, 741 (3d Cir. 2012) (emphasis in original) (quoting 31 U.S.C. § 3729(b)(2)(A)(ii)); *see also Peck*, 2020 WL 6781799, at *6 (citing *Garg*, 478 F. App'x at 741).  As a result, for a False Claims Act suit, "the pleadings must contain specific facts that assert the government's money was spent as a result of the fraudulent claim."  *See Brooks*, 2019 WL 1125834, at *3; *see also United States ex rel. Heath v. Wis. Bell, Inc.*, 111 F. Supp. 3d 923, 927 (E.D. Wis. 2015).

Here, Foster failed to allege facts linking a fraudulent claim by Defendants to government spending. Foster alleged that Defendants made false claims to the government because they made false claims to Fannie Mae and Freddie Mac, who are government-sponsored entities. *See* Second Am. Cplt., at ¶¶ 12, 20, 39 (Dckt. No. 34). But Fannie and Freddie are not the government.

Fannie Mae and Freddie Mac do have a unique status. Most corporations arise under state law, but Fannie and Freddie are corporate creatures of the federal government. They are private corporations chartered by Congress. *See* 12 U.S.C. § 1716b (Fannie Mae is a "Government-sponsored private corporation"); 12 U.S.C. § 1452 (Freddie Mac is a "body corporate under the direction of a Board of Directors"). They are shareholder-owned entities operating under a congressional charter.

The Seventh Circuit has acknowledged, in the context of a tax dispute, that Fannie and Freddie "are federally chartered, privately owned corporations. They were created by Congress to bolster the housing market by establishing a secondary mortgage market." *Fed. Nat'l Mortg. Ass'n v. City of Chicago*, 874 F.3d 959, 960 (7th Cir. 2017).

But the Seventh Circuit does not appear to have addressed whether the False Claims Act applies to Fannie and Freddie. But another court in this district pointed to that passage in *Federal National Mortgage Association* when addressing a *qui tam* case, and ultimately held that defrauding Fannie and Freddie does not give rise to a claim under the False Claims Act. *See U.S. ex rel. Brooks v. Wells Fargo Bank N.A.*, 2019 WL 1125834, at *4 (N.D. Ill. 2019) ("The fact that the government has provided funding to Fannie Mae and Freddie Mac does not relieve Brooks of the obligation to tie the fraud to specific government payments. . . . The Seventh

Circuit has made clear that Fannie Mae and Freddie Mac are private corporations.") (citing *Fed. Nat'l Mortg. Ass'n*, 874 F.3d at 960).

The Ninth Circuit has held that Fannie and Freddie do not count as government spenders under the False Claims Act. *See U.S. ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259, 1260–61 (9th Cir. 2016) ("The question presented by this appeal is whether the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) are officers, employees, or agents of the federal government for purposes of the False Claims Act. Upon de novo review, we hold they are not.") (citations omitted). Other Circuits have held that other government-backed entities do not necessarily fall within the reach of the False Claims Act. *See, e.g.*, *U.S. ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 503 (3d Cir. 2017) (concluding that the Small Business Administration did not "necessarily qualify as the 'Government' for purposes of the FCA"); *United States v. Wells Fargo & Co.*, 943 F.3d 588, 596-97 (2d Cir. 2019) (holding that Federal Reserve Bank personnel are not officers or employees of the United States within the meaning of the False Claims Act).

And, in other contexts, other courts have recognized that Fannie and Freddie are private actors, not government actors. *See, e.g., Meridian Invs., Inc. v. Fed. Loan Mortg. Corp.*, 855 F.3d 573, 579 (4th Cir. 2017) (holding, in the context of a contract dispute, "the government does not exert control over Freddie Mac such that it loses its private-party status" despite its public purpose); *U.S. ex rel. Todd v. Fidelity Nat'l Fin., Inc.*, 2014 WL 4636394, at *9–10 (D. Colo. 2014).

"Although Freddie Mac and Fannie Mae rely on federal government money at times, they still generate revenue pursuant to their operation within the secondary mortgage market." *Brooks*, 2019 WL 1125834, at *4 (cleaned up). Simply put, Freddie and Fannie sometimes

20

spend on behalf of the United States. But not always. Sometimes they spend as private corporations. So, there is liability only if Foster alleged specific facts showing actual government spending. And the complaint alleges no such thing with particularity.

Foster has not alleged any facts linking the fraudulent claim with actual government spending. Instead, Foster merely says that Fannie Mae and Freddie Mac are "Government Sponsored Entities" and that "[t]he loss was borne by the government since it backed Fannie Mae and Freddie Mac." *See* Second Am. Cplt., at ¶¶ 12, 70 (Dckt. No. 34).

"The fact that the government has provided funding to Fannie Mae and Freddie Mac does not relieve [Foster] of the obligation to tie the fraud to specific government payments." *Brooks*, 2019 WL 1125834, at *3 (citing *Heath*, 111 F. Supp. 3d at 927). "The [False Claims Act] requires more than fraud against anyone who happens to receive money from the federal government. Were that the case, the scope of the [False Claims Act] would be enormous." *Garg*, 478 F. App'x at 741.

Fannie Mae and Freddie Mac are not entirely funded by the government. And while government-sponsored enterprises rely on federal funds, they do not exclusively rely on federal funds. So, a payment by Fannie Mae or Freddie Mac is not necessarily a payment by the federal government.

Since Foster failed to provide specific allegations linking the fraud to government spending, he has not satisfied the pleading requirements of Rule 9(b).

**Conclusion**

For the reasons stated above, the motion to dismiss is granted.

Date:   September 30, 2022

_____

Steven C. Seeger
United States District Judge